# BRADY HANDGUN VIOLENCE PREVENTION ACT

*P.L. 103–159, see page 107 Stat. 1536*

DATES OF CONSIDERATION AND PASSAGE

*House: November 10, 22, 1993*
*Senate: November 19, 20, 24, 1993*

Cong. Record Vol. 139 (1993)

House Report (Judiciary Committee) No. 103–344, Nov. 10, 1993
[To accompany H.R. 1025]

House Conference Report No. 103–412, November 22, 1993
[To accompany H.R. 1025]

*No Senate Report was submitted with this legislation. The House Report (this page) is set out below and the House Conference Report (page 2011) follows.*

## HOUSE REPORT NO. 103–344

[page 1]

The Committee on the Judiciary, to whom was referred the bill (H.R. 1025) to provide for a waiting period before the purchase of a handgun, and for the establishment of a national instant criminal background check system to be contacted by firearms dealers before the transfer of any firearm, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

* * * * *

[page 7]

## EXPLANATION OF AMENDMENT

Inasmuch as H.R. 1025 was ordered reported with a single amendment in the nature of a substitute, the contents of this report constitute an explanation of that amendment.

## SUMMARY AND PURPOSE

The purpose of H.R. 1025 is to prevent convicted felons and other persons who are barred by law from purchasing guns from licensed gun dealers, manufacturers or importers. The bill would establish a national, five-working-day waiting period for the purchase of a handgun. Local law enforcement officials are required to use the waiting period to determine whether a prospective handgun purchaser has a felony conviction or is otherwise prohibited by law from buying a gun. States with their own programs for conducting background checks of handgun purchasers would be exempt from the waiting period, provided they are in compliance with criminal record computerization timetables to be established by the Attorney General. The bill also exempts from the waiting period any individual who obtains from the chief law enforcement officer in his

1984

ATF000106

BRADY HANDGUN CONTROL ACT
P.L. 103–159
[page 8]

or her area a statement that the individual needs a firearm to protect someone in his or her family from imminent harm.

H.R. 1025 directs the Attorney General to develop a national instant criminal background check system capable of instant response to inquiries and use by licensed gun dealers, manufacturers, or importers at the point of firearm purchase. This system is intended to enable those licensees to confirm the lawfulness of a sale without a waiting period. As soon as this system is operational, the waiting period provisions of H.R. 1025 will cease to be in effect. Instead, dealers will be required to consult the national instant criminal background check system before transferring a firearm.

BACKGROUND

*The prevalence of gun violence*

The United States is beset by an epidemic of gun violence, as evidenced by the following data:

15,377 Americans were murdered with firearms in 1992. 12,489 of these murders were committed with handguns.[1]

Gun murders in the United States increased by 41 percent between 1988 and 1992.[2]

530,000 Americans were robbed or assaulted by firearm-wielding criminals in 1991.[3]

Armed rapists attacked nearly 15,000 women in the United States last year.[4]

Two University of California economists have estimated the direct medical cost of firearms injuries at $1.4 billion annually, and the indirect cost of lost productivity at $19 billion annually.[5]

The level of firearm violence in this country is, by far, the highest among developed nations. By contrast, in 1990 handguns killed a total (including murders, suicides, and accidents) of 22 people in Great Britain, 87 in Japan, and 68 in Canada.[6] The comparable United States figure is more than 24,000.[7]

The magnitude of these statistics can numb observers to the enormous tragedy of each individual handgun crime. On March 30, 1981, however, the attempted assassination of President Reagan shocked the American public. In a few seconds, and at close range, John Hinckley, Jr., shot President Reagan in the chest with a .22 caliber pistol, shot White House Press Secretary James Brady in the head, and shot a Secret Service agent and a District of Columbia Police Officer.[8]

---

[1] U.S. Department of Justice, Federal Bureau of Investigation, "Uniform Crime Reports for the United States 1992" at 18.

[2] Id.

[3] U.S. Department of Justice, Bureau of Justice Statistics, "Sourcebook of Criminal Justice Statistics 1992" at 371.

[4] Id. at 292.

[5] Wendy Max & Dorothy Rice, "Shooting in the Dark: Estimating the Cost of Firearm Injuries", in Health Affairs (Winter 1992).

[6] These figures were obtained by staff of the Judiciary Committee's Subcommittee on Crime and Criminal Justice in phone conversations with the appropriate consular offices (1992).

[7] U.S. Department of Justice, Federal Bureau of Investigation, "Uniform Crime Reports—1990".

[8] See "Waiting Period Before the Sale, Delivery, or Transfer of a Handgun," Hearings Before the Subcommittee on Crime of the Committee on the Judiciary, House of Representatives, 100th Cong., 1st and 2d sess. (November 30, 1987 and February 24, 1988) (statement of Jim Brady).

1985

ATF000107

## LEGISLATIVE HISTORY
HOUSE REPORT NO. 103–344

[page 9]

All four men recovered, but Jim Brady was left with a permanent legacy of pain and everyday struggle. His heroic endurance, and the dedication of Mr. Brady and Ms. Sarah Brady to the campaign for effective control of gun violence, have galvanized a national movement. A 1993 Gallup poll showed that 88 percent of Americans support a waiting period prior to a handgun purchase.[9] In fact, according to national polls conducted in 1991, 80 percent of Americans favor the registration of handguns,[10] and 72 percent of Americans support laws requiring firearms purchasers to have a police-issued permit.[11] H.R. 1025, the Brady Handgun Violence Prevention Act, is a product of this movement and it is named in honor of Jim Brady.

### *The availability of handguns*

Federal law already prohibits convicted felons, fugitives from justice, persons adjudicated as mentally defective, and certain other categories of persons from obtaining firearms.[12] Federal law also prohibits the sale or transfer of firearms to such individuals.[13]

These statutes notwithstanding, it is clear from the number of crimes committed with firearms that criminals have relatively easy access to guns. Criminals obtain guns from a number of sources: they steal them, they get them from friends or associates, and they buy them from professional gun runners on the black market.[14]

Another major source of criminals' guns are gun shops. A Bureau of Justice Statistics survey of prison inmates revealed that 27 percent of armed felons say they bought their guns at retail outlets.[15]

The experiences of States which require background checks [16] before firearm sales also indicate that many repeat offender criminals buy guns directly from firearms dealers. For example, in California, a background check intercepted 2,500 felons attempting to buy guns from dealers last year.[17] Thirty-seven of these individuals were convicted murderers—yet they walked into gun shops and

---

[9] George Gallup, Jr., "The Gallup Poll Monthly", No. 306 (March 1991) at 50, reprinted in U.S. Department of Justice, Bureau of Justice Statistics, "Sourcebook of Criminal Justice Statistics 1992" at 211.

[10] U.S. Department of Justice, Bureau of Justice Statistics, "Sourcebook of Criminal Justice Statistics 1992" at 214.

[11] Id. at 212.

[12] 18 U.S.C. § 922(g). Under this provision, the following classes of persons are prohibited from receiving firearms that have moved in interstate commerce: persons convicted of crimes punishable by more than one year in prison; fugitives from justice; unlawful users of controlled substances; persons who are addicted to controlled substances; persons who have been adjudicated mentally defective; persons who have been committed to a mental institution; aliens who are illegally or unlawfully in the United States; persons who have been dishonorably discharged from the Armed Forces; and persons who have renounced U.S. citizenship.

[13] 18 U.S.C. § 922(d), which also includes persons under indictment for a crime punishable by more than one year in prison.

[14] See James D. Wright & Peter H. Rossi, "Armed and Considered Dangerous" at 182–88 (1989) (reporting result of survey of prison inmates).

[15] Hearing on H.R. 1025, the Brady Handgun Violence Prevention Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, September 30, 1993 (statement of Deputy Assistant Attorney General Eleanor Acheson at 4).

[16] The following states currently require either a background check or a permit to purchase a handgun: California, Connecticut, Delaware, Florida, Hawaii, Iowa, Illinois, Indiana, Massachusetts, Maryland, Michigan, Minnesota, Missouri, Nebraska, North Carolina, New Jersey, New York, Oregon, Rhode Island, Tennessee, Virginia, Wisconsin. See Handgun Control, Inc., "State Handgun Purchase Laws" (August 1993).

[17] Hearing on H.R. 1025, the Brady Handgun Violence Prevention Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, September 30, 1993 (statement of Deputy Assistant Attorney General Eleanor Acheson at 4).

1986

ATF000108

# BRADY HANDGUN CONTROL ACT

P.L. 103–159

[page 10]

asked for guns.[18] Each year in Illinois some 3,000 prohibited persons seek to purchase firearms and are denied.[19]

The majority of States, however, lack this crucial tool for ensuring that laws prohibiting the sale of handguns to criminals are observed.[20]

## BRIEF EXPLANATION OF H.R. 1025

H.R. 1025 would provide for a law enforcement background check of any person seeking to purchase a handgun. Initially, the bill would enable these background checks by establishing a national five-working-day waiting period before a person could purchase a handgun. At the same time, the bill provides for the future establishment of a national system to enable licensed firearm dealers, manufacturers and importers (hereinafter collectively referred to as "transferors") to request instantaneous, point-of-purchase background checks. When this system becomes operational, the national waiting period requirement will expire.

*The waiting period*

The waiting period under H.R. 1025 would work as follows. When a person informs a Federally-licensed firearm transferor of his or her intention to purchase a handgun, the transferor would be required to notify local law enforcement officials of the proposed sale. The transferor would be required to provide certain information to the law enforcement officials, including the purchaser's name, address, and date of birth.

The bill requires local law enforcement officials to make a reasonable effort to ascertain whether the prospective purchaser is forbidden from buying the handgun. This background check must be conducted within five business days from the date on which the prospective purchaser first indicated his or her intention to purchase the handgun. If law enforcement officials notify the transferor within this five-business-day period that the sale would be prohibited by law, H.R. 1025 would forbid the transferor from completing the sale. If at any time within the five days law enforcement officials notify the gun transferor that the sale would not be prohibited, or if that time period expires and the transferor has not been notified by law enforcement that the sale would be a prohibited one, the transferor may complete the sale.

To summarize: A sale to a lawful purchaser can be delayed by no more than five business days, and the delay may be shorter if law enforcement officials are able to complete the background check in less than five days.

Furthermore, the waiting period requirements in H.R. 1025 will apply only in States which do not currently conduct background checks. States with their own background check systems will be exempted, whether they conduct the checks with a waiting period system, an instant-check system, or a permit-to-purchase system, provided they are in compliance with criminal record computerization timetables to be established by the Attorney General. States

---

[18] Id.

[19] Id. at page 5 of Ms. Acheson's statement; see also Handgun Control, Inc., "Waiting Periods Work" (August 1993) (describing success of state waiting periods).

[20] See footnote 16, supra.

1987

ATF000109

LEGISLATIVE HISTORY

HOUSE REPORT NO. 103–344

[page 11]

that will not be immediately exempt from the waiting period due to such non-compliance may gain exemptions by establishing background check systems.

Even in States without their own background checks, the bill exempts from the waiting period any individual who obtains from the chief law enforcement officer in his or her area a statement that the individual needs a firearm to protect the individual or someone in his or her family from imminent harm.

H.R. 1025 also contains detailed specifications regarding the records generated by the background check. Except for transactions that would violate Federal, State, or local laws, the chief law enforcement officer is required to destroy within 20 days any record generated by the background check system, including those records sent in by transferors. The bill specifically forbids the use of these records for any purpose other than to carry out the background check.

*The instant-check system*

H.R. 1025 would also direct the Attorney General to establish a nationwide criminal background check system that would enable licensed firearms transferors to determine instantly whether a proposed transfer would be a prohibited one. The bill would direct the Attorney General to expedite current efforts to upgrade Federal and State criminal history record collections, and to develop computer hardware and software for linking these record collections into a nationwide system that would enable instant responses to inquiries.

The bill would authorize $100 million for States to use in computerizing their criminal history records and in making these records accessible to the national system. The bill would also permit States to use for these purposes formula grant funds obtained under 42 U.S.C. § 3759(b).

The bill establishes specific schedules governing the implementation of the national instant-check system. Within six months after enactment of the bill, the Attorney General would be required to investigate the criminal records system of each State and make determinations of the improvements each State should make to enable a national system. The Attorney General would be required to set for each State a timetable for giving the national system on-line access to the State's criminal history records. These timetables must require each State to make 80 percent of its current records available to the national system within 5 years after the enactment of the bill.

H.R. 1025 also requires that 30 months after its enactment the Attorney General must make a determination as to whether the national instant-check system is operational. The system will be considered operational if 80 percent of current criminal history records nationwide are available to the system. This determination is not discretionary. If the instant-check system meets the statutory standard, the Attorney General must certify it to be operational.

Once the system is operational, the national waiting period requirement will no longer be in effect. Instead, gun transferors will be required to consult the instant-check system before any firearm

ATF000110

BRADY HANDGUN CONTROL ACT

P.L. 103–159

[page 12]

sale. If the system informs the transferor that the prospective purchaser is prohibited from buying the firearm, the sale cannot go forward. The bill sets forth an appeals procedure by which persons denied the ability to purchase a firearm may correct erroneous records. This procedure is not intended, nor should it be interpreted, to restrict an individual's rights under 5 U.S.C. 552(a).

The Attorney General is also directed to monitor the compliance of individual States with the timetables governing their maintenance of criminal history records. If, at the point when the national instant-check system is certified to be operational, any State is not in compliance with its timetable, H.R. 1025's waiting period requirement would remain in effect in that State until the State comes into compliance.

If the national system is not operational at the 30-month point, or if any State is not in compliance with its timetable, the Attorney General is directed to continue to monitor the development of the system. The Attorney General must certify the national system as soon as it becomes operational. She must also continue to monitor the States, and to declare the waiting period to be expired in any State which comes into compliance with its timetable after the 30-month point.

To ensure expeditious development of the instant-check system, H.R. 1025 provides stringent penalties for both States and the Department of Justice. The Attorney General is authorized to reduce by up to 50 percent the criminal justice grant funds available to any State that does not comply with its criminal history records timetable. In addition, if the Attorney General does not certify the national instant check system to be operational 30 months after enactment of the bill, H.R. 1025 imposes a 5 percent reduction, imposed on a monthly basis, in the general administrative funds appropriated to the Department of Justice. If certification of the system does not occur by the 42nd month after enactment, the penalty is increased to 10 percent, imposed on a monthly basis.

## HISTORY OF THE LEGISLATION

### 100TH CONGRESS

A bill to require a national waiting period for the purchase of handguns was first introduced in the 100th Congress as H.R. 975. This bill would have imposed a national seven-day waiting period before any sale of a firearm to an individual who is not a Federally-licensed gun transferor, gun manufacturer, or gun importer. The Subcommittee on Crime held hearings on H.R. 975 on November 30, 1987, and February 24, 1988.[21]

On June 30, 1988, the Committee on the Judiciary marked up an omnibus drug control bill, H.R. 4916. During the mark-up, H.R. 975 was offered as an amendment to H.R. 4916. This amendment was adopted. H.R. 4916 was subsequently reported from the Committee.

On September 15, 1988, H.R. 4916 was brought to the full House of Representatives for a vote. Representative Bill McCollum offered

---

[21] "Waiting Period Before the Sale, Delivery, or Transfer of a Handgun," Hearings Before the Subcommittee on Crime of the Committee on the Judiciary, House of Representatives, 100th Cong., 1st and 2d sess. (November 30, 1987 and February 24, 1988).

ATF000111

LEGISLATIVE HISTORY

HOUSE REPORT NO. 103–344

[page 13]

an amendment to require the Attorney General to develop a national system for the identification of felons attempting to buy firearms, as a substitute for the waiting period provision in H.R. 4916. The McCollum amendment was adopted, and H.R. 4916 was enacted as the "Anti-Drug Abuse Act of 1988."

## 101ST CONGRESS

H.R. 467, introduced in the 101st Congress, was similar to the waiting period provision that had been struck from H.R. 4916 in the 100th Congress. On April 5 and 6, 1989, two days of hearings were held on H.R. 467 and other gun control bills.[22]

## 102D CONGRESS

The waiting period bill was introduced as H.R. 7 in the 102d Congress. This bill differed from prior versions of the waiting period by: (1) including a requirement that the prospective gun purchaser submit to the transferor a sworn statement that he intends to purchase a gun and is not prohibited from doing so; (2) an exception permitting holders of valid State-issued permits to purchase firearms to buy guns without the waiting period; and (3) exempting firearms sold by mail from the bill.

On March 21, 1991, the Subcommittee on Crime and Criminal Justice held a hearing on H.R. 7.[23] The Subcommittee heard testimony in support of the bill from law enforcement representatives, including Commissioner Lee Brown of the New York City Policy Department, Mr. Hubert Williams of the Police Foundation on behalf of a coalition of law enforcement organization, and Chief Kenneth Collins of the Maplewood, Minnesota, Police Department. The Subcommittee also heard testimony in support of H.R. 7 from survivors of gun violence and family members of gunshot victims. The subcommittee heard testimony in opposition to the Brady Bill from Mr. Paul McNulty, Acting director, Office of Police Development, U.S. Department of Justice, and from Mr. James J. Baker, Director of Federal Affairs of the National Rifle Association.

On April 10, 1991, the Subcommittee on Crime and Criminal Justice met to consider H.R. 7. The bill was reported favorably by a roll call vote of 9 to 4.

On April 23, 1991, the Committee on the Judiciary met to consider H.R. 7. An amendment was offered by Representatives Charles Schumer and Representative Jim Sensenbrenner to make it clear that a handgun sale could proceed under the bill at the expiration of the 7-day waiting period, provided that the transferor had not been informed by a law enforcement official that the prospective purchaser was not prohibited from buying a gun.

On May 8, 1991, H.R. 7 was brought to the full House of Representatives for a vote. Representative Harley Staggers offered an amendment in the nature of a substitute which would not have imposed a waiting period, but rather would have required the Attor-

[22]"Semiautomatic Assault Weapons Act of 1989," Hearing Before the Subcommittee on Crime of the Committee on the Judiciary, House of Representatives, 101st Cong., 1st sess. (April 5 and 6, 1989).
[23]"Brady Handgun Violence Prevention Act," Hearing Before the Subcommittee on Crime and Criminal Justice of the Committee on the Judiciary, House of Representatives, 102d Cong., 1st sess. (March 21, 1991).

ATF000112

BRADY HANDGUN CONTROL ACT

P.L. 103–159

[page 14]

ney General to develop a national system for the identification of felons attempting to buy firearms. This amendment was defeated by a roll call vote of 193 to 234. H.R. 7 was then approved by the House of Representatives by a roll call vote of 239 to 186.

H.R. 7 was then combined with H.R. 3371, a comprehensive anti-crime bill, for purposes of conference with the Senate. The conference report included a version of the Brady Bill similar to that passed in the Senate.[24] This version imposed a national 5-business-day waiting period, and also directed that a national point-of-purchase background check system be developed, with the waiting period to expire as soon as the instant-check system became operational. The conference report was approved by the House on November 27, 1991, by a roll call vote of 205 to 203. The conference report was never voted on by the Senate.

103D CONGRESS

*Subcommittee action*

H.R. 1025 was introduced by Representative Schumer and Representative Sensenbrenner on February 22, 1993. The Subcommittee on Crime and Criminal Justice held a hearing on H.R. 1025 on September 29, 1993. Mr. Jim Brady and Ms. Sarah Brady, Chairman of Handgun Control, Inc., testified in support of the bill. The Subcommittee also heard testimony in support of the bill from Ms. Eleanor Acheson, Assistant Attorney General for Policy Development, U.S. Department of Justice, from Mr. Tim Mullaney on behalf of the Fraternal Order of Police, and from Mr. Dave Mitchell, Chief of Police for Prince Georges County, Maryland, on behalf of the International Association of Chiefs of Police. Testimony in opposition to H.R. 1025 was heard from Richard Gardiner of the National Rifle Association, Richard Feldman of the American Shooting Sports Council, Neal Knox of the Firearms Coalition, and David Kopel of the Independence Institute.

On October 29, 1993, the Subcommittee on Crime and Criminal Justice met to consider H.R. 1025. The Subcommittee adopted two amendments, one which clarified that the instant-check system would be based on the Interstate Identification Index, unless the Attorney General determines that another system would be preferable, and another which clarified that the bill does not require State and local law enforcement agencies to destroy certain records if the maintenance of the records is required by State or local law. A reporting quorum being present, the Subcommittee then reported the bill favorably by a roll call vote of 10–3.

*Committee action*

On November 4, 1993, the Committee on the Judiciary met to consider H.R. 1025. By voice vote, the Committee adopted an amendment to permit persons denied the opportunity to purchase a firearm because of an error in criminal history records to sue the appropriate government agency for correction of the records. By a vote of 16–19, the Committee rejected an amendment to provide prospective purchasers with the reasons they were denied the right to make that purchase. Two amendments which would have elimi-

[24] Conference Report 102–405.

1991

## LEGISLATIVE HISTORY
### HOUSE REPORT NO. 103–344
[page 15]

nated the waiting period provisions of the bill were defeated, one by a vote of 10–25 and the other by a vote of 15–20. An amendment that would have pre-empted state waiting period laws after the establishment of the national instant background check system was defeated by a vote of 16–19. An amendment to provide local cost reimbursement was defeated by a vote of 12–23. Several other amendments were defeated on voice votes. Then, a reporting quorum being present, the committee reported the bill favorably by a roll call vote of 23–12.

### SECTION-BY-SECTION ANALYSIS

#### SECTION 1

This section states the short title, the "Brady Handgun Violence Prevention Act."

#### SECTION 2

This Section provides that before a Federal firearms licensee transfers a firearm to a non-licensee, a background check of the prospective purchaser will be conducted. This Section contains two distinct provisions for ensuring that background checks are conducted: an interim provision involving a waiting period of up to 5 business days, and a permanent provision involving an instant check on a national instant criminal background check system. This Section also provides that whoever violates either the interim provision or the permanent provision shall be imprisoned for not more than one year, fined not more than $1,000, or both.

*Interim provision*

Subsection (a) of this Section amends section 922 of title 18, United States Code, by adding a new subsection (s). The new subsection (s) would be the interim background check provision, and it would be effective beginning on the date that is 90 days after enactment of this section and ending when the Attorney General certifies that a national instant criminal background check system is operational. It would make it unlawful for any licensed importer, manufacturer, or dealer to sell, deliver, or transfer a handgun to an individual who is not licensed under 18 U.S.C. 923 unless certain waiting period and background check requirements have been met.

Specifically, new subsection (s) would require that after the most recent proposal of a handgun transfer by the transferee (i.e., the purchaser):

(1) The transferor must receive a dated statement from the transferee proposing the transfer, containing the transferee's name, address, and date of birth, and stating that the transferee is not under indictment for a crime punishable by imprisonment for a term exceeding 1 year; has not been convicted in any court of such a crime; is not a fugitive from justice; is not an unlawful user of or addicted to any controlled substance; has not been adjudicated as a mental defective or been committed to a mental institution; is not an alien who is illegally or unlawfully in the United States; has not been discharged from the Armed Forces under dishonorable conditions; and is not a

ATF000114

BRADY HANDGUN CONTROL ACT

P.L. 103–159

[page 16]

person who, having been a citizen of the United States, has renounced such citizenship;

(2) The transferor (i.e., the dealer) must verify the identity of the transferee by examining the identification document presented by the transferee;

(3) The transferor must, within one day of receiving this statement, furnish notice of its contents to the chief law enforcement officer of the place of residence of the transferee and transmit a copy of the statement to that law enforcement officer; and

(4) Either:

(a) The transferor must receive notice within 5 business days from the chief law enforcement officer that the officer has no information indicating that receipt or possession of the handgun by the transferee would violate Federal, State, or local law; or

(b) Five business days must elapse from the date the transferor furnishes notice of the contents of the transferee's statement, during which period the transferor does not receive information indicating that receipt or possession of the handgun by the transferee would violate Federal, State, or local law.

"Business days" are defined as days in which State offices are open.

