# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

DONALD J. ROBERTS, II,
*et al.*

Plaintiffs,

v.

U.S. DEPARTMENT OF JUSTICE,
*et al.*,

Defendants.

Case No.  1:20-cv-10639-TLL-PTM

Hon. Thomas L. Ludington

## **DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Defendants hereby oppose Plaintiffs' Motion for Summary Judgment, ECF No. 17, and cross-move for summary judgment in Defendants' favor.  In support of this motion, Defendants submit the accompanying Memorandum in Support and Statement of Undisputed Material Facts, all of which are contained in this single document.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Eric J. Soskin*
ERIC J. SOSKIN (PA Bar #200663)

1

Senior Trial Counsel
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW Rm. 12002
Washington, DC 20530
Telephone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov
*Counsel for Defendants*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................... i

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................. ii

ISSUES PRESENTED..................................................................................................... v

TABLE OF AUTHORITIES .......................................................................................... vi

INTRODUCTION ........................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND............................................. 1

STANDARD OF REVIEW ............................................................................................ 7

ARGUMENT ................................................................................................................... 9

I.   The 2020 PSA Is Within ATF's Authority. ........................................................... 9

   A.  The Statutory Text Demonstrates That ATF Correctly Interprets Section 922(t)(3)
       to Require an Evaluation of the Information NICS Provides to the State. ...................... 10

   B.  The Structure and Purpose of the Brady Act Confirm that ATF's Interpretation Is
       Correct.............................................................................................................. 12

II.  The 2020 PSA Correctly Reflects That Michigan Law Has Changed.................................. 15

   A.  Michigan Now Interprets State Law to Require that State Officials Obtain
       Information From NICS, But Not to Review the Results................................................ 15

   B.  In the 2020 PSA, ATF Appropriately Deferred to Michigan's Interpretation of its
       Own State Law.................................................................................................... 18

III. The 2020 PSA Is Not Arbitrary and Capricious. ................................................. 20

   A.  ATF Did Not Err By Considering Evidence of Michigan's Practice. ............................ 20

   B.  Issuance of the 2020 PSA Did Not Require Notice-and-Comment................................. 21

   C.  The 2020 PSA Does Not Compel Michigan to Be a NICS POC. .................................. 23

CONCLUSION............................................................................................................... 25

## <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

The parties have agreed, through their counsel, to submit the following Statement of Undisputed Facts in Support of both parties' briefing on their respective motions for summary judgment. These facts are agreed to as undisputed solely for the purposes of summary judgment in the above-captioned litigation and not for any other purposes.

1.     Plaintiff, Donald J Roberts, II, is a United States citizen.

2.     The events or omissions giving rise to this suit occurred in Roscommon County, Michigan, a county within this district.

3.     As of March 7, 2020, Mr. Roberts had no disqualification that would prevent him from acquiring, keeping, or bearing arms.

4.     Mr. Roberts is a member of Gun Owners of America, Inc.

5.     Mr. Roberts is a resident of McBain, Michigan.

6.     Mr. Roberts possesses a valid unexpired Michigan CPL issued March 16, 2016 and expiring February 24, 2021.

7.     On March 7, 2020, Mr. Roberts visited a federal firearms licensee doing business as H&H Fireworks, Guns and Sporting Goods at 8979 W. Houghton Lake Dr., Houghton Lake, MI 48629.

8.     Mr. Roberts visited said FFL for the purpose of purchasing a shotgun with his unexpired Michigan CPL.

9.     Upon inquiry and presentment of his CPL, Mr. Roberts was advised that

ii

sale of the firearm using his unexpired Michigan CPL could not be completed unless he submitted to a FBI NICS background check, consistent with the ATF's March 3, 2020, Michigan Public Safety Advisory.

10.     Consistent with ATF instructions, the FFL refused to make the sale, and Mr. Roberts left the store without purchasing the firearm.

11.     Were it not for the challenged agency action, Mr. Roberts would, subject to the discretion of the FFL, be able to use his Michigan CPL in lieu of a background check to purchase firearms at a federally licensed firearms dealer, as authorized by 18 U.S.C. § 922(t)(3).

12.     Plaintiff, Gun Owners of America, Inc. ("GOA") is a California non-stock corporation with its principal place of business at 8001 Forbes Place, Springfield, VA 22151.

13.     GOA is organized and operated as a non-profit membership organization that is exempt from federal income taxes under IRC § 501(c)(4).

14.     GOA was incorporated in 1976 to preserve, protect, and defend the Second Amendment rights of gun owners.

15.     GOA has thousands of members and supporters, including residents of the Eastern District of Michigan, who possess Michigan CPLs, and who would use them to purchase firearms, but for the challenged agency action.

16.     On October 29, 1998, ATF sent an "OPEN LETTER TO ALL MICHIGAN FEDERAL FIREARMS LICENSEES," stating that "[t]he Michigan permit to

purchase a handgun ... will [] qualify as an alternative to the NICS check...."

17.     On March 24, 2006, Defendant ATF issued an "Open Letter to Michigan Federal Firearms Licensees" ("2006 Open Letter") which stated that, "Michigan's Concealed Pistol Licenses (CPLs) issued on or after November 22, 2005 will qualify as an alternative to a [NICS] check."

18.     ATF's 2006 Open Letter instructed Michigan FFLs that, when transferring firearms, they would be permitted to accept Michigan CPLs in lieu of running a NICS check.

19.     On March 3, 2020, ATF issued a "PUBLIC SAFETY ADVISORY TO ALL MICHIGAN FEDERAL FIREARMS LICENSEES," which states that ATF's "March 24, 2006 [letter] is rescinded as of the date of this letter...."

20.     The parties stipulate that Complaint Exhibits A, B and C, being ATF communications, are admissible for the purpose of this motion.

