**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

**DONALD J. ROBERTS, II, and**

**GUN OWNERS OF AMERICA, INC.,**

             **Plaintiffs,**

                                      **Case No. 20-cv-10639-TLL-PTM**

**v.**

                                        **Hon. Thomas L. Ludington**

**U.S. JUSTICE DEPARTMENT,**

**BUREAU OF ALCOHOL, TOBACCO, FIREARMS**
**AND EXPLOSIVES, and**

**REGINA LOMBARDO, in her official capacity as**
**Acting Director, Bureau of Alcohol, Tobacco,**
**Firearms, and Explosives,**

             **Defendants.**

_____

**<u>PLAINTIFFS' COMBINED REPLY TO DEFENDANTS' BRIEF IN OPPOSITION</u>**
**<u>TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND</u>**
**<u>RESPONSE IN OPPOSITION TO DEFENDANTS'</u>**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Kerry L. Morgan (P32645)
PENTIUK, COUVREUR & KOBILJAK, P.C.
2915 Biddle Avenue, Suite 200
Wyandotte, MI 48192
Main: (734) 281-7100
F: (734) 281-2524
KMorgan@pck-law.com
*Counsel for Plaintiffs*

Robert J. Olson
William J. Olson
Jeremiah L. Morgan
WILLIAM J. OLSON, P.C.
370 Maple Avenue West, Ste. 4

Vienna, VA 22180
T: (703) 356-5070
T: (540) 450-8777
F: (703) 356-5085
wjo@mindspring.com
*Of Counsel*

Eric J. Soskin (PA Bar #200663)
U.S. Department of Justice, Civil Division
1100 L Street, NW Rm. 12002
Washington, DC  20530
T: (202) 353-0533
F: (202) 616-8740
eric.soskin@usdoj.gov
*Counsel for Defendants*

_____

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES…………………………………………………………iv

ARGUMENT…………………………………………………………………..…1

I.    ATF Has No Authority to "Interpret" Section 922(t)(3) to Create Additional Burdens on States................................................................................................... 1

    A.    ATF Is Entitled to No Deference ................................................ 1

    B.    The Agency Has Added Obligations to the Statute .................................. 2

II.    The Government's "Straightforward Interpretation" of Section 922(t)(3) Conflicts with what ATF Required of Michigan ................................................................. 5

III.    "The Law of The State" of Michigan Is Found in MCL Section 28.426................ 8

IV.    ATF Claims Michigan Law Has Been "Changed" through Hearsay and Speculation about an Informal Interpretative Gloss by a Single Nameless Bureaucrat within MSP ............................................................................... 9

V.    The Government Now Seeks to Change the Basis for the Challenged Action..... 14

VI.    Section 922(t)(3)'s Very Existence Undermines the Government's "Structure and Purpose" Argument......................................................................................... 15

VII.    The ATF Incorrectly Claims the 2020 PSA Is an Interpretative Rule................. 17

CONCLUSION………………………………………………………………………18

## <u>TABLE OF AUTHORITIES</u>

<u>Statutes</u>
18 U.S.C. § 922(t)(3) ................................................................................ 1–10, 13, 15-19
MCL § 28.426 ................................................................................................................. 8, 13

<u>Regulations</u>
63 *Fed. Reg.* 58272 ........................................................................................................... 17

<u>Cases</u>
*Beer & Wine Ass'n v. Atty General*, 142 Mich. App. 294 (1985) ................................. 11
*Bullock v. IRS*, 401 F. Supp. 3d 1144 (D. Mont. 2019) ................................................. 17
*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) .............. 1
*CFTC v. Erskine*, 512 F.3d 309 (6th Cir. 2008) ............................................................. 14
*Frey v. Dep't of Mgmt. and Budget*, 429 Mich. 315 (1987) ......................................... 11
*Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082 (9th Cir. 2003).......................................... 17
*Midwest Inst. of Health, PLLC v. Governor of Mich. (In re Certified*
     *Questions from the United States Dist. Court)*,
     2020 Mich. LEXIS 1758 (Mich. Oct. 2, 2020)............................................ 12
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................... 18
*Printz v. United States*, 521 U.S. 898 (1997)................................................................ 4, 7
*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ................................................................. 2
*Taylor v. Principi*, 92 F. App'x 274 (6th Cir. 2004)...................................................... 13
*United States v. Hayes*, 555 U.S. 415 (2009)................................................................... 7
*Willis v. Winters*, 235 Ore. App. 615 (Or. App. 2010) ................................................... 8
*Willis v. Winters*, 350 Ore. 299 (Or. 2011) ................................................................ 4, 8
*Wilson v. Lynch*, 835 F.3d 1083 (9th Cir. 2016)............................................................ 17
*Wyoming ex rel. Crank v. United States*, 2007 U.S. Dist. LEXIS 107992 (D. Wy. 2007)......... 8, 9
*Wyoming ex rel. Crank v. United States*, 539 F.3d 1236 (10th Cir. 2008)…………………………..1

## ARGUMENT

Now comes Plaintiffs and for their combined Reply to Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment, and Response in Opposition to Defendants' Motion for Summary Judgment states as follows:

## I.   ATF Has No Authority to "Interpret" Section 922(t)(3) to Create Additional Burdens on States.

### A.   ATF Is Entitled to No Deference.

The government contends ATF's newly imposed duty on Michigan is supported by Section 922(t)(3).  Plaintiffs believe that the statute gives ATF no such authority and is clear and unambiguous on its face, leaving no room for ATF to provide additional meaning to its provisions through adoption of enforcement requirements, or other methods of what ATF calls "interpretation."[1] *See* Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Opp.") at 12.