New subsection (s) would provide that these waiting period and background check provisions would be inappliable to handgun transfers in five circumstances:

(1) The transferee has, within the 10 days preceding a proposed handgun transfer, received a written statement from the chief law enforcement officer of the transferee's place of residence stating that the transferee requires access to a handgun because of a threat to the life of the transferee or any member of his or her household;

(2) The transferee has, within the five years preceding the transfer and after having his or her criminal background checked by a State or local government, received from his or her State of residence a permit that allows him or her to possess a handgun;

(3) The law of the State in which the transfer takes place requires a background check prior to handgun transfers (except that this exception will not apply in States which fail to maintain their criminal history records as provided in Section 3(c));

(4) the Secretary of the Treasury has approved the transfer under section 5812 of the Internal Revenue Code of 1986; or

(5) the Secretary of the Treasury has certified that compliance with the waiting period and background check provisions of this bill is impracticable because the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025, the business premises of the transferor at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer, and there is an absence of telecommunications facilities in the geographical area in which the business premises are located.

1993

ATF000115

## LEGISLATIVE HISTORY

HOUSE REPORT NO. 103–344

[page 17]

The new subsection would require a chief law enforcement officer who receives notice pursuant to this bill of a proposed handgun transfer to make a reasonable effort to ascertain within five business days, using available criminal history records, whether there is any legal impediment to the transfer. It would also require any handgun transferor who, after the transfer, receives information that receipt or possession of the handgun by the transferee violates Federal, State or local law to communicate all information the transferor has about the transfer to the chief law enforcement officer of the place of business of the transferor and to the chief law enforcement officer of the place of residence of the transferee. Any transferor who receives information through this section that is not otherwise available to the public is prohibited from disclosing such information, except to the transferee, to law enforcement authorities, or pursuant to the direction of a court of law.

Except for records relating to a proposed firearm transfer that would violate the law, new subsection (s) requires law enforcement officers to destroy within 20 days any records generated by the background check system. While the records exist, they may only be used to carry out the purposes of this subsection. No information in the records may be conveyed by the law enforcement officer to a person who does not have a need to know in order to do so.

New subsection (s) would also provide that a chief law enforcement officer or other person responsible under the subsection for providing criminal history background information shall not be liable in an action at law for damages either for wrongfully permitting a firearm transfer that is unlawful or for wrongfully preventing a firearm transfer that would have been lawful. The term "chief law enforcement officer" is defined as the chief of police, the sheriff, or an equivalent officer or the designee of any such individual.

The new subsection (s) would also direct the Secretary of the Treasury to take necessary actions to ensure that the provisions of the subsection are published and disseminated to licensed dealers, law enforcement officers, and the public.

Section 2 also amends section 921(a) of title 18 by defining the term "handgun" to mean a firearm which has a short stock and is designed to be held and fired by the use of a single hand, and any combination of parts from which such a firearm can be assembled.

*The permanent provision*

Section 2 would also amend section 922 of title 18 by adding a new subsection (t), to follow the new subsection (s) discussed above. The new subsection (t) would be the permanent instant background check provision, and it would be in effect beginning on the date that the Attorney General certifies that a national instant criminal background check system is operational.

This new subsection would make it unlawful for any licensed importer, manufacturer, or dealer to sell, deliver, or transfer a firearm to an individual who is not such a licensee unless:

(1) The transferor (i.e., the dealer) has first contacted the national instant criminal background check system;

(2) The system has notified the transferor that the system has not located any record that demonstrates that receipt of

1994

ATF000116

BRADY HANDGUN CONTROL ACT

P.L. 103-159

[page 18]

the firearm by the transferor would violate Federal, State, or local law; and

(3) The transferor has verified the identity of the transferee by examining an identification document.

New subsection (t) would provide that these background check requirements would be inapplicable to firearm transfers in three circumstances:

(1) The transferee has, within the five years preceding the transfer and after having his or her criminal background checked by a State or local government, received from his or her State of residence a permit that allows him or her to possess a firearm;

(2) The Secretary of the Treasury has approved the transfer under section 5812 of the Internal Revenue Code of 1986; or

(3) The Secretary of the Treasury has certified that compliance with the background check provisions is impracticable because the ratio of the number of law enforcement officers of the state in which the transfer is to occur to the number of square miles of land area of the state does not exceed 0.0025, the business premises of the transferor at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer, and there is an absence of telecommunications facilities in the geographical area in which the business premises are located.

The new subsection would require a transferor to include in the record of the transfer the unique identification number provided by the system with respect to the transfer. It would also provide that a firearms licensee who transfers a firearm and knowingly fails to comply with the requirements of the subsection, in a case where compliance would have revealed that the transfer was unlawful, may, after notice and opportunity for a hearing, in addition to any other penalties provided by law, be fined not more than $5,000. The Secretary is also authorized to suspend the license of such a licensee for up to 6 months.

New subsection (t) also provides that neither a local government nor any governmental employee responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages either for wrongfully permitting a firearm transfer that is unlawful or for wrongfully preventing a firearm transfer that would have been lawful.

This Section also provides that whoever violates either the interim provision or the permanent provision shall be imprisoned for not more that one year, fined not more than $1,000, or both.

SECTION 3

Section 3 directs the Attorney General to establish a national instant criminal background check system that any firearm licensee may contact for information on whether receipt of a firearm by a prospective transferee would violate subsection (g) or (n) of title 18 or any State or local law. This Section further provides that the Attorney General shall expedite the upgrading and indexing of State criminal history records, the development of hardware and software systems to link State criminal history records systems into the national system, and current FBI initiatives relating to techno-

1995

ATF000117

LEGISLATIVE HISTORY
HOUSE REPORT NO. 103–344
[page 19]

logically advanced fingerprint and criminal record identification systems.

This Section establishes specific deadlines for action. Within six months of enactment, the Attorney General must determine the basic framework of the national instant criminal background check system. This system should be based on the Interstate identification Index unless the Attorney General finds that the Interstate Identification Index would not provide a satisfactory basis for the national instant criminal background check system.

Also within six months of enactment, the Attorney General must determine for each State a timetable by which the State should be able to provide criminal records on-line to the national instant criminal background check system. These timetables must require that, within five years from enactment, each State achieve at least 80 percent currency of case dispositions in computerized criminal history files for all cases in which there has been an event of activity within the last five years. The timetables must also require each State to maintain such levels of record currency thereafter. Each State must be notified of these determinations.

Thirty months after enactment, the Attorney General shall determine whether the national system has achieved at least 80 percent currency of case dispositions in computerized criminal history files for all cases in which there has been an event of activity within the last five years on a national average basis. The Attorney General shall also determine at that time whether the States are in compliance with their timetables. If these conditions are met, the Attorney General must certify that the national system is established. Upon establishment, the Attorney General must notify each firearm licensee and the chief law enforcement official of each State that the system is so established and how they are to contact that system.

If the national system is not established thirty months after enactment, but at some later date the conditions required for establishment of the national system are met, the Attorney General must at that time certify that the national system is established.

If, on the date of certification of the national instant criminal background check system, a State is not in compliance with its timetable, then the waiting period provisions of Section 2 shall remain in effect in that State. The Attorney General shall certify if a State achieves compliance with its timetable at some point after the date of certification of the national system. If that occurs, the waiting period provisions shall cease to be in effect in that State.

Six years after enactment, the Attorney General must determine whether each State is in compliance with its timetable. If a State is not in compliance, then the waiting period provisions of Section 2 shall go into effect in that State, even if the national instant criminal background check system has already been established.

Upon establishment of the national instant criminal background check system, the Attorney General must notify each licensee and the chief law enforcement officer of each State of the existence and purpose of the system and the means to be used to contact the system.

Section 3 would authorize the Attorney General to obtain from other Federal agencies such information on persons prohibited by

ATF000118

## BRADY HANDGUN CONTROL ACT

P.L. 103–159

[page 20]

subsection (g) or (n) of section 922 of title 18 from receiving a fire-arm as is necessary to enable operation of the national instant criminal background check system. This Section would also direct the Attorney General to develop such hardware, software, and other equipment as is necessary for the national instant criminal background check system.

This Section provides a procedure for correcting erroneous records once the national instant criminal background check system has been established. Under this Section, an individual who is denied the opportunity to purchase a firearm because of information provided by the national instant criminal background check system may request the Attorney General to provide the reason why the system informed the prospective transferor that receipt of a firearm by the prospective transferee would be unlawful. The Attorney General must comply immediately with this request. The prospective transferee may submit to the Attorney General information to correct, clarify, or supplement records of the system. After receipt of such information, the Attorney General shall immediately consider the information, correct any erroneous records in the system, and give notice of the error to the agency that was the source of the error.

This Section also directs the Attorney General to promulgate regulations to ensure the privacy and security of the information of the national instant criminal background check system. Except with respect to persons prohibited by subsection (g) or (n) of section 922 of title 18 from receiving a firearm, Section 3 further prohibits any Federal department, agency, officer, or employee from using the system or any part thereof to establish a registry of firearms, firearms owners, or firearms transactions.

This Section also defines the term "licensee" to mean a licensed importer, licensed manufacturer, or licensed dealer under section 923 of title 18. The terms "firearm," "licensed importer," "licensed manufacturer," and "licensed dealer" have the meanings stated in section 921(a), (3), (9), (10), and (11), respectively, of title 18.

### SECTION 4

This Section provides a specific remedy for the erroneous denial of a handgun under Section 2 and 3(a). It provides that any person denied a handgun due to the provision of erroneous information pursuant either to the waiting period provisions of Section 2 or to the national instant criminal background check system provisions under Section 3(a), and who has exhausted the administrative remedies available for the correction of such erroneous information, may bring an action against the appropriate governmental agency for an order directing the correction of the error. This Section also provides that the prevailing party in any action brought pursuant to it may, in the discretion of the court, recover a reasonable attorney's fee. The Committee does not intend this particular avenue for relief to restrict in any way an individual's rights under 5 U.S.C. 552(a), nor should the Section be so interpreted.

### SECTION 5

This Section provides funding authority for the improvement of criminal records and prescribes penalties to ensure the prompt de-

1997

ATF000119

LEGISLATIVE HISTORY

HOUSE REPORT NO. 103-344

[page 21]

velopment of the national instant criminal background check system. Subsection (a)(1) provides authority to use the existing five percent set-aside funding under Section 509(b) of the Omnibus Crime Control and Safe Streets Act for the improvement of State criminal history records and the sharing with the Attorney General of records required by the national instant criminal background check system.

Subsection (a)(2) provides new funding authority of $100 million for a grant program to be administered by the Bureau of Justice Statistics. The grant funds are to be used for the creation or improvement in each State of a computerized criminal history record system, and to make the records in those systems accessible to the national instant criminal background check system. States whose record repositories have the lowest percent currency of case dispositions in computerized criminal history files are to be given preference in receiving grants.

Subsection (b) authorizes the Attorney General to reduce by up to 50 percent a State's allocation of criminal justice grant funds available under title I of the Omnibus Crime Control and Safe Streets Act of 1968 if the State is not in compliance with the timetables established in Section 3(c).

Subsection (c) provides that if the Attorney General does not certify the establishment of the national instant criminal background check system within 30 months of enactment, the general administrative funds appropriated to the Department of Justice shall be reduced by 5 percent on a monthly basis. Subsection (c) also provides that if the Attorney General does not certify the establishment of the national instant criminal background check system within 42 months of enactment, the general administrative funds appropriated to the Department of Justice shall be reduced by 10 percent on a monthly basis.

## COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

## COMMITTEE ON GOVERNMENT OPERATIONS OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Operations were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

## NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 2(l)(3)(B) of House Rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditure.

1998

ATF000120

## BRADY HANDGUN CONTROL ACT

P.L. 103–159

[page 22]

### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(C)(3) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill H.R. 1025, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, November 9, 1993.*

Hon. JACK BROOKS,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 1025, the Brady Handgun Violence Prevention Act.

Enactment of H.R. 1025 could affect direct spending and receipts. Therefore, pay-as-you-go procedures, as required by section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985, would apply to the bill.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

JAMES L. BLUM
(For Robert D. Reischauer, Director).

### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

1. Bill number: H.R. 1025.
2. Bill title: Brady Handgun Violence Prevention Act.
3. Bill status: As ordered reported by the House Committee on the Judiciary on November 4, 1993.
4. Bill purpose: H.R. 1025 would establish a federal waiting period of five business days before a licensed dealer may transfer a handgun to a private purchaser. During that waiting period, a local law enforcement official would be required to make a "reasonable effort" to determine whether the applicant is ineligible to purchase a handgun under federal or state law. Prospective purchasers with valid handgun permits or special permission from local law enforcement officials would not be subject to the waiting period. The waiting period would not apply in states that maintain some other system—either an instant background check system or a permit system—for verifying that purchasers do not have criminal records.

The waiting period eventually would be superseded by a national instant background check computer system to be established by the Attorney General. H.R. 1025 would authorize appropriations totaling $100 million over the fiscal years 1994 through 1998 to the Attorney General to establish a national instant criminal background check system, to upgrade state criminal history records, and to link state criminal history check systems into the national system.

In addition, H.R. 1025 would establish new federal crimes and associated penalties for violation of the bill's provisions. These penalties would include imprisonment and both civil and criminal fines.

1999

ATF000121

## LEGISLATIVE HISTORY
### HOUSE REPORT NO. 103–344
[page 23]

Finally, the bill would allow a person erroneously denied a handgun to bring a legal action against a state or local official, or against the United States, for such denial if the person has exhausted all available administrative remedies. The bill would provide for the award of attorney's fees to the prevailing party in any such action.

5. Estimated cost to the Federal Government:

[By fiscal year, in millions of dollars]

|  | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|
| Revenues: |  |  |  |  |  |
| Estimated receipts from fines | (¹) | (¹) | (¹) | (¹) | (¹) |
| Direct spending: |  |  |  |  |  |
| Crime Victims Fund: |  |  |  |  |  |
| Estimated budget authority | 0 | (¹) | (¹) | (¹) | (¹) |
| Estimated outlays | 0 | (¹) | (¹) | (¹) | (¹) |
| Authorizations: |  |  |  |  |  |
| Authorization of appropriations | 100 |  |  |  |  |
| Estimated outlays | 50 | 25 | 20 | 5 |  |

¹ Less than $500,000.

The costs of this bill fall within budget function 750.

Basis of estimate: The estimate assumes that the Congress will appropriate the full amount authorized for fiscal year 1994. The outlay estimates are based on information from the Department of Justice regarding implementation of the national instant background check system.

The imposition of new civil and criminal fines could cause governmental receipts to increase through greater penalty collections, but CBO estimates that any such receipts would be insignificant. Criminal fines would be deposited in the Crime Victims Fund and would be spent in the following year. Thus, direct spending from the fund would match the increase in revenues from criminal fines with a one-year lag.

Enactment of the bill could result in legal actions brought against the United States for erroneous denial of a handgun. Any attorney's fees that the United States would have to pay would be considered direct spending. However, we estimate that such actions would be rare and that the amount of any payments made by the federal government would not be significant.

6. Pay-as-you-go considerations: Section 252 of the Balanced Budget and Emergency Deficit Control Act of 1985 sets up pay-as-you-go procedures for legislation affecting direct spending or receipts through 1998. Enactment of H.R. 1025 would affect both receipts and direct spending; however, CBO estimates that any changes in spending and receipts would be insignificant.

7. Estimated cost to State and local governments: There would be additional costs to local law enforcement authorities for background checks before the national system is operational. It appears that 23 states, including California, New York, and Florida, already require a background check for handgun purchases. In addition, because any efforts required in the remaining states would be spread over a large number of local jurisdictions, the impact on any given jurisdiction is likely to be small. In most cases, the work would probably be handled with existing resources.

2000

ATF000122

## BRADY HANDGUN CONTROL ACT

P.L. 103–159

[page 24]

State and local governments could face legal actions brought by persons erroneously denied handguns and would be liable for attorney's fees. We estimate that any such actions would be infrequent and that any costs to a given state or local jurisdiction would be small.

Finally, the bill would require states to achieve, within five years of enactment, as least 80 percent currency of case dispositions in computerized criminal history files for all cases in which there has been some activity within the last five years. As a result, state and local governments could incur costs to enhance and upgrade criminal history systems to the extent that federal grants are not sufficient to cover their costs. CBO has not yet completed an estimate of this cost to state and local governments. However, these costs could be substantial.

8. Estimate comparison: None.

9. Previous CBO estimate: None.

10. Estimate prepared by: Mark Grabowicz.

11. Estimate approved by: C.G. Nuckols, Assistant Director for Budget Analysis.

### INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.R. 1025 will have no significant inflationary impact on prices and costs in the national economy.

\*    \*    \*    \*    \*

[page 31]

## ADDITIONAL VIEWS OF JIM RAMSTAD

Although I voted to report the bill out of committee, I must express my deep disappointment at the circumstances under which this bill came before the committee and will be brought to the House floor.

Since those controlling the committee could not reach a consensus on their own crime bill, it has been split into at least 7 pieces. But, as we all know, the sum of these 7 bills' parts amounts to substantially less than the original crime legislation.

By passing the modified Brady Bill separately, rather than as one element of a comprehensive anti-crime package, we risk sending a message that it alone is the answer to our nation's violent crime problem. No proponent of this bill should fool themselves for one second—this is not a panacea for crime control nor will it substantially reduce the violence on our streets.

As we all know, the vast majority of violent crime in America is committed with illegal guns, which will in no way be impacted by the modified Brady Bill. Since the average violent criminal serves only 37 percent of his or her sentence, what our country really needs are more prisons so we can put violent criminals away and put an end to our prisons' current revolving door syndrome.

2001

ATF000123

## LEGISLATIVE HISTORY
### HOUSE REPORT NO. 103–344

We also need better enforcement of existing laws against crimes with firearms, drug treatment in prisons, habeas corpus reform and tougher sentences for repeat offenders, as well as the death penalty for the most heinous crimes.

In addition, I want to emphasize my strong support for the rights of law-abiding gun owners. While I do not believe that the modified Brady Bill—leading to a national instant background check system—strikes at the heart of the Second Amendment, there is little doubt that some of the bill's supporters have every intention of doing future damage to the Second Amendment rights of lawful Americans.

Most people agree that passage of the modified Brady Bill is inevitable. I want to make sure this action does not lead to a rash of anti-gun legislation that tramples on the rights of law-abiding individuals.

However, my cop friends in Minnesota have shown me first hand that a background check for handgun purchases can work to screen out felons and mentally ill people who attempt to buy handguns legally. I've seen the statistics from the Minneapolis Police Department, the St. Paul Police Department, the Maplewood Police Department and a number of other police departments in Minnesota.

I am voting for the modified Brady Bill because the 5-day waiting period will be phased out once a national instant background check system is operational and because passage of this bill will expedite implementation of this instant check system.

[page 32]

But I still intend to work for a number of perfecting changes to the bill. Most importantly, I support the inclusion of a "time-certain" provision to further expedite the implementation of the instant check system and ensure that the waiting period is truly an "interim," and not a permanent, feature of the bill.

Moreover, I support allowing those individuals who are determined ineligible to purchase a handgun under the waiting period provision in the bill to request that local law enforcement provide reasons for that determination. I have agreed to work with Mr. Brooks and Mr. Schumer on such a provision and am optimistic it will be included in the bill during floor consideration.

JIM RAMSTAD.

ATF000124

BRADY HANDGUN CONTROL ACT

P.L. 103–159

[page 33]

## DISSENTING VIEWS OF HON. BOB GOODLATTE, HON. BILL McCOLLUM, HON. LAMAR SMITH, HON. STEVEN SCHIFF, AND HON. GEORGE GEKAS

We write in opposition to H.R. 1025, the Brady Handgun Violence Prevention Act, better known as the Brady bill. Our nation's crime statistics are skyrocketing and we all desperately wish to find a magic cure for this senseless violence. The Brady Bill is not a cure. The bill is merely a symbolic gesture. It is a gimmick to which members of Congress will attempt to point when constituents question their commitment to get tough on crime.

The truth is that the Judiciary Committee leadership has backed away from real crime reform such as prison construction and streamlining the habeas corpus appeals process because of intraparty bickering. Although members of this body were told we would have an opportunity to tackle the crime problem during consideration of a comprehensive crime bill such as H.R. 3131, or H.R. 2872, the omnibus bill, introduced by Congressman McCollum which has 82 cosponsors, we now know that is not the case.

The Brady Bill will not solve our nation's crime epidemic because it does nothing to keep handguns out of the hands of violent criminals. This bill contains a major flaw that its supporters refuse to acknowledge. It only deals with firearm sales from legal, lawful dealers. A survey of State prison inmates in 1991 showed that of those who had ever possessed a handgun, 73 percent obtained it by other than purchase from a gun dealer. Those individuals who will be impacted by this regulation of firearm transactions are law-abiding citizens who attempt to purchase firearms for lawful purposes such as marksmanship, hunting, and personal protection.

Clearly, the current version of the Brady bill is somewhat of an improvement from the legislation offered in the last Congress. The fact that it includes an instant check which would immediately identify felons and others who are prohibited from obtaining a firearm under current federal law, is a move away from over broad gun control measures which do nothing to stop crime and infringe upon second amendment rights. A uniform national instant check law instead guarantees immediate delivery of a handgun to a proven law-abiding citizen. An instant check system protects the rights of all Americans.

One of our major concerns with H.R. 1025 is that although the bill calls for a phase-in of the point of sale background check system, it gives no date by which such a system must be implemented. This vagueness could easily be used to delay indefinitely the switch-over from the waiting period to the instant check, thereby establishing a permanent waiting period. There needs to be a date upon which the waiting period sunsets.

H.R. 1025 is written in a way which gives the Attorney General virtually unfettered discretion to maintain the waiting period be-

2003

ATF000125

LEGISLATIVE HISTORY
HOUSE REPORT NO. 103–344
[page 34]

yond two and a half years by failing to impose a specific time for the implementation of the national instant check system. The Attorney General would certify when the national instant check system comes on line, depending on whether all states are in compliance with timetables established by the Attorney General. Thus the Attorney General need only establish a timetable that a single state could not meet to prevent the national instant check system from being certified.

In addition, if a state were unable to meet or maintain the standard for completeness of criminal records (80 percent currency in computerized files showing disposition of all cases in which there has been activity within the past 5 years) within the specified six years, it would be required to retain or return to the waiting period phase and also would risk the loss of certain Federal funds.

The technological capability currently exists to identify violent felons and predatory criminals through existing criminal justice records. For this reason, we support a date certain for implementation of the point-of-purchase check.

Some of our colleagues who support waiting periods have used unsubstantiated claims to back their arguments for the waiting period. They have argued that states and the FBI do not have the capability to bring the national instant check system on line within a specified deadline because half the states are not currently hooked up to the federal computer system.

We would direct those individuals to read a recent Washington Post article from October 25, 1993. This article quotes Emett Rathbun, overseer of the FBI's Interstate Identification Index, the computerized system that states currently tap into before making a sale. Mr. Rathbun was quoted as saying, "[I]t is true that 25 states still do not feed information into the system by computer. However, records from those states are instead provided by the FBI." He called the argument used by waiting period advocates "immaterial". The Interstate Identification Index has 18 million nationwide records that are available for use, along with state records, by the five states that do point-of-sale background screening. This is the most accurate up-to-date nationwide information available and allows the five states with point-of-purchase checks to do instantaneously what takes 15 days in California—with the same standard of accuracy.

These five states—Virginia, Delaware, Florida, Illinois and Wisconsin—successfully operate point-of-sale background check systems which were implemented in less than a year's time and at relatively modest costs.

Virginia's instant check system was passed in March 1989, and was on-line November 1, 1989, within eight months. Florida's instant check system was passed in 1989, and on-line February 1, 1991. Delaware's instant check system was approved in June 1990 and took effect in February 1991, within eight months. Wisconsin's instant check system was signed into law on April 26, 1991, and was on-line December 1, 1991, within eight months. Illinois' instant check system was approved in the summer of 1991 and went into effect in January 1992.

To date the Virginia system has processed over half a million transactions and has denied over 5,500 purchases. In addition, 318

ATF000126

BRADY HANDGUN CONTROL ACT

P.L. 103–159

[page 35]

wanted felons were identified as a result of the check. Clearly, Virginia's system is doing what it was intended to do.

Lt. Jim Snow, the assistant records management officer with the Virginia State Police says that the current system used in Virginia provides the best background search available. He has gone on record saying that five extra days would not allow a more thorough check, because "we can check what needs to be checked in two minutes or less."