## **ISSUES PRESENTED**

1.  Does Michigan law meet the requirements of 18 U.S.C. § 922(t)(3)?

2.  Did ATF act within its authority in issuing the 2020 March 3, 2020 Public Safety Advisory ("2020 PSA")

3.  Is the 2020 PSA arbitrary and capricious?

4.  Does the APA require that ATF engage in notice-and-comment rulemaking to issue the 2020 PSA?

# INDEX OF AUTHORITIES

## Cases

*ANA Intern., Inc. v. Way,*
   393 F.3d 886 (9th Cir. 2004) ................................................................. 21

*Atrium Med. Ctr. v. HHS,*
   766 F.3d 560 (6th Cir. 2014) ................................................................... 9

*Bangura v. Hansen,*
   434 F.3d 487 (6th Cir. 2006) ................................................................... 9

*Belville Mining Corp. v. U.S.,*
   999 F.2d 989 (6th Cir. 1993) ................................................................. 22

*Bowen v. Georgetown Hosp.,*
   488 U.S. 204 (1988) ............................................................................. 21

*Carolina Fisheries Ass'n v. Gutierrez,*
   518 F. Supp. 2d 62 (D.D.C. 2007) .......................................................... 8

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) ............................................................................... 8

*City of Bangor v. Citizens Comm. Co.,*
   532 F.3d 70 (1st Cir. 2008) .................................................................. 18

*City of New York v. DOD,*
   913 F.3d 423 (4th Cir. 2019) ................................................................ 24

*Covenant Med. Ctr. v. Sebelius,*
   994 F. Supp. 2d 862 (E.D. Mich. 2014) .................................................. 8

*Dismas Charities v. DOJ,*
   401 F.3d 666 (6th Cir. 2005) ................................................................ 23

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ............................................................................. 22

*Harkness v. Sec. of the Navy,*
   174 F. Supp. 3d 990 (W.D. Tenn. 2016) ................................................. 8

*Ivy Sports Med., LLC v. Burwell,*
    767 F.3d 81 (D.C. Cir. 2014) ............................................................................. 22

*KPK Techs., Inc. v. Cuccinelli,*
    No. 19-10342, 2019 WL 4416689 (E.D. Mich. Sept. 16, 2019) .................................. 8

*Lansing Dairy, Inc. v. Espy,*
    39 F.3d 1339 (6th Cir. 1994) ............................................................................. 15

*M.L. Johnson Family Properties, LLC v. Bernhardt,*
    924 F.3d 842 (6th Cir. 2019) ............................................................................. 9

*Macias v. N.M. Dep't of Labor,*
    21 F.3d 366 (10th Cir. 1994) ............................................................................. 18

*McDonald Welding v. Webb,*
    829 F.2d 593 (6th Cir. 1987) ............................................................................. 8

*Mendoza v. Perez,*
    754 F.3d 1002 (D.C. Cir. 2014) .......................................................................... 23

*Morgan v. ATF,*
    473 F. Supp. 2d 756 (E.D. Mich. 2007) ................................................................ 18

*Morgan v. ATF,*
    509 F.3d 273 (6th Cir. 2007) ............................................................................. 18

*National Rifle Ass'n v. Reno,*
    216 F.3d 122 (D.C. Cir. 2000) ................................................................... 12, 14, 15

*Perez v. Mortgage Bankers Association,*
    575 U.S. 92 (2015) .................................................................................... 22, 23

*Reed v. Reno,*
    146 F.3d 392 (6th Cir. 1998) ............................................................................. 9

*Resolute Forest Prods. v. USDA,*
    187 F. Supp. 3d 100 (D.D.C. 2016) ..................................................................... 8

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ................................................................................... 15, 17

*S. Rehab. Grp., PLLC v. HHS,*
    732 F.3d 670 (6th Cir. 2013) ............................................................................. 9

*Simms v. NHTSA*,
    45 F.3d 999 (6th Cir. 1995) ............................................................................ 8

*Singh v. Johnson*,
    No. 15-cv-12957, 2016 WL 3476701 (E.D. Mich. June 27, 2016) ............................ 8

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ...................................................................................... 9

*Texas Tech Physicans Assoc. v. HHS*,
    917 F.3d 837 (5th Cir. 2019) ......................................................................... 9

*U.S. v. Price Bros.*,
    721 F. Supp. 869 (E.D. Mich. 1989) .............................................................. 21

*United States v. Abramski*,
    573 U.S. 173 (2014) ..................................................................................... 15

*United States v. Cassidy*,
    899 F.2d 543 (6th Cir. 1990) ........................................................................ 18

*United States v. Mills*,
    8850 F.3d 693 (4th Cir. 2017) ...................................................................... 13

*United States v. Shepherd*,
    922 F.3d 753 (6th Cir. 2019) ........................................................................ 10

*United States v. Zabawa*,
    719 F.3d 555 (6th Cir. 2013) ........................................................................ 11

*Voyageur Outward Bound School v. U.S.*,
    444 F. Supp. 3d 182  (D.D.C. 2020) .............................................................. 22

*Wilson v. Lynch*,
    835 F.3d 1083 (9th Cir. 2016) ...................................................................... 23

*Wyoming ex rel. Crank v. United States*,
    2007 WL 9735116 (D. Wyo. May 8, 2007) ..................................................... 19

## Statutes

5 U.S.C. § 553(b)(A) ............................................................................... 10, 22

5 U.S.C. § 706(2)(A) .................................................................................... 8

18 U.S.C. Chapter 44 ................................................................................... 2

18 U.S.C. § 921 ........................................................................................... 2

18 U.S.C. § 921(a)(20) ............................................................................. 18

18 U.S.C. § 922(b)(2) ............................................................................... 18

18 U.S.C. § 922(d) ....................................................................................... 2

18 U.S.C. § 922(g) ....................................................................................... 2

18 U.S.C. § 922(g)(1) ............................................................................... 18

18 U.S.C. § 922(t) ........................................................................... 1, 12, 13

18 U.S.C. § 922(t)(1) ......................................................................... 2, 13

18 U.S.C. § 922(t)(3) .................................................................... passim

MCL § 28.426 .............................................................................. passim

MCL §§ 28.421 ............................................................................................ 4

## **Other Authorities**

Federal Rule of Civil Procedure 56 .................................................. 1

28 C.F.R. 25.6(c)(1)(iv) ......................................................................... 13

28 C.F.R. 25.6(j) ......................................................................................... 3

63 FR 58272 ........................................................................... 4, 10, 25

63 FR 8379 ................................................................................................. 3

## INTRODUCTION

Federal law requires that a federal firearms licensee ("FFL") not transfer a firearm until after a background check is conducted through a National Instant Criminal Background Check System ("NICS").  This requirement may be satisfied by alternative means, namely, if the person acquiring the firearm presents to the FFL a state-issued firearms permit—but only if "the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law."  18 U.S.C. § 922(t)(3).

In 2006, Michigan informed ATF that a new state law governing Michigan's concealed pistol license ("CPL") satisfied these requirements, and ATF notified Michigan FFLs that they could accept CPLs as alternatives to NICS checks.  Since then, however, Michigan officials have reinterpreted state law and determined that state law requires them only to initiate a NICS search on CPL applicants, not to evaluate the results to "verif[y] that the information available" does not "indicate that possession of a firearm" would be unlawful.  State law has thereby changed, and accordingly, ATF issued a Public Safety Advisory to Michigan FFLs ("2020 PSA"), explaining that CPL holders are not exempt from NICS checks.  ATF's action is reasonable, proper, and consistent with law, and Plaintiffs' challenge to it should be rejected.