In this case, the government alleges it has put forth "the correct understanding of the statute," not merely a reasonable one.  Opp. at 10.  Indeed, as the government readily admits, this is not a case where any sort of deference is appropriate, such as under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  Opp. at 9; *see also Wyoming ex*

---

[1] The government argues that "the information available" to a state official means conducting a NICS check.  For purposes of this case, Plaintiffs adopt that understanding, since the Michigan statute at issue requires a NICS check.  However, "the information available" to a state official certainly could be obtained through sources and methods outside a NICS check.  For example, as the government explains (Opp. at 3 n.1), the NICS system draws records from three federal law enforcement databases.  If a state official checked the records in these databases independently of the NICS system, he would have verified "the information available" and would be in compliance with Section 922(t)(3).  Indeed, if the Brady Act — the act that established the NICS system — had intended strictly that *only* a NICS check could qualify under Section 922(t)(3), then obviously Congress would have used the words "NICS check" instead of "information available."

*rel. Crank v. United States*, 539 F.3d 1236, 1245 (10th Cir. 2008).  Rather, the government asks

only for the "power to persuade"[2] the Court of the rightness of its position.  The parties, then,

agree that it is up to this Court to determine the meaning of Section 922(t)(3), rather than simply

deferring to the agency's actions.[3]

### B.   The Agency Has Added Obligations to the Statute.

It is abundantly clear that, in its 2020 PSA, ATF has added its own laundry list of

obligations to those in the statute.  These obligations are above and beyond its allegation that

Section 922(t)(3) requires Michigan to engage in additional investigations and determinations

outside of the NICS system.  ATF in this case has dreamt up and imposed a host of additional

and entirely new requirements for Michigan that are in no way an "interpretation" of Section

922(t)(3), but a blatant expansion of it.  The government alleges that its new requirements are

rational and reasonable, but that is not the question before the Court.   The question is whether

they are statutorily authorized.  Because Section 922(t)(3) provides no cover for ATF's actions,

the agency has engaged in a "'clear and prejudicial violation of applicable statutes or

regulations.'"  *See* Opp. at 8.

---

[2]  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (persuasive value in "a particular case will depend upon the thoroughness evident in [the government's] consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements....")

[3]  Nothing in Section 922(t)(3) empowers ATF to interpret its provisions, or to apply those provisions through audits of various state practices, revocations of state permit exemptions, and demands for compliance with contrived ATF standards not found in the law.  The government alleges that its "interpretation of § 922(t)(3) [is] authorized by the APA, 5 U.S.C. § 553(b)(A)" (Opp. at 10), but that statute merely denotes those times when agency rulemaking need not be published in the Federal Register.  Next, the government claims that its "2020 PSA fulfills ATF's 1998 commitment to 'notify licensees ... whether or not permits issued by [a] State will suffice as alternatives....'"  *Id.*  But a decades-old rulemaking provides no authority for the challenged action, even if the agency (circularly) "committ[ed]" to doing something it was without authority to do in the first place.  At bottom, then, the government provides no independent source of authority for imposing its requirements on Michigan, and neither does Section 922(t)(3).

For example, in its March 3, 2020 letter to the Michigan AG, ATF listed several "corrective measures" that Michigan must take before ATF would again agree to recognize Michigan permits as a NICS alternative.  ATF000105.  As discussed below, Section 922(t)(3) does not authorize such "corrective measures."

First, ATF's March 3, 2020 letter to the Michigan AG demanded that "[a] full NICS check ... must be completed by an authorized Michigan official *on all individuals previously issued CPLs without a full NICS check* or without conducting the necessary research and make an updated prohibited person determination...."  ATF000105 (emphasis added).  Nothing in Section 922(t)(3) requires a state to fix *alleged* problems that happened in the past in order to qualify for a NICS exemption regarding how its permits will be treated in the future.  When ATF recognized Michigan permits as NICS alternatives in 2006, it did not require existing permits to be brought into compliance with the new statute.  Rather, ATF simply stated that all permits as of an effective date would be recognized as NICS alternatives.  *See* Complaint Exhibit A at 2.

Second, ATF's March 3, 2020 letter demanded that "[a]ll CPLs *previously issued* to individuals found to be prohibited ... *must be revoked*...."  ATF000105 (emphasis added).  But nothing in Section 922(t)(3) says anything about requiring *revocation* of state permits, even if issued to persons ineligible to possess firearms under federal law.  Indeed, ATF's overbearing approach smacks of the anti-commandeering and Tenth Amendment problems that Plaintiffs raised in their motion.  *See* Plaintiffs' Motion for Summary Judgment ("MSJ") at 8, 16.  While the government claims this is a non-issue, alleging "[a] state can always choose *not* to make its firearms permits ones that satisfy 18 U.S.C. § 922(t)(3)" (Opp. at 24), nothing in the statute permits ATF to require that a state *revoke* previously issued firearms permits.  On the contrary, Michigan CPLs are entirely a creature of state law.  *Even if* ATF has some power to opine

3

whether certain permits are valid NICS alternatives, it certainly has no power to order the revocation of other state permits it believes are *not* valid NICS alternatives.  *See Willis v. Winters*, 350 Ore. 299, 312 (Or. 2011) ("Congress has not enacted a law requiring license denial as a means of enforcing [federal] policy") (all four Oregon courts to consider this issue agreed that the federal government has no control over the issuance of state permits).