Furthermore, the FBI has been working on implementing a national computerized record system for the past five years. Substantial federal resources have already been directed toward the goal of creating a reliable automated criminal data retrieval system nationwide. In FY 90–92 $27 million dollars in federal funds went to the states expressly for the purpose of upgrading state records and automated access. In 1988 an amendment to the omnibus crime bill by former Representative Michael Dewine (R–OH) required that all justice grants to the states have a 5 percent earmark to be used for the purpose of developing and improving access to automated criminal history records. This resulted in an additional $20 million to the states in 1992. All fifty states were participants in this program even though it requires a 25 percent state match.

Finally, the administration's budget requests an additional $25 million in FY 94 and $50 million in FY 95 grants to the states to continue upgrading criminal records infrastructure and to establish a computer interface with the FBI's criminal record databases.

Yet another argument for going directly to instant check is that a federally mandated waiting period is merely that. The Constitution prohibits the federal government from requiring any activity of local law enforcement including background checks. Even the bill's sponsor, Representative Schumer, admitted in a March 4, 1993 interview on "Crossfire" that the wait is only to give law enforcement the "option" to check a purchaser's background. Thus the "Brady Bill" provides for neither a mandatory background check nor a waiting period since neither can be required of local law enforcement by the authority granted to the federal government by the U.S. Constitution.

Moreover, because H.R. 1025 provides no funds to local authorities with which to conduct background checks, it is yet another unfunded federal mandate to the states.

During Judiciary Committee mark up of H.R. 1025 amendments were offered and defeated to strike the waiting period and create a specific date for implementation of the instant check system contained in the bill.

Several technical amendments which failed would have improved the bill. One such amendment applied the instant check system to handguns only. According to the FBI "Uniform Crime Reports" less than 1 percent of all serious crimes involve long guns. There is no valid reason for the instant check system to be applied to long gun purchases.

Amendments were also offered and defeated which would have protected lawful purchasers. Waiting periods and checks carried out by local police create additional opportunities for the infringement of civil liberties. Thus, amendments were offered to provide specific procedures for operation of the instant check system, re-

2005

ATF000127

**LEGISLATIVE HISTORY**

HOUSE REPORT NO. 103–344

[page 36]

quire that all records of the search of an eligible transferee be destroyed, give individuals whose purchases have been denied the right to request a written reason for the denial to be provided within five business days, and create a remedy for those individuals erroneously denied correction of the information in the system.

H.R. 1025 contains no system to redress a wrongful denial of purchase. If a person improperly is denied his rights, the only redress is to hire an attorney and go to court to prove he or she is law-abiding. This turns the presumption of innocence, on which our legal system is based, upside own. it allows for arbitrary and capricious misuse of the regulatory process by over-zealous or corrupt government officials, resulting in the denial of basic rights to honest citizens.

No system is 100 percent perfect and problems will arise that require redress. For example, in one state with a waiting period, Maryland, 80–85 percent of denials were reversed on appeal.

If a criminal record is available, it is available instantaneously. A five business day waiting period accomplishes nothing. In fact those states which require a wait are, for the most part, simply using law enforcement personnel to conduct the point-of-purchase instant check that dealers use in the five states with instant check systems in place.

An instant check system is effective and requires only that criminal records be updated and computerized, something our criminal justice system needs badly in any event. An instant check will stop those criminals who try to buy a firearm from a licensed dealer and it does so without infringing on the rights on the law-abiding.

The real issue here is "why wait"? The technology is available. It's already working in Virginia, Delaware, Florida, Illinois and Wisconsin. A date for the implementation of a national point-of-sale instant check should be set in law and adhered to.

BOB GOODLATTE.
LARMAR SMITH.
GEORGE W. GEKAS.
BILL MCCOLLUM.
STEVE SCHIFF.

ATF000128

## BRADY HANDGUN CONTROL ACT

P.L. 103–159
[page 37]

### DISSENTING VIEWS OF HON. LAMAR SMITH

I strongly oppose passage of H.R. 1025, the Brady Bill.

H.R. 1025 provides false hope to Americans frustrated and frightened by America's growing crime rate.

Every year, nearly 5 million people in the United States are victims of violent crime. In the United States a murder is committed every 21 minutes, a rape every 5 minutes, a robbery every 46 seconds, and an aggravated assault every 29 seconds.

Many Americans are shocked to hear that violent criminals serve an average of only 6 years for murder, 3 years for rape, 2 years for robbery and 1 year for assault.

But instead of tougher sentences, the answer we are given in this legislation is a five day waiting period for handgun purchases. And since over 80 percent of felons purchasing guns avoid going to legitimate dealers to buy them, a waiting period will have little impact on the crime rate.

According to a Police Foundation Firearm Abuse Study, only two percent of violent crimes occur within one month of that weapon's purchase. And H.R. 1025, with its five day waiting period, would cover only one-fourth of this time period.

How can we rationally expect a criminal who is not deterred by our justice system from committing violent crimes, to be deterred by a five day wait?

Congress must face reality—the only real answer to gun violence is swift, severe and guaranteed punishment. Republicans have such a plan embodied in H.R. 2872, the Michel-McCollum Crime Control Act of 1993.

H.R. 2872 includes the reforms that Americans demand: an effective and believable death penalty, reform of the appeals process, ending parole for serious offenses, prison construction instead of early release, mandatory minimum sentences, victims' rights, and a common sense approach to police searches and use of evidence in court.

The Brady Bill is no substitute for comprehensive crime control legislation. Instead, passage of H.R. 1025 will likely help the criminal by placing restrictions on the self defense of law-abiding citizens.

LAMAR SMITH.

2007

ATF000129

LEGISLATIVE HISTORY
HOUSE REPORT NO. 103–344
[page 38]

## ADDITIONAL DISSENTING VIEWS BY CONGRESSMAN STEVE SCHIFF

There is a legitimate debate regarding whether a five day waiting period and personal background check prior to a handgun purchase, as proposed in H.R. 1025, will help reduce crime. The proponents of the Brady Bill believe that if this legislation is enacted, it will prevent convicted criminals from acquiring handguns. Opponents respond that criminals do not normally purchase guns from licensed dealers; they buy guns illegally—or just steal them, and that conducting a background check on each purchaser hurts law enforcement by diverting scarce resources away from concentrating on criminals, and inhibits the ability of individuals to defend themselves in emergency situations. After a career as a criminal prosecutor (but also having two years experience as a defense attorney), I think that the latter view is the most accurate. However, my most stringent objection to the Brady Bill is that this bill, as currently written, is an unfunded federal mandate on state and local law enforcement agencies.

### UNFUNDED FEDERAL MANDATE

The Brady Bill establishes a five day waiting period before the purchase of a handgun from a licensed gun dealer, and then requires local police or sheriffs to conduct a personal background check on each purchaser, solely at the local agency's expense. Although an authorization of $100,000,000 is included in the bill to help automate state criminal history records, it cannot be used by state or local law enforcement agencies to offset the cost of performing the individual personal background check.

In both the Subcommittee on Crime and Criminal Justice markup on October 29, 1993, and the full Judiciary Committee markup on November 4, 1993, I attempted to offer three amendments, any one of which would remedy this objection to the bill. My first amendment proposed to change the burden of performing the background check from state and local law enforcement to the Federal Bureau of Investigation, which maintains the most comprehensive criminal records in the country. Although proponents continue to champion the importance of this background check, they are unwilling to allow our most advanced law enforcement agency to perform this check. As a result, this amendment failed.

My second amendment directly addressed the fact that H.R. 1025 imposes an unfunded federal mandate on the states, many of which do not have the state and local law enforcement resources to conduct the required background checks. This amendment proposed to require the federal government to reimburse, at a cost determined in advance by the Attorney General of the United States, the state or local agency for the cost of performing the background checks. I believe that if the supporters of the Brady Bill are convinced that

ATF000130

## BRADY HANDGUN CONTROL ACT

P.L. 103–159

[page 39]

a background check is a national priority, and still not willing to have a federal law enforcement agency conduct the check, then it should be paid for by Congress. If states believe that conducting personal background checks of firearms purchasers is an efficient use of their own law enforcement dollars, then they can pass such laws within those states at any time. In fact, several states have already adopted such procedures. This amendment was also defeated.

My final amendment proposed to make the performance of the background check an option, rather than a requirement, for state and local law enforcement agencies, while keeping the waiting period. Currently in the bill, a state or local law enforcement agency "shall make a reasonable effort to" check the backgrounds of prospective handgun purchasers within five days. My amendment would strike the above and insert "may," thus making it an option for state and local agencies who do have the law enforcement resources to perform the background check, to do so. This is appropriate if Congress is unwilling to conduct the check federally, or reimburse local law enforcement agencies for doing it. This amendment failed as well.

### WAITING PERIOD VERSUS INSTANT CHECK

Although I do not support the five day waiting period and personal background check, as outlined in the first part of H.R. 1025, for the reasons I stated above, I do support the concept of a national instant computer check, as discussed in the second part of this bill. The instant check system, which allows for an immediate determination as to whether the purchaser is a convicted felon, does not burden state and local law enforcement agencies, as does the personal background check in Brady. The national instant check sets up a telephone link between licensed firearms dealers and federal law enforcement computers, instead placing the burden and cost on the federal government.

### COMBATTING CRIME

Keeping firearms out of the hands of criminals is a laudable goal. However, I do not believe that H.R. 1025, as currently written, will help us to achieve this goal.

I believe that we already have on the books one of the most effective gun control laws: the law that makes it a federal crime for a convicted felon to be in possession of a firearm. I support this law and encourage its vigorous enforcement by the Department of Justice.

In addition, we need to encourage states to adopt truth in sentencing, which would require a convicted criminal to serve at least eighty-five percent of his or her sentence. Sadly, convicted criminals in state prisons serve, on the average, only thirty-seven percent of their sentences. If we kept these offenders behind bars for most of their judge- or jury-imposed sentences, we would not have so many criminals attempting to get guns on the streets.

ATF000131

**LEGISLATIVE HISTORY**

HOUSE REPORT NO. 103–344

[page 40]

Combatting crime is an issue in which the Congress must be involved; states cannot fight this epidemic alone. However, mandating that states perform a personal background check of handgun purchasers, without providing either federal resources or dollars is not the answer.

STEVE SCHIFF.

2010

ATF000132

BRADY HANDGUN CONTROL ACT

P.L. 103–159

## HOUSE CONFERENCE REPORT NO. 103–412

•         •         •         •

[page 13]

### JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 1025), to provide for a waiting period before the purchase of a handgun, and for the establishment of a national instant criminal background check system to be contacted by firearms dealers before the transfer of any firearm, submit the following joint statement to the House and the Senate in explanation of the effect of the action agreed upon by the managers and recommended in the accompanying conference report:

The Senate amendment struck all of the House bill after the enacting clause and inserted a substitute text.

The House recedes from its disagreement to the amendment of the Senate with an amendment that is a substitute for the House bill and the Senate amendment. The differences between the House bill, the Senate amendment, and the substitute agreed to in conference are noted below, except for clerical corrections, conforming changes made necessary by agreements reached by the conferees, and minor drafting and clerical changes.

Section 103(b) of the Senate amendment provided for certain standards to be utilized by the Attorney General in determining whether a national background check system was established within 24 months. The House had no such provision, and the managers agreed that the Senate recede.

Section 302(c) of the Senate amendment provided authorization for a licensee to transfer or deliver firearms from another licensee at any location without regard to the State which is specified on the license. The House had no such provision, and the managers agreed that the Senate recede.

Section 302(e)(b) of the Senate amendment provided mandatory imprisonment for thirty years, no part of which may be suspended, for any person who stole a gun during a robbery or riot. The House had no such proivision, and the managers agreed that the Senate recede.

Section 304 of the Senate amendment changed the definition of antique firearms to include any firearm manufactured in or before 1918. The House had no such provision, and the managers agreed that the Senate recede.

Section 305 of the Senate amendment specified, among other things, that any rule or regulation of the Bureau of Alcohol, Tobacco, and Firearms would not be effective until 30 days after a copy was provided to all licensees. The House had no such provision, and the managers agreed that the Senate recede.

Section 401 of the Senate amendment provided for notification to the Department of Justice by the States of any person adjudicated as a mental defective or committed to a mental institution.

2011

ATF000133

LEGISLATIVE HISTORY
HOUSE CONF. REP. NO. 103–412

[page 14]

The House had no such provision, and the managers agreed that the Senate recede.

Section 2(a) of the House bill contained a five year sunset of the waiting period. The Senate amendment provided for a four-year sunset with a possible extension of one-year by the Attorney General. The managers agreed that the Senate recede to section 2(a) of the House bill, with conforming amendments.

The managers further agreed to add in sections 106(b)(2) and 301(l) of the Senate amendment the words "which may be appropriated" before the word "from".

JACK BROOKS,
BILL HUGHES,
CHARLES SCHUMER,
F. JAMES SENSENBRENNER, Jr.,
GEORGE W. GEKAS,
*Managers on the Part of the House.*

JOSEPH R. BIDEN, Jr.,
TED KENNEDY,
HOWARD M. METZENBAUM,
*Managers on the Part of the Senate.*

ATF000134

107 STAT. 1536        PUBLIC LAW 103–159—NOV. 30, 1993

Public Law 103–159
103d Congress

## An Act

Nov. 30, 1993
[H.R. 1025]

To provide for a waiting period before the purchase of a handgun, and for the establishment of a national instant criminal background check system to be contacted by firearms dealers before the transfer of any firearm.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Brady Handgun
Violence
Prevention
Act.
Inter-
governmental
relations.
Law
enforcement
and crime.
18 USC 921 note.

# TITLE I—BRADY HANDGUN CONTROL

**SEC. 101. SHORT TITLE.**

This title may be cited as the "Brady Handgun Violence Prevention Act".

**SEC. 102. FEDERAL FIREARMS LICENSEE REQUIRED TO CONDUCT CRIMINAL BACKGROUND CHECK BEFORE TRANSFER OF FIREARM TO NON-LICENSEE.**

(a) INTERIM PROVISION.—

(1) IN GENERAL.—Section 922 of title 18, United States Code, is amended by adding at the end the following:

Effective date.
Termination
date.

"(s)(1) Beginning on the date that is 90 days after the date of enactment of this subsection and ending on the day before the date that is 60 months after such date of enactment, it shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell, deliver, or transfer a handgun to an individual who is not licensed under section 923, unless—

"(A) after the most recent proposal of such transfer by the transferee—

"(i) the transferor has—

"(I) received from the transferee a statement of the transferee containing the information described in paragraph (3);

"(II) verified the identity of the transferee by examining the identification document presented;

"(III) within 1 day after the transferee furnishes the statement, provided notice of the contents of the statement to the chief law enforcement officer of the place of residence of the transferee; and

"(IV) within 1 day after the transferee furnishes the statement, transmitted a copy of the statement

ATF000135

PUBLIC LAW 103–159—NOV. 30, 1993      107 STAT. 1537

to the chief law enforcement officer of the place of residence of the transferee; and

"(ii)(I) 5 business days (meaning days on which State offices are open) have elapsed from the date the transferor furnished notice of the contents of the statement to the chief law enforcement officer, during which period the transferor has not received information from the chief law enforcement officer that receipt or possession of the handgun by the transferee would be in violation of Federal, State, or local law; or

"(II) the transferor has received notice from the chief law enforcement officer that the officer has no information indicating that receipt or possession of the handgun by the transferee would violate Federal, State, or local law;

"(B) the transferee has presented to the transferor a written statement, issued by the chief law enforcement officer of the place of residence of the transferee during the 10-day period ending on the date of the most recent proposal of such transfer by the transferee, stating that the transferee requires access to a handgun because of a threat to the life of the transferee or of any member of the household of the transferee;

"(C)(i) the transferee has presented to the transferor a permit that—

"(I) allows the transferee to possess or acquire a handgun; and

"(II) was issued not more than 5 years earlier by the State in which the transfer is to take place; and

"(ii) the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a handgun by the transferee would be in violation of the law;

"(D) the law of the State requires that, before any licensed importer, licensed manufacturer, or licensed dealer completes the transfer of a handgun to an individual who is not licensed under section 923, an authorized government official verify that the information available to such official does not indicate that possession of a handgun by the transferee would be in violation of law;

"(E) the Secretary has approved the transfer under section 5812 of the Internal Revenue Code of 1986; or

"(F) on application of the transferor, the Secretary has certified that compliance with subparagraph (A)(i)(III) is impracticable because—

"(i) the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025;

"(ii) the business premises of the transferor at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer; and

"(iii) there is an absence of telecommunications facilities in the geographical area in which the business premises are located.

"(2) A chief law enforcement officer to whom a transferor has provided notice pursuant to paragraph (1)(A)(i)(III) shall make a reasonable effort to ascertain within 5 business days whether

ATF000136

107 STAT. 1538          PUBLIC LAW 103–159—NOV. 30, 1993

receipt or possession would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General.

"(3) The statement referred to in paragraph (1)(A)(i)(I) shall contain only—

"(A) the name, address, and date of birth appearing on a valid identification document (as defined in section 1028(d)(1)) of the transferee containing a photograph of the transferee and a description of the identification used;

"(B) a statement that the transferee—

"(i) is not under indictment for, and has not been convicted in any court of, a crime punishable by imprisonment for a term exceeding 1 year;

"(ii) is not a fugitive from justice;

"(iii) is not an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act);

"(iv) has not been adjudicated as a mental defective or been committed to a mental institution;

"(v) is not an alien who is illegally or unlawfully in the United States;

"(vi) has not been discharged from the Armed Forces under dishonorable conditions; and

"(vii) is not a person who, having been a citizen of the United States, has renounced such citizenship;

"(C) the date the statement is made; and

"(D) notice that the transferee intends to obtain a handgun from the transferor.

"(4) Any transferor of a handgun who, after such transfer, receives a report from a chief law enforcement officer containing information that receipt or possession of the handgun by the transferee violates Federal, State, or local law shall, within 1 business day after receipt of such request, communicate any information related to the transfer that the transferor has about the transfer and the transferee to—

"(A) the chief law enforcement officer of the place of business of the transferor; and

"(B) the chief law enforcement officer of the place of residence of the transferee.

"(5) Any transferor who receives information, not otherwise available to the public, in a report under this subsection shall not disclose such information except to the transferee, to law enforcement authorities, or pursuant to the direction of a court of law.

"(6)(A) Any transferor who sells, delivers, or otherwise transfers a handgun to a transferee shall retain the copy of the statement of the transferee with respect to the handgun transaction, and shall retain evidence that the transferor has complied with subclauses (III) and (IV) of paragraph (1)(A)(i) with respect to the statement.

"(B) Unless the chief law enforcement officer to whom a statement is transmitted under paragraph (1)(A)(i)(IV) determines that a transaction would violate Federal, State, or local law—

Records.

"(i) the officer shall, within 20 business days after the date the transferee made the statement on the basis of which the notice was provided, destroy the statement, any record

ATF000137

containing information derived from the statement, and any record created as a result of the notice required by paragraph (1)(A)(i)(III);

"(ii) the information contained in the statement shall not be conveyed to any person except a person who has a need to know in order to carry out this subsection; and

"(iii) the information contained in the statement shall not be used for any purpose other than to carry out this subsection.

"(C) If a chief law enforcement officer determines that an individual is ineligible to receive a handgun and the individual requests the officer to provide the reason for such determination, the officer shall provide such reasons to the individual in writing within 20 business days after receipt of the request.

"(7) A chief law enforcement officer or other person responsible for providing criminal history background information pursuant to this subsection shall not be liable in an action at law for damages—

"(A) for failure to prevent the sale or transfer of a handgun to a person whose receipt or possession of the handgun is unlawful under this section; or

"(B) for preventing such a sale or transfer to a person who may lawfully receive or possess a handgun.

"(8) For purposes of this subsection, the term 'chief law enforcement officer' means the chief of police, the sheriff, or an equivalent officer or the designee of any such individual.

"(9) The Secretary shall take necessary actions to ensure that the provisions of this subsection are published and disseminated to licensed dealers, law enforcement officials, and the public.".

<div style="float:right">Publication.<br>Public<br>information.</div>

(2) HANDGUN DEFINED.—Section 921(a) of title 18, United States Code, is amended by adding at the end the following:

"(29) The term 'handgun' means—

"(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and

"(B) any combination of parts from which a firearm described in subparagraph (A) can be assembled.".

(b) PERMANENT PROVISION.—Section 922 of title 18, United States Code, as amended by subsection (a)(1), is amended by adding at the end the following:

<div style="float:right">Effective date.</div>

"(t)(1) Beginning on the date that is 30 days after the Attorney General notifies licensees under section 103(d) of the Brady Handgun Violence Prevention Act that the national instant criminal background check system is established, a licensed importer, licensed manufacturer, or licensed dealer shall not transfer a firearm to any other person who is not licensed under this chapter, unless—

"(A) before the completion of the transfer, the licensee contacts the national instant criminal background check system established under section 103 of that Act;

"(B)(i) the system provides the licensee with a unique identification number; or

"(ii) 3 business days (meaning a day on which State offices are open) have elapsed since the licensee contacted the system, and the system has not notified the licensee that the receipt of a firearm by such other person would violate subsection (g) or (n) of this section; and

"(C) the transferor has verified the identity of the transferee by examining a valid identification document (as defined in

ATF000138

107 STAT. 1540          PUBLIC LAW 103–159—NOV. 30, 1993

section 1028(d)(1) of this title) of the transferee containing a photograph of the transferee.

"(2) If receipt of a firearm would not violate section 922 (g) or (n) or State law, the system shall—

"(A) assign a unique identification number to the transfer;

"(B) provide the licensee with the number; and

Records.

"(C) destroy all records of the system with respect to the call (other than the identifying number and the date the number was assigned) and all records of the system relating to the person or the transfer.

"(3) Paragraph (1) shall not apply to a firearm transfer between a licensee and another person if—

"(A)(i) such other person has presented to the licensee a permit that—

"(I) allows such other person to possess or acquire a firearm; and

"(II) was issued not more than 5 years earlier by the State in which the transfer is to take place; and

"(ii) the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law;

"(B) the Secretary has approved the transfer under section 5812 of the Internal Revenue Code of 1986; or

"(C) on application of the transferor, the Secretary has certified that compliance with paragraph (1)(A) is impracticable because—

"(i) the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025;

"(ii) the business premises of the licensee at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer (as defined in subsection (s)(8)); and

"(iii) there is an absence of telecommunications facilities in the geographical area in which the business premises are located.

"(4) If the national instant criminal background check system notifies the licensee that the information available to the system does not demonstrate that the receipt of a firearm by such other person would violate subsection (g) or (n) or State law, and the licensee transfers a firearm to such other person, the licensee shall include in the record of the transfer the unique identification number provided by the system with respect to the transfer.

"(5) If the licensee knowingly transfers a firearm to such other person and knowingly fails to comply with paragraph (1) of this subsection with respect to the transfer and, at the time such other person most recently proposed the transfer, the national instant criminal background check system was operating and information was available to the system demonstrating that receipt of a firearm by such other person would violate subsection (g) or (n) of this section or State law, the Secretary may, after notice and opportunity for a hearing, suspend for not more than 6 months or revoke any license issued to the licensee under section 923, and may impose on the licensee a civil fine of not more than $5,000.

ATF000139

"(6) Neither a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages—

"(A) for failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful under this section; or

"(B) for preventing such a sale or transfer to a person who may lawfully receive or possess a firearm.".

(c) PENALTY.—Section 924(a) of title 18, United States Code, is amended—

(1) in paragraph (1), by striking "paragraph (2) or (3) of"; and

(2) by adding at the end the following:

"(5) Whoever knowingly violates subsection (s) or (t) of section 922 shall be fined not more than $1,000, imprisoned for not more than 1 year, or both.".

**SEC. 103. NATIONAL INSTANT CRIMINAL BACKGROUND CHECK SYSTEM.**

Computers.
Records.
Telecommunications.
18 USC 922 note.

(a) DETERMINATION OF TIMETABLES.—Not later than 6 months after the date of enactment of this Act, the Attorney General shall—

(1) determine the type of computer hardware and software that will be used to operate the national instant criminal background check system and the means by which State criminal records systems and the telephone or electronic device of licensees will communicate with the national system;

(2) investigate the criminal records system of each State and determine for each State a timetable by which the State should be able to provide criminal records on an on-line capacity basis to the national system; and

(3) notify each State of the determinations made pursuant to paragraphs (1) and (2).