## STATUTORY AND REGULATORY BACKGROUND

Congress passed the Brady Handgun Violence Prevention Act ("Brady Act") to,

*inter alia*, "provide for . . . a national instant criminal background check system to be contacted by firearms dealers before the transfer of any firearm." Pub. L. No. 103-159, 107 Stat. 1536 (1993); Administrative Record ("AR"), ECF No. 16, at ATF000135. The Act's purpose is "to prevent convicted felons and other persons who are barred by law from purchasing guns from licensed dealers, manufacturers or importers." H.R. Rep. No. 103-344, at 1 (1993); ATF000106.

The Brady Act and the Gun Control Act of 1968 ("GCA"), 18 U.S.C. Chapter 44, are interrelated. The GCA operates to "regulate more effectively interstate commerce in firearms" to reduce crime and misuse and "help combat . . . the incidence of serious crime." *See* 18 U.S.C. § 921 *et seq*.; S. Rep. No. 89-1866, at 1 (1966). Among its provisions, the GCA designates several categories of persons for whom it is unlawful to "receive" or "possess" "any firearm," including those convicted of felonies, fugitives from justice, and those who have been convicted of a misdemeanor crime of domestic violence ("MCDV"). 18 U.S.C. § 922(g). These prohibitions are paired with a ban on the knowing transfer of firearms to such persons. *See* 18 U.S.C. § 922(d).

A core part of the Brady Act is 18 U.S.C. § 922(t)(1), which requires that an FFL not transfer a firearm to a non-licensee until after a background check is conducted through NICS (which is administered by a unit of the FBI) to confirm that the transfer would not violate federal or state law. 18 U.S.C. § 922(t)(3) establishes a limited exception to this mandatory background check, providing that 18 U.S.C. § 922(t)(1) "shall not apply to a firearm transfer between a licensee and another person if--

2

(A)(i) such other person has presented to the licensee a permit that—

> (I) allows such other person to possess or acquire a firearm; and

> (II) was issued not more than 5 years earlier by the State in which the transfer is to take place; and

(ii) the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law.

18 U.S.C. § 922(t)(3).  This provision is commonly known as the "alternate permit" requirement because state permits that satisfy 18 U.S.C. § 922(t)(3) serve as alternatives on which FFLs can rely instead of carrying out a background check through NICS.[1]

Prior to the November 30, 1998 effective date of Section 922(t), ATF issued a Notice of Proposed Rulemaking ("NPRM") regarding the implementation of the NICS background check requirement.  *See* 63 FR 8379; ATF000143.  In the NPRM, ATF explained that "the information available" as referenced in section 922(t)(3)(A)(ii) would include the NICS databases and therefore, permits issued on or after November 30, 1998 will be valid alternatives "only if the State officials conduct a NICS check on all permit applicants."  63 FR at 8381; ATF000147.  The NPRM also explained that for alternate permits, the "critical issue is . . . whether the State has conducted a background check on that individual to ensure that the individual is not prohibited from possessing

---

[1] States with NICS-alternate permits have a state statute that authorizes access to the NICS Indices, which comprise three database systems.  The states run a search, and information (not the actual records) from the three systems is returned to the state to review, conduct additional research, and make a determination.  The FBI does not investigate or determine whether the permit holder is prohibited, it simply provides access to the databases.  *See* 28 C.F.R. 25.6(d), (f).

a firearm." *Id.* The NPRM further stated that "[i]f a State does not disqualify all individuals prohibited under Federal law, the permits issued by that State would not be accepted as alternatives," and committed that "ATF will notify licensees in each State whether or not permits issued by that State will suffice as alternatives." *Id.* After considering comments to the NPRM, ATF issued a final rule adopting the requirement that a NICS check be performed, *see* 63 FR 58272; ATF000154; 27 C.F.R. § 478.102(d)(1)(iii), and reaffirming that if the State "did not disqualify all individuals prohibited under Federal law," "the permits issued by that State would not be accepted as alternatives under the permanent provisions of the Brady Law." ATF000157.

Michigan law provides for two types of firearms permits. Michigan Compiled Law ("MCL") § 28.422 authorizes local police to issue "licenses to purchase, carry, possess, or transport pistols," ("LTPs"), which are not at issue in this case because they have been continuously recognized by ATF as valid alternate permits since 1998. *See* ATF000098; ATF000273. MCL §§ 28.421 and 28.425 provide for "concealed pistol licenses" ("CPLs"), and MCL § 28.426 explains the requirements for issuance of a CPL:

> (2) A county clerk shall not issue a license to an applicant . . . unless both of the following apply:
>
> (a) The department of state police, or the county sheriff . . ., has determined through the federal national instant criminal background check system that the applicant is not prohibited under federal law from possessing or transporting a firearm.
>
> (b) If the applicant is not a United States citizen, the department of state police has verified through the United States Immigration and Customs Enforcement databases that the applicant is not an illegal

4

alien or a nonimmigrant alien.

Michigan enacted the NICS background check requirement in MCL § 28.426(2)(a) in November 2005. In February 2006, the state Attorney General ("AG") requested that ATF determine that a Michigan CPL would qualify as an alternate permit, explaining , as ATF later recounted, that MCL § 28.426 required:

> (1) "A full NICS check be[] conducted by an authorized Michigan government official"; (2) "A determination made by that official that the permit holder is not prohibited under federal or state law from possessing firearms"; and (3) "The permit being denied if the individual is prohibited from possessing a firearm under federal (or state) law."

ATF000056 (Aug. 2019 briefing paper discussing Michigan alternate permits and describing AG letter). In response, ATF issued a March 2006 "Open Letter to Michigan FFLs" ("2006 Open Letter") informing them that Michigan CPLs now qualified as alternate permits under 18 U.S.C. § 922(t)(3). Compl., ECF No. 1, Ex. 1; ATF000065.