Third, ATF's March 3, 2020 letter demanded that, if Michigan "[s]hould [] determine that an individual is in possession of a firearm in violation of Federal, but not State law, those cases should immediately be referred to the local ATF field office."  ATF000105.  It is hard to imagine a more blatant violation of the principles elucidated in *Printz v. United States*, 521 U.S. 898 (1997).  As was the case in *Printz*, ATF here "purports to direct state law enforcement officers to participate ... in the administration of a federally enacted regulatory scheme," by requiring state authorities to refer their residents to the federal government for prosecution.  *Id.* at 904.  But as the Court noted in *Printz*, "[t]he Constitution does not leave to speculation who is to administer the laws enacted by Congress," and it certainly is not the Michigan State Police.  *Id.* at 922.  As in *Printz*, "[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program ... such commands are fundamentally incompatible with our constitutional system of dual sovereignty."  *Id.* at 935.  ATF cannot require Michigan to participate in federal law enforcement as a condition of Section 922(t)(3) eligibility.

In the conclusion of its March 3, 2020 letter to the Michigan AG, ATF again states clearly that, "[u]nless these corrective measures are fully implemented, FFLs will be unable to accept Michigan CPLs as a NICS alternative under the Brady law."  ATF000105.  No doubt, the

government will seek to recharacterize these demands as merely a "choice" whether to comply or not comply with Section 922(t)(3).  *See* Opp. at 24.  Yet none of the "corrective measures" ATF demanded is permitted by Section 922(t)(3), which is not a carrot/stick that the agency can wield against Michigan to coerce compliance with its non-statutory mandates.  None of these "corrective measures" was required in 2006, when Michigan CPLs were recognized as NICS alternatives, and there is no legal basis for requiring them now.

ATF may envision itself as the supreme arbiter and enforcer of the nation's gun control laws, but Section 922(t)(3) does not permit the agency to act as a Reconstruction era Congress, imposing whatever conditions and qualifications it deems appropriate for readmission to the Union.  Of course, ATF's most egregious extra-statutory demand is still to come — requiring Michigan to conduct federal investigations and make determinations of federal law entirely outside the NICS system.

## II. The Government's "Straightforward Interpretation" of Section 922(t)(3) Conflicts with what ATF Required of Michigan.

The government presents what it markets as a "straightforward interpretation" of Section 922(t)(3):  "to qualify as an alternate permit, the information available to state officials upon issuance of that permit must include **information obtained through a NICS check**, and the State must 'disqualify all individuals prohibited under Federal law' if those persons are flagged by NICS."[4]  Opp. at 10 (emphasis added).  So far, so good.  For purposes of this case (*see* fn.1, *supra*), Plaintiffs agree with this interpretation.  *See* MSJ at 8-9.

---

[4]  There is no dispute here that Michigan meets the second of these criteria — if NICS reports *any* prohibiting record, Michigan *always* denies the CPL.  *See* ATF000020 ("in every reported instance where a NICS background check produced information that indicated an applicant was ineligible for a CPL because a statutory disqualification applies, the MSP CPL Unit has denied CPL applications accordingly.").  And specifically when it comes to MCDV, Michigan notes that "when information contained in NICS indicates that a CPL applicant has committed a

But the government's "straightforward interpretation" offered to the Court conflicts with what ATF has actually done here.  Speaking out of both sides of its mouth, the government claims that Section 922(t)(3) requires verification only of "information obtained through a NICS check," but then on the very next page argues a state must "review the NICS information ... **and other** 'information available'...."  *Cf.* Opp. at 10, 11.  Elsewhere, the government repeats this not-so-straightforward interpretation, that Michigan must "take the information returned by a NICS search and conduct the **additional** research or analysis needed...."  Opp. at 5.  Later, the government again claims that, "[w]hen a NICS check indicates that a CPL applicant is potentially disqualified ... a Michigan official 'pull[s] police reports ... to check for qualifying prohibitors,' thereby 'request[ing] the documentation needed to research the prohibition."  Opp. at 16-17 (*citing* ATF000034).  All of that research would happen *outside* the NICS system and involves information that is *not* "obtained *through* a NICS check."

The government claims that Michigan "declines to 'verif[y]' whether that information" (referring to information provided by NICS) indicates a person is prohibited.  Opp. at 12.  But that is not true:  Michigan disqualifies anyone for whom NICS reports a prohibiting record.  *See* fn.4, *supra*.  Rather, this case involves a microscopically small subset of cases where NICS itself reports *incomplete and inconclusive* information — *potentially* disqualifying MCDV records that represent *potential* MCDVs, for which the NICS system *does not contain sufficient information* for Michigan (or anyone else, for that matter) to make a conclusive determination as to eligibility.  The dispute in this case is whether, when it comes to these potentially disqualifying records, Michigan is required to go beyond the information in the NICS system, to *investigate* and *uncover* additional information and records from state and local authorities, to *analyze* that

disqualifying offense under the MCDV prohibition ... the CPL application is denied."
ATF000016-17.