(b) ESTABLISHMENT OF SYSTEM.—Not later than 60 months after the date of the enactment of this Act, the Attorney General shall establish a national instant criminal background check system that any licensee may contact, by telephone or by other electronic means in addition to the telephone, for information, to be supplied immediately, on whether receipt of a firearm by a prospective transferee would violate section 922 of title 18, United States Code, or State law.

(c) EXPEDITED ACTION BY THE ATTORNEY GENERAL.—The Attorney General shall expedite—

(1) the upgrading and indexing of State criminal history records in the Federal criminal records system maintained by the Federal Bureau of Investigation;

(2) the development of hardware and software systems to link State criminal history check systems into the national instant criminal background check system established by the Attorney General pursuant to this section; and

(3) the current revitalization initiatives by the Federal Bureau of Investigation for technologically advanced fingerprint and criminal records identification.

(d) NOTIFICATION OF LICENSEES.—On establishment of the system under this section, the Attorney General shall notify each licensee and the chief law enforcement officer of each State of

ATF000140

the existence and purpose of the system and the means to be used to contact the system.

(e) ADMINISTRATIVE PROVISIONS.—

(1) AUTHORITY TO OBTAIN OFFICIAL INFORMATION.—Notwithstanding any other law, the Attorney General may secure directly from any department or agency of the United States such information on persons for whom receipt of a firearm would violate subsection (g) or (n) of section 922 of title 18, United States Code or State law, as is necessary to enable the system to operate in accordance with this section. On request of the Attorney General, the head of such department or agency shall furnish such information to the system.

(2) OTHER AUTHORITY.—The Attorney General shall develop such computer software, design and obtain such telecommunications and computer hardware, and employ such personnel, as are necessary to establish and operate the system in accordance with this section.

(f) WRITTEN REASONS PROVIDED ON REQUEST.—If the national instant criminal background check system determines that an individual is ineligible to receive a firearm and the individual requests the system to provide the reasons for the determination, the system shall provide such reasons to the individual, in writing, within 5 business days after the date of the request.

(g) CORRECTION OF ERRONEOUS SYSTEM INFORMATION.—If the system established under this section informs an individual contacting the system that receipt of a firearm by a prospective transferee would violate subsection (g) or (n) of section 922 of title 18, United States Code or State law, the prospective transferee may request the Attorney General to provide the prospective transferee with the reasons therefor. Upon receipt of such a request, the Attorney General shall immediately comply with the request. The prospective transferee may submit to the Attorney General information to correct, clarify, or supplement records of the system with respect to the prospective transferee. After receipt of such information, the Attorney General shall immediately consider the information, investigate the matter further, and correct all erroneous Federal records relating to the prospective transferee and give notice of the error to any Federal department or agency or any State that was the source of such erroneous records.

Confidential information.

(h) REGULATIONS.—After 90 days' notice to the public and an opportunity for hearing by interested parties, the Attorney General shall prescribe regulations to ensure the privacy and security of the information of the system established under this section.

(i) PROHIBITION RELATING TO ESTABLISHMENT OF REGISTRATION SYSTEMS WITH RESPECT TO FIREARMS.—No department, agency, officer, or employee of the United States may—

(1) require that any record or portion thereof generated by the system established under this section be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or political subdivision thereof; or

(2) use the system established under this section to establish any system for the registration of firearms, firearm owners, or firearm transactions or dispositions, except with respect to persons, prohibited by section 922 (g) or (n) of title 18, United States Code or State law, from receiving a firearm.

(j) DEFINITIONS.—As used in this section:

ATF000141

PUBLIC LAW 103–159—NOV. 30, 1993       107 STAT. 1543

(1) LICENSEE.—The term "licensee" means a licensed importer (as defined in section 921(a)(9) of title 18, United States Code), a licensed manufacturer (as defined in section 921(a)(10) of that title), or a licensed dealer (as defined in section 921(a)(11) of that title).

(2) OTHER TERMS.—The terms "firearm", "handgun", "licensed importer", "licensed manufacturer", and "licensed dealer" have the meanings stated in section 921(a) of title 18, United States Code, as amended by subsection (a)(2).

(k) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated, which may be appropriated from the Violent Crime Reduction Trust Fund established by section 1115 of title 31, United States Code, such sums as are necessary to enable the Attorney General to carry out this section.

### SEC. 104. REMEDY FOR ERRONEOUS DENIAL OF FIREARM.

(a) IN GENERAL.—Chapter 44 of title 18, United States Code, is amended by inserting after section 925 the following new section:

### "§ 925A. Remedy for erroneous denial of firearm

"Any person denied a firearm pursuant to subsection (s) or (t) of section 922—

"(1) due to the provision of erroneous information relating to the person by any State or political subdivision thereof, or by the national instant criminal background check system established under section 103 of the Brady Handgun Violence Prevention Act; or

"(2) who was not prohibited from receipt of a firearm pursuant to subsection (g) or (n) of section 922,

may bring an action against the State or political subdivision responsible for providing the erroneous information, or responsible for denying the transfer, or against the United States, as the case may be, for an order directing that the erroneous information be corrected or that the transfer be approved, as the case may be. In any action under this section, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs.".

(b) TECHNICAL AMENDMENT.—The chapter analysis for chapter 44 of title 18, United States Code, is amended by inserting after the item relating to section 925 the following new item:

"925A. Remedy for erroneous denial of firearm.".

### SEC. 105. RULE OF CONSTRUCTION.

18 USC 921 note.

This Act and the amendments made by this Act shall not be construed to alter or impair any right or remedy under section 552a of title 5, United States Code.

### SEC. 106. FUNDING FOR IMPROVEMENT OF CRIMINAL RECORDS.

(a) USE OF FORMULA GRANTS.—Section 509(b) of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3759(b)) is amended—

(1) in paragraph (2) by striking "and" after the semicolon;

(2) in paragraph (3) by striking the period and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(4) the improvement of State record systems and the sharing with the Attorney General of all of the records described in paragraphs (1), (2), and (3) of this subsection and the records

ATF000142

107 STAT. 1544          PUBLIC LAW 103–159—NOV. 30, 1993

18 USC 922 note.

required by the Attorney General under section 103 of the Brady Handgun Violence Prevention Act, for the purpose of implementing that Act.".

(b) ADDITIONAL FUNDING.—

(1) GRANTS FOR THE IMPROVEMENT OF CRIMINAL RECORDS.—The Attorney General, through the Bureau of Justice Statistics, shall, subject to appropriations and with preference to States that as of the date of enactment of this Act have the lowest percent currency of case dispositions in computerized criminal history files, make a grant to each State to be used—

(A) for the creation of a computerized criminal history record system or improvement of an existing system;

(B) to improve accessibility to the national instant criminal background system; and

(C) upon establishment of the national system, to assist the State in the transmittal of criminal records to the national system.

(2) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated for grants under paragraph (1), which may be appropriated from the Violent Crime Reduction Trust Fund established by section 1115 of title 31, United States Code, a total of $200,000,000 for fiscal year 1994 and all fiscal years thereafter.

# TITLE II—MULTIPLE FIREARM PURCHASES TO STATE AND LOCAL POLICE

SEC. 201. REPORTING REQUIREMENT.

Section 923(g)(3) of title 18, United States Code, is amended—

(1) in the second sentence by inserting after "thereon," the following: "and to the department of State police or State law enforcement agency of the State or local law enforcement agency of the local jurisdiction in which the sale or other disposition took place,";

(2) by inserting "(A)" after "(3)"; and

(3) by adding at the end thereof the following:

Records.

"(B) Except in the case of forms and contents thereof regarding a purchaser who is prohibited by subsection (g) or (n) of section 922 of this title from receipt of a firearm, the department of State police or State law enforcement agency or local law enforcement agency of the local jurisdiction shall not disclose any such form or the contents thereof to any person or entity, and shall destroy each such form and any record of the contents thereof no more than 20 days from the date such form is received. No later than the date that is 6 months after the effective date of this subparagraph, and

Certification.

at the end of each 6-month period thereafter, the department of State police or State law enforcement agency or local law enforcement agency of the local jurisdiction shall certify to the Attorney General of the United States that no disclosure contrary to this subparagraph has been made and that all forms and any record of the contents thereof have been destroyed as provided in this subparagraph.".

ATF000143

PUBLIC LAW 103–159—NOV. 30, 1993      107 STAT. 1545

# TITLE III—FEDERAL FIREARMS LICENSE REFORM

Federal
Firearms
License Reform
Act of 1993.

### SEC. 301. SHORT TITLE.

This title may be cited as the "Federal Firearms License Reform Act of 1993".

18 USC 921 note.

### SEC. 302. PREVENTION OF THEFT OF FIREARMS.

(a) COMMON CARRIERS.—Section 922(e) of title 18, United States Code, is amended by adding at the end the following: "No common or contract carrier shall require or cause any label, tag, or other written notice to be placed on the outside of any package, luggage, or other container that such package, luggage, or other container contains a firearm.".

(b) RECEIPT REQUIREMENT.—Section 922(f) of title 18, United States Code, is amended—

(1) by inserting "(1)" after "(f)"; and

(2) by adding at the end the following new paragraph:

"(2) It shall be unlawful for any common or contract carrier to deliver in interstate or foreign commerce any firearm without obtaining written acknowledgement of receipt from the recipient of the package or other container in which there is a firearm.".

(c) UNLAWFUL ACTS.—Section 922 of title 18, United States Code, as amended by section 102, is amended by adding at the end the following new subsection:

"(u) It shall be unlawful for a person to steal or unlawfully take or carry away from the person or the premises of a person who is licensed to engage in the business of importing, manufacturing, or dealing in firearms, any firearm in the licensee's business inventory that has been shipped or transported in interstate or foreign commerce.".

(d) PENALTIES.—Section 924 of title 18, United States Code, is amended by adding at the end the following new subsection:

"(i)(1) A person who knowingly violates section 922(u) shall be fined not more than $10,000, imprisoned not more than 10 years, or both.

"(2) Nothing contained in this subsection shall be construed as indicating an intent on the part of Congress to occupy the field in which provisions of this subsection operate to the exclusion of State laws on the same subject matter, nor shall any provision of this subsection be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this subsection.".

### SEC. 303. LICENSE APPLICATION FEES FOR DEALERS IN FIREARMS.

Section 923(a)(3) of title 18, United States Code, is amended—

(1) in subparagraph (A), by adding "or" at the end;

(2) in subparagraph (B) by striking "a pawnbroker dealing in firearms other than" and inserting "not a dealer in";

ATF000144

107 STAT. 1546          PUBLIC LAW 103–159—NOV. 30, 1993

      (3) in subparagraph (B) by striking "$25 per year; or" and inserting "$200 for 3 years, except that the fee for renewal of a valid license shall be $90 for 3 years."; and
      (4) by striking subparagraph (C).

Approved November 30, 1993.

LEGISLATIVE HISTORY—H.R. 1025 (S. 414):

HOUSE REPORTS: Nos. 103–344 (Comm. on the Judiciary) and 103–412
      (Comm. of Conference).
CONGRESSIONAL RECORD, Vol. 139 (1993):
    Nov. 10, considered and passed House.
    Nov. 19, 20, considered and passed Senate, amended, in lieu of S. 414.
    Nov. 23, House agreed to conference report.
    Nov. 24, Senate agreed to conference report.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 29 (1993):
    Nov. 30, Presidential remarks.

ATF000145

in disaster surveys, documentation, and processing would be reduced.

The disadvantages are:

(1) States with larger highway programs could lose some ER funding as the higher disaster eligibility threshold in these States might eliminate some disasters which would have qualified for funding under the current threshold; and

(2) The FHWA would be required to track States with different disaster eligibility thresholds, resulting in more review time and paperwork.

Commenters are invited to present their views on the options discussed above. In addition, the FHWA welcomes other suggestions concerning the current dollar threshold and appropriate methods to update this threshold.

## Rulemaking Analyses and Notices

### Executive Order 12866 (Regulatory Planning and Review) and DOT Regulatory Policies and Procedures

The FHWA has determined preliminarily that any action taken regarding the disaster eligibility threshold will not be a significant regulatory action within the meaning of Executive Order 12866 or significant within the meaning of the Department of Transportation's regulatory policies and procedures. It is anticipated that the economic impact of any action taken in this rulemaking will be minimal. Any changes are not anticipated to adversely affect, in a material way, any sector of the economy. In addition, any changes are not likely to interfere with any action taken or planned by another agency or materially alter the budgetary impact of any entitlement, grants, user fees, or loan programs.

The FHWA emphasizes, however, that this document is published to generate discussion and comments which may be used in formulating specific proposals for the revision of a section of the current regulation dealing with disaster eligibility determinations for ER funding. It is not anticipated that these changes will affect the total Federal funding available under the ER program. Consequently, a full regulatory evaluation is not required. In any event, we strongly encourage and will actively consider comments on this matter, as well as other issues relating to the projected impact of actions contemplated in this ANPRM.

### Regulatory Flexibility Act

In compliance with the Regulatory Flexibility Act (5 U.S.C. 601–612), the FHWA will evaluate the effects of any action proposed on small entities. This ANPRM will only generate comments

and discussions on one of the disaster eligibility criteria used for providing emergency relief assistance to States in accordance with the existing laws, regulations and guidance. Thus, it would be premature to assess the economic impact of any action that might be contemplated. Because the States are not included in the definition of "small entity" set forth in 5 U.S.C. 601, we do not anticipate that any adjustment to the disaster eligibility threshold that might be considered would have a substantial economic impact on small entities within the meaning of the Regulatory Flexibility Act. We encourage commenters to evaluate any options addressed here with regard to their potential for impact, however, and to formulate their comments accordingly.

### Executive Order 12612 (Federalism Assessment)

Any action that might be proposed in subsequent stages of this proceeding will be analyzed in accordance with the principles and criteria contained in Executive Order 12612. Given the nature of the issues involved in this proceeding, the FHWA anticipates that any action contemplated will not have sufficient federalism implications to warrant the preparation of a federalism assessment. Nor does the FHWA anticipate that any action taken would preempt any State law or State regulation or affect the States' ability to discharge traditional State governmental functions. We encourage commenters to consider these issues, however, as well as matters concerning any costs or burdens that might be imposed on the States as a result of actions considered here.

### Executive Order 12372 (Intergovernmental Review)

Catalog of Federal Domestic Assistance Program Number 20.205, Highway Planning and Construction. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities apply to this program.

### Paperwork Reduction Act

Any action that might be contemplated in subsequent phases of this proceeding is not likely to involve a collection of information requirement for the purposes of the Paperwork Reduction Act of 1995, 44 U.S.C. 3501–3500, or information collection requirements not already approved for the ER program. The FHWA, however, will evaluate any actions that might be

considered in accordance with the terms of the Paperwork Reduction Act.

### National Environmental Policy Act

The agency also will analyze any action that might be proposed for the purpose of the National Environmental Policy Act of 1969 (42 U.S.C. 4321–4347) to assess whether there would be any effect on the quality of the environment.

### Regulation Identification Number

A regulation identification number (RIN) is assigned to each regulatory action listed in the Unified Agenda of Federal Regulations. The Regulatory Information Service Center publishes the Unified Agenda in April and October of each year. The RIN number contained in the heading of this document can be used to cross reference this action with the Unified Agenda.

### List of Subjects in 23 CFR Part 668

Emergency relief program, Grant programs-transportation, Highways and roads.

**Authority:** 23 U.S.C. 315; 23 U.S.C. 101; 23 U.S.C. 120(e); 23 U.S.C. 125; 49 CFR 1.48(6).

Issued on: February 11, 1998.

Kenneth R. Wykle,
*Administrator, Federal Highway Administration.*

[FR Doc. 98–4172 Filed 2–18–98; 8:45 am]
BILLING CODE 4910-22-P

## DEPARTMENT OF THE TREASURY

### Bureau of Alcohol, Tobacco and Firearms

**27 CFR Parts 178 and 179**

[Notice No. 857]

RIN: 1512-AB67

### Implementation of Public Law 103–159, Relating to the Permanent Provisions of the Brady Handgun Violence Prevention Act (93F–057P)

**AGENCY:** Bureau of Alcohol, Tobacco and Firearms (ATF), Department of the Treasury.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Bureau of Alcohol, Tobacco and Firearms (ATF) is proposing to amend the regulations to implement the provisions of Public Law 103–159, relating to the permanent provisions of the Brady Handgun Violence Prevention Act. These proposed regulations implement the law by requiring, with some exceptions, a licensed firearms importer, manufacturer, or dealer to contact the

in addition to the unique identification number (if any) provided by the system, on the firearms transaction record (ATF Form 4473). The proposed regulations also require that licensees maintain a copy of each Form 4473 for which a NICS transaction number has been received, regardless of whether the transfer of the firearm was completed. This will enable ATF to determine compliance with the law by licensees and purchasers.

*Exceptions to NICS*

The statute provides the following exceptions to the national instant background check system:

1. The transferee presents to the licensee a permit which was issued not more than 5 years earlier by the State in which the transfer is to take place and which allows the transferee to possess or acquire a firearm, and the law of the State provides that such a permit is to be issued only after an authorized government official has verified that available information does not indicate that possession of a firearm by the transferee would be in violation of the law;

2. Purchases of firearms which are subject to the National Firearms Act and which have been approved for transfer under 27 CFR Part 179 (Machine Guns, Destructive Devices, and Certain Other Firearms); or

3. Purchases of firearms for which the Secretary has certified that compliance with NICS is impracticable because the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025 (i.e., 25 officers per 10,000 square miles), the premises of the licensee are remote in relation to the chief law enforcement officer of the area, and there is an absence of telecommunications facilities in the geographical area in which the business premises are located.

Proposed regulations which implement these provisions of the law are set forth in §§ 178.102(d), 178.131, and 178.150.

It should be noted that State "instant check" and "point of sale check" systems will not qualify as alternatives to the NICS check required by the permanent provisions of the Brady law. Therefore, NICS checks must be conducted on firearms purchasers in those States.

With respect to purchases of firearms which are subject to the National Firearms Act, ATF is proposing to amend § 179.86 to provide that in addition to any other records checks that may be conducted to determine

whether the transfer, receipt, or possession of a firearm would place the transferee in violation of law, the Director must contact NICS.

*Permits*

The Brady law provides that a licensee is not required to initiate a NICS check where the purchaser presents a permit that allows the purchaser to "possess or acquire a firearm." The proposed regulations clarify that this exception includes permits to carry concealed weapons as well as permits specifically authorizing the purchase of a firearm.

For purposes of the permanent provisions of the Brady law, it is irrelevant whether the permit covers the type of firearm that is being purchased. For example, a licensee need not initiate a NICS check where an individual who wishes to purchase a rifle presents a handgun permit, as long as that permit meets all the requirements of the Brady law. The critical issue is not the type of firearm for which the permit was issued, but whether the State has conducted a background check on that individual to ensure that the individual is not prohibited from possessing a firearm. Of course, all such transactions must still comply with State law.

*NICS Checks in Conjunction With the Issuance of Permits*

The law provides that the permit must have been issued not more than 5 years earlier by the State in which the transfer is to take place. Furthermore, the permit is a valid alternative under the Brady law only if the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law.

In construing the language of the statute, it is ATF's position that as of November 30, 1998, "the information available to" State officials will include the NICS database. Accordingly, the proposed regulations provide that permits issued on or after November 30, 1998, will be valid alternatives under the permanent provisions of the Brady law only if the State officials conduct a NICS check on all permit applicants. It should be noted that the NICS database will provide a more extensive background check of the purchaser than other record systems containing only criminal records. NICS will include records from the Defense Department concerning dishonorable discharges, records from the State Department regarding individuals who have

renounced United States citizenship, and other information not available in criminal records.

*Permits Issued to Persons Prohibited Under Federal Law*

The proposed regulations provide that a permit would be a valid alternative only if the issuing State verifies that possession of a firearm by the permittee would not be in violation of Federal, State, or local law. There may be States that would issue a permit to individuals (such as persons who have renounced United States citizenship or persons convicted of a misdemeanor crime of domestic violence) even though these individuals are subject to Federal firearms disabilities. If a State does not disqualify all individuals prohibited under Federal law, the permits issued by that State would not be accepted as alternatives under the permanent provisions of the Brady law. Prior to the effective date of the permanent provisions of the Brady law, ATF will notify licensees in each State whether or not permits issued by that State will suffice as alternatives under the Brady law.

*Pawn Transactions*

The permanent provisions of the Brady law apply to any transfer of a firearm by a licensed importer, manufacturer, or dealer to a nonlicensee. This includes the redemption of a pawned firearm. It should be noted that the Violent Crime Control and Law Enforcement Act of 1994, Public Law 103–322, amended § 922(s) of the GCA to exempt transactions involving the return of a handgun to the person from whom it was received. Thus, the redemption of a pawned handgun by the person from whom it was received is not subject to the waiting period and background check requirements imposed by the interim provisions of the Brady law. However, no such exemption appears in § 922(t). Thus, the proposed regulations would apply the permanent provisions of the Brady law to pawn transactions.

*Firearms Transaction Record (Form 4473)*

In general, the regulations provide that prior to the transfer of a firearm to a prospective purchaser, the buyer must complete, sign, and date a firearms transaction record, Form 4473. The form requests certain information, including the transferee's name, sex, height, weight, race, residence address, date of birth, and place of birth. ATF is proposing to amend the regulations to solicit additional optional information about the purchaser, such as the

**8382**        Federal Register / Vol. 63, No. 33 / Thursday, February 19, 1998 / Proposed Rules

transferee's social security number and alien registration number (if applicable), to facilitate the transfer of a firearm.

ATF believes this additional information will help minimize the misidentification of firearms purchasers as felons or other prohibited persons whose receipt and possession would violate the law. For example, by providing a social security number, the transferee might avoid confusion with a prohibited buyer who has the same name and date of birth as the transferee. This would clearly help expedite the transfer. ATF would note that ATF Form 5300.35, Statement of Intent to Obtain a Handgun (Brady form), currently requests the purchaser's social security number and alien registration number as optional information. Because the NICS check will be based upon information from the Form 4473, the proposed regulations would not require firearms purchasers to fill out a separate Brady form.

*Executive Order 12866*

It has been determined that this proposed regulation is not a significant regulatory action as defined by Executive Order 12866. Therefore, a Regulatory Assessment is not required.

*Regulatory Flexibility Act*

It is hereby certified that these proposed regulations will not have a significant economic impact on a substantial number of small entities. The revenue effects of this rulemaking on small businesses flow directly from the underlying statute. Likewise, any secondary or incidental effects, and any reporting, recordkeeping, or other compliance burdens flow directly from the statute. Accordingly, a regulatory flexibility analysis is not required.

*Paperwork Reduction Act*

The collections of information contained in this notice of proposed rulemaking have been submitted to the Office of Management and Budget (OMB) for review in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)). Comments on the collections of information should be sent to the Office of Management and Budget, Attention: Desk Officer for the Department of the Treasury/Bureau of Alcohol, Tobacco and Firearms (ATF), Office of Information and Regulatory Affairs, Washington, D.C., with copies to the Chief, Document Services Branch, Room 3450, Bureau of Alcohol, Tobacco and Firearms, 650 Massachusetts Avenue, NW., Washington, DC 20226. Comments are specifically requested concerning:

Whether the proposed collections of information are necessary for the proper performance of the functions of ATF, including whether the information will have practical utility;

The accuracy of the estimated burden associated with the proposed collections of information (see below);

How the quality, utility, and clarity of the information to be collected may be enhanced; and

How the burden of complying with the proposed collections of information may be minimized, including through the application of automated collection techniques or other forms of information technology.

The collections of information in this proposed regulation are in §§ 178.102, 178.124(c), 178.125(e), 178.129(b), 178.131, and 178.150. This information is required to implement the provisions of Public Law 103–159, relating to the permanent provisions of the Brady Handgun Violence Prevention Act. The collections of information are required to ensure compliance with the law. The likely respondents and/or recordkeepers are individuals and businesses.

*Estimated number of respondents:* 10,273,851.