In 2017, however, ATF and FBI learned that Michigan had revised its interpretation of MCL § 28.426. Under Michigan's new view, as reflected in ATF and FBI summaries of that view as described to FBI by Michigan State Police ("MSP") officials, Michigan had decided that MSP officials need not take the information returned by a NICS search and conduct the additional research or analysis needed to "determin[e] . . .whether a CPL applicant was prohibited by federal law from possessing a firearm." *See* ATF000098 (ATF's Michigan CPL talking points), ATF000104 (Mar. 3, 2020 letter from ATF to Michigan AG); *compare* ATF000056 (ATF briefing paper on Michigan CPLs). FBI and ATF worked to persuade the MSP to resume making such

determinations, including by "assist[ing] Michigan officials in applying federal law" and "giv[ing] MSP case-specific guidance upon request." ATF000104 (Mar. 3, 2020 Letter from ATF to Michigan AG). In July 2018, FBI and ATF's cooperative efforts with the MSP appeared to succeed, as the MSP advised FBI that the Michigan AG had "granted MSP the authority" for to complete the process of determining whether NICS check information indicated a disqualification from firearms possession. *See id.*; AR000023-000024 (FBI emails to ATF describing Michigan's actions).

However, in March 2019, Michigan legal counsel again revised their interpretation of Michigan law, apparently due to the election of a new state AG, and relayed that view to FBI. *See* ATF000024, ATF000079.[2] The result of this revised interpretation was significant: in early 2019, Michigan approved the issuance of 50 CPLs for individuals with potentially-disqualifying misdemeanor convictions for domestic violence, and without evaluating whether those convictions were in fact disqualifying. *See* ATF00028 (FBI email to ATF describing conversation with MSP official), ATF00038-44 (spreadsheet of potentially prohibited persons who received CPLs), ATF00058 (ATF briefing paper). FBI and ATF again attempted to resolve the issue with Michigan officials cooperatively, inviting state officials to discuss the CPL issuance process on a conference call. *See* ATF00026 (email correspondence between FBI and

---

[2] This action by the MSP initially appeared to be an interim step, "pending a new opinion from" the Michigan AG. ATF000079. In issuing the 2020 PSA, ATF relied on, *inter alia*, the subsequent inaction that has left this supposedly-interim step in place, not on any follow-up by the Michigan AG, which has not occurred.

ATF), ATF00058.  Instead of engaging in discussion, Michigan "refus[ed] to meet with [ATF Deputy Assistant Director] Curtis [Gilbert]," ATF000047 (ATF internal email thread discussing Michigan CPLs), and reiterated the state's view that state law requires the MSP only to "request the documentation needed to research" whether a person is prohibited, not to actually assess that information to determine whether it indicates that an individual is a prohibited person.  ATF00034-35 (email correspondence between FBI and ATF);[3] *see also* ATF000058.

In light of Michigan's interpretation of state law as not requiring that a state official "verif[y]" whether NICS information "indicates" that a CPL applicant is prohibited from acquiring or possessing firearms, ATF decided that its March 2006 open letter was no longer valid.  *See* ATF000105 (letter from ATF to Michigan AG). Accordingly, ATF issued the 2020 PSA, which informed FFLs that they could no longer accept Michigan CPLs as alternate permits, and must instead carry out a NICS check before transferring a firearm to the holder of a Michigan CPL.  *See* Compl. at Ex. 2; ATF000100-ATF000101.

## STANDARD OF REVIEW

"When a federal court is reviewing a final agency action, the usual rules and standards governing summary judgment do not apply."  *KPK Techs., Inc. v. Cuccinelli*, No. 19-10342, 2019 WL 4416689 at *3 (E.D. Mich. Sept. 16, 2019).  This is "because of the

---

[3] FBI and ATF are also concerned that Michigan is no longer putting evidence of marijuana use (i.e. arrests, charges, other information regarding possession) into the NICS Index. *See* ATF00034, ATF00058.  However, ATF does not contend that this was the basis for the 2020 PSA.  *See* ATF000080.

limited role of a court in reviewing the administrative record." *Harkness v. Sec. of the Navy*, 174 F. Supp. 3d 990, 1004 (W.D. Tenn. 2016) (quoting *N. Carolina Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 78-79 (D.D.C. 2007). "Summary judgment [is] the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *KPK Techs.* at *3 (quoting *Singh v. Johnson*, 2016 WL 3476701 at *7 (E.D. Mich. June 27, 2016) and *Resolute Forest Prods. v. USDA*, 187 F. Supp. 3d 100, 106 (D.D.C. 2016)).

"The court's function in reviewing final agency action" is "prescribed by the APA." *Simms v. NHTSA*, 45 F.3d 999, 1003 (6th Cir. 1995). A court may set aside or hold unlawful only "agency action that is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)). "[T]his [APA] section . . . requir[es] the party challenging the agency's action to show that the action had no rational basis or that it involved a clear and prejudicial violation of applicable statutes or regulations." *McDonald Welding v. Webb*, 829 F.2d 593, 595 (6th Cir. 1987). In applying this "'narrow' standard of review[,] 'the court is not empowered to substitute its judgment for that of the agency.'" *Covenant Med. Ctr. v. Sebelius*, 994 F. Supp. 2d 862, 869 (E.D. Mich. 2014) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

"In addition to arbitrary and capricious review, the APA authorizes courts to review agency actions for conformity with law," *Bangura v. Hansen*, 434 F.3d 487, 502 (6th Cir. 2006) (citing 5 U.S.C. § 706(2)(A)), including whether an agency interpretation

is consistent with the statutory text.  This "standard should not be a rubber stamp," *Reed v. Reno*, 146 F.3d 392, 397 (6th Cir. 1998), but an "agency's decision is presumptively valid" when subject to challenge under Section 706 of the APA. *Texas Tech Physicians Assoc. v. HHS*, 917 F.3d 837, 844 (5th Cir. 2019).  The agency is entitled to deference "for its reasonable interpretation of an ambiguous statute it is charged with administering." *M.L. Johnson Family Props., LLC v. Bernhardt*, 924 F.3d 842 (6th Cir. 2019).  Such interpretations generally "do not warrant *Chevron*-style deference" where they are "contained in policy statements . . . and were not promulgated via notice and comment rulemaking."  *Atrium Med. Ctr. v. HHS*, 766 F.3d 560, 567 (6th Cir. 2014). Instead, they are "entitled to respect . . . to the extent that they have the power to persuade." *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  "In deciding whether the [agency's] interpretation is persuasive," courts "look to the statute's text and design" and whether the interpretation is "consistent with congressional purpose." *Id.* (quoting *S. Rehab. Grp., PLLC v. HHS*, 732 F.3d 670, 685 (6th Cir. 2013)).