6

additional information, to *draw legal conclusions* from that additional information, and then to *create and enter* new information[5] (records) into the NICS system.

Michigan notes the problems inherent in background check investigations outside NICS, including "non-uniform or incomplete reporting," "the possibility that many misdemeanor offenses include disjunctive elements that may (but do not necessarily) constitute disqualifying conduct," the "interpretation of quite old case records that were very likely not created in contemplation" of MCDV,[6] and "applying the 'civil rights restored' MCDV exception" which "can in some cases present considerable questions of law and fact." ATF000017.  Each of these concerns involves information that is not "information obtained through a NICS check" — the "straightforward interpretation" of Section 922(t)(3) the government has offered to this Court. Michigan follows the results provided by NICS — as Congress provided in Section 922(t)(3).

---

[5]  This last requirement, that Michigan create new prohibiting records and enter them into the NICS system, most clearly violates the anti-commandeering principles explained in *Printz*.  That is because *even if* ATF were correct that Michigan must investigate information outside NICS and make final determinations as to eligibility for a CPL, Section 922(t)(3) can in no way be understood to require ATF's additional step — a requirement that *state* authorities then create new *federal* prohibiting records and enter them into a *federal* government database for future use by the *federal* government that is entirely unrelated to CPL issuance or Section 922(t)(3) eligibility.

[6]  As the Supreme Court concluded in *United States v. Hayes*, 555 U.S. 415 (2009), a predicate MCDV relationship "need not be denominated an element of the predicate offense," but rather "the Government must prove beyond a reasonable doubt that the victim of the predicate offense was the defendant's current or former spouse or was related to the defendant in another specified way."  *Id.* at 426.  This means that it is often not enough to merely look at the face of the statutory provision reported by NICS.  Rather, in order to determine whether a potentially disqualifying record is actually prohibiting, an investigator often must contact state or local governments or courts in order to seek out highly detailed charging information, arrest records, or other information, in order to establish the existence of the predicate MCDV relationship. None of this information is "NICS information;" rather, it exists entirely outside the NICS system and is precisely the reason that NICS was unable to give a definitive result in the first place.

ATF may prefer as a matter of policy that Michigan go further than the statute requires, but that is a change for Congress, not the agency, to consider.

### III.     "The Law of The State" of Michigan Is Found in MCL Section 28.426.

The government next claims that "the law of the state" of Michigan is found not in any statute enacted by the legislative branch, but rather in an informal, interim, and unwritten legal opinion provided by a bureaucrat within the Michigan State Police ("MSP") — an opinion nowhere to be found in the administrative record, but instead alluded to through multiple levels of hearsay across multiple government agencies. *See* Section IV, *infra.*  Interestingly, the government claims that "'traditional federalism principle[s]'" require this approach.  Opp. at 18.

On the contrary, the phrase "the law of the state" envisions a simple and straightforward analysis based on an examination of the face of the state statute.  Multiple courts have taken this approach.  *See Wyoming ex rel. Crank v. United States*, 2007 U.S. Dist. LEXIS 107992 (D.Wy. 2007) ("[t]he relevant 'law of the state' here is Wyoming's CCW permitting statute...."); *see also Willis v. Winters*, 235 Ore. App. 615, 629 (Or. App. 2010) (noting that Section 922(t)(3) "provides ... an exception ... *if the law of Oregon*" meets certain requirements, then looking to "Oregon's concealed handgun licensing statutes."); *see also Willis v. Winters*, 350 Ore. 299, 303-305, 316 (noting that "waiver of the background check depends on the law of the state that issued the permit," and looking at numerous Oregon *statutes* to determine the boundaries of state law).

The government references a mishmash of authorities where courts, in completely different contexts to the one presented here, have relied on "a state agency's interpretation" of a state law.  Opp. at 18-19.  Meanwhile, the government fails to mention the cases discussed above involving the same inquiry as here, where courts have looked to a state's *statutes* to determine

Section 922(t)(3) eligibility.[7]  Indeed, Plaintiffs have not found any opinion where a court has

looked beyond a state statute to local practices or interpretations when analyzing Section

922(t)(3) eligibility.

**IV.   ATF Claims Michigan Law Has Been "Changed" through Hearsay and Speculation about an Informal Interpretative Gloss by a Single Nameless Bureaucrat within MSP.**

As Plaintiffs had pointed out, the state statute which forms the predicate for Michigan's

Section 922(t)(3) exemption has remained unchanged, even though ATF's position about that

exemption has swung 180 degrees.  *See* MSJ at 3-4.  In its Opposition, the government takes

issue with Plaintiffs' claim that Michigan law "'*has not changed in any* way since 2005.'"  Opp.

at 15 (emphasis added).  Rather, the government claims that "Michigan law *has* changed since

2006, namely, through the interpretation made by Michigan legal counsel and shared with

FBI...."  Opp. at 15.