*Estimated total annual reporting and/ or recordkeeping burden:* 199,357 hours.

*Estimated average annual burden per respondent and/or recordkeeper:* 1.16 minutes.

Section 178.102 requires, with some exceptions, licensees to contact NICS before transferring any firearm to an unlicensed individual. The estimated total annual reporting and/or recordkeeping burden associated with this requirement is 112,978 hours. Section 178.124(c) requires licensees to record on Form 4473 the date the licensee contacts NICS and any identification number provided by NICS. The licensee must also verify the identity of the person acquiring the firearm by examining an identification document presented by the transferee. Form 4473 will include certain optional information about the purchaser, such as the person's social security number and alien registration number. The estimated total annual reporting and/or recordkeeping burden associated with this requirement is 53,549 hours. Section 178.125(e) requires licensees to include in their records of disposition the identification number provided by NICS. The estimated total annual reporting and/or recordkeeping burden associated with this requirement is 18,444 hours. Section 178.129(b) requires licensees to retain a completed Form 4473 for a period of not less than 5 years where the transfer of a firearm is not made. The estimated total annual

recordkeeping burden associated with this requirement is 553 hours. Section 178.131 requires licensees to maintain certain records for firearms transactions not subject to a NICS check. The estimated annual recordkeeping burden associated with this requirement is 13,833 hours. Section 178.150 provides for an alternative to NICS in certain geographical locations. Licensees must submit a written application to the Director containing certain information. The same requirement currently applies to the waiting period provision of the Brady law for transfers of handguns. Since this requirement was established in 1994, no licensee has qualified for an exception from the provisions of Brady based on geographical location. As such, ATF does not believe that there is any reporting and/or recordkeeping burden associated with the requirements of § 178.150 with regard to NICS.

Certain collections of information contained in § 178.129(b), previously approved under control numbers 1512–0520, 1512–0006, and 1512–0524, are merely being redesignated as § 178.129(c) in this notice of proposed rulemaking. Similarly, the collections of information in § 178.129(c), (d), and (e), previously approved under control numbers 1512–0129 and 1512–0526, are being redesignated as § 178.129(d), (e), and (f) in the proposed regulation.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number assigned by the Office of Management and Budget.

*Public Participation*

ATF requests comments on the proposed regulations from all interested persons. Comments received on or before the closing date will be carefully considered. Comments received after that date will be given the same consideration if it is practical to do so, but assurance of consideration cannot be given except as to comments received on or before the closing date.

ATF will not recognize any material in comments as confidential. Comments may be disclosed to the public. Any material which the commenter considers to be confidential or inappropriate for disclosure to the public should not be included in the comment. The name of the person submitting a comment is not exempt from disclosure.

Any interested person who desires an opportunity to comment orally at a public hearing should submit his or her request, in writing, to the Director within the 90-day comment period. The Director, however, reserves the right to

ATF000148

determine, in light of all circumstances, whether a public hearing is necessary.

*Disclosure*

Copies of this notice and the written comments will be available for public inspection during normal business hours at: ATF Public Reading Room, Room 6480, 650 Massachusetts Avenue, NW., Washington, DC.

Drafting Information: The author of this document is James P. Ficaretta, Regulations Division, Bureau of Alcohol, Tobacco and Firearms.

List of Subjects in 27 CFR Parts 178 and 179

Administrative practice and procedure, Arms and munitions, Authority delegations, Customs duties and inspection, Exports, Imports, Military personnel, Penalties, Reporting and recordkeeping requirements, Research, Seizures and forfeitures, Transportation.

*Authority and Issuance*

Accordingly, 27 CFR Parts 178 and 179 are amended as follows:

PART 178—COMMERCE IN FIREARMS AND AMMUNITION

1. The authority citation for 27 CFR Part 178 continues to read as follows:

Authority: 5 U.S.C. 552(a); 18 U.S.C. 847, 921–930; 44 U.S.C. 3504(h).

2. Section 178.11 is amended by adding a definition for "NICS" to read as follows:

§ 178.11  Meaning of terms.
*    *    *    *    *

*NICS.* The National Instant Criminal Background Check System established by the Attorney General pursuant to 18 U.S.C. 922(t).
*    *    *    *    *

3. Section 178.96 is amended by revising the first sentence in paragraph (b), and by revising paragraph (c) to read as follows:

§ 178.96  Out-of-State and mail order sales.
*    *    *    *    *

(b) A licensed importer, licensed manufacturer, or licensed dealer may sell a firearm that is not subject to the provisions of § 178.102(a) to a nonlicensee who does not appear in person at the licensee's business premises if the nonlicensee is a resident of the same State in which the licensee's business premises are located, and the nonlicensee furnishes to the licensee the firearms transaction record, Form 4473, required by § 178.124. *  *  *

(c)(1) A licensed importer, licensed manufacturer, or licensed dealer may

sell or deliver a rifle or shotgun, and a licensed collector may sell or deliver a rifle or shotgun that is a curio or relic, to a nonlicensed resident of a State other than the State in which the licensee's place of business is located if—

(i) The purchaser meets with the licensee in person at the licensee's premises to accomplish the transfer, sale, and delivery of the rifle or shotgun;

(ii) The licensed importer, licensed manufacturer, or licensed dealer complies with the provisions of § 178.102;

(iii) The purchaser furnishes to the licensed importer, licensed manufacturer, or licensed dealer the firearms transaction record, Form 4473, required by § 178.124; and

(iv) The sale, delivery, and receipt of the rifle or shotgun fully comply with the legal conditions of sale in both such States.

(2) For purposes of paragraph (c) of this section, any licensed manufacturer, licensed importer, or licensed dealer is presumed, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both such States.

4. Section 178.97 is revised to read as follows:

§ 178.97  Loan or rental of firearms.

(a) A licensee may lend or rent a firearm to any person for temporary use off the premises of the licensee for lawful sporting purposes: *Provided,* That the delivery of the firearm to such person is not prohibited by § 178.99(b) or § 178.99(c), the licensee complies with the requirements of § 178.102, and the licensee records such loan or rental in the records required to be kept by him under Subpart H of this part.

(b) A club, association, or similar organization temporarily furnishing firearms (whether by loan, rental, or otherwise) to participants in a skeet, trap, target, or similar shooting activity for use at the time and place such activity is held does not, unattended by other circumstances, cause such club, association, or similar organization to be engaged in the business of a dealer in firearms or as engaging in firearms transactions. Therefore, the licensing and recordkeeping requirements contained in this part pertaining to firearms transactions would not apply to this temporary furnishing of firearms for use on premises on which such an activity is conducted.

5. Section 178.102 is revised to read as follows:

§ 178.102  Sales or deliveries of firearms on and after November 30, 1998.

(a) *Background check.* Except as provided in paragraph (d) of this section, a licensed importer, licensed manufacturer, or licensed dealer shall not sell, deliver, or transfer a firearm to any other person who is not licensed under this part unless—

(1) Before the completion of the transfer, the licensee has contacted NICS;

(2)(i) NICS informs the licensee that it has no information that receipt of the firearm by the transferee would be in violation of Federal or State law and provides the licensee with a unique identification number; or

(ii) Three business days (meaning days on which State offices are open) have elapsed from the date the licensee contacted NICS and NICS has not notified the licensee that receipt of the firearm by the transferee would be in violation of law; and

(3) The licensee verifies the identity of the transferee by examining the identification document presented in accordance with the provisions of § 178.124(c).

(b) *Unique identification number.* In any transaction for which a licensee receives a unique identification number from NICS, such number shall be recorded on a firearms transaction record, Form 4473, which shall be retained in the records of the licensee in accordance with the provisions of § 178.129. This applies regardless of whether the transaction is approved or denied by NICS, and regardless of whether the firearm is actually transferred.

(c) *Time limitation on NICS checks.* A NICS check conducted in accordance with paragraph (a) of this section may be relied upon by the licensee only for use in a single transaction, and for a period not to exceed 30 calendar days. If the transaction is not completed within the 30-day period, the licensee shall initiate a new NICS check prior to completion of the transfer.

*Example 1.* A purchaser completes the Form 4473 on December 15, 1998, and a NICS check is initiated by the licensee on that date. The licensee is informed by NICS that the information available to the system does not indicate that receipt of the firearm by the transferee would be in violation of law, and a unique identification number is provided. However, the State imposes a 7-day waiting period on all firearms transactions, and the purchaser does not return to pick up the firearm until January 22, 1999. The licensee must conduct another NICS check before transferring the firearm to the purchaser.

*Example 2.* A purchaser completes the Form 4473 on January 25, 1999, and arranges

for the purchase of a single firearm. A NICS check is initiated by the licensee on that date. The licensee is informed by NICS that the information available to the system does not indicate that receipt of the firearm by the transferee would be in violation of law, and a unique identification number is provided. The State imposes a 7-day waiting period on all firearms transactions, and the purchaser returns to pick up the firearm on February 15, 1999. Before the licensee completes Section B of the Form 4473, the purchaser decides to purchase an additional firearm. The transfer of these two firearms is considered a single transaction; accordingly, the licensee may add the second firearm to the Form 4473, and transfer that firearm without conducting another NICS check.

*Example 3.* A purchaser completes a Form 4473 on February 15, 1999. The licensee receives a unique identification number from NICS on that date, Section B of the Form 4473 is completed by the licensee, and the firearm is transferred. On February 20, 1999, the purchaser returns to the licensee's premises and wishes to purchase a second firearm. The purchase of the second firearm is a separate transaction; thus, a new NICS check must be initiated by the licensee.

(d) *Exceptions to NICS check.* The provisions of paragraph (a) of this section shall not apply if—

(1) The transferee has presented to the licensee a permit or license that—

(i) Allows the transferee to possess, acquire, or carry a firearm;

(ii) Was issued not more than 5 years earlier by the State in which the transfer is to take place; and

(iii) The law of the State provides that such a permit or license is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by the transferee would be in violation of Federal, State, or local law: *Provided,* That on and after November 30, 1998, the information available to such official includes the NICS;

(2) The firearm is subject to the provisions of the National Firearms Act and has been approved for transfer under 27 CFR Part 179; or

(3) On application of the licensee, in accordance with the provisions of § 178.150, the Director has certified that compliance with paragraph (a)(1) of this section is impracticable.

(e) The document referred to in paragraph (d)(1) of this section (or a copy thereof) shall be retained or the required information from the document shall be recorded on the firearms transaction record in accordance with the provisions of § 178.131.

6. Section 178.124 is amended by revising paragraph (c), by removing "paragraph (c)(1)(ii)" in paragraphs (d) and (e) and adding in its place "paragraph (c)(3)(iii)", and by revising the first sentence in paragraph (f) to read as follows:

§ 178.124 Firearms transaction record.

* * * * *

(c)(1) Prior to making an over-the-counter transfer of a firearm to a nonlicensee who is a resident of the State in which the licensee's business premises is located, the licensed importer, licensed manufacturer, or licensed dealer so transferring the firearm shall obtain a Form 4473 from the transferee showing the transferee's name, sex, residence address (including county or similar political subdivision), date and place of birth; height, weight and race of the transferee; whether the transferee is a citizen of the United States; the transferee's State of residence; and certification by the transferee that the transferee is not prohibited by the Act from transporting or shipping a firearm in interstate or foreign commerce or receiving a firearm which has been shipped or transported in interstate or foreign commerce or possessing a firearm in or affecting commerce.

(2) In order to facilitate the transfer of a firearm and enable NICS to verify the identity of the person acquiring the firearm, ATF Form 4473 also requests certain optional information. This information includes the transferee's social security number and alien registration number (if applicable). Such information may help avoid the possibility of the transferee being misidentified as a felon or other prohibited person.

(3) The licensee shall identify the firearm to be transferred by listing on the Form 4473 the name of the manufacturer, the name of the importer (if any), the type, model, caliber or gauge, and the serial number of the firearm. After the transferee has executed the Form 4473, but before transferring the firearm described on the Form 4473, the licensee:

(i) Shall comply with the requirements of § 178.102 and record on the form the date on which the licensee contacted the NICS, as well as any response provided by the system, including any identification number provided by the system;

(ii) Shall verify the identity of the transferee by examining the identification document (as defined in § 178.11) presented, and shall note on the Form 4473 the type of identification used;

(iii) Shall, in the case of a transferee who is an alien legally in the United States, cause the transferee to present documentation establishing that the transferee is a resident of the State (as defined in § 178.11) in which the licensee's business premises is located, and shall note on the form the documentation used. Examples of acceptable documentation include utility bills or a lease agreement which show that the transferee has resided in the State continuously for at least 90 days prior to the transfer of the firearm; and

(iv) Shall sign and date the form if the licensee does not know or have reasonable cause to believe that the transferee is disqualified by law from receiving the firearm.

* * * * *

(f) Form 4473 shall be submitted, in duplicate, to a licensed importer, licensed manufacturer, or licensed dealer by a transferee who is purchasing or otherwise acquiring a firearm by other than an over-the-counter transaction, who is not subject to the provisions of § 178.102(a), and who is a resident of the State in which the licensee's business premises are located.
* * *

* * * * *

7. Section 178.124a is amended by removing the period at the end of the introductory text of paragraph (e) and adding in its place a colon.

8. Section 178.125(e) is amended by revising the text following the eighth sentence to read as follows:

§ 178.125 Record of receipt and disposition.

* * * * *

(e) *Firearms receipt and disposition by dealers.* * * * The record shall show the date of the sale or other disposition of each firearm, the name and address of the person to whom the firearm is transferred, or the name and license number of the person to whom transferred if such person is a licensee, or the firearms transaction record, Form 4473, serial number if the licensed dealer transferring the firearm serially numbers the Forms 4473 and files them numerically, and the identification number (if any) provided by the NICS. The format required for the record of receipt and disposition of firearms is as follows:

FIREARMS ACQUISITION AND DISPOSITION RECORD

| Description of firearm | | | | | Receipt | | | Disposition | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Manufacturer and/or Importer | Model | Serial No. | Type | Caliber or gauge | Date | Name and address or name and license No. | Date | Name | Address or license No. if license, or Form 4473 Serial No. if forms 4473 filed numerically | Identification No. provided by NICS (if any) |  |

9. Section 178.129 is amended by revising paragraph (b), by redesignating paragraphs (c), (d), and (e) as paragraphs (d), (e), and (f), by adding new paragraph (c), and by revising the parenthetical text at the end of the section to read as follows:

§ 178.129   Record retention.

*   *   *   *   *

(b) *Firearms transaction record.* Licensees shall retain each Form 4473 and Form 4473(LV) for a period of not less than 20 years after the date of sale or disposition. Where a licensee has received a transaction number from NICS for a proposed firearms transaction, but the sale, delivery, or transfer of the firearm is not made, the licensee shall record the transaction number on the Form 4473, and retain the Form 4473 for a period of not less than 5 years after the date of the NICS inquiry. Forms 4473 shall be retained in the licensee's records as provided in § 178.124(b); *Provided,* That Forms 4473 with respect to which a sale, delivery or transfer did not take place shall be separately retained in alphabetical (by name of transferee) or chronological (by date of transferee's certification) order.

(c) *Statement of intent to obtain a handgun, reports of multiple sales or other disposition of pistols and revolvers, and reports of theft or loss of firearms.* Licensees shall retain each Form 5300.35 (Statement of Intent to Obtain a Handgun(s)) for a period of not less than 5 years after notice of the intent to obtain the handgun was forwarded to the chief law enforcement officer, as defined in § 178.150(c). Licensees shall retain each copy of Form 3310.4 (Report of Multiple Sale or Other Disposition of Pistols and Revolvers) for a period of not less than 5 years after the date of sale or other disposition. Licensees shall retain each copy of Form 3310.11 (Federal Firearms Licensee Theft/Loss Report) for a period of not less than 5 years after the date the theft or loss was reported to ATF.

*   *   *   *   *

(Paragraph (c) approved by the Office of Management and Budget under control numbers 1512–0520, 1512–0006, and 1512–0524; Paragraph (f) approved by the Office of Management and Budget under control number 1512–0526; all other recordkeeping approved by the Office of Management and Budget under control number 1512–0129)

§ 178.130   [Removed]

10. Section 178.130 is removed.

11. Section 178.131 is revised to read as follows:

§ 178.131   Firearms transactions not subject to a NICS check.

(a)(1) A licensed importer, licensed manufacturer, or licensed dealer whose sale, delivery, or transfer of a firearm is made pursuant to the alternative provisions of § 178.102(d) and is not subject to the NICS check prescribed by § 178.102(a) shall maintain the records required by paragraph (a) of this section.

(2) If the transfer is pursuant to a permit or license in accordance with § 178.102(d)(1), the licensee shall either retain a copy of the purchaser's permit or license and attach it to the firearms transaction record, Form 4473, or record on the firearms transaction record, Form 4473, any identifying number, the date of issuance, and the expiration date (if provided) from the permit or license.

(3) If the transfer is pursuant to a certification by ATF in accordance with §§ 178.102(d)(3) and 178.150, the licensee shall maintain the certification as part of the records required to be kept under this subpart and for the period prescribed for the retention of Form 5300.35 in § 178.129(c).

(b) The requirements of this section shall be in addition to any other recordkeeping requirements contained in this part.

12. Section 178.150 is revised to read as follows:

§ 178.150   Alternative to NICS in certain geographical locations.

(a) The provisions of § 178.102(d)(3) shall be applicable when the Director has certified that compliance with the provisions of § 178.102(a)(1) is impracticable because:

(1) The ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025;

(2) The business premises of the licensee at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer; and

(3) There is an absence of telecommunications facilities in the geographical area in which the business premises are located.

(b) A licensee who desires to obtain a certification under this section shall submit a written request to the Director. Each request shall be executed under the penalties of perjury and contain information sufficient for the Director to make such certification. Such information shall include statistical data, official reports, or other statements of government agencies pertaining to the ratio of law enforcement officers to the number of square miles of land area of a State and statements of government agencies and private utility companies regarding the absence of telecommunications facilities in the geographical area in which the licensee's business premises are located.

(c) For purposes of this section and § 178.129(c), the "chief law enforcement officer" means the chief of police, the sheriff, or an equivalent officer or the designee of any such individual.

PART 179—MACHINE GUNS, DESTRUCTIVE DEVICES, AND CERTAIN OTHER FIREARMS

13. The authority citation for 27 CFR Part 179 continues to read as follows:

**Authority:** 26 U.S.C. 7805.

14. Section 179.86 is amended by adding a sentence at the end of the section to read as follows:

§ 179.86   Action on application.

*   *   *   In addition to any other records checks that may be conducted to determine whether the transfer, receipt, or possession of a firearm would place the transferee in violation of law, the Director shall contact the National

Instant Criminal Background Check System.

Signed: December 31, 1997.

**John W. Magaw,**
*Director.*

Approved: January 16, 1998.

**John P. Simpson,**
*Deputy Assistant Secretary, (Regulatory, Tariff and Trade Enforcement).*

[FR Doc. 98–4215 Filed 2–18–98; 8:45 am]
**BILLING CODE 4810–31–P**

---

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 86

[FRL–5967–8]

### Control of Air Pollution From Motor Vehicles and New Motor Vehicle Engines; Modification of Federal On-Board Diagnostic Regulations for Light-Duty Vehicles and Light-Duty Trucks; Notice of Document Availability

**AGENCY:** Environmental Protection Agency.

**ACTION:** Proposed rule; document availability.

**SUMMARY:** On May 28, 1997, the U.S. Environmental Protection Agency (EPA or Agency) published a Notice of Proposed Rulemaking (see 62 FR 28932) proposing changes to the federal on-board diagnostics program. One of the proposed changes to the federal OBD program was to indefinitely allow manufacturers to comply with EPA's regulations by demonstrating compliance with the exception of the CARB OBDII anti-tampering provisions and certain evaporative emission monitoring requirements. In that NPRM, the Agency also proposed to update the version of the California OBDII regulations which with manufacturers must comply to a more recently revised version. The NPRM noted that the current version of CARB's regulations were contained in Mail-Out #96–34. However, CARB Mail-Out #96–34 was intended primarily for public comment purposes. In the May 28, 1997 NPRM, the Agency went on to state that, after CARB finalized their regulatory revisions being developed via Mail-Out #96–34, the Agency would, in its final rule, allow compliance with that revised final version provided that relevant portions of that version were acceptable for federal OBD compliance demonstration. The Agency received comments during the public comment period following publication of the

NPRM that this approach of incorporating CARB OBDII regulations would not allow EPA enough time to analyze the final revised version of the CARB OBDII changes for appropriateness and applicability to the federal OBD program. The Agency is in the process of developing the final rulemaking. CARB recently finalized its OBDII changes in CARB Mail-Out #97–24. The Agency has analyzed CARB Mail-Out #97–24 and has determined that it is appropriate for federal OBD compliance and its use for federal OBD presents no regulatory process concerns. This analysis, as well as CARB Mail-Out #97–24 is available in EPA Air Docket A–96–32 (see **ADDRESSES**).

**DATES:** The Docket will remain open until March 23, 1998 for any parties wishing to submit comment on CARB Mail-Out #97–24.

**ADDRESSES:** Materials relevant to this rulemaking are contained in Docket No. A–96–32. The docket is located at The Air Docket, 401 M. Street, SW., Washington, DC 20460, and may be viewed in room M1500 between 8:00 a.m. and 5:30 p.m., Monday through Friday. The telephone number is (202) 260–7548 and the facsimile number is (202) 260–4400. A reasonable fee may be charged by EPA for copying docket material.

Comments must be submitted to Holly Pugliese, Vehicle Programs and Compliance Division, U.S. Environmental Protection Agency, 2565 Plymouth Road, Ann Arbor, Michigan 48105, or Internet e-mail at "pugliese.holly@epamail.epa.gov."

**FOR FURTHER INFORMATION CONTACT:**
Holly Pugliese, Telephone 313–668–4288.

Dated: February 9, 1998.

**Richard D. Wilson,**
*Acting Assistant Administrator for Air and Radiation.*

[FR Doc. 98–4010 Filed 2–18–98; 8:45 am]
**BILLING CODE 6560–50–P**

---

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 444

[FRL–5968–5]

RIN 2040–AD03

### Effluent Limitations Guidelines, Pretreatment Standards, and New Source Performance Standards for the Industrial Waste Combustor Subcategory of the Waste Combustors Point Source Category; Correction, Announcement of Meeting

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Correction, Announcement of Meeting.

**SUMMARY:** In proposed rule 63 FR 6391, in the Federal Register issue of February 6, 1998, make the following correction for the date of the workshop and public hearing. EPA will conduct a workshop and public hearing on the pretreatment standards of the rule on April 1, 1998, from 9:00 a.m. to 10:30 a.m.

The Office of Science and Technology within EPA's Office of Water is announcing the workshop and public hearing to elicit comments on the proposed pretreatment standards for the Industrial Waste Combustor Subcategory of the Waste Combustors Point Source Category (63 FR 6391, February 6, 1998). The meeting will be held in Washington, D.C. on April 1, 1998 at the EPA Headquarters Auditorium. Persons wishing to present formal comments at the public hearing should have a written copy for submittal. All testimony presented or submitted in writing to the designated EPA representative at the public hearing will be considered formal comments on the proposal. In addition, written comments regarding the Industrial Waste Combustors proposal will be accepted until May 7, 1998. Both formal comments from the public hearing and written comments received by EPA will be addressed in the Agency's response to comments and will be part of the public docket for the final rule.

**DATES:** EPA will conduct a workshop and public hearing for the Industrial Waste Combustors Subcategory of the Waste Combustors Point Source Category on April 1, 1998. The Industrial Waste Combustors meeting will be held from 9:00 a.m. to 10:30 a.m.

**ADDRESSES:** The Industrial Waste Combustors meeting will be held in the EPA Headquarters Auditorium, Waterside Mall, 401 M St. SW, Washington, D.C.