## ARGUMENT

### I.   The 2020 PSA Is Within ATF's Authority.

The 2020 PSA explains that, in light of Michigan's change in legal interpretation, ATF concluded that Michigan CPLs issued pursuant to MCL § 28.426 are not issued pursuant to a State law that "provides that such a permit is to be issued *only* after an authorized government official has *verified* that the information available to such official does not indicate that possession of a firearm by such other person would be in

violation of law." 18 U.S.C. § 922(t)(3) (emphasis added); *see* ATF00010-ATF000101. Issuance of the 2020 PSA fulfills ATF's 1998 commitment to "notify licensees . . . whether or not permits issued by [a] State will suffice as alternatives," ATF000147, an interpretation of § 922(t)(3) authorized by the APA, 5 U.S.C. § 553(b)(A).   Thus, contrary to Plaintiffs' claim that the 2020 PSA is *ultra vires*, *see* Compl. ¶ 64, the 2020 PSA is within ATF's authority and sets forth the correct understanding of the statute.

### A. The Statutory Text Demonstrates That ATF Correctly Interprets Section 922(t)(3) to Require an Evaluation of the Information NICS Provides to the State.

ATF's longstanding interpretation of 18 U.S.C. § 922(t)(3) is that, to qualify as an alternate permit, the information available to state officials upon issuance of that permit must include information obtained through a NICS check, and the State must "disqualify all individuals prohibited under Federal law" if those persons are flagged by NICS.   63 FR 58275; ATF000157.   This is a straightforward interpretation of the statutory text, which announces that state law must compel state government officials to "*veri[y]*" that the information they have available "*does not indicate*" that "possession of a firearm . . . would be in violation of law."   18 U.S.C. § 922(t)(3) (emphasis added). ATF's interpretation is therefore not *ultra vires*.

"To determine ordinary meaning" of the statutory text of the terms 'verify' and 'indicate,' "dictionaries are a good place to start." *United States v. Shepherd*, 922 F.3d 753, 758 (6th Cir. 2019) (quoting *United States v. Zabawa*, 719 F.3d 555, 559 (6th Cir. 2013)). The relevant definition of "verify" in the online version of the Oxford English

Dictionary is "[t]o ascertain or test the accuracy or correctness of (something), esp. by examination or by comparison with . . . some standard; to check or correct in this way." VERIFY (4a.), *OED Online*, http://oed.com/view/Entry/222511 (last visited Oct. 14, 2020). This definition illustrates that, by using "verify," the statute requires an affirmative act on the part of the state official: to review the NICS information and "ascertain" whether, pursuant to that and other "information available," whether the individual is prohibited by law from possessing a firearm. Here, because Michigan no longer interprets its law to require MSP to evaluate NICS information, Michigan law does not "provide[] that [a CPL] is to be issued *only* after an authorized government official has *verified*" an applicant's status as non-prohibited. 18 U.S.C. § 922(t)(3).

The dictionary definition of "indicate" reinforces this conclusion. That term means "[t]o point to or towards the presence, existence, or reality of; to be a sign or symptom of." INDICATE (2a.), *OED Online*, http://oed.com/view/ Entry/94416 (last visited Oct. 1, 2020). This definition does not require that a fact be clear on its face, but only that it provide "a sign" or suggestion that some fact is present. *Id.* Coupled with the term "verify," the statute therefore obligates state officials—if the permits they issue are to qualify as alternate permits—to take an "indicat[ion]" from a NICS check as a "sign" of the potential "existence" of a disqualification, and take the steps needed to "verify" whether the individual is in fact disqualified under federal law.

Plaintiffs' argument that MCL § 28.426(2)(a) satisfies 18 U.S.C. § 922(t)(3) without regard to Michigan's interpretation ignores the "verified" and "does not

indicate" language.  In essence, Plaintiffs contend that because Michigan law requires a NICS check and NICS is being accessed, those elements alone are sufficient to satisfy 18 U.S.C. § 922(t)(3)(A)(ii).  This approach contradicts the text, elevates form over substance, and differs from ATF's understanding of the interpretations of the other 20-plus states that have permits that qualify as NICS alternatives. *See* ATF000272-ATF000275; https://go.usa.gov/xGhKJ (last visited Oct. 14, 2020).  As discussed further below, *see infra* Part II.A, Michigan actually obtains information indicating that certain CPL applicants may be prohibited, but nonetheless declines to "verif[y]" whether that information means that possession of a firearm by those applicants "would be in violation of law." 18 U.S.C. § (t)(3)(a).  This does not suffice.

### B. The Structure and Purpose of the Brady Act Confirm that ATF's Interpretation Is Correct.

Both the purpose and the structure of 18 U.S.C. § 922(t) reinforce that ATF is correct to follow the plain-text meaning of the statute's terms as defined above.  "[T]he very purpose of the Gun Control and Brady Acts. . . [is] to ensure that individuals not authorized to possess firearms are unable to purchase them." *National Rifle Ass'n* ("*NRA*") *v. Reno*, 216 F.3d 122, 133 (D.C. Cir. 2000); *see* H.R. Rep. No. 103-344, at 1 (1993) (statute is designed "to prevent convicted felons and other persons who are barred by law from purchasing guns").  ATF's interpretation fulfills this purpose, in contrast to Plaintiffs' theory that as long as the state contacts NICS—regardless of what the NICS information indicates—Michigan's work to satisfy Section 922(t)(3) is done.

The "statute establishes a detailed scheme to enable the [FFL] to verify . . . whether a potential buyer may lawfully own a gun," including by having the FFL "determine whether the potential purchaser is for any reason disqualified from owning a firearm" through a NICS check. *Abramski v. United States*, 573 U.S.169, 172 (2014). The Brady Act accomplishes this purpose by generally requiring that, prior to a firearms sale, the FFL "contacts the [NICS] system," 18 U.S.C. § 922(t)(1), and obtains a "Proceed" indicator, meaning that the NICS contains no information that the purchaser is prohibited.[4]   In the event NICS cannot immediately provide information as to whether a purchaser is prohibited, the statute provides three business days for the FBI's NICS Section to obtain additional information or analyze the information available to it (during which time the FFL is prohibited from completing the transfer). *Id.* Only if NICS does not provide a further response within three business days does Section 922(t)(1) permit an FFL to carry out the transfer without a "Proceed" response.[5]

Like the background check requirement, the alternate permit provision is also situated in 18 U.S.C. § 922(t), and it directly references 18 U.S.C. § 922(t)(1). *See* 18 U.S.C. § 922(t)(3) ("Paragraph (1) [18 U.S.C. § 922(t)(1)] shall not apply to a firearm

---

[4] A NICS check generates three possible responses:  Proceed (allowing the transfer), Deny (instructing the FFL not to complete the transfer), or Delay.  See 28 C.F.R. 25.6(c)(1)(iv). A "Delay" occurs when the FBI is unable to provide immediately a definitive response of either Proceed or Deny, and further research is required.