In order to even consider this claim, this Court needs to have reached two threshold

conclusions, both favorable to ATF.  First, the Court would need to have adopted ATF's

interpretation of Section 922(t)(3) — that "verifi[cation]" of the "information available" to a

state official includes more than simply accessing the information available in the NICS system

and instead involves *investigating* and *gathering* additional information, *making* legal

determinations about that new information, and *creating* new records for addition to NICS.  *See*

Section II, *supra*.  Second, the Court would need to have concluded that the term "state law" as

---

[7]  Ironically, the government cherry picks from a different portion of *Wyoming ex rel. Crank*, arguing that courts must defer to the "'underlying substance of the state procedure.'"  Opp. at 19. But in that passage, the court was discussing an entirely different matter — "a state civil rights restoration procedure" and its effect under 18 U.S.C. Section 921(a)(20).  As noted above, when later discussing Section 922(t)(3), the court made clear that "[t]he relevant 'law of the state' here is Wyoming's CCW permitting *statute*...." 2007 U.S. Dist. LEXIS 107992 at 27, 41 (emphasis added).

used in Section 922(t)(3) includes something more than the plain text of the Michigan statute at issue.  *See* Section III, *supra*.  And even if the Court makes it this far down ATF's rabbit hole, the government still cannot prevail, because a nameless bureaucrat within the MSP has no authority, through an informal and apparently unwritten opinion that has never been produced, to officially "reinterpret" or "change" Michigan law to mean anything other than what the state statute plainly says — a statute that, as written, ATF concedes qualifies under Section 922(t)(3).[11]

The government claims that "Michigan officials have reinterpreted state law ... State law has thereby changed...."  Opp. at 1.  Apparently, ATF believes the state legislature in not the only lawmaking body in this state, and that a single person in the executive branch actually has superior legislative authority.  Yet even if such "reinterpretation" by state officials were possible in theory, the government "officials" referred to here are not part of the Michigan legislature or the courts, the branches of government traditionally constitutionally tasked with enacting and interpreting the law.  Nor are the "officials" within the Michigan Governor or Attorney General's office, executive branch *elected* officials with the responsibility to carry out Michigan law.

Rather, the so-called "officials" who have allegedly "changed" Michigan law are referred to in the record only vaguely as "MSP legal counsel" and "legal opinions provided to MSP by their attorneys...."  *See* ATF000009, ATF000024, ATF000104.  In order to give this informal opinion the air of legitimacy, ATF speculates that the "MSP legal counsel" opinion was "*apparently* due to the election of a new state AG," opines that it "*appeared* to be an interim step, 'pending a new opinion from' the Michigan AG," and hypothesizes that it was done

---

[8]  At least a dozen times, the government attempts to attribute this supposed informal MSP lawyer's opinion to Michigan, as having officially changed its interpretation of state law.  *See* Opp. at 5, 7, 9, 11, 14, 15, 19, 20, 21, 22.

"*possibly* in consultation with the Michigan AG"[9] — yet the government provides no evidence to support this conjecture. In fact, the opposite appears to be true, since the government notes that "MSP 'legal counsel spoke with their AG and they are not interested in having a call to discuss....'"[10]  *See* Opp. at 6, 17 (emphasis added). Indeed, MSP reported that it "sought further legal guidance" — but apparently had not received any — "from the Michigan Attorney General's Office...."[11] ATF000010.

What's more, the administrative record neither identifies the particular attorney responsible for the alleged reinterpretation of state law, nor provides the particulars of his or her apparently unwritten opinion, other than summaries *recounted as hearsay from MSP legal counsel to MSP, then to FBI, and then to ATF.  See* ATF000023-24. Nevertheless, the

---

[9]  As the government is quick to point out, this case involves review of the administrative record, which provides the only available evidence as to what was before the agency when it made its decision. *See* Opp. at 8. There is no room for the government's speculation as to who "appeared" to be behind the MSP guidance.

[10]  The government misinterprets another passage from the administrative record, coming to the conclusion that "Michigan officials have informed the FBI that this 'decision on research' would not have been reached 'without ... guidance' from the Michigan Attorney General." Opp. at 17 (quoting from ATF000028). On the contrary, the April 9, 2019 email in ATF000028 first references the **existing** "guidance from the MSP legal counsel" that had already occurred by at least March 22, 2019 (*see* ATF000023). Only after referring to that interim guidance, the email references a second possible **future** decision, for which "MSP legal counsel will not make a decision on research without [AG] guidance." ATF000028. Indeed, the government refers to both the "interim step" and the "follow-up by the Michigan AG, which has not occurred." Opp. at 6 n.2. If anything, then, this email indicates that the Michigan AG was not involved in the "interim step" that the government claims "changed" Michigan law.

[11]  *Even if* this case involved a formal opinion issued by the Michigan Attorney General, such opinion does not carry the force of law about the meaning of Michigan statutes. *See Beer & Wine Ass'n v. Atty General*, 142 Mich. App. 294, 300 (1985). Nor is such an opinion legally binding on courts. *See Frey v. Dep't of Mgmt. and Budget*, 429 Mich. 315, 338 (1987). At most, such an AG opinion could be used to guide the actions and practices of state officials. *See* MSJ at 5-7, Opp. at 16. But again, that is not the situation here — an informal, interim opinion by some "legal counsel" within MSP far removed from a formal opinion of the Michigan Attorney General.

11

government claims that there has been "a change in state law *promulgated by* 'legal counsel,'"

rather than simply "a change 'in practice by state officials,'" as Plaintiffs claimed.  Opp. at 16

(emphasis added).