ATF000152



Thursday
October 29, 1998

Part III

# Department of the Treasury

Bureau of Alcohol, Tobacco and Firearms

27 CFR Parts 178 and 179
Implementation of Public Law 103–159, Relating to the Permanent Provisions of the Brady Handgun Violence Prevention Act; Final Rule

ATF000153

58272    Federal Register / Vol. 63, No. 209 / Thursday, October 29, 1998 / Rules and Regulations

## DEPARTMENT OF THE TREASURY

**Bureau of Alcohol, Tobacco and Firearms**

**27 CFR Parts 178 and 179**

**[T.D. ATF–415; Ref: Notice No. 857; 93F–057P]**

**RIN 1512–AB67**

**Implementation of Public Law 103–159, Relating to the Permanent Provisions of the Brady Handgun Violence Prevention Act**

**AGENCY:** Bureau of Alcohol, Tobacco and Firearms (ATF), Department of the Treasury.

**ACTION:** Final rule. Treasury decision.

**SUMMARY:** The Bureau of Alcohol, Tobacco and Firearms (ATF) is amending the regulations to implement the provisions of Public Law 103–159, relating to the permanent provisions of the Brady Handgun Violence Prevention Act. These regulations implement the law by requiring, with some exceptions, a licensed firearms importer, manufacturer, or dealer to contact the national instant criminal background check system (NICS) before transferring any firearm to an unlicensed individual. NICS will advise the licensee whether the system contains any information that the prospective purchaser is prohibited by law from possessing or receiving a firearm.

**DATES:** This rule is effective November 30, 1998.

**FOR FURTHER INFORMATION CONTACT:** James P. Ficaretta, Regulations Division, Bureau of Alcohol, Tobacco and Firearms, 650 Massachusetts Avenue, NW., Washington, DC 20226 (202–927–8230).

**SUPPLEMENTARY INFORMATION:**

### Background

On November 30, 1993, Public Law 103–159 (107 Stat. 1536) was enacted, amending the Gun Control Act of 1968 (GCA), as amended (18 U.S.C. Chapter 44). Title I of Public Law 103–159, the Brady Handgun Violence Prevention Act (the "Brady law" or "Brady"), imposed as an interim measure a waiting period of 5 days before a licensed importer, manufacturer, or dealer may sell, deliver, or transfer a handgun to an unlicensed individual. The waiting period applies only in States without an acceptable alternate system of conducting background checks on handgun purchasers. The interim provisions of the Brady law, 18 U.S.C. 922(s), became effective on February 28, 1994, and cease to apply on November 30, 1998.

### Permanent Provisions of the Brady Law

The permanent provisions of the Brady law provide for the establishment of a national instant criminal background check system ("NICS") that a firearms licensee must contact before transferring any firearm to an unlicensed individual. The law requires that the permanent system be established not later than November 30, 1998. While the interim provisions apply only to handguns, the permanent provisions of the Brady law apply to all firearms. Furthermore, the law provides that the system may take up to three business days to notify the licensee whether receipt of a firearm by the prospective purchaser would be in violation of law.

### National Instant Criminal Background Check System

The Brady law requires that the Attorney General establish a permanent national instant criminal background check system that any licensee may contact, by telephone or by other electronic means in addition to the telephone, for information on whether receipt of a firearm by a prospective transferee would violate Federal or State law. The law requires that the permanent system be established not later than November 30, 1998. It is expected that the NICS will be established by October 31, 1998, although licensees will not be required to contact NICS until November 30, 1998.

Upon establishment of the system, the Attorney General is required to notify each firearms licensee and the chief law enforcement officer of each State of the existence and purpose of NICS and the means to be used to contact NICS. Beginning on the date that is 30 days after the Attorney General notifies firearms licensees that NICS is established, the permanent provisions of Brady, 18 U.S.C. 922(t), become effective.

### Statutory Requirements

Section 922(t) generally makes it unlawful for any licensed firearms importer, manufacturer, or dealer to sell, deliver, or transfer a firearm to an unlicensed individual (transferee), unless—

1. Before the completion of the transfer, the licensee contacts the national instant background check system;

2. The system provides the licensee with a unique identification number signifying that transfer of the firearm would not be in violation of law OR 3 business days (meaning a day on which

State offices are open) have elapsed from the date the licensee contacted the system and the system has not notified the licensee that receipt of the firearm by the transferee would be in violation of law; and

3. The licensee verifies the identity of the transferee by examining a valid identification document containing a photograph of the transferee.

### Exceptions to NICS

The statute provides the following exceptions to the national instant background check system:

1. The transferee presents to the licensee a permit which was issued not more than 5 years earlier by the State in which the transfer is to take place and which allows the transferee to possess or acquire a firearm, and the law of the State provides that such a permit is to be issued only after an authorized government official has verified that available information does not indicate that possession of a firearm by the transferee would be in violation of the law;

2. Purchases of firearms which are subject to the National Firearms Act and which have been approved for transfer under 27 CFR Part 179 (Machine Guns, Destructive Devices, and Certain Other Firearms); or

3. Purchases of firearms for which the Secretary has certified that compliance with NICS is impracticable because the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025 (i.e., 25 officers per 10,000 square miles), the premises of the licensee are remote in relation to the chief law enforcement officer of the area, and there is an absence of telecommunications facilities in the geographical area in which the business premises are located.

### Penalties for Noncompliance

Section 922(t) provides that a firearms licensee who transfers a firearm and knowingly fails to comply with the requirements of the law, in a case where compliance would have revealed that the transfer was unlawful, is subject to license suspension or revocation and a civil fine of not more than $5,000.

### Notice of Proposed Rulemaking

On February 19, 1998, ATF published in the Federal Register a notice proposing regulations to implement the requirements placed on Federal firearms licensees by section 922(t) (Notice No. 857; 63 FR 8379). The comment period for Notice No. 857 closed on May 20, 1998.

ATF000154

On June 4, 1998, pursuant to section 103(h) of the Brady law, the Department of Justice issued proposed regulations establishing the methods of operation for NICS, including policies and procedures for ensuring the privacy and security of the system and appeal procedures for individuals who are determined by NICS to be ineligible to purchase a firearm (63 FR 30429, 30430, and 30514). Accordingly, these issues were not addressed in ATF's proposed regulations.

Prior to the close of the comment period, two commenters requested that public hearings be held on the proposed regulations and one commenter requested that the comment period be extended. ATF believes that it is necessary to advise Federal firearms licensees of their responsibilities under the permanent provisions of the Brady law as much in advance of the November 30, 1998, effective date as possible. An extension of the comment period and the holding of public hearings would delay the issuance of final regulations. Furthermore, ATF believes that 90 days is a sufficient amount of time for all interested parties to respond to the issues raised in the notice. Finally, ATF believes that any information received during an extension of the comment period or presented in oral testimony at a public hearing would be similar to that received during the 90-day comment period. Accordingly, ATF is not extending the comment period or holding public hearings on the proposed regulations.

*Analysis of Comments*

In response to Notice No. 857, ATF received 8,492 comments, representing 8,779 signatures. Comments were submitted by Federal firearms licensees, licensed firearms collectors, nonlicensed individuals, industry trade groups, and other organizations (e.g., National Association of Arms Shows, Inc., National Pawnbrokers Association, Violence Policy Center, Gun Owners of America, and the National Rifle Association of America), members of Congress, State representatives, and law enforcement officials.

Approximately 125 commenters addressed issues which were outside the scope of the notice. These include user fees for NICS checks, hours of operation that NICS will be available for background checks, how firearms licensees will receive final notification from NICS in the event a background check is delayed, provisions for a toll free appeal hotline that firearms purchasers can contact in the event of a wrongful denial of a purchase, and

ATF's assurance that in most cases a NICS check will be instantaneous. These issues are being addressed in the Department of Justice's rulemaking proceeding.

Twenty-three commenters expressed opposition to the Brady law and urged its repeal. One hundred sixty-six commenters requested other changes that would also require legislative action. These include eliminating the provision of the law which authorizes NICS to take up to three business days to respond to a request for a background check, restricting the Department of Justice's role in implementing any provisions of the Brady law, exempting State "instant check" and "point of sale check" systems from a NICS check, and prohibiting NICS from containing information on certain categories of persons prohibited from receiving or possessing firearms (such as renunciates and persons discharged from the military under dishonorable conditions). ATF is not adopting any of these comments because they are inconsistent with the language of the statute.

*Long Guns, Antique Firearms, and Licensed Collectors of Curios or Relics*

Forty-seven commenters contend that the permanent provisions of the Brady law either do not apply or should not apply to transfers of long guns. Some commenters point out that the title of the statute, the "Brady Handgun Violence Prevention Act," clearly shows that Congress intended the law, both the temporary and permanent provisions, to apply only to handguns. Other commenters argue that since the interim provisions of the Brady law apply only to handguns, it is apparent that the permanent provisions should apply only to handguns as well. These commenters maintain that ATF has exceeded its authority under the Brady law by proposing to require NICS checks for all firearms, including rifles and shotguns.

While the title of the statute is the "Brady Handgun Violence Prevention Act," the plain language of the law clearly states that the permanent provisions apply to all firearms, including rifles and shotguns. In that regard, section 922(t)(1) provides that a Federal firearms licensee "shall not transfer a firearm" to an unlicensed individual unless before the completion of the transfer, the licensee contacts NICS. Section 103(j)(2) of the Brady law provides that the term "firearm" has the meaning prescribed in § 921(a) of the GCA. This section defines "firearm," in part, as "any weapon (including a starter gun) which will or is designed to

or may readily be converted to expel a projectile by the action of an explosive; . . ." Thus, the term "firearm" clearly includes rifles and shotguns.

Two commenters inquired whether antique firearms are subject to the permanent provisions of the Brady law. Pursuant to section 921(a)(3), the term "firearm" does not include an antique firearm (as defined in section 921(a)(16)). Accordingly, the transfer of an antique firearm is not subject to the Brady law.

Several commenters requested clarification whether the permanent provisions of the Brady law apply to licensed collectors of curios or relics. The transfer of a firearm by a licensed collector is not subject to section 922(t), since the law by its terms applies only to the transfer of a firearm by a licensed importer, manufacturer, or dealer to an unlicensed person. Furthermore, since the permanent provisions of Brady do not apply to transfers among licensees, the transfer of a curio or relic firearm to a licensed collector is not subject to permanent Brady. However, in transactions involving firearms not classified as curios or relics, the licensed collector has the same status as a nonlicensee. Thus, a licensed collector's acquisition of a firearm that is not a curio or relic from an importer, manufacturer, or dealer is subject to the requirements of permanent Brady.

*Pawn Transactions*

In Notice No. 857, ATF advised that the proposed regulations would apply the permanent provisions of the Brady law to the redemption of a pawned firearm. As ATF noted, the Violent Crime Control and Law Enforcement Act of 1994, Public Law 103–322, amended § 922(s) of the GCA to specifically exempt transactions involving the return of a handgun to the person from whom it was received. However, no such exemption appears in § 922(t).

Three hundred thirty-eight commenters disagreed with ATF's interpretation that the permanent provisions of the Brady law apply to the redemption of a pawned firearm. Many of the commenters argue that the law was intended to apply only to the sale of a firearm and not to pawn transactions involving the redemption of a firearm. A national trade association representing 3,600 pawnbrokers suggested that Congress did not intend to cover the redemption of a pawned firearm, and that the term "transfer" in the Brady law referred to a transfer of title. The commenter further contends that the amendment of § 922(s) of the GCA by the Violent Crime Control and

Law Enforcement Act of 1994 "indicates their [Congress'] intent to not apply Brady to pawn loans." Several commenters suggested that because pawn loan customers would not have the disposable income to pay for a NICS check, they would instead sell their firearms on the street through unregulated sources.

After carefully considering the arguments raised by the commenters, ATF has concluded that the permanent provisions of the Brady law apply to the redemption of a pawned firearm. Unlike § 922(s) of the GCA, there is no provision in § 922(t) which exempts transactions involving the return of a firearm to the person from whom it was received.

Furthermore, ATF does not agree with the commenters who suggested that the return of a redeemed firearm is not a "transfer" within the meaning of the permanent provisions of the Brady law. The redemption of a pawned firearm has always been treated as a disposition under the GCA, and a Form 4473 has always been required for such redemptions. Furthermore, in *Huddleston* v. *United States*, 415 U.S. 814 (1974), the Supreme Court held that the redemption of a pawned firearm was an acquisition within the meaning of the GCA. Thus, there is no basis for exempting the redemption of a pawned firearm from the permanent provisions of Brady.

### Consignments

ATF has received inquiries regarding the return by a licensee of a consigned firearm to an unlicensed individual. In these cases, the unlicensed individual has delivered a firearm to the licensee for sale. Sales of the firearm are handled in the same manner as other firearm sales. However, if the licensee does not sell the firearm, it may be returned to the unlicensed individual.

ATF has always treated the return of consigned firearms as a transfer or disposition within the meaning of the GCA. The individual to whom the consigned firearms are returned must complete a Form 4473 in the same manner as any unlicensed individual who is acquiring a firearm from a licensee. Accordingly, the final regulations do not provide any exemption for the return of a consigned firearm.

### Repaired and Replacement Firearms

While this issue was not specifically addressed in the proposed rule, approximately 55 comments dealt with the application of permanent Brady to repaired and replacement firearms. Most of those commenters argued that the

return of a repaired firearm to the person from whom it was received should not be considered a "transfer" for purposes of the Brady law.

The notice of proposed rulemaking did not propose that such transactions should be subject to permanent Brady. After carefully considering the comments on this issue, ATF agrees that the return of a repaired or replacement firearm by a licensee is not a "transfer" within the meaning of the Brady law.

Historically, the return of a repaired or replacement firearm by a licensee has been treated in a different fashion from other dispositions under the GCA. Since the enactment of the GCA in 1968, the regulations have provided that a Form 4473 "shall not be required to record the disposition made of a firearm delivered to a licensee for the sole purpose of repair or customizing when such firearm or a replacement firearm is returned to the person from whom received." See 27 CFR 178.124(a).

The final rule does not require NICS checks in any situation in which the transferee is not required to complete a Form 4473. Accordingly, transactions falling within the exemption found in section 178.124(a) are not subject to the requirement for an NICS check.

### Time of NICS Check

As proposed in Notice No. 857, § 178.102(c) provided that a NICS check may be relied upon by the licensee only for use in a single transaction and for a period not to exceed 30 days. If the transaction is not completed within the 30-day period, the licensee must initiate a new NICS check prior to completion of the transfer.

ATF received approximately 40 comments on this proposal. Many commenters objected to the proposal that a separate NICS check must be conducted for each separate transaction. They contend that this requirement is unnecessary and places a burden on both NICS and the licensee. Two commenters stated as follows:

The purpose of the check is to ensure the individual who wishes to purchase a firearm is not a prohibited possessor under the law. In this instance, there is no reason to require a separate NICS check if an individual purchases more than one firearm within a 30 day calendar period.

Many other commenters were concerned about the validity of a NICS check with respect to the return or exchange of a newly purchased firearm.

The Brady law provides that a licensee may not transfer a firearm to an unlicensed individual unless, before the completion of the transfer, the licensee contacts NICS. It is clear that the law contemplates that once the transfer is

completed, any additional transfer of a firearm to the same individual would be a separate transfer that would require a separate NICS check. With respect to the return or exchange of a newly purchased firearm, replacement firearms are not subject to a NICS check. However, if the firearm is being returned and exchanged for a different firearm, this constitutes a separate transaction and another NICS check would be required.

Several commenters objected to ATF's proposal that a NICS check should only be valid for 30 calendar days. Three commenters argued that the Brady law does not specify or impose any time limit on the validity of a NICS check. Three other commenters suggested that a NICS check should be acceptable for multiple purchases for 5 years, the same period of time for which a permit is valid.

Another commenter, a trade organization representing approximately 300 firearms dealers, asserted that the proposed 30-day limitation is unreasonable and unnecessary. This commenter states that customers often order firearms and then later return to the licensee's premises to effect the transfer. Based on the experience of its membership, this commenter believed that many transfers do not take place within 30 days, due to the customer's own business commitments or the customer's personal circumstances. Accordingly, this commenter proposed that the NICS check should be valid for a period of 60 days. Another commenter expressed similar concerns, and recommended that the check should be valid for 45 days "to allow normal transactions to occur, given delays and distances normally encountered in firearms sales situations."

As ATF stated in Notice No. 857, it is clear that the Brady law contemplates that the licensee should contact NICS immediately prior to the transfer of a firearm. However, ATF recognized that many States have waiting periods which mandate a delay of up to 10 days before the firearm may be transferred. Thus, the proposed rule provided that a NICS check would be valid in a single transaction for a period of up to 30 days. This would allow the purchaser a reasonable period of time to come back for the firearm in States with lengthy waiting periods.

After carefully considering the comments, ATF has decided not to extend the period in which a NICS check retains its validity. ATF believes that the 30-day period is reasonable in that it allows sufficient time for a purchaser to return to take possession of a firearm. In situations where a

purchaser has ordered a custom-made firearm and a longer delay is required, the licensee may choose to conduct the NICS check after the firearm comes in, rather than at the time that the order is placed. In any event, licensees should try to avoid lengthy delays between the time the NICS check is conducted and the time the firearm is transferred. The 30-day limit provides a concrete limit beyond which the firearm may not be transferred pursuant to a "stale" NICS check.

*Permits*

The Brady law provides that a licensee is not required to initiate a NICS check where the purchaser presents a permit that allows the purchaser to "possess or acquire a firearm." The final rule clarifies that the permit must be valid under State law. Section 178.102(d)(1)(i) of the proposed regulations clarified that this exception includes permits to carry concealed weapons as well as permits specifically authorizing the purchase of a firearm.

Five commenters expressed opposition to ATF's proposal that a permit to carry concealed weapons was included within the permit exemption provided by permanent Brady. Four of the commenters contend that the proposed regulation expands the scope of the exemption and that the clear language of the Brady law limits the exemption to a permit to "possess or acquire" a firearm. Two commenters maintain that this provision of the law applies only to permits specifically authorizing the purchase of a firearm.

Some commenters assert that excepting concealed weapons permit holders from a NICS check would significantly increase the number of exempt firearms transactions. For example, one commenter noted that "[t]his expansion will dramatically increase the possibility of unlawful firearms purchase[s] in part because the varying state systems for revocation of the permits frequently involve considerable delay."

Notwithstanding these comments, it is ATF's conclusion from the plain language of the Brady law that a permit to "possess" a firearm includes a permit to carry concealed weapons. Furthermore, ATF's position in this matter is consistent with that taken with respect to the permit alternative under the interim provisions of the Brady law. Accordingly, § 178.102(d)(1)(i) is being adopted in the final regulations as proposed.

*NICS Checks in Conjunction With the Issuance of Permits*

The law provides that for a permit to qualify as an alternative to the NICS check at the time of transfer, it must have been issued not more than 5 years earlier by the State in which the transfer is to take place. Furthermore, the permit is a valid alternative under permanent Brady only if the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law.

In construing the language of the statute, the proposed regulations provided that as of November 30, 1998, "the information available to" State officials who issue permits will include a NICS check. The proposed regulations also clarified that if a State did not disqualify all individuals prohibited under Federal law, the permits issued by that State would not be accepted as alternatives under the permanent provisions of the Brady law.

Approximately 3,700 commenters objected to ATF's proposal that the acceptance of permits as alternatives was conditioned upon the State running a NICS check prior to issuing the permit. Most of the commenters contend that the statute does not mandate that State officials conduct a NICS check on all permit applicants. Two commenters argued that "[t]his portion of the proposed regulation violates *Prinz [sic] v. United States.* Here the United States Supreme Court held that "The Federal Government may not compel the States to enact or administer a federal regulatory program.' "

The issuance of regulations setting standards for permits that meet the criteria of the statute in no way implicates Tenth Amendment or Federalism concerns. Neither the Brady law nor the regulations require States to establish or administer permit systems at all. However, the law does set forth certain standards that State permits must meet in order to be recognized as valid Brady alternatives.

As of November 30, 1998, "the information available to" State officials will include NICS. As indicated in Notice No. 857, a NICS check will provide a more extensive background check of the purchaser than other record systems containing only criminal records. NICS will include records from the Department of Defense concerning dishonorable discharges, records from the Department of State regarding individuals who have renounced United

States citizenship, and other information not available in criminal records.

Accordingly, § 178.102(d)(1)(iii) is adopted as proposed.

One commenter noted that Notice No. 857 was silent with respect to State permits issued prior to the effective date of the permanent provisions of the Brady law. Prior to November 30, 1998, the information "available to" State permit officials did not include NICS. Permits issued prior to that date that were recognized by ATF as valid alternatives under interim Brady will continue to be recognized as valid alternatives after November 30, 1998, notwithstanding the fact that no NICS check was conducted prior to the issuance of the permits. These permits will be "grandfathered" for a period not to exceed 5 years or the duration of the permit, whichever is shorter.

*Firearms Transaction Record (Form 4473)*

In general, the regulations provide that prior to the transfer of a firearm to a prospective purchaser, the buyer must complete, sign, and date a firearms transaction record, Form 4473. The form requests certain information, including the transferee's name, sex, height, weight, race, residence address, date of birth, and place of birth. In Notice No. 857, ATF proposed amending the regulations to solicit additional optional information about the purchaser, including the transferee's social security number, to facilitate the transfer of a firearm (§ 178.124(c)(2)). ATF noted in Notice No. 857 that ATF Form 5300.35, Statement of Intent to Obtain a Handgun (Brady form), currently requests the purchaser's social security number as optional information.

Approximately 8,000 commenters addressed this proposal. Twenty-five commenters misunderstood the proposal and were under the impression the proposed regulation was requiring purchasers to provide their social security number on Form 4473. The remaining commenters expressed other concerns and urged ATF to withdraw the proposed regulation. Many commenters contend that requesting the purchaser's social security number violates the individual's right to privacy. The commenters are also concerned about the possible misuse of the information, including the establishment of a national registry of firearms owners. Other commenters are concerned that the request for a purchaser's social security number as additional optional information may eventually become a requirement. These commenters also believe that a firearm

transfer may be unnecessarily delayed or the purchaser subjected to additional scrutiny if the social security number is not provided.

The final regulations will include the purchaser's social security number on Form 4473 as optional information. The social security number is a unique identifier. ATF believes that providing this information on Form 4473 will facilitate the transfer of a firearm. As discussed in Notice No. 857, ATF believes this additional information will help minimize the misidentification of firearms purchasers as felons or other prohibited persons whose receipt and possession would violate the law. For example, by providing this information the transferee might avoid confusion with a prohibited buyer who has the same name and date of birth as the transferee. Nevertheless, providing the social security number on Form 4473 is optional under the proposed regulation and the purchaser is not required to provide such information.

With respect to the commenters' concern regarding the establishment of a national registry of firearms owners, ATF would note that the registration of firearms, firearms owners, or firearms transactions or dispositions is specifically prohibited by 18 U.S.C. 926(a) and section 103(i) of the Brady law. ATF would further note that Forms 4473 are maintained by dealers, not the Federal Government.

In Notice No. 857, ATF proposed that in any transaction for which a licensee receives a unique identification number from NICS, such number will be recorded on Form 4473 and retained in the records of the licensee, regardless of whether the transaction is approved or denied by NICS, and regardless of whether the firearm is actually transferred (27 CFR 178.102(b)). Several commenters objected to the proposed requirement that licensees retain copies of Form 4473 for denied NICS checks or where there is no transfer of a firearm. The commenters argue that this requirement is unnecessary and only serves to increase the paperwork burden on licensees. ATF disagrees with the commenters and finds the requirement to be both necessary and warranted. As explained in the notice, requiring licensees to retain Form 4473 in all cases will enable ATF to determine compliance with the law by licensees and purchasers. Accordingly, the regulation is being adopted as proposed. The final rule clarifies that the transaction number provided by NICS shall include either a NICS transaction number or, in States where the State is recognized as a point of contact for

NICS checks, a State transaction number.

Seven commenters contend that the Brady law requires Form 4473 to be destroyed after each firearm transaction. Specifically, § 922(t)(2)(C) provides that if a NICS check indicates receipt of a firearm by a prospective purchaser would not violate Federal or State law.

[T]he system shall . . . destroy all records of the system with respect to the call (other than the identifying number and the date the number was assigned) and all records of the system relating to the person or the transfer.

The Brady law does not require the Form 4473 to be destroyed after each firearm transaction. The "system" mentioned in the law refers to the national instant background check system (NICS) established by the Attorney General. In addition, the Department of Justice has issued proposed regulations with respect to the destruction of records in the NICS (AG Order No. 2158–98; June 4, 1998, 63 FR 30430).