[5] Permitting a transaction to proceed following a three-day delay balances the Brady Act's purpose of keeping firearms from the hands of those who cannot lawfully possess them with the burden on the rights of law-abiding firearms purchasers that would be imposed by an indefinite delay on their ability to purchase.

transfer . . . if"). These "subsections . . . should be read harmoniously," *U.S. v. Mills*, 850 F.3d 693, 698 (4th Cir. 2017) (discussing *in pari materia* canon of construction), to provide comparable means of accomplishing the statutory purpose—that a background check be conducted prior to any firearms transfer from an FFL. The structure of the statute thereby suggests that the alternative background checks under Section 922(t)(3) should involve a review of NICS information similar to such checks under Section§ 922(t)(1). Thus, just as the FBI NICS section must research and analyze information that "indicates," but does not conclusively determine, that a person is prohibited, state officials should also carry out such research and analysis. As explained below, under Michigan's revised interpretation of state law, Michigan officials are not doing so.

Interpreting 18 U.S.C. § 922(t)(3) to require the research and analysis necessary to determine whether a person is prohibited is consistent with ATF's longstanding position that there be "parity between the background check required of permittees and the NICS check undergone by other purchasers of firearms." ATF Memorandum, Qualification of Permits as Alternatives to NICS Check (Oct. 8, 1998) at 2; ATF000170. Under this approach, a state-issued permit qualifies as an alternate permit only if "the permittee has been subjected to the *same background check* that he would get if he attempted to purchase a firearm without a permit." *Id.* (emphasis added).[6]

---

[6] Plaintiffs appear to suggest that ATF's "parity" requirement is not met if state officials verify whether the information available would place an applicant in violation of law. MSJ Br. at 19. If so, their complaint is with Congress, not ATF, which required state officials to do so in the text of 18 U.S.C. § 922(t)(3). *See supra* Part II.A.

14

In contrast, Plaintiffs' interpretation contradicts the structure of the statute and frustrates its purpose. By permitting FFLs to accept an alternate permit where state law requires a less-extensive background check than a NICS check performed at the time of purchase, Plaintiffs would incentivize prohibited persons who seek firearms to obtain alternate permits. This would undercut the statute's purpose of "ensur[ing] that [those] not authorized to possess firearms are unable to purchase them." *NRA*, 216 F.3d at 133. Plaintiffs' reading would improperly "undermine," or "virtually repeal . . . [the Brady Act's] core provisions," *Abramski*, 573 U.S. at 179-80, and should be rejected.

## II.   The 2020 PSA Correctly Reflects That Michigan Law Has Changed.

Plaintiffs' argument places overwhelming evidence on the assumption that, because the text of MCL 28.426(2) "*has not changed in any way* since 2005[,] [t]he 'law of the State provides' in 2020 exactly what it did in 2005." P's Mot. for S.J., ECF No. 17 ("MSJ Br."), at 3-4 (emphasis in original). Not so. Michigan law *has* changed since 2006, namely, through the interpretation made by Michigan legal counsel and shared with FBI, and because state law has changed, ATF acted correctly in issuing the 2020 PSA because the agency is obligated to "consider . . . the wisdom of its policy on a continuing basis." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1354 (6th Cir. 1994) (quoting *Rust v. Sullivan*, 500 U.S. 173, 186 (1991)). This includes ATF's actions here.

### A. Michigan Now Interprets State Law to Require that State Officials Obtain Information From NICS, But Not to Review the Results.

As reflected in ATF's description of Michigan's 2005 letter, Michigan originally

interpreted MCL § 28.426 to require that a CPL be issued only if, following a NICS check, the state official carrying out the check made "[a] determination . . . that the permit holder is not prohibited under federal or state law from possessing firearms." ATF000056.  In "an informal opinion" in 2017, the Michigan AG reiterated that view, "recommending that the MSP make and enter determinations of federal firearms prohibitions." ATF000017.[7]  But that interpretation has changed. *See* ATF000018.

As ATF understands it, Michigan currently interprets MCL § 28.426 to require state officials only to obtain information from a NICS check, but not to "conduct[] the necessary research or render[] a final determination as to whether a CPL applicant [is] prohibited by federal law from possessing a firearm."  ATF000049.  Indeed, in Michigan's view, MSP lacks the "authority to make and enter a final determination of factual and legal issues" regarding an applicant.  ATF000015; *see* ATF000009.  Contrary to Plaintiffs' suggestion, this appears to be a change in state law promulgated by "legal counsel," ATF000049, not a change "in practice by state officials."  MSJ Br. at 5.

Michigan's treatment of potentially-disqualifying MCDV (misdemeanor domestic violence convictions) illustrates the consequences of current Michigan law. When a NICS check indicates that a CPL applicant is potentially disqualified due to an

---

[7] The 2018 Michigan AG opinion resulted from a cooperative process among the Michigan AG office, the Michigan state police, FBI, and ATF.  This included at least one conference call to discuss and "clarif[y]" federal law, and agreement by FBI to "assist Michigan officials in applying federal law" and by ATF to "give MSP case-specific guidance upon request." ATF000049.  These facts, as illuminated in the record, demonstrate the error in Plaintiffs' assertion that the "federal government has refused to help Michigan with interpreting federal law." MSJ Br. 18-19.

MCDV, a Michigan official "pull[s] police reports . . . to check for qualifying prohibitors," thereby "request[ing] the documentation needed to research the prohibition."   ATF000034.   Once Michigan officials obtain that information, "however[,] they are not finalizing any research . . . [to] determine if it meets the federal prohibition."   *Id.*, ATF000035.   Instead, Michigan allows the CPL application to advance to a county clerk, for potential approval and issuance of the CPL.   *See* ATF000025.   Michigan likewise forgoes analysis of information that "applicants . . . may have an active warrant" disqualifying them as fugitives from justice.   ATF000014.

Michigan's handling of NICS checks is not the result of a mistake or of neglect: MSP informed FBI that MSP is proceeding pursuant to the instructions of MSP legal counsel interpreting state law, possibly in consultation with the Michigan AG.   *See* ATF000009-ATF000010 (MSP response to FBI audit); ATF000031.   MSP officials "have been directed to issue CPLs without conducting the research for MCDV," based on "information from MSP legal" counsel.   *Id.* (noting that no similar "direction was provided for the LTP"); *see also* ATF000028 (describing "guidance from the MSP legal counsel that CPL applications be advanced without further "MCDV research"). Michigan officials have informed the FBI that this "decision on research" would not have been reached "without . . . guidance" from the Michigan Attorney General, ATF000028, and that MSP "legal counsel spoke with their AG and they are not interested in having a call to discuss [these] matters" with the FBI or ATF.  ATF000026.