At bottom, then, the government's argument rests on the claim that the Michigan statute

has been amended because a single nameless, faceless, unelected, and unaccountable bureaucrat

within (or hired by) the executive branch has given an informal, unwritten opinion,[12] recounted

in the record only through multiple levels of hearsay, about what a Michigan statute — enacted

by the legislative branch — might mean.[13]

In addition to the fact that Michigan law cannot be "changed" in this manner, Plaintiffs'

Motion for Summary Judgment explained that ATF's action was "a solution in search of a

problem," since neither ATF nor FBI has identified a single prohibited person who has

wrongfully obtained a Michigan CPL, much less used a CPL to obtain a firearm.  MSJ. at 21-22.

*See also* ATF000062-63 (ATF "did not identify a [single] prohibited CPL holder using a CPL to

circumvent a NICS check and obtain a firearm....")  The government responds that "ATF

primarily relied on Michigan's legal interpretation, not specific ... *potential examples* ... in

---

[12]  *See* The Big Lebowsky (1998) (https://www.youtube.com/watch?v=1vBesOFURek).  [13]  The
Michigan Supreme Court takes separation of powers issues much more seriously than does ATF.
On October 2, 2020, the Michigan Supreme Court struck down Governor Whitmer's purported
use of the Emergency Management Act to declare a "state of emergency" and then legislate the
minutia of state life, and found the Emergency Powers of the Governor Act to be an unlawful
delegation of legislative power.  *Midwest Inst. of Health, PLLC v. Governor of Mich. (In re
Certified Questions from the United States Dist. Court)*, 2020 Mich. LEXIS 1758 at *2 (Mich.
Oct. 2, 2020).

[13]  The Michigan Supreme Court takes separation of powers issues much more seriously than
does ATF.  On October 2, 2020, the Michigan Supreme Court struck down Governor Whitmer's
purported use of the Emergency Management Act to declare a "state of emergency" and then
legislate the minutia of state life, and found the Emergency Powers of the Governor Act to be an
unlawful delegation of legislative power.  *Midwest Inst. of Health, PLLC v. Governor of Mich.
(In re Certified Questions from the United States Dist. Court)*, 2020 Mich. LEXIS 1758 at *2
(Mich. Oct. 2, 2020).

issuing the 2020 PSA." Opp. at 20-21 (emphasis added). Of course, even if this were true, factors that the agency relied on constitute only part of the "arbitrary and capricious" analysis. Often times, equally important are factors before the agency that it failed to consider and facts that were available to the agency which undermine the challenged action. *See Taylor v. Principi*, 92 F. App'x 274, 276-77 (6th Cir. 2004). The fact that the government can point to no evidence of any real-world problem in this case undercuts ATF's drastic action to revoke the CPL exemption.

Of course, the highly-factual give-and-take between Michigan officials and the MSP, FBI, and ATF about the requirements of state law is entirely irrelevant. As explained above, Section 922(t)(3) does not look beyond the face of state law to what state officials think or do in practice.[14] MSJ at 5-6. Rather, Section 922(t)(3) looks only to the plain text of the state statute — what "the law of the State provides." And, unambiguously, MCL § 28.426 requires that, prior to the issuance of any CPL, "[t]he issuing agency has determined through the federal national instant criminal background check system that the applicant is not prohibited under federal law from possessing or transporting a firearm."

The plain language of that statute was good enough for ATF in 2006, and the government admits that this language is still sufficient under Section 922(t)(3). *See* Opp. at 5. Congress made Section 922(t)(3) simple for a reason — it avoids the type of subjective and convoluted inquiry and analysis of state interpretation and practice into which the government asks the Court to engage here.

---

[14] Likewise, ATF's Alabama PSA (*see* Compl. ¶¶ 25-28) was based on specific Alabama sheriffs who allegedly failed to run NICS checks in spite of a state law that requires them to do so. As in Alabama, the decision of a single state officer (there, a sheriff, here, MSP legal counsel) cannot be used to undermine the Section 922(t)(3) permit exemption for an entire state. Otherwise, a single rogue state official could undermine and nullify the entire statutory provision enacted by Congress.

## V.  The Government Now Seeks to Change the Basis for the Challenged Action.

Plaintiffs' Motion for Summary Judgment explained that the 2019 FBI Audit of Michigan had found **three** grounds of concern with the way Michigan officials were handling NICS checks:  (i) fugitive from justice; (ii) controlled substance user; and (iii) misdemeanor crime of domestic violence ("MCDV").  MSJ at 9-10.  However, as Plaintiffs noted, the ATF Michigan PSA challenged here relied only on **two** grounds of concern:  "MCDV and drug use as reasons for its revocation of the Michigan CPL exemption," leaving out the FBI's fugitive from justice argument.  *See id.* at 10 n.8.  Now, the government walks back another reason ATF gave for the challenged action, claiming that, while "FBI and ATF are also concerned that Michigan is no longer putting evidence of marijuana use ... into the NICS Index ... ATF does not contend that this was the basis for the 2020 PSA."  Opp. at 7 n.3.  Indeed, the government's opposition does not discuss any of the marijuana issues that Plaintiffs' motion addressed.  In other words, ATF apparently now claims that the basis for the challenged action is only how Michigan handles **one** set of records — those dealing with MCDV.