Several commenters misinterpreted § 178.124(c)(3) as proposed by ATF. It is their understanding that the regulation requires licensees to provide NICS with information regarding the firearm being transferred (e.g., type, model, caliber or gauge, etc.). The commenters are opposed to NICS collecting and maintaining such information. The proposed regulation was not intended to require licensees to provide NICS with specific information about an individual's firearms purchase. For clarification purposes, ATF is amending § 178.124(c) and revising Form 4473 to specify that information about the firearm being transferred (e.g., the name of the manufacturer, the type, model, caliber, etc.) will be recorded on the Form 4473 by the licensee after the completion of the NICS check.

*Civil Penalties*

As explained in the notice of proposed rulemaking, section 922(t)(5) of the GCA provides that a licensee who knowingly transfers a firearm and knowingly fails to comply with the provisions of section 922(t)(1) with respect to the transfer may be subject to revocation or suspension of the license for up to 6 months and a civil fine of not more than $5,000. This provision applies only where at the time that the transferee most recently proposed the transfer, the national instant criminal background check system was operating and information was available to the system demonstrating that the transferee's receipt of a firearm would violate section 922(g) or (n) of the GCA, or State law.

The GCA, 18 U.S.C. 923(e), already provides ATF with authority to revoke a firearms license, after notice and opportunity for hearing, where the licensee has willfully violated any of the provisions of the GCA or the regulations issued thereunder. Furthermore, section 923(f) provides that revocation actions are subject to *de novo* judicial review by the district court in which the licensee resides or has his principal place of business.

ATF is amending Subpart E of Part 178 to provide that the existing procedures for revocation of licenses will also apply to the suspension and revocation of licenses under section 922(t)(5), as well as the imposition of a civil fine under this provision. The final rule also clarifies that such actions are subject to *de novo* judicial review by the district court.

*Miscellaneous*

Approximately 3,700 commenters expressed opposition to proposed § 178.97(b). This section requires a NICS check where a club or similar organization temporarily furnishes firearms to participants in a trap or similar shooting activity for use off the premises. The commenters contend that this requirement "is neither required by, nor is consistent with, the statute." ATF views the activity mentioned above in the same manner as the loan or rental of a firearm to a nonlicensee for temporary use off the licensed premises for lawful sporting purposes. In that regard, § 178.97(a) requires the licensee to record the transaction in his permanent records of acquisition and disposition and on Form 4473. It is ATF's position that such a transfer is subject to the requirements of the Brady law. Accordingly, § 178.97(b) is adopted in the final regulations as proposed.

ATF is amending § 178.102(c) by revising Example 2 at the end of the section to clarify that a firearms transaction is completed when the licensee executes the Form 4473 and the firearm is transferred to the purchaser. Some commenters believe the wording of the proposed regulation is confusing and implies that a firearms transaction is completed when the licensee executes the Form 4473, regardless of when the actual transfer of the firearm takes place.

The proposed regulation in § 178.125(e) would have required dealers to record in their records of disposition the identification number provided by NICS. ATF has determined that requirement is unnecessary since the final regulations require licensees to record the unique identification number provided by NICS on Form 4473 and to retain each Form 4473 for a period of

not less than 20 years after the date of sale or disposition. Accordingly, ATF is not amending the regulation.

Finally, section 178.125a(a) is being amended to provide that licensees are not required to comply with the provisions of § 178.102 when selling firearms from the licensee's personal collection, provided that the licensee has maintained the firearm as part of his or her personal collection for at least one year.

## Executive Order 12866

It has been determined that this final rule is not a significant regulatory action as defined in Executive Order 12866. Therefore, a Regulatory Assessment is not required.

## Regulatory Flexibility Act

It is hereby certified that this final rule will not have a significant economic impact on a substantial number of small entities. The revenue effects of this rulemaking on small businesses flow directly from the underlying statute. Likewise, any secondary or incidental effects, and any reporting, recordkeeping, or other compliance burdens flow directly from the statute. Accordingly, a regulatory flexibility analysis is not required.

## Paperwork Reduction Act

The collections of information contained in this final regulation have been reviewed and approved by the Office of Management and Budget in accordance with the requirements of the Paperwork Reduction Act (44 U.S.C. 3507(d)) under control number 1512–0544. Other collections of information contained in this final rule have been approved under control numbers: 1512–0520, 1512–0006, and 1512–0524 (§ 178.129(c)) and 1512–0129 and 1512–0526 (§ 178.129(d), (e), and (f)). An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number assigned by the Office of Management and Budget.

The collections of information in this final rule are in 27 CFR 178.102, 178.124(c), 178.129(b), 178.131, and 178.150. This information is required to implement the provisions of Public Law 103–159, relating to the permanent provisions of the Brady Handgun Violence Prevention Act. The collections of information are required to ensure compliance with the law. The likely respondents and/or recordkeepers are individuals and businesses.

*Estimated number of respondents:* 106,000.

*Estimated burden hours:* 1 hour.

However, the above mentioned regulations which implement the Brady law require amendments to ATF Form 4473. In order to prevent a duplication of burden hours, the burden hours that are associated with the collections of information in these regulations (1,136,266 hours) will be reported under OMB control number 1512–0129, the Supporting Statement for ATF Form 4473, Firearms Transaction Record, Part I. The following paragraphs explain the additional burden hours.

Section 178.102 requires, with some exceptions, licensees to contact NICS before transferring any firearm to an unlicensed individual. The estimated total annual reporting and/or recordkeeping burden associated with this requirement is 824,000 hours. Section 178.124(c) requires licensees to record on Form 4473 the date the licensee contacts NICS and any identification number provided by NICS. The licensee must also verify the identity of the person acquiring the firearm by examining an identification document presented by the transferee. Form 4473 will include certain optional information about the purchaser, such as the person's social security number and alien registration number. Section 178.131 requires licensees to maintain certain records for firearms transactions not subject to a NICS check. The estimated total annual reporting and/or recordkeeping burden associated with §§ 178.124(c) and 178.131 is 308,266 hours. Section 178.129(b) requires licensees to retain a completed Form 4473 for a period of not less than 5 years where the transfer of a firearm is not made. The estimated total annual recordkeeping burden associated with this requirement is 4,000 hours. Section 178.150 provides for an alternative to NICS in certain geographical locations. Licensees must submit a written application to the Director containing certain information. The same requirement currently applies to the waiting period provision of the Brady law for transfers of handguns. Since this requirement was established in 1994, no licensee has qualified for an exception from the provisions of Brady based on geographical location. As such, ATF does not believe that there is any reporting and/or recordkeeping burden associated with the requirements of § 178.150 with regard to NICS.

Certain collections of information contained in § 178.129(b), previously approved under control numbers 1512–0520, 1512–0006, and 1512–0524, are merely being redesignated as § 178.129(c) in this final rule. Similarly, the collections of information in § 178.129(c), (d), and (e), previously

approved under control numbers 1512–0129 and 1512–0526, are being redesignated as § 178.129(d), (e), and (f) in the final regulation.

Comments concerning the accuracy of these burden estimates and suggestions for reducing the burden should be directed to the Chief, Document Services Branch, Room 3110, Bureau of Alcohol, Tobacco and Firearms, 650 Massachusetts Avenue, NW, Washington, DC 20226, and to the Office of Management and Budget, Attention: Desk Officer for the Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Office of Information and Regulatory Affairs, Washington, DC 20503.

## Disclosure

Copies of the notice of proposed rulemaking, all written comments, and this final rule will be available for public inspection during normal business hours at: ATF Public Reading Room, Room 6480, 650 Massachusetts Avenue, NW., Washington, DC.

*Drafting Information.* The author of this document is James P. Ficaretta, Regulations Division, Bureau of Alcohol, Tobacco and Firearms.

## List of Subjects

### Part 178

Administrative practice and procedure, Arms and ammunition, Authority delegations, Customs duties and inspection, Exports, Imports, Military personnel, Penalties, Reporting requirements, Research, Seizures and forfeitures, and Transportation.

### Part 179

Administrative practice and procedure, Arms and munitions, Authority delegations, Customs duties and inspection, Exports, Imports, Military personnel, Penalties, Reporting requirements, Research, Seizures and forfeitures, and Transportation.

## Authority and Issuance

For the reasons discussed in the preamble, ATF amends 27 CFR Parts 178 and 179 as follows:

## PART 178—COMMERCE IN FIREARMS AND AMMUNITION

**Paragraph 1.** The authority citation for 27 CFR Part 178 continues to read as follows:

**Authority:** 5 U.S.C. 552(a); 18 U.S.C. 847, 921–930; 44 U.S.C. 3504(h).

**Par. 2.** Section 178.11 is amended by adding a definition for "NICS" to read as follows:

## § 178.11 Meaning of terms.

\* \* \* \* \*

*NICS.* The National Instant Criminal Background Check System established by the Attorney General pursuant to 18 U.S.C. 922(t).

\* \* \* \* \*

Par. 3. Section 178.73 is revised to read as follows:

## § 178.73 Notice of revocation, suspension, or imposition of civil fine.

(a) *Basis for action.* Whenever the regional director (compliance) has reason to believe that a licensee has willfully violated any provision of the Act or this part, a notice of revocation of the license, ATF Form 4500, may be issued. In addition, a notice of revocation, suspension, or imposition of a civil fine may be issued on ATF Form 4500 whenever the regional director (compliance) has reason to believe that a licensee has knowingly transferred a firearm to an unlicensed person and knowingly failed to comply with the requirements of 18 U.S.C. 922(t)(1) with respect to the transfer and, at the time that the transferee most recently proposed the transfer, the national instant criminal background check system was available to the system demonstrating that the transferee's receipt of a firearm would violate 18 U.S.C. 922(g) or 922(n) or State law.

(b) *Issuance of notice.* The notice shall set forth the matters of fact constituting the violations specified, dates, places, and the sections of law and regulations violated. The regional director (compliance) shall afford the licensee 15 days from the date of receipt of the notice in which to request a hearing prior to suspension or revocation of the license, or imposition of a civil fine. If the licensee does not file a timely request for a hearing, the regional director (compliance) shall issue a final notice of suspension or revocation and/or imposition of a civil fine on ATF Form 4501, as provided in § 178.74.

Par. 4. Section 178.74 is revised to read as follows:

## § 178.74 Request for hearing after notice of suspension, revocation, or imposition of civil fine.

If a licensee desires a hearing after receipt of a notice of suspension or revocation of a license, or imposition of a civil fine, the licensee shall file a request, in duplicate, with the regional director (compliance) within 15 days after receipt of the notice of suspension or revocation of a license, or imposition of a civil fine. On receipt of such request, the regional director (compliance) shall, as expeditiously as

possible, make necessary arrangements for the hearing and advise the licensee of the date, time, location and the name of the officer before whom the hearing will be held. Such notification shall be made no less than 10 days in advance of the date set for the hearing. On conclusion of the hearing and consideration of all the relevant presentations made by the licensee or the licensee's representative, the regional director (compliance) shall render a decision and shall prepare a brief summary of the findings and conclusions on which the decision is based. If the decision is that the license should be revoked, or, in actions under 18 U.S.C. 922(t)(5), that the license should be revoked or suspended, and/or that a civil fine should be imposed, a certified copy of the summary shall be furnished to the licensee with the final notice of revocation, suspension, or imposition of a civil fine on ATF Form 4501. If the decision is that the license should not be revoked, or in actions under 18 U.S.C. 922(t)(5), that the license should not be revoked or suspended, and a civil fine should not be imposed, the licensee shall be notified in writing.

Par. 5. Section 178.78 is revised to read as follows:

## § 178.78 Operations by licensee after notice.

In any case where denial, suspension, or revocation proceedings are pending before the Bureau of Alcohol, Tobacco and Firearms, or notice of denial, suspension, or revocation has been served on the licensee and he has filed timely request for a hearing, the license in the possession of the licensee shall remain in effect even though such license has expired, or the suspension or revocation date specified in the notice of revocation on Form 4500 served on the licensee has passed: *Provided,* That with respect to a license that has expired, the licensee has timely filed an application for the renewal of his license. If a licensee is dissatisfied with a posthearing decision revoking or suspending the license or denying the application or imposing a civil fine, as the case may be, he may, pursuant to 18 U.S.C. 923(f)(3), within 60 days after receipt of the final notice denying the application or revoking or suspending the license or imposing a civil fine, file a petition for judicial review of such action. Such petition shall be filed with the U.S. district court for the district in which the applicant or licensee resides or has his principal place of business. In such case, when the regional director (compliance) finds that justice so requires, he may

postpone the effective date of suspension or revocation of a license or authorize continued operations under the expired license, as applicable, pending judicial review.

Par. 6. Section 178.96 is amended by revising the first sentence in paragraph (b), and by revising paragraph (c) to read as follows:

## § 178.96 Out-of-State and mail order sales.

\* \* \* \* \*

(b) A licensed importer, licensed manufacturer, or licensed dealer may sell a firearm that is not subject to the provisions of § 178.102(a) to a nonlicensee who does not appear in person at the licensee's business premises if the nonlicensee is a resident of the same State in which the licensee's business premises are located, and the nonlicensee furnishes to the licensee the firearms transaction record, Form 4473, required by § 178.124. \* \* \*

(c)(1) A licensed importer, licensed manufacturer, or licensed dealer may sell or deliver a rifle or shotgun, and a licensed collector may sell or deliver a rifle or shotgun that is a curio or relic to a nonlicensed resident of a State other than the State in which the licensee's place of business is located if—

(i) The purchaser meets with the licensee in person at the licensee's premises to accomplish the transfer, sale, and delivery of the rifle or shotgun;

(ii) The licensed importer, licensed manufacturer, or licensed dealer complies with the provisions of § 178.102;

(iii) The purchaser furnishes to the licensed importer, licensed manufacturer, or licensed dealer the firearms transaction record, Form 4473, required by § 178.124; and

(iv) The sale, delivery, and receipt of the rifle or shotgun fully comply with the legal conditions of sale in both such States.

(2) For purposes of paragraph (c) of this section, any licensed manufacturer, licensed importer, or licensed dealer is presumed, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both such States.

Par. 7. Section 178.97 is revised to read as follows:

## § 178.97 Loan or rental of firearms.

(a) A licensee may lend or rent a firearm to any person for temporary use off the premises of the licensee for lawful sporting purposes: *Provided,* That the delivery of the firearm to such person is not prohibited by § 178.99(b) or § 178.99(c), the licensee complies

with the requirements of § 178.102, and the licensee records such loan or rental in the records required to be kept by him under Subpart H of this part.

(b) A club, association, or similar organization temporarily furnishing firearms (whether by loan, rental, or otherwise) to participants in a skeet, trap, target, or similar shooting activity for use at the time and place such activity is held does not, unattended by other circumstances, cause such club, association, or similar organization to be engaged in the business of a dealer in firearms or as engaging in firearms transactions. Therefore, licensing and recordkeeping requirements contained in this part pertaining to firearms transactions would not apply to this temporary furnishing of firearms for use on premises on which such an activity is conducted.

**Par. 8.** Section 178.102 is revised to read as follows:

**§ 178.102  Sales or deliveries of firearms on and after November 30, 1998.**

(a) *Background check.* Except as provided in paragraph (d) of this section, a licensed importer, licensed manufacturer, or licensed dealer (the licensee) shall not sell, deliver, or transfer a firearm to any other person who is not licensed under this part unless the licensee meets the following requirements:

(1) Before the completion of the transfer, the licensee has contacted NICS;

(2)(i) NICS informs the licensee that it has no information that receipt of the firearm by the transferee would be in violation of Federal or State law and provides the licensee with a unique identification number; or

(ii) Three business days (meaning days on which State offices are open) have elapsed from the date the licensee contacted NICS and NICS has not notified the licensee that receipt of the firearm by the transferee would be in violation of law; and

(3) The licensee verifies the identity of the transferee by examining the identification document presented in accordance with the provisions of § 178.124(c).

*Example for paragraph (a).* A licensee contacts NICS on Thursday, and gets a "delayed" response. The licensee does not get a further response from NICS. If State offices are not open on Saturday and Sunday, 3 business days would have elapsed on the following Tuesday. The licensee may transfer the firearm on the next day, Wednesday.

(b) *Transaction number.* In any transaction for which a licensee receives a transaction number from NICS (which shall include either a NICS transaction

number or, in States where the State is recognized as a point of contact for NICS checks, a State transaction number), such number shall be recorded on a firearms transaction record, Form 4473, which shall be retained in the records of the licensee in accordance with the provisions of § 178.129. This applies regardless of whether the transaction is approved or denied by NICS, and regardless of whether the firearm is actually transferred.

(c) *Time limitation on NICS checks.* A NICS check conducted in accordance with paragraph (a) of this section may be relied upon by the licensee only for use in a single transaction, and for a period not to exceed 30 calendar days from the date that NICS was initially contacted. If the transaction is not completed within the 30-day period, the licensee shall initiate a new NICS check prior to completion of the transfer.

*Example 1 for paragraph (c).* A purchaser completes the Form 4473 on December 15, 1998, and a NICS check is initiated by the licensee on that date. The licensee is informed by NICS that the information available to the system does not indicate that receipt of the firearm by the transferee would be in violation of law, and a unique identification number is provided. However, the State imposes a 7-day waiting period on all firearms transactions, and the purchaser does not return to pick up the firearm until January 22, 1999. The licensee must conduct another NICS check before transferring the firearm to the purchaser.

*Example 2 for paragraph (c).* A purchaser completes the Form 4473 on January 25, 1999, and arranges for the purchase of a single firearm. A NICS check is initiated by the licensee on that date. The licensee is informed by NICS that the information available to the system does not indicate that receipt of the firearm by the transferee would be in violation of law, and a unique identification number is provided. The State imposes a 7-day waiting period on all firearms transactions, and the purchaser returns to pick up the firearm on February 15, 1999. Before the licensee executes the Form 4473, and the firearm is transferred, the purchaser decides to purchase an additional firearm. The transfer of these two firearms is considered a single transaction; accordingly, the licensee may add the second firearm to the Form 4473, and transfer that firearm without conducting another NICS check.

*Example 3 for paragraph (c).* A purchaser completes a Form 4473 on February 15, 1999. The licensee receives a unique identification number from NICS on that date, the Form 4473 is executed by the licensee, and the firearm is transferred. On February 20, 1999, the purchaser returns to the licensee's premises and wishes to purchase a second firearm. The purchase of the second firearm is a separate transaction; thus, a new NICS check must be initiated by the licensee.

(d) *Exceptions to NICS check.* The provisions of paragraph (a) of this section shall not apply if—

(1) The transferee has presented to the licensee a valid permit or license that—

(i) Allows the transferee to possess, acquire, or carry a firearm;

(ii) Was issued not more than 5 years earlier by the State in which the transfer is to take place; and

(iii) The law of the State provides that such a permit or license is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by the transferee would be in violation of Federal, State, or local law: *Provided,* That on and after November 30, 1998, the information available to such official includes the NICS;

(2) The firearm is subject to the provisions of the National Firearms Act and has been approved for transfer under 27 CFR Part 179; or

(3) On application of the licensee, in accordance with the provisions of § 178.150, the Director has certified that compliance with paragraph (a)(1) of this section is impracticable.

(e) The document referred to in paragraph (d)(1) of this section (or a copy thereof) shall be retained or the required information from the document shall be recorded on the firearms transaction record in accordance with the provisions of § 178.131.

(Approved by the Office of Management and Budget under control number 1512–0544)

**Par. 9.** Section 178.124 is amended by revising paragraph (c)(1)(ii)'' in paragraphs (d) and (e) and adding in its place ''paragraph (c)(3)(ii)'', by revising the first sentence in paragraph (f), and by revising the parenthetical text at the end of the section to read as follows:

**§ 178.124  Firearms transaction record.**

\* \* \* \* \*

(c)(1) Prior to making an over-the-counter transfer of a firearm to a nonlicensee who is a resident of the State in which the licensee's business premises is located, the licensed importer, licensed manufacturer, or licensed dealer so transferring the firearm shall obtain a Form 4473 from the transferee showing the transferee's name, sex, residence address (including county or similar political subdivision), date and place of birth; height, weight and race of the transferee; whether the transferee is a citizen of the United States; the transferee's State of residence; and certification by the transferee that the transferee is not prohibited by the Act from transporting or shipping a firearm in interstate or foreign commerce or receiving a firearm which has been shipped or transported

in interstate or foreign commerce or possessing a firearm in or affecting commerce.

(2) In order to facilitate the transfer of a firearm and enable NICS to verify the identity of the person acquiring the firearm, ATF Form 4473 also requests certain optional information. This information includes the transferee's social security number and alien registration number (if applicable). Such information may help avoid the possibility of the transferee being misidentified as a felon or other prohibited person.

(3) After the transferee has executed the Form 4473, the licensee:

(i) Shall verify the identity of the transferee by examining the identification document (as defined in § 178.11) presented, and shall note on the Form 4473 the type of identification used;

(ii) Shall, in the case of a transferee who is an alien legally in the United States, cause the transferee to present documentation establishing that the transferee is a resident of the State (as defined in § 178.11) in which the licensee's business premises is located, and shall note on the form the documentation used. Examples of acceptable documentation include utility bills or a lease agreement which show that the transferee has resided in the State continuously for at least 90 days prior to the transfer of the firearm; and

(iii) Shall comply with the requirements of § 178.102 and record on the form the date on which the licensee contacted the NICS, as well as any response provided by the system, including any identification number provided by the system.

(4) The licensee shall identify the firearm to be transferred by listing on the Form 4473 the name of the manufacturer, the name of the importer (if any), the type, model, caliber or gauge, and the serial number of the firearm.

(5) The licensee shall sign and date the form if the licensee does not know or have reasonable cause to believe that the transferee is disqualified by law from receiving the firearm and transfer the firearm described on the Form 4473.

\* \* \* \* \*

(f) Form 4473 shall be submitted, in duplicate, to a licensed importer, licensed manufacturer, or licensed dealer by a transferee who is purchasing or otherwise acquiring a firearm by other than an over-the-counter transaction, who is not subject to the provisions of § 178.102(a), and who is a resident of the State in which the

licensee's business premises are located.

\* \* \* \*

(Paragraph (c) approved by the Office of Management and Budget under control number 1512–0544; paragraph (f) approved by the Office of Management and Budget under control number 1512–0130; all other recordkeeping approved by the Office of Management and Budget under control number 1512–0129)

### § 178.124a  [Amended]

**Par. 10.** Section 178.124a is amended by removing the period at the end of the introductory text of paragraph (e) and adding in its place a colon.

### § 178.125a  [Amended]

**Par. 11.** Section 178.125a is amended by adding ''comply with the provisions of § 178.102 or'' after the phrase ''is not required to'' in the introductory text of paragraph (a).

**Par. 12.** Section 178.129 is amended by revising paragraph (b), by redesignating paragraphs (c), (d), and (e) as paragraphs (d), (e), and (f), by adding new paragraph (c), and by revising the parenthetical text at the end of the section to read as follows:

### § 178.129  Record retention.

\* \* \* \* \*

(b) *Firearms transaction record.* Licensees shall retain each Form 4473 and Form 4473(LV) for a period of not less than 20 years after the date of sale or disposition. Where a licensee has initiated a NICS check for a proposed firearms transaction, but the sale, delivery, or transfer of the firearm is not made, the licensee shall record any transaction number on the Form 4473, and retain the Form 4473 for a period of not less than 5 years after the date of the NICS inquiry. Forms 4473 shall be retained in the licensee's records as provided in § 178.124(b): *Provided,* That Forms 4473 with respect to which a sale, delivery or transfer did not take place shall be separately retained in alphabetical (by name of transferee) or chronological (by date of transferee's certification) order.

(c) *Statement of Intent to obtain a handgun, reports of multiple sales or other disposition of pistols and revolvers, and reports of theft or loss of firearms.* Licensees shall retain each Form 5300.35 (Statement of Intent to Obtain a Handgun(s)) for a period of not less than 5 years after notice of the intent to obtain the handgun was forwarded to the chief law enforcement officer, as defined in § 178.150(c). Licensees shall retain each copy of Form 3310.4 (Report of Multiple Sale or Other Disposition of Pistols and Revolvers) for a period of not less than 5 years after the

date of sale or other disposition. Licensees shall retain each copy of Form 3310.11 (Federal Firearms Licensee Theft/Loss Report) for a period of not less than 5 years after the date the theft or loss was reported to ATF.