### B. In the 2020 PSA, ATF Appropriately Deferred to Michigan's Interpretation of its Own State Law.

In issuing the 2020 PSA, ATF "appropriately relied on" the state agency's "interpretation of its own . . . laws," as "traditional federalism principle[s]" suggest is obligatory. *Morgan v. ATF*, 509 F.3d 273, 275-76 (6th Cir. 2007); *see Macias v. N.M. Dep't of Labor*, 21 F.3d 366, 369 (10th Cir. 1994) (federal courts should "give deference to a state administrative agency's interpretation and application of a state statute"); *City of Bangor v. Citizens Comm. Co.*, 532 F.3d 70, 94 (1st Cir. 2008) ("Federal courts generally defer to a state agency's interpretation of those statutes it is charged with enforcing"). "Just as this Court defers to the state courts and other relevant authorities as to issues of state and local law, [ATF] surely should be permitted to do so as well." *Morgan v. ATF*, 473 F. Supp. 2d 756, 765-66 (E.D. Mich. 2007) (rejecting argument that ATF has a "duty" to "independently analyze and confirm the accuracy of a local government official's interpretation of local law") (internal quotations omitted).

Other provisions of the GCA likewise incorporate state interpretations of state law, demonstrating that Congress intended ATF to defer to states, as it has done here. For example, 18 U.S.C. § 921(a)(20), which defines the prohibition on the possession of firearms by felons in 18 U.S.C. § 922(g)(1), specifically instructs that  "[w]hat constitutes a conviction of [a misdemeanor punishable by more than two years imprisonment] shall be determined in accordance with the law of the jurisdiction." *See United States v. Cassidy*, 899 F.2d 543, 546 (6th Cir. 1990) ("it is clear that Congress intended that courts refer to state law to determine whether an individual should be

subject to federal firearms disabilities by virtue of a criminal conviction"). Similarly, 18 U.S.C. § 922(b)(2) prohibits firearms sales that "would be in violation of any State law or any published ordinance." And courts have made clear that it is the "underlying substance of the state procedure," as interpreted by states, not its "label," that governs the relationship between state and federal law. *Wyoming ex rel. Crank v. United States*, Case No. 06-cv-0111, 2007 WL 9735116 at *10 (D. Wyo. May 8, 2007).

ATF's reliance on Michigan's interpretations of state law is also consistent with the agency's longstanding practice in interpreting 18 U.S.C. § 922(t)(3). Prior to the effective date of that section, ATF directed its field offices to "quer[y]" states "to determine if their requirements for issuing permits will qualify the permit" as an alternative so that ATF could fulfill its "responsibility to determine whether" those permits satisfy the alternate permit exception. ATF000164, ATF000166-167. ATF explained at the time that this determination could be made only through "discuss[ions] . . . with the State representatives," and not "simply [by] examin[ing] the laws of the various States." ATF000167. Similarly, in 2004, ATF asked states with alternate permits "to send a written response to ATF, explaining how the State licensing authority complies with the minimum requirements" under 18 U.S.C. § 922(t)(3). ATF000278. And ATF reiterated in 2018 that its "[f]ield counsel" are to analyze alternate permits by "correspond[ing] with the State entity" about the requirements of State law. ATF000276; *see* ATF000276-ATF000281.

In short, Plaintiffs cannot succeed on a theory that Michigan law is unchanged.

III.   **The 2020 PSA Is Not Arbitrary and Capricious**.

    A. **ATF Did Not Err by Considering Evidence of Michigan's Practice.**

The record reveals that Michigan's interpretation of its state law is leading to the issuance of Michigan CPLs without any verification of whether potentially-disqualifying information demonstrates that an applicant is a prohibited person.  For example, in May 2019, MSP confirmed to ATF that dozens of people potentially prohibited for MCDVs were "pushed back out" for issuance of CPLs, and "50 were approved that could possibly be federally prohibited." ATF000036.  Michigan even provided a list of those individuals to ATF.  *See* ATF000038-ATF000043.  Each time this occurs, "the potential of a disqualified individual obtaining a firearm grows because these subjects are being issued a CPL even though federally disqualifying information may be available for denial purposes." ATF000009.

Plaintiffs contend that ATF should not have considered this information in issuing the 2020 PSA because ATF "did not identify a [single] prohibited CPL holder using a CPL to circumvent a NICS check and obtain a firearm." MSJ Br. at 21 (quoting ATF000063).  As explained above, however, ATF primarily relied on Michigan's legal interpretation, not specific examples, in issuing the 2020 PSA.  The examples merely confirm that the state's actions conform to its legal interpretation, and indeed, in its response to the FBI's NICS audit, the MSP disagreed only as to the "breadth" of the problem, not the fact that disqualified persons may be obtaining firearms.  ATF000016.

Nor does this examination of Michigan's practices transform "compliance" with

federal law into a new, improper factor to ATF decisions.  *See* MSJ Br. at 7.[8]  Rather, in light of its understanding of Michigan's changed interpretation of law, ATF reviewed the state's practices "to aid in ATF's assessment . . . by identifying potential examples of CPLs issued to persons Federally prohibited," recognizing that such information would be "useful in [an] argument to revoke [FFL use of] CPLs" as alternate permits. ATF000060, ATF000062.  Courts may consider a law's implementation as part of an inquiry into its meaning, because "past administrative practice" helps shed light on the reasonableness of an "interpretation of the statute." *Bowen v. Georgetown Hosp.*, 488 U.S. 204, 213-14 (1988); *ANA Intern., Inc. v. Way*, 393 F.3d 886, 899 (9th Cir. 2004) (Tallman, J., dissenting) ("Looking to agency practice . . . may inform our interpretation of a statute"); *cf. U.S. v. Price Bros.*, 721 F. Supp. 869, 872-73 (E.D. Mich. 1989) (using agency practice as a tool for understanding meaning).  ATF has reasonably done the same here.

### B. Issuance of the 2020 PSA Did Not Require Notice-and-Comment.

### 1. No Heightened Standard of Review Is Appropriate.

The 2020 PSA does not "constitute[] a complete reversal of policy made without a reasoned explanation," as Plaintiffs allege. Compl., ¶ 60.  Since 1998, ATF has consistently taken the position that a permit will qualify as a NICS alternate "only after the permittee has been subjected to the same background check that he would get if he attempted to purchase a firearm without a permit.  The only difference is that the law provides that the permit may be good for up to five years." ATF000170. The "reversal

---

[8] ATF's longstanding view is that it "lacks authority to adopt" a "condition to a permit's qualification as an alternative" that is not found in the statute.  ATF000169.

of policy" here is attributable to Michigan, not to ATF.  *See supra* Part II.A; AR000023.