Yet the document in the record on which ATF relies clearly states — twice — that ATF's concerns arose because "MSP was holding … open ... at least 40 CPLs [who were possible] *drug abusers* prohibited under 18 U.S.C. § 922(g)(3))," and "that CPLs were being issued to federally prohibited habitual *marijuana users*...."  ATF000079-80 (emphasis added).[16]

---

[16]  It is unclear why the government would now seek to recast the basis for the challenged action. Perhaps the government wishes to dodge Plaintiffs' arguments, which demonstrate that the challenged action was arbitrary and capricious for revoking Michigan's exemption based on concerns over marijuana records.  *See* MSJ at 10-13.  Regardless, Plaintiffs would argue on the one hand that, to the extent the FBI and ATF findings about Michigan failing to report drug users would contribute to a finding that the challenged action is arbitrary and capricious, the Court should consider them, because the agency cannot shy away from the administrative record it has created and on which it purported to rely.  Otherwise, review of "the whole record" would be replaced by review of the *post hoc* justifications provided by government lawyers during

**VI.    Section 922(t)(3)'s Very Existence Undermines the Government's "Structure and Purpose" Argument.**

The government claims that "[b]oth the purpose and the structure" of Section 922(t)(3) support ATF's position.  Opp. at 12.  First, the government claims that the "purpose" of the Brady Act is "'to ensure that individuals not authorized to possess firearms are unable to purchase them.'"  Opp. at 12 (*citing NRA v. Reno*, 216 F.3d 122, 133 (D.C. Cir. 2000)).  The government claims that "ATF's interpretation fulfills this purpose...."  *Id.*

Of course, were the intent of Congress to create the most airtight of systems, with the slimmest of chances that any prohibited person would ever obtain a firearm, then Congress would never have included Section 922(t)(3) in the Brady Act, because it is a provision which explicitly exempts certain state permit holders at the time of purchase from the otherwise "'detailed scheme to enable the [FFL] to verify ... whether a potential buyer may lawfully own a gun.'"  *See* Opp. at 13 (*quoting Abramski v. United States*, 573 U.S. 169, 172 (2014)).  In fact, Section 922(t)(3)(A)(i)(II) explicitly provides a five-year period wherein a permit holder is utterly exempt from a NICS check, *in spite of* the fact that it is possible for a person to become prohibited after obtaining such a permit.  It is clear, then, that Congress in Section 922(t)(3) sought to strike a balance between ensuring that prohibited persons do not obtain firearms on the one hand, while still providing easy access to law-abiding state permit holders on the other.  The broad, general "purpose" of keeping prohibited people from getting guns cannot be used to justify agency action to nullify an explicit statutory exemption.

---

litigation.  On the other hand, to the extent that ATF relied on marijuana/drug use for its challenged action could be somehow seen as supporting the challenged action, the Court should reject them, because the government can waive reliance on arguments, even if they help its case. *See, e.g., CFTC v. Erskine*, 512 F.3d 309, 314 (6th Cir. 2008).

Next, the government claims that "[t]he structure of the statute thereby suggests that [Section 922(t)(3)] background checks ... should involve a review of NICS information similar to" the background check for a firearm sale.  Opp. at 14.  The government, as did Plaintiffs, claims there should be "**parity**" (ATF000170) between *gun* and *permit* background checks, but then strangely concludes that the NICS check for a Michigan CPL should be conducted **differently** (with Michigan doing additional investigations) from a NICS check for a firearm sale (with the FBI alone performing any additional investigation that it may believe necessary).  That is nonsensical.

As the government admits, this case involves a tiny sliver of background checks that result in potentially disqualifying, possible MCDV records.  As Plaintiffs explained, Michigan has asked for help from the federal government in conducting additional investigations, but FBI and ATF have refused.[17]  MSJ at 19.  The government has never alleged that either ATF or FBI staff could not easily handle these investigations while still preserving Michigan's Section 922(t)(3) exemption.  Even while Michigan personnel are ill-equipped and untrained to conduct such investigations and make legal determinations applying federal law, FBI and ATF personnel do so *every single day*.  *Id.* at 18.  The government admits that the FBI ordinarily does the follow-up investigations for NICS checks on gun sales and gives no reason why either FBI or ATF cannot reasonably do so here.  *See* Opp. at 13.

---

[17]  In spite of its steadfast refusal to conduct a few follow-up investigations on a very few potentially disqualifying records contained in the NICS system, the government attempts to paint itself as the victim here, claiming that it has "worked to persuade" Michigan, engaged in "cooperative efforts," "attempted to resolve the issue ... cooperatively," and worked in a "cooperative process."  Opp. at 5, 6, 16 n.7.  On the contrary, a cooperative spirit is not what ATF has done here — "you do exactly what we say, or else we'll revoke your exemption."  The government is not the victim of Michigan.  Rather, hundreds of thousands of Michigan gun owners are victims of ATF's challenged action.