\* \* \* \* \*

(Paragraph (b) approved by the Office of Management and Budget under control number 1512–0544; Paragraph (c) approved by the Office of Management and Budget under control numbers 1512–0520, 1512–0006, and 1512–0524; Paragraph (f) approved by the Office of Management and Budget under control number 1512–0526; all other recordkeeping approved by the Office of Management and Budget under control number 1512–0129)

### § 178.130  [Removed]

**Par. 13.** Section 178.130 is removed.

**Par. 14.** Section 178.131 is revised to read as follows:

### § 178.131  Firearms transactions not subject to a NICS check.

(a)(1) A licensed importer, licensed manufacturer, or licensed dealer whose sale, delivery, or transfer of a firearm is made pursuant to the alternative provisions of § 178.102(d) and is not subject to the NICS check prescribed by § 178.102(a) shall maintain the records required by paragraph (a) of this section.

(2) If the transfer is pursuant to a permit or license in accordance with § 178.102(d)(1), the licensee shall either retain a copy of the purchaser's permit or license and attach it to the firearms transaction record, Form 4473, or record on the firearms transaction record, Form 4473, any identifying number, the date of issuance, and the expiration date (if provided) from the permit or license.

(3) If the transfer is pursuant to a certification by ATF in accordance with §§ 178.102(d)(3) and 178.150, the licensee shall maintain the certification as part of the records required to be kept under this subpart and for the period prescribed for the retention of Form 5300.35 in § 178.129(c).

(b) The requirements of this section shall be in addition to any other recordkeeping requirements contained in this part.

(Approved by the Office of Management and Budget under control number 1512–0544)

**Par. 15.** Section 178.150 is revised to read as follows:

### § 178.150  Alternative to NICS in certain geographical locations.

(a) The provisions of § 178.102(d)(3) shall be applicable when the Director has certified that compliance with the provisions of § 178.102(a)(1) is impracticable because:

(1) The ratio of the number of law enforcement officers of the State in

which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025;

(2) The business premises of the licensee at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer; and

(3) There is an absence of telecommunications facilities in the geographical area in which the business premises are located.

(b) A licensee who desires to obtain a certification under this section shall submit a written request to the Director. Each request shall be executed under the penalties of perjury and contain information sufficient for the Director to make such certification. Such information shall include statistical data, official reports, or other statements of government agencies pertaining to the ratio of law enforcement officers to the number of square miles of land area of a State and statements of government agencies and private utility companies regarding the absence of telecommunications facilities in the geographical area in which the licensee's business premises are located.

(c) For purposes of this section and § 178.129(c), the "chief law enforcement officer" means the chief of police, the sheriff, or an equivalent officer or the designee of any such individual.

(Approved by the Office of Management and Budget under control number 1512–0544)

## PART 179—MACHINE GUNS, DESTRUCTIVE DEVICES, AND CERTAIN OTHER FIREARMS

**Par. 16.** The authority citation for 27 CFR part 179 continues to read as follows:

Authority: 26 U.S.C. 7805.

**Par. 17.** Section 179.86 is amended by adding a sentence at the end of the section to read as follows:

§ 179.86 Action on application.

* * * In addition to any other records checks that may be conducted to determine whether the transfer, receipt, or possession of a firearm would place the transferee in violation of law, the Director shall contact the National Instant Criminal Background Check System.

Signed: October 1, 1998.

John W. Magaw,
*Director.*

Approved: October 16, 1998.

John P. Simpson,
*Deputy Assistant Secretary (Regulatory, Tariff and Trade Enforcement).*

[FR Doc. 98–28986 Filed 10–28–98; 8:45 am]
BILLING CODE 4810–31–P

ATF000163



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, DC 20226

JUN 2 6 1998

ASSISTANT
DIRECTOR

7: 2800

F:PD:NFC
5300

MEMORANDUM TO:   All Special Agents in Charge
All District Directors
All Assistant Chief Counsels

FROM:   Assistant Director
(Firearms, Explosives and Arson)

SUBJECT:   Implementation of Permanent Provisions
of the Brady Law

On November 30, 1998, the permanent provisions of the Brady
law, 18 U.S.C. § 922(t), will go into effect. As of that
date, the interim provisions of the Brady law, 18 U.S.C.
§ 922(s), will no longer apply. By the end of the summer,
ATF must be in a position to advise Federal firearms
licensees (FFLs) how they should comply with permanent
Brady.

In order to ensure that we can accurately advise FFLs of
their responsibilities under permanent Brady, we are
requesting that you make contact with officials in all
States under your jurisdiction. The purpose of the contact
is to ensure that the States are aware of the permanent
Brady requirements, and determine how the States plan to
implement those requirements if they have agreed to be a
Point of Contact (POC) State for the Federal Bureau of
Investigation (FBI). In addition, all States should be
queried to determine if their requirements for issuing
permits will qualify the permit as a Brady alternative.

ATF000164

- 2 -

All Special Agents in Charge
All District Directors
All Assistant Chief Counsels

### Background

Pursuant to the permanent provisions of the Brady law,
licensees will contact the National Instant Criminal
Background Check System (NICS) prior to transferring a
firearm to an unlicensed individual.  NICS will deny the
transfer if the system contains information indicating that
the individual's receipt of a firearm would place the
transferee in violation of Federal or State law.  The
Criminal Justice Information System (CJIS) Division of the
FBI will administer NICS.

The permanent provisions of the Brady law differ in several
significant respects from the interim provisions of the
Brady law.  There will be no Brady form; nor will there be a
five-day waiting period mandated by law.  Instead, licensees
will generally get an "instant" response from NICS.
However, the law provides that NICS may take up to
3 business days to provide a response.  After that, if the
licensee receives no response from NICS, the transfer may
occur.

The permanent provisions of the Brady law will apply to all
firearms, not just handguns.  There will be no State
"instant check" or "point of sale" check alternatives to the
permanent provisions of Brady; however, many "instant check"
and "point of sale" check States will participate with the
FBI as POCs for purposes of conducting NICS checks.  The
major alternative to a NICS check under the permanent
provisions of the Brady law is a permit that complies with
the conditions set forth in the statute.

### State Liaison Efforts

For the past several years, ATF has been working with the
FBI, State governments and Federal firearms licensees to
ensure a smooth transition period.  On February 19, 1998,
ATF published proposed regulations to implement the
permanent provisions of the Brady law.  ATF has conducted

2=16

ATF000165

- 3 -

All Special Agents in Charge
All District Directors
All Assistant Chief Counsels

several Federal firearms licensee seminars devoted primarily to Brady topics; the FBI has attended some of these seminars, and will be attending several more.

Many States have agreed to serve as POCs for the FBI. A POC State would conduct a NICS check, as well as any other background check required by State law, before approving the transfer of a firearm. This would eliminate the need for FFLs to make a separate NICS check through the FBI for each firearms transfer. In some States, the State will be a POC for all firearms; in other States, the State will serve as a POC for handguns but not long guns.

As previously noted, the major alternative provided under permanent Brady is a permit that satisfies the requirements of the statute. In order to qualify as an alternative under permanent Brady, State law must require that the permit is to be issued only after an authorized government official has verified that the information "available" to such official does not indicate that the person's possession or receipt of a firearm would be in violation of law. The information "available" to State permit officials on and after November 30, 1998, will include the information provided by NICS. Accordingly, the proposed regulations provide that permits issued after on and after that date will qualify as alternatives only if the State authorities conduct NICS checks prior to issuing permits. Furthermore, the proposed regulations provide that under permanent Brady, a permit will not qualify as an alternative if the State would allow the issuance of a permit to anyone whose possession or receipt of a firearm would be in violation of Federal or State law.

Prior to November 30, 1998, ATF and the FBI will advise Federal firearms licensees how to contact NICS. It will be the FBI's responsibility to provide licensees with the technical information regarding NICS. The FBI's regulations will address the following issues: the fees charged for NICS checks; registration, password and other security requirements for contacting NICS; alternative electronic means for contacting NICS; and retention and routine uses of NICS records. However, it will be ATF's responsibility to

3-16

ATF000166

- 4 -

All Special Agents in Charge
All District Directors
All Assistant Chief Counsels


determine whether firearms permits issued by the various States will constitute exceptions to the NICS requirement. Furthermore, we will need information as to how the POC States are conducting operations, so that we can advise licensees how to operate in compliance with permanent Brady.

### Brady Report

Pursuant to the above, Assistant Chief Counsels, Special Agents in Charge and District Directors should coordinate their efforts and provide a single report (emanating from the Special Agent in Charge) detailing the results of their contacts with State officials to the Firearms Programs Division no later than July 31, 1998. For each State, we would like to know whether there will be any permits that will qualify as alternatives under the permanent provisions of the Brady law. If a State has agreed to be a POC, we need to know what procedures it intends to follow.

To assist you in this matter, we have attached two checklist forms; the first is for the States that will be participating as POCs; the second one is for States that have any type of firearms permit. In addition, we have attached for your reference a list of the FBI's NICS contacts with State governments, a partial ATF list of State contacts, and an FBI list of the anticipated POC status of each State.

In compiling the answers to the questions on these checklists, it will not be enough to simply examine the laws of the various States; it will also be necessary to discuss several issues with the State representatives. We believe that the checklist forms are self-explanatory.

Finally, the Justice Department has raised the issue of whether ATF should condition the status of alternative permits on whether the State has an effective mechanism of ensuring the revocation of permits if the permit holder incurs firearms disabilities after the issuance of the permit. The proposed regulations do not address this issue, and ATF has not yet officially responded to this proposal. However, we would appreciate any information you could get

4-16

ATF000167

– 5′ –

All Special Agents in Charge
All District Directors
All Assistant Chief Counsels


as to whether State permits that would otherwise qualify as alternatives under permanent Brady would be affected by this type of requirement.

Thank you for your assistance in this matter.  We appreciate your valuable input on Brady issues, and encourage you to continue providing us with feedback on issues that come up in the course of your discussions with the States, the FBI, or Federal firearms licensees.  If you have any questions regarding this memorandum, please contact Nancy Cook at (202) 927-8056.

Jimmy Wooten

Attachments

5-16

ATF000168



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, DC 20226

CHIEF
COUNSEL

OCT  8 1998

CC-53,868   FE:JNS

MEMORANDUM TO:   Acting Assistant General Counsel
(Enforcement)

FROM:   Chief Counsel

SUBJECT:   Qualification of State Permits as
Alternatives to NICS Check under the Brady
Law

This is in response to your request for an opinion on
whether the Bureau of Alcohol, Tobacco and Firearms (ATF)
has legal authority to adopt a comment submitted by the
Justice Department's Office of Policy Development (OPD).
OPD has suggested that ATF amend its proposed regulations
implementing the Brady law, to impose an additional
condition to a permit's qualification as an alternative
under Brady.  OPD suggests that ATF condition the
acceptance of permits as Brady alternatives on the
existence of an appropriate permit revocation mechanism
under State law.

The condition proposed by OPD is not found in the law, and
there is no indication that Congress intended that such a
condition be imposed.  Accordingly, it is our conclusion
that ATF lacks authority to adopt OPD's comment.

### Background

The permanent provisions of the Brady law, 18 U.S.C.
§ 922(t), provide for an "instant check" of criminal
records (as well as other records) by the National Instant
Criminal Background Check System ("NICS").  Certain State
permits are recognized as alternatives under permanent
Brady.  The permit alternative under permanent Brady is
virtually identical to the permit alternative that was
provided under interim Brady.

ATF000169

- 2 -

Acting Assistant General Counsel
(Enforcement)


The pertinent provisions of the Brady law, 18 U.S.C.
§ 922(t)(3), provide an alternative to the NICS check
requirement imposed by section 922(t)(1) in cases
where:

> (A)(i) such other person has presented to the
licensee a permit that --
>> (I)  allows such other person to possess
or acquire a firearm; and
>> (II) was issued not more than 5 years
earlier by the State in which the transfer is to
take place; and
> (ii) the law of the State provides that such
a permit is to be issued only after an authorized
government official has verified that the
information available to such official does not
indicate that possession of a firearm by such
other person would be in violation of law. . . .

In interpreting this provision, ATF has been careful to
ensure that there is parity between the background check
required of permittees and the NICS check undergone by
other purchasers of firearms.  In its proposed regulations,
ATF announced that as of November 30, 1998, the
"information available" to State permit officials would
include a NICS check; accordingly a permit issued on or
after November 30, 1998, would not be a valid alternative
unless a NICS check was done prior to its issuance.
Furthermore, ATF proposed that the permit would not
constitute an alternative under permanent Brady unless the
State would disqualify anyone prohibited under Federal law.

Thus, a permit issued on or after November 30, 1998,
will qualify as an alternative only after the permittee has
been subjected to the same background check that he would
get if he attempted to purchase a firearm without a permit.
The only difference is that the law provides that the
permit may be good for up to five years.

### OPD Comment

OPD has suggested that ATF should adopt a further condition
for State permits.  It is OPD's suggestion that a permit
should qualify "only if the state establishes a mechanism

ATF000170

- 3 -

Acting Assistant General Counsel
(Enforcement)


designed to identify and revoke permits that have been
issued to persons who become subsequently disqualified."
The proposed amendment further provides that "[a]
revocation mechanism will check whether a transferee who
possesses a permit or license has been subsequently
disqualified under the law of the State from possessing a
license or permit."

OPD's comment provides several examples of acceptable State
systems.  In each of these systems, the State not only goes
to extraordinary lengths to find out whether holders of
permits have incurred subsequent disabilities, but the
State also ensures that the Federal firearms licensee will
have this information when the permit is presented to him.[1]

### Legal Issues

While the Department of Justice did not provide a formal
legal opinion as to ATF's statutory authority on this
matter, OPD has provided an informal legal memorandum that
concluded that ATF had authority to impose this requirement
through a regulation.  The OPD memorandum cites several
cases holding that ATF has authority to revoke ATF permits
even in the absence of specific statutory or regulatory
authority to do so.  These cases are not on point.  No one
questions that the States may have authority to revoke
their own firearms permits; the question is whether the
Brady law provides ATF with the authority to condition the
acceptance of permits as Brady alternatives on the
existence of an appropriate revocation mechanism.

---

[1] In the first example, the State automatically cross-
references its concealed weapons permit database with its
criminal history records *once per week*.  The second example
is a State that requires dealers to check with the State's
permit authority prior to selling a firearm.  In the third
example, the State requires that the permit database be
checked each time that a person purchases a firearm.  In
the fourth example, the State cross-references its criminal
records with its permit database on a quarterly basis, and
then notifies firearms licensees that permits are no longer
valid.

ATF000171

- 4 -

Acting Assistant General Counsel
(Enforcement)


OPD also suggests that it is logical to interpret the
statute as providing an exemption only for permits that are
"valid." ATF agrees that it is a logical reading of the
statute that a permit must be "valid" under State law in
order to qualify as an alternative under permanent Brady.
Thus, forged permits would clearly not qualify.
Furthermore, permits are not valid beyond their expiration
date. ATF's final rule, which is currently in review at
the Department, explicitly states that a permit must be
"valid" and the preamble explains that this means that the
permit must be valid under State law.

OPD's comment, however, goes beyond requiring that the
permit must be valid under *State law* - it assumes that a
permit is not a valid alternative under *the Brady law*
unless the State takes certain steps to revoke permits
where a person has incurred firearms disabilities.
Essentially, OPD is interpreting the term "permit" in the
Brady law to mean a valid permit in a State where the State
has an appropriate revocation mechanism that would satisfy
OPD's fairly stringent criteria. We can find no basis for
such an interpretation in the Brady law.

OPD also suggests that any ATF regulation on this issue
would be entitled to deference under Chevron U.S.A., Inc.
v. Natural Resources Defense Council, Inc., 467 U.S. 837
(1984). We disagree. The Supreme Court has held that "if
the intent of Congress is clear, that is the end of the
matter; for the court, as well as the agency, must give
effect to the unambiguously expressed intent of Congress."
Chevron, 467 U.S. at 842-843. If, on the other hand, "the
statute is silent or ambiguous with respect to the specific
issue, the question for the court is whether the agency's
answer is based on a permissible construction of the
statute." Id. at 843.

A reviewing court does not get to Chevron deference,
therefore, unless and until it determines that Congress's
purpose and intent on the question at issue cannot be
judicially ascertained. "Only if, after this
investigation, we conclude that Congress either had no
intent on the matter, or that Congress's purpose and intent
regarding the matter is ultimately unclear, do we reach the
issue of Chevron deference." Timex V.I., Inc. v. United

ATF000172

- 5 -

Acting Assistant General Counsel
(Enforcement)


States, No. 97-1520, 1998 U.S. App. LEXIS 23734 (Fed. Cir.
September 23, 1998). See also Muwwakkil v. Office of
Personnel Management, 18 F.3d 921, 925 (Fed. Cir. 1994).

To ascertain whether Congress had an intention on the
question at issue, it is necessary to employ the
"traditional tools of statutory construction." Chevron,
467 U.S. at 843 n. 9.  The first and foremost tool to be
used is the statute's text, giving it its plain meaning.
See VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d
1574, 1579 (Fed. Cir. 1990), cert. denied, 499 U.S. 922
(1991).  Because the text of the statute is Congress's
final expression of its intent, if the text answers the
questions, that is the end of the matter.  Muwwakkil,
18 F.3d at 924.  If, on the other hand, the statute's text
does not explicitly address the precise issue, the court
does not at that point simply defer to the agency; instead,
the court will look to other "tools" including the
statute's structure, canons of statutory construction, and
legislative history.  See Dunn v. Commodity Futures Trading
Comm'n, 519 U.S. 465 (1997).

In the case at hand, there is nothing in the statutory
language that indicates that Congress intended the term
"permit" to apply only to permits issued by States that had
appropriate revocation mechanisms.[2]  Instead, the plain
language of the statute provides that a permit will qualify
as an alternative if it meets the conditions set forth in
the law.  There is no mention at all of State revocation
procedures.  Furthermore, there is no grant of discretion
to the agency to develop standards for such permits.

Even if it were not clear that the plain language of the
statute ruled out the interpretation suggested by OPD, the
traditional canons of statutory construction would
similarly weigh against the interpretation advocated by

---

[2.] There may be rational policy reasons behind a regulation
which would impose such a requirement.  However, as the
court noted in Orca Bay Seafoods v. Northwest Truck Sales,
Inc., 32 F.3d 433, 436 (9th Cir. 1994), in striking down
regulations issued by the Secretary of Transportation,
"rationality is not enough.  The Secretary needed
authority."

- 6 -

Acting Assistant General Counsel
(Enforcement)


OPD.  A general rule of statutory construction states that
"the mention of one thing implies the exclusion of another;
expressio unius est exclusio alterius."  United States v.
Castro, 837 F.2d 441, 442 (11th Cir. 1988), quoting 73 Am.
Jur. 2d, Statutes, sec. 211, at 405.

It should be noted that "this principle has its limits and
exceptions and cannot apply when the legislative history
and context are contrary to such a reading of the statute."
837 F.2d at 443.  However, in the case at hand, there is
no legislative history that would be contrary to such a
result.  Furthermore, the law specifically provides that
permits will be accepted as valid alternatives if they meet
the standards set forth in the statute.  Thus, the plain
language of the law is contrary to the result advocated by
OPD.  Clearly, an agency will not be entitled to Chevron
deference where its interpretation of a law is contrary to
the plain language of the law.  See, e.g., Muwwakkil,
18 F.3d at 925.

It should be noted that in National Rifle Association v.
Brady, 914 F.2d 475, 484 (4th Cir. 1990), cert. denied,
499 U.S. 959 (1991), the Fourth Circuit set aside two ATF
regulations implementing the Firearms Owners Protection Act
of 1986.  With respect to one of the regulations that was
set aside, the law required licensed collectors to maintain
records of the "receipt, sale, or other disposition" of
curio and relic firearms.  The implementing regulation
required collectors to inventory the curios or relics
possessed in their collection and record the same prior to
commencing or continuing a firearms curio or relic
collection.

The Fourth Circuit held that the regulation impermissibly
expanded on the requirements of the statute.  The court
explained as follows:

> The statute makes no mention of any requirement
> that licensed collectors inventory their pre-
> existing collections and record their contents.
> Rather it makes clear that records need only be
> kept concerning the receipt and disposition of
> curios and relics.  The Secretary's regulation
> creates a whole new recordkeeping requirement

- 7 -

Acting Assistant General Counsel
(Enforcement)
.

> above and beyond the requirements provided for by
> the plain language of the statute.

914 F.2d at 485.  The court rejected the Government's
argument that the terms "receipt" and "possession"
were synonymous, noting that the Government's
interpretation would "place a gloss on the statute
which is not supported by the statute's plain
language."  914 F.2d at 484.

Similarly, there is nothing in the "plain language" of
the Brady law that would support the interpretation
put forward by OPD.  We recognize the policy
considerations underlying the OPD suggestion.  There
is no question that the recognition of five-year
permits as alternatives to a NICS check may result in
the purchase of firearms by individuals with Federal
firearms disabilities, where the individuals have
received a State permit prior to committing a
disabling offense.  However, it appears that this is
an inevitable result of the law, and not something
that ATF can address through the regulations.  As the
Fourth Circuit suggested in the NRA v. Brady decision,
"courts are simply not at liberty to ignore the plain
language of the statute.  The policy arguments
forwarded by the Secretary with respect to enforcement
'should be directed to the Congress rather than
to [the courts].'" 914 F.2d 475, 485, quoting
McCulloch v. Sociedad Nacional, 374 U.S. 10, 22
(1963).

### Administrative Procedure Act Issues

Finally, it should be noted that even if the statute
provided ATF with authority to impose additional
qualifications on the acceptance of permits as Brady
alternatives, this issue was not raised in ATF's notice of
proposed rulemaking.  The Administrative Procedure Act
(APA), 5 U.S.C. 553, generally requires that before an
agency issues a rule, it must first publish a notice of
proposed rulemaking which, among other things, contains
"either the terms or substance of the proposed rule or a
description of the subjects and issues involved."  5 U.S.C.
§ 553(b)(3).

ATF000175

- 8 -

Acting Assistant General Counsel
(Enforcement)


It is well established that a final rule may differ in some particulars from the proposed rule. <u>Brazos Electric Power Cooperative, Inc. v. Southwestern Power Administration</u>, 819 F.2d 537, 543 (5th Cir. 1987). However, an agency does not have "carte blanche to establish a rule contrary to its original proposal simply because it receives suggestions to alter it during the comment period." <u>Chocolate Manufacturers Association v. Block</u>, 755 F.2d 1098, 1104 (4th Cir. 1985). Instead, the notice of proposed rulemaking must be sufficiently descriptive to alert interested parties to the possibility of changes eventually adopted from the comments. <u>See Wagner Electric Corp. v. Volpe</u>, 466 F.2d 1013, 1019 (3d Cir. 1972). The question is whether the notice would "fairly apprise interested persons of the 'subjects and issues' before the Agency." <u>National Black Media Coalition v. FCC</u>, 791 F.2d 1016 (2d Cir. 1986). Other courts deem the notice to be sufficient if the final rule is a "logical outgrowth" of the proposed rule. <u>Brazos</u>, 819 F.2d at 543.

It is arguable that the notice of proposed rulemaking put interested parties on notice that ATF would be defining the conditions that must be met by permit alternatives under Brady. However, there was certainly nothing in the notice that indicated that ATF was considering imposing conditions that went beyond the language of the statute. Furthermore, the specific criteria that OPD is proposing have no basis in the record, and might be difficult to defend. Accordingly, the adoption of the OPD comment would be subject to challenge under the APA, even if it was determined that ATF had authority to promulgate such a regulation.

ATF000176

Case 1:20-cv-10639-TLL-PTM   ECF No. 16-2   filed 07/10/20   PageID.264   Page 72 of 72

- 9 -

Acting Assistant General Counsel
(Enforcement)

### Conclusion

For the above reasons, it is our conclusion that the Brady
law provides no authority for the regulation proposed by
OPD.  Furthermore, even if such authority existed, the
adoption of the OPD comment would be subject to challenge
under the APA.


Stephen J. McHale

ATF000177