In any event, even if the 2020 PSA represented a change in policy by ATF and not Michigan, the agency's action would be valid.  Agencies are not prohibited from changing course when they have "good reasons" to do so.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  These reasons do not need to demonstrate that "the new policy [is] better than the . . . old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better."  *Id.*  Here, Michigan's change of interpretation of its law and decision to begin issuing permits to CPL applicants who were potentially prohibited by Federal law from possessing firearms is a good reason for the new policy, and the 2020 PSA explains that the agency believes it to be better, given Michigan's actions.  *See* Compl. at Ex. 1.[9]

### 2. The 2020 PSA Is an Interpretive Rule, for which Notice-and-Comment Rulemaking Is Not Required.

The 2020 PSA was issued to clarify and advise the public of ATF's construction of 18 U.S.C. § 922(t)(3)(A)(ii), and is therefore an interpretive rule.  "Not all 'rules' must be issued through the notice-and-comment process, [which] . . . does not apply" to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."  *Perez v. Mortgage Bankers Association*, 575 U.S. 92, 96 (2015), (citing 5 U.S.C. § 553(b)(A)).  "[T]he critical feature of interpretive rules is that they are

---

[9] As a general matter "[a]gencies possess 'at least some inherent authority to revisit their prior decisions.'"  *Voyageur Outward Bound School v. U.S.*, 444 F. Supp. 3d 182, 189-90 (D.D.C. 2020), citing *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.); *see Belville Mining Corp. v. U.S.*, 999 F.2d 989, 997 (6th Cir. 1993) ("the general rule is that an agency has inherent authority to reconsider").

issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Id.* at 97. (internal quotations omitted); *see Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (to be interpretive, a rule must derive from existing law that "compels or logically justifies the proposition"). Here, the 2020 PSA explains ATF's view of the statute in light of the terms contained therein.

Plaintiffs err when they assert that the Michigan PSA "is a substantive or legislative rule because it purports to amend 27 C.F.R. § 478.102(d)(1)(iii) by imposing additional requirements beyond the 'law of the State,' changes the obligations and legal consequences for firearm purchasers and sellers in Michigan, and . . . 'effectively amends a prior legislative rule.'" Compl. ¶¶ 66-68. As explained above, the 2020 PSA is consistent with the text of the statute, explains the obligations and legal consequences under the statute itself, and affects only prior ATF guidance of the same nature: an interpretation of law. *Compare Wilson v. Lynch*, 835 F.3d 1083, 1100 (9th Cir. 2016) (ATF Open Letter interpreting 18 U.S.C. §§ 922(d)(3), (g)(3) in states decriminalizing marijuana was "textbook interpretative"). Thus, regardless of its impact, or the fact "it departs from [a] prior interpretation," it remains an "interpretive rule" not subject to notice-and-comment. *Dismas Charities, Inc. v. DOJ*, 401 F.3d 666, 681 (6th Cir. 2005).

### C.  The 2020 PSA Does Not Compel Michigan to Be a NICS POC.

Plaintiffs place great weight on a single reference in an FBI audit report to Michigan as a "partial POC" state,[10] and suggest that this language indicates that ATF

---

[10] States may "voluntarily play a role" in the NICS check process by having "a 'point of contact' ["POC"] designated to 'serv[e] as the intermediary between an FFL and . . .

has improperly conflated Michigan's duties under 18 U.S.C. § 922(t)(3) with the duties of NICS "point-of-contact" (POC) states. *See* MSJ Br. at 14-18. Not so. Nothing in the 2020 PSA turns on Michigan's status as a non-POC state, nor does ATF's longstanding requirement that the background checks conducted for alternate permits ensure "parity" with NICS checks requested by an FFL at the point-of-sale, ATF000170, "force involuntary POC status upon Michigan." MSJ Br. at 16. A state can always choose *not* to make its firearms permits ones that satisfy 18 U.S.C. § 922(t)(3); a state's choice to do is voluntary. Should a state so choose, moreover, the burdens are far less than those involved in being a NICS POC state, where the state would assume responsibility for NICS checks each and every time a background check is required at the point-of-sale. By comparison, the NICS check for one alternate permit is valid for up to five years and may replace numerous FFL-initiated NICS checks (if the permit-holder makes multiple purchases during the five-year life of the permit). And, contrary to Michigan's stated objection, 18 U.S.C. § 922(t)(3) does not turn a state official into an "interpret[er] [of] federal law," but only requires that the official "apply[] federal law to the facts and circumstances of each license applicant." ATF000049.

Nor does ATF's interpretation of 18 U.S.C. § 922(t)(3) unconstitutionally "commandeer[] state personnel" in violation of the Tenth Amendment, as Plaintiffs

---

NICS." *City of New York v. DOD*, 913 F.3d 423, 427 (4th Cir. 2019) (quoting 28 C.F.R. § 25.2). This state POC carries out the NICS check (and may also check other data sources, such as state databases) prior to the transfer of a firearm by an FFL. States that act as such intermediaries are known as "POC states."

contend.   MSJ Br. at 8, 16.   As ATF explained when commenters raised similar objections to the 1998 NPRM, the "standards for permits that meet the criteria" of 18 U.S.C. § 922(t)(3) in no way implicates Tenth Amendment or Federalism concerns" because nothing "require[s] States to establish or administer permit systems . . . recognized as valid . . . alternatives" to FFL NICS check requirements.   63 FR 58275; ATF000157.   The mere availability of the alternate permit provision does not commandeer States or state officials, who remain free to structure state permit systems however they choose (or not at all), as long as those systems are otherwise lawful.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be granted and Plaintiffs' motion for summary judgment should be denied.


DATED: October 15, 2020                    Respectfully submitted,

                                           JEFFERY BOSSERT CLARK
                                           Acting Assistant Attorney General

                                           LESLEY FARBY
                                           Assistant Branch Director

                                            /s/ Eric J. Soskin
                                           ERIC J. SOSKIN (PA Bar #200663)
                                           Senior Trial Counsel
                                           U.S. Department of Justice, Civil Division
                                           1100 L Street, NW, Room 12002
                                           Washington, D.C. 20530
                                           Telephone: (202) 353-0533
                                           Fax: (202) 616-8470
                                           Email: Eric.Soskin@usdoj.gov
                                           *Attorneys for Defendants*