If this problem were as serious as the ATF claims, why has the government not simply conducted the further research and analysis into the 50 or so Michigan permits involved, to determine if any of those persons is actually prohibited?  That would seem to be the rational solution to this dispute.  But the government refuses to budge even an inch.  Instead, ATF has decided to "make a federal case" mountain out of a molehill.[18]

## VII.   The ATF Incorrectly Claims the 2020 PSA Is an Interpretative Rule.

Finally, the government disputes Plaintiffs' claim that the 2020 PSA violated the APA's requirement of notice-and-comment rulemaking procedures, contending the PSA is an interpretative rule and "is consistent with the text of the statute … itself, and affects only prior ATF guidance of the same nature:  an interpretation of law."  Opp. at 23.  Defendants try to obscure the fact that the PSA imposes additional affirmative requirements on Michigan that did not exist under its 1998 notice-and-comment rulemaking (63 *Fed. Reg*. 58272), or in its 2006 Michigan Open Letters.  *See* Sections I.B and II, *supra*.  That alone makes the 2020 PSA a legislative rule.  "Legislative rules ... create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress."  *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003) (citations omitted).  *See also Bullock v. IRS*, 401 F. Supp. 3d 1144 (D. Mont. 2019).  The *Wilson v. Lynch*, 835 F.3d 1083 (9th Cir. 2016), case cited by the government involved an ATF Open Letter which imposed no new duty — instead, it merely provided another illustration as to how the prior rule should be applied.  *See Wilson* at 1100.

---

[18]   The number of Michigan residents holding CPLs varies widely across sources, but a lower estimate is that, as of February 2018, there were over 620,000 active CPLs within the state, a number which has been steadily increasing over time.  https://www.mlive.com/news/2018/02/michigan_gun_ownership_by_the_1.html.  This case has resulted from a dispute between ATF and Michigan as to a mere 50 of those permits, issued over a period of two years.  *See* ATF000036-39.

**CONCLUSION**

In this case, ATF has acted far in excess of its statutory jurisdiction, adding a whole host of bureaucratic requirements to Section 922(t)(3) that do not exist anywhere in the statute, and which Congress clearly never intended to impose on the states.  ATF's Michigan PSA is not in accordance with the law, which requires only that the plain text of a state statute meet certain simple, straightforward requirements.  All courts to consider Section 922(t)(3) eligibility have looked only at statutory provisions to determine compliance, and the government admits that the Michigan statute suffices.

Section 922(t)(3) most certainly does not delve into the minutia of how various state and local authorities implement their state statutes in practice.  If it were otherwise, then a single rogue official within a state could ruin the Section 922(t)(3) exemption for an entire state, simply by refusing to follow the law.  In fact, the government here has claimed that an official "change" to the Michigan statute has been "promulgated" not by the legislative branch, but by a single low-level bureaucrat within the state police.  Yet the government is unable even to reproduce this informal opinion, instead relying on four levels of hearsay across state and federal government agencies to recount this unwritten amendment to Michigan law.

Next, ATF's 2020 Michigan PSA is arbitrary and capricious, because there is no "'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In this case, the government has even gone so far as to claim that the reasons for the challenged action given in the record are not the same reasons it relies on now.  The challenged action is unsupported by substantial evidence because, try as it might, the government has found *no evidence* that *any* Michigan CPL holder has *ever* used such permit to obtain a firearm in violation of federal law.  Rather, the government

relies on fearmongering about the potential for ineligible persons to obtain firearms, based on a very small number of permits that have been issued to persons who may be potentially disqualified from firearm possession. Yet no one knows for sure. The government claims that this is a serious "public safety" concern, but ATF refuses to dig deeper to find out whether those persons are actually disqualified, and the FBI refuses to conduct the follow-up investigations that Michigan authorities are ill-equipped to perform.

Rather, ATF seeks to impose upon the states the requirements to perform federal investigations, make determinations of federal law, and then to create and report new federal disqualifying records to NICS for future use by the federal government. Contrary to the government's claim, this is not simply a "choice" that Michigan has, either to comply with agency demands or forego its Section 922(t)(3) exemption. Rather, these federal mandates blatantly commandeer local authorities to enforce a federal statutory scheme, something never contemplated (much less authorized) by Section 922(t)(3), and a tactic that the Supreme Court already struck down within the very same statutory scheme.

Finally, the government pretends the challenged action falls within the statute by claiming that Michigan is being required only to look at "information obtained through a NICS check." But the government's own words quickly undermine that claim. If NICS had the necessary information to make these eligibility determinations, then this dispute would not exist, because NICS would have provided Michigan with a clear answer, and Michigan would have followed that guidance. Rather, what ATF has required is that Michigan poke around outside the NICS system, something Congress never contemplated.

Rather than simply having one of its trained examiners spend a few days to perform a few follow-up investigations and report the results to Michigan, ATF instead has chosen to take a far

more drastic action, purporting to revoke the Section 922(t)(3) exemption for an entire state.  The agency's irrational decision smacks of an underlying agenda that is unrelated to the reasons given in the administrative record.  But at bottom, the challenged action unlawfully deprives hundreds of thousands of law-abiding Michigan gun owners of the ability to use their state permits to obtain firearms in the manner Congress provided.  For the reasons above, the Court should deny the government's Cross Motion for Summary Judgment and Grant Summary Judgment in Plaintiffs' favor.

/s/ Kerry L. Morgan
Kerry L. Morgan (P32645)
Pentiuk, Couvreur & Kobiljak, P.C.
2915 Biddle Avenue, Suite 200
Wyandotte, MI 48192
Main: (734) 281-7100
F: (734) 281-2524
KMorgan@pck-law.com
*Counsel for Plaintiffs

Dated: November 6, 2020

Robert J. Olson
William J. Olson
Jeremiah L. Morgan
William J. Olson, P.C.
370 Maple Avenue West, Suite 4
Vienna, VA 22180-5615
T: (703) 356-5070
T: (540) 450-8777
F: (703) 356-5085
wjo@mindspring.com (e-mail)
Of counsel