UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DONALD J. ROBERTS, II,
GUN OWNERS OF AMERICA, INC.,

                    Plaintiffs,                          Case No. 20-CV-10639

v.                                                       Honorable Thomas L. Ludington

U.S. DEPARTMENT OF JUSTICE,
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES,
REGINA LOMBARDO.

                    Defendants.
_____/

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT,
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND
DISMISSING PLAINTIFFS' COMPLAINT**

On March 9, 2020, Plaintiffs Donald J. Roberts, II and Gun Owners of America, Inc.

brought action against Defendants the United States Department of Justice, Bureau of Alcohol,

Tobacco, Firearms and Explosives ("BATF"), and BATF Acting Director, Regina Lombardo. ECF

No. 1. Plaintiffs allege that Defendants' March 2020 public safety advisory is arbitrary and

capricious and was otherwise issued in violation of the Administrative Procedure Act ("APA"), 5

U.S.C. § 1001 *et seq. Id.* The advisory rescinded prior BATF guidance that allowed Michigan

concealed pistol license ("CPL") holders to purchase a firearm without a background check at the

point of purchase. On July 10, 2020, Defendants filed the certified administrative record. ECF No.

16. Cross-motions for summary judgment as well as response and reply briefs have been filed.

ECF Nos. 17, 21, 23, 24. For the reasons stated below, Plaintiffs' Motion for Summary Judgment

will be denied, Defendants' Motion for Summary Judgment will be granted, and Plaintiffs'

Complaint will be dismissed.

# I.

## A.

In 1968, Congress passed the Gun Control Act (the "GCA"), Pub L. No. 90-618, 82 Stat. 1213 (1968), to limit the firearm industry to certain federally licensed dealers, manufacturers, and importers. A federally licensed firearm dealer is referred to as a "federal firearm licensee" ("FFL"). The GCA, as amended, prohibits certain persons from possessing firearms, including felons, "fugitive[s] from justice," controlled substance users, and those convicted of a "misdemeanor crime of domestic violence" ("MCDV").[1] 18 U.S.C. § 922(g). These persons are referred to as "prohibited persons."

In 1993, Congress amended the GCA with the Brady Handgun Violence Prevention Act (the "Brady Act"), Pub. L. No. 103-159, 107 Stat. 1536 (1993). Congress found that, despite previous legislation, the country was "beset by an epidemic of gun violence," spurred in part by criminals with "relatively easy access to firearms." ECF No. 16-2 at PageID.194 (H.R. Rep. No. 103-344 (1993)). The interim provisions of the Brady Act imposed a five-day waiting period for firearm sales. Brady Act § 102(a)(1). During the waiting period, the FFL was required to provide local law enforcement with certain information regarding the purchaser, which would then be used to perform a background check.[2] *Id.* The permanent provisions of the Brady Act directed the

---

[1] MCDV includes any offense that:

> (i)   is a misdemeanor under Federal, State, or Tribal law; and

> (ii)  has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.

18 U.S.C. § 921(a)(33)(A).

[2] The Supreme Court later invalidated this obligation on local law enforcement as unconstitutional. *Printz v. United States*, 521 U.S. 898, 933 (1997) (holding that interim provisions of Brady Act commandeered state officials in violation of the Tenth Amendment).

Attorney General to establish a "national instant background check system" ("NICS") that would be accessible to every FFL. *Id.* § 103(b).

NICS was finally established in 1998 and is currently operated by the FBI. Today, every FFL must contact NICS and provide certain information before completing the sale of a firearm. 18 U.S.C. § 922(t)(1). The process works as follows: The prospective purchaser completes ATF Form 4473,[3] which requires certain personal information. 27 C.F.R. § 478.102. The FFL then contacts NICS by telephone and relates the information.[4] *Id.* NICS uses the information to search for disqualifying records in three databases maintained by the FBI: Interstate Identification Index, National Crime Information Center, and NICS Indices. 28 C.F.R. § 25.6. After performing the search, NICS provides the FFL with one of three possible responses:

> (A) "Proceed" response, if no disqualifying information was found in the NICS Index, NCIC, or III.

> (B) "Delayed" response, if the NICS search finds a record that requires more research to determine whether the prospective transferee is disqualified from possessing a firearm by Federal or state law. A "Delayed" response to the FFL indicates that the firearm transfer should not proceed pending receipt of a follow-up "Proceed" response from the NICS or the expiration of three business days (exclusive of the day on which the query is made), whichever occurs first . . .[5]

---

[3] A sample Form 4473 is available on the BATF website. *See* U.S. DOJ, BATF, Firearm Transfer Record, https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download [https://perma.cc/BHB6-Z4CP] (last visited Nov. 24, 2020).

[4] An exception occurs where the FFL is located in a "point-of-contact state." A "point-of-contact state," or "POC state," is a state that voluntarily serve as an intermediary between the FFL and NICS. 28 C.F.R. § 25.2. In such states, FFLs contact the state POC rather than NICS directly. *Id.* The state POC then conducts a NICS check as well as a check of state databases, if required by state law. *Id.* Michigan is non-POC state, so Michigan FFLs contact NICS directly.

[5] When a response is "delayed," FBI examiners conduct a review of the relevant criminal records. *See* U.S. Gov't Accountability Off., GAO-00-64, Gun Control: Implementation of the National Instant Background Check System, 31–32 (2000), https://www.gao.gov/new.items/g100064.pdf [https://perma.cc/GAL7-DSSY]. "Extensive research" us often necessary "when the search identifies criminal records showing an arrest for a potentially disqualifying offense but containing no information about the outcome or result. For example, there may be a record showing a felony-related arrest with no final disposition, such as whether the case was dismissed or resulted in a conviction." *Id.* at 32. FBI examiners may then reach out to local law enforcement for additional information. *Id.* at 52. Accordingly, the research may require FBI examiners to make a legal determination based on specific facts, like whether a prior offense constitutes a MCDV. *See* When a Prior Conviction Qualifies as a "Misdemeanor Crime of Domestic Violence," 31 Op. O.L.C. 123–139 (2007), https://www.justice.gov/sites/default/files/olc/opinions/2007/05/31/atfmcdv-opinion.pdf [https://perma.cc/DYH6-GBE8] (providing guidance as to the application of 18 U.S.C. § 922(g)(9)).

(C) "Denied" response, when at least one matching record is found in either the NICS Index, NCIC, or III that provides information demonstrating that receipt of a firearm by the prospective transferee would violate 18 U.S.C. 922 or state law. The "Denied" response will be provided to the requesting FFL by the NICS Operations Center during its regular business hours.

*Id.* § 25.6(c)(1)(iv).

However, the Brady Act allows certain state-issued firearm permits to serve as substitutes for a NICS check at the point of purchase. Such permits are referred to as "Brady alternates." The statute provides,

(3) Paragraph (1) shall not apply to a firearm transfer between a licensee and another person if—

(A)(i) such other person has presented to the licensee a permit that—

(I) allows such other person to possess or acquire a firearm; and

(II) was issued not more than 5 years earlier by the State in which the transfer is to take place; and

(ii) the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law;

18 U.S.C. § 922(t)(3). The regulations specify that "the information available to such official includes the NICS." 27 C.F.R. § 478.102(d)(1)(iii).

**B.**

Compared to federal law, Michigan imposes relatively few restrictions. No purchase license is required for the purchase of long guns. For pistols, the general rule is that purchasers must obtain a "license to purchase" ("LTP"), which may be issued to the purchaser by a police chief or, in the absence of such official, a county sheriff.[6] M.C.L. § 28.422(3). State law provides

---

[6] The statute does not specify any particular chief or sheriff.

that the issuing official "shall" issue such licenses "with due speed and diligence . . . unless he or she has probable cause to believe that the applicant would be a threat to himself or herself or to other individuals, or would commit an offense with the pistol that would violate" state or federal law. *Id.* The LTP application is provided on a form prepared by the Michigan State Police ("MSP") and must be completed under oath. *Id.* § 28.422(4). An applicant is qualified if the issuing official determines that she is not subject to a lengthy list of disqualifications, which include certain prior convictions and mental health dispositions. *Id.* § 28.422(3).

Michigan exempts two classes of purchasers from the LTP requirement: (1) concealed pistol license ("CPL") holders, and (2) purchasers who buy "from [an FFL] in compliance with 18 USC 922(t)." M.C.L. § 28.422a(1). In addition to purchasing a pistol, the CPL allows its holder to carry a concealed pistol.[7] Legal Michigan residents may apply for a CPL if they are (1) at least 21 years of age, (2) not subject to certain legal dispositions (*e.g.*, personal protective order, involuntary hospitalization), (3) not a felon, (4) not dishonorably discharged from the military, (5) not convicted of certain misdemeanors, (6) not previously found "guilty but mentally ill," (7) not currently or previously committed to a mental institution, (8) not diagnosed with mental illness "that includes an assessment that the individual presents a danger to himself or herself or to another," (9) not under a court order of legal incapacity, and (10) have completed qualified pistol safety training. M.C.L. § 28.425b(7). MSP is responsible for making many of these determinations and preparing a report for the "county clerk of the county in which the [applicant] resides," who,

---

[7] In any case, Michigan allows residents to "open carry" a pistol. As MSP explained in a public notice, "[I]t is legal for a person to carry a firearm in public as long as the person is carrying the firearm with lawful intent and the firearm is not concealed . . . because there is no Michigan law that prohibits it." Michigan State Police, Legal Update No. 86 (Oct. 26, 2010), https://www.michigan.gov/documents/msp/MSP_Legal_Update_No._86_2_336854_7.pdf [https://perma.cc/7Y8F-LTGA].

upon "determining that all of the [foregoing] circumstances exist," "shall issue" a CPL to the applicant. *Id.* § 28.425b(1), (7).

In 2005, Michigan added a NICS check requirement of its own through the enactment of M.C.L. § 28.426. The NICS check requirement applies to both LTP and CPL applicants. The section reads,

> (1) An issuing agency shall not issue a license to an applicant under section 2 [for LTPs] unless both of the following apply:
>
>> (a) The issuing agency has determined through the federal national instant criminal background check system that the applicant is not prohibited under federal law from possessing or transporting a firearm . . . .
>
> (2) A county clerk shall not issue a license to an applicant under section 5b [for CPLs] unless both of the following apply:
>
>> (a) The department of state police, or the county sheriff under section 5a(4), has determined through the federal national instant criminal background check system that the applicant is not prohibited under federal law from possessing or transporting a firearm . . . .

M.C.L. § 28.426.

Whether the purchase is completed with an LTP, CPL, or NICS check, Michigan requires the purchaser to deliver a copy of the "Pistol Sale Record"—a standard form containing certain information about the transaction—to local law enforcement within 10 days of receiving the record. M.C.L. § 28.422a(2).

## C.

On October 29, 1998, BATF issued a public letter entitled "Open Letter to All Michigan Federal Firearms Licensees." ECF No. 16-1 at PageID.88. The letter informed Michigan FFLs that on November 30, 1998, the permanent provisions of the Brady Act would take effect, requiring FFLs to contact NICS prior to completing a sale. *Id.* The letter noted that while Michigan's LTP was a valid Brady alternate, the Michigan CPL "did not qualify as an alternate under the interim

provisions of Brady and will not qualify under the permanent provisions." *Id.* at PageID.89. Another BATF letter on March 15, 2004 confirmed that the Michigan CPL was "not an alternative to NICS" and reminded FFLs that they "must contact NICS . . . prior to transfer of a firearm." *Id.* at PageID.90.

In November 2005, Michigan enacted M.C.L. § 28.426 "[t]o align the state statute [regarding CPL issuance] with [] federal law." *See* Michigan House Fiscal Agency Bill Analysis, H.B. 4977, Sept. 13, 2005. As discussed above, M.C.L. § 28.426 requires MSP to conduct a NICS background check and determine that "the applicant is not prohibited under federal law from possessing or transporting a firearm."[8] BATF internal records indicate that shortly after Michigan enacted M.C.L. § 28.426, Michigan Attorney General Michael Cox wrote to the BATF "requesting NICS exemption status" for the Michigan CPL.[9] ECF No. 16-1 at PageID.143. According to BATF officials, the letter "stipulated" that Michigan CPL issuance would entail:

1. A full NICS check being conducted by an authorized Michigan government official;

2. A determination made by that official that the permit holder is not prohibited under federal or state law from possessing firearms; and

3. The permit being denied if the individual is prohibited from possessing a firearm under federal (or state) law.

*Id* (enumeration added). In response, BATF issued another letter on March 24, 2006, entitled "Open Letter to All Michigan Federal Firearm Licensees." ECF No. 16-1 at PageID.91. The letter stated that because of recent changes to Michigan law, any CPL "issued on or after November 22, 2005" would "qualify as [a] NICS check alternative[]." *Id.*

---

[8] Though the statutory history is unclear, BATF records suggest that Michigan was already performing background checks for LTPs, which is why the LTP has been a Brady alternate since 1998. *See* ECF No. 16-1 at PageID.89, 91.
[9] The letter is not part of the administrative record.

As a result, Michigan CPL holders were able to purchase firearms with their CPLs in lieu of a NICS check for many years—that is, until federal authorities concluded that MSP was not making determinations consistent with M.C.L. § 28.426(2)(a) (requiring MSP to "determine[] . . . that the applicant is not prohibited under federal law from possessing or transporting a firearm") and Attorney General Cox's letter. According to BATF internal records, in 2017, the FBI performed a NICS audit in Michigan revealing "non-compliance with the background check requirement."[10] ECF No. 16-1 at PageID.185. BATF later recounted the FBI's 2017 findings in a 2020 letter to Michigan Attorney General Dana Nessel:

> [BATF] was informed by the FBI that although the Michigan State Police, the authority responsible for running background checks for the issuance of CPLs, was accessing the NICS Index to obtain prohibited person information, it was not conducting the necessary research or rendering a final determination as to whether a CPL applicant was prohibited by Federal law from possessing a firearm. Specifically, [BATF] was informed that MSP was holding in an indefinite open status at least 40 CPLs because it was waiting for a decision from FBI NICS that these individual were drug abusers prohibited under 18 U.S.C. § 922(g)(3), or persons convicted of a misdemeanor crime of violence prohibited under 18 U.S.C. § 922(g)(9)—Federal prohibitions for which there is apparently no State equivalent.

ECF No. 16-1 at PageID.191. Following the audit, FBI and BATF tried to persuade MSP to ensure that applicants were not prohibited under federal law, and, at least initially, had some success. *Id.* After "[m]uch back and forth discussion," MSP informed the FBI that the Michigan Attorney General had granted MSP "the authority to make determinations on MCDV [misdemeanor crime of domestic violence] and enter those in the NICS Indices database." *Id.* at PageID.110 (FBI email to BATF).

However, in March 2019, MSP informed the FBI that following the recent election of Attorney General Dana Nessel, the "direction that the MSP permit unit has received in the past on [the CPL] issue ha[d] changed." *Id.* at PageID.111. Kevin Collins, an MSP Field Support Section

---

[10] The audit is not part of the administrative record.

Manager, communicated to the FBI that MSP legal counsel "[were] not adhering to the previous direction provided" but were "waiting on an opinion from the new AG as to whether the new AG agrees with the process." *Id.* As a result, 63 CPL applications that were awaiting further research on a potential MCDV prohibition were "pushed to the county clerks" without further investigation—50 of those applications were approved, leading the FBI to conclude that 50 CPLs were issued to persons with a potential MCDV prohibition. *Id.* at PageID.115 (April 2019 FBI email to BATF).

The FBI tried to initiate a conference call with MSP regarding the matter, but MSP declined. *Id.* at PageID.113, 115. As Collins apparently communicated to the FBI, "MSP legal counsel spoke with [the] AG and they are not interested in having a call to discuss matters that have been previously talked about. They are standing firm that they do not have to conduct research for MCDV."[11] *Id.* at PageID.113. The FBI apparently sent an "informational brief" to the Michigan Attorney General regarding the issue on April 17, 2019.[12] *Id.* at PageID.145 (August 2019 BATF memo).

---

[11] Collins further discussed MSP's policy during the FBI's pre-audit process in 2019:

> Q: You're no longer entering marijuana use to the NICS index. So even though marijuana is still an illegal drug federally, Michigan is not applying the federal prohibition to subjects that may be disqualified?
>
> A: The MSP is not at this time . . . We still provide the training for locals but do not provide them legal advice. Whether a local PD/SO enters marihuana use into the NICS Index is between them and their corporate counsel.
>
> Q: Are the applications for the subjects with possible MCDVs on their records[] still being held for processing awaiting the opinion from the MI AG or are they being processed and issued?
>
> A: We are no longer holding onto any applications pending federal determinations. We are processing all of them.

ECF No.16-1 at PageID.123 (May 2019 FBI email to BATF) (question-and-answer format added).

[12] The brief is not part of the administrative record.

In June 2019, the FBI conducted a NICS audit of Michigan, assessing the State's compliance with federal law. *Id.* at PageID.93. The audit, summarized in an FBI report which included MSP's written response, found, in their view, several instances of noncompliance. The central finding of the audit was that Michigan CPL applicants "[were] not being evaluated and/or denied with criteria based on all of the federal prohibitions outlined in [18 U.S.C. § 922(g)]." *Id.* at PageID.96. Specifically, the FBI was concerned that Michigan was not denying CPL applicants with MCDVs, "fugitives from justice," or marijuana users. *See id.* at PageID.95–109. MSP disputed the findings but acknowledged its disagreement with federal authorities, stating, "MSP has not been made aware of federal law requiring a state agency in our position to make a final determination of factual and legal issues in applying federal law under 18 U.S.C. § 922(g) . . . ." *Id.* at PageID.97. Elsewhere, MSP agreed that it had changed course—albeit, with rather vague reasoning—but maintained that it was awaiting further guidance:

> As generally discussed in the above proposed finding, in July 2018, the MSP received an informal opinion of the Michigan Attorney General recommending that the MSP make and enter determinations of federal firearm prohibitions . . .
>
> Upon implementing those practices, the MSP did in fact make and enter determinations under 18 USC 922(g)(9).  During this time, concerns became heightened when discovering the potential complexities involved in making final determinations that a CPL applicant is or is not federally disqualified as having committed an MCDV.  Generally, it is necessary to consider evolving federal caselaw and often necessary to rely on the interpretation of quite old case records that were very likely not created in contemplation of recording information for the application of a federal firearm disqualifier . . .
>
> Also during this time, Michigan experienced changes in law and state government, and those changes combined with the complexities involved in some cases under some federal firearm prohibitions led the MSP to seek additional guidance from the Michigan Attorney General's Office in 2019.  As previously stated, the MSP and its formal legal counsel have been, and intend to continue to be, actively engaged in a resolution of this matter, which we hope to have completed before the conclusion of 2019 or soon thereafter.

ECF No. 16-1 at PageID.104–05.

Despite the stark findings with respect to the CPL program, the audit found no comparable violations by local law enforcement in issuing LTPs. *See* ECF No. 16-1 at PageID.95–109. The stark distinction between the LTP and CPL programs seems largely explained by internal FBI correspondence reflecting that the Michigan official charged with training local law enforcement was, for whatever reason, "contin[uing] to direct [them] to conduct research according to federal law on all LTP applications," even as MSP followed a different protocol with respect to CPL applications.[13] *See* ECF No. 16-1 at PageID.118 (April 2019 FBI email).

### D.

On March 3, 2020, BATF issued an advisory entitled "Public Safety Advisory to All Michigan Federal Firearms Licensees" (the "PSA"). *Id.* at PageID.187–88. The PSA informed Michigan FFLs that given recent changes to Michigan's CPL process, the March 2006 Open Letter was rescinded, and "a valid Michigan CPL is no longer a NICS alternative under 18 U.S.C. § 922(t)." *Id.* As a result, "[a]ll Michigan FFLs are required to conduct a NICS background check prior to the transfer of a firearm to a non-licensee, even if that individual posses a valid, unexpired CPL." *Id.* at PageID.188.

BATF also sent a letter to the Michigan Attorney General, informing her that BATF was rescinding the March 2006 Open Letter. *Id.* at PageID.190–92. The letter concluded with a list of "corrective measures" that Michigan would have to take before the CPL could qualify as a Brady alternate again.[14] *Id.* at PageID.192.

---

[13] FBI records reflect that while the MSP research program was led by Kevin Collins, a different Michigan official, Jason Pierce, was tasked with training local law enforcement on LTP research. ECF No. 16-1 at PageID.118. It remains unclear why exactly Michigan officials would offer different guidance for substantially identical duties.
[14] These "corrective measures" are discussed in greater detail in Section III.B., *infra*.

**E.**

The following facts are undisputed. Plaintiff Gun Owners of America, Inc. ("GOA") is a tax exempt, nonprofit California corporation with a principal place of business in Virginia. ECF No. 21 at PageID.448. GOA was "incorporated in 1976 to preserve, protect, and defend the Second Amendment rights of gun owners." *Id.* GOA has thousands of members, including Michigan CPL holders residing in the Eastern District of Michigan. *Id.*

On March 7, 2020, Plaintiff Donald J. Roberts, II, a Michigan resident and member of GOA, attempted to purchase a firearm using his valid Michigan CPL from an FFL in Roscommon County, Michigan. *Id.* at PageID.447. The FFL informed Roberts that the sale could not be completed unless he submitted to an FBI NICS background check, consistent with the PSA. *Id.* at PageID.448. Roberts presumably declined, as the FFL refused to complete the sale. *Id.*

**F.**

On March 9, 2020, Plaintiffs filed a complaint against Defendants alleging that the PSA violated the APA. Specifically, Plaintiffs contend that the PSA is arbitrary and capricious (Count I), exceeds BATF's statutory authority (Count II), and was promulgated without proper notice and comment (Count III). ECF No. 1 at PageID.16–19. Plaintiffs initially alleged that the PSA violated 18 U.S.C. § 926(a) (Count IV)—which Plaintiffs construe as prohibiting Defendants from creating a "national gun registry"[15]—but this claim was dismissed by joint stipulation of the parties. ECF No. 19.

On July 10, 2020, the parties filed the administrative record, which was certified by BATF Deputy Assistant Director Andrew R. Graham. ECF No. 16. On September 25, 2020, Plaintiffs

---

[15] Indeed, Plaintiffs initially construed the PSA as "an attempt to eliminate the Section 922(t)(3) exemption, force more firearm transfers into the NICS system, and thereby collect information on more firearm buyers and transfers, in violation of the clear prohibition of Section 926(a)." ECF No. 1 at PageID.19–20.

moved for summary judgment. ECF No. 17. On October 15, 2020, Defendants filed a combined cross-motion for summary judgment and response to Plaintiffs' motion. ECF No. 21. The remaining response and reply briefs have been filed. ECF Nos. 23, 24.

## II.

"The APA establishes the procedures federal administrative agencies use for 'rule making,' defined as the process of 'formulating, amending, or repealing a rule.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95 (2015) (citing 5 U.S.C. § 551(5)). Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA further empowers federal courts to set aside unlawful agency action.

> (2) [The reviewing court shall] hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . .
> >
> > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> >
> > (D) without observance of procedure required by law; . . . .

5 U.S.C. § 706(2). "When a federal court is reviewing a final agency action, the usual rules and standards governing summary judgment do not apply." *KPK Techs., Inc. v. Cuccinelli*, No. 19-10342, 2019 WL 4416689, at *3 (E.D. Mich. Sept. 16, 2019) (citing *Alexander v. Merit Sys. Prot. Bd.*, 165 F.3d 474, 480–81 (6th Cir. 1999)). "[S]ummary judgment 'serves as the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review.'" *Singh v. Johnson*, No. 15-CV-12957, 2016 WL 3476701, at *3 (E.D. Mich. June 27, 2016) (quoting *Resolute Forest Prod., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100, 106 (D.D.C. 2016)).

### III.

### A.

The first issue is whether Defendants had the statutory authority to issue the PSA. The dispute turns on the construction of 18 U.S.C. § 922(t)(3)(A)(ii), which qualifies a state permit as a Brady alternate when "the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law." According to Plaintiffs, the section "looks only to whether 'the law of the State provides'" for the requisite NICS check. Accordingly, they reason that because M.C.L. § 28.426 has not changed since 2005, the Michigan CPL should remain a Brady alternate. ECF No. 17 at PageID.418–19. In other words, Plaintiffs contend that § 922(t)(3) "looks *only* to the face of [M.C.L. § 28.426]" and not to the way the state statute is being administered. Consequently, according to Plaintiffs, the PSA adds "new requirements to the statute." *Id.* at PageID.420, 438 (emphasis original). Defendants, in response, argue that Plaintiffs' interpretation is contrary to the plain text as well as the "structure and purpose" of the Brady Act. ECF No. 21 at PageID.463–69. As indicated in the PSA, BATF contends that § 922(t)(3) requires MSP to determine whether, based on the "information available"—principally, a NICS check[16]—a CPL applicant is prohibited from possessing a firearm under federal or state law.

Typically, disputes over agency interpretation of a statute involve the application of *Chevron* deference. *See, e.g.*, *Gun Owners of Am. v. Barr*, 363 F. Supp. 3d 823, 831 (W.D. Mich. 2019) (holding that BATF's interpretation of "automatically" in statutory definition of "machine gun" was entitled to *Chevron* deference). However, Plaintiffs are not challenging a statutory

---

[16] As Defendants note, while "information available . . . includes the NICS," 27 CFR § 478.102(d)(1)(iii), the regulations do not limit the "information available" to NICS.

interpretation appearing in a federal regulation but in a public safety advisory. "Generally, 'interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law' and were not promulgated via notice and comment rulemaking, 'do not warrant *Chevron*-style deference.'" *Atrium Med. Ctr. v. U.S. Dep't of Health & Human Servs.*, 766 F.3d 560, 567 (6th Cir. 2014) (quoting *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000)). "Rather, such interpretations are normally entitled to respect . . . but only to the extent that [they] have the power to persuade." *Id.* (internal quotation marks omitted). To determine whether the agency's interpretation is persuasive, courts "look to the statute's text and design, including whether the regulation is consistent with the congressional purpose." *S. Rehab. Grp., P.L.L.C. v. Sec'y of Health & Human Servs.*, 732 F.3d 670, 685 (6th Cir. 2013) (internal quotation marks and citations omitted).

BATF's interpretation of § 922(t)(3) is consistent with the text, design, and purpose of the Brady Act, and is therefore persuasive. The "purpose of the Gun Control and Brady Act[] [is] to ensure that individuals not authorized to possess firearms are unable to purchase them." *Nat'l Rifle Ass'n of Am., Inc. v. Reno*, 216 F.3d 122, 133 (D.C. Cir. 2000); *see also* ECF No. 16-2 at PageID.193 (H.R. Rep. No. 103-344 (1993)) ("The purpose of H.R. 1025 is to prevent convicted felons and other persons who are barred by law from purchasing guns from licensed gun dealers, manufacturers, and importers."). The text requires state officials to "verify" that the information available does not indicate that possession of a firearm by the permit holder would be unlawful.[17] 18 U.S.C. § 922(t)(3)(A)(ii). According to Defendants, this means that state officials may have to

---

[17] Plaintiffs insist that MSP executes its duties under the Brady Act because it "disqualifies anyone for whom NICS reports a prohibiting record." ECF No. 23 at PageID.521. The FBI found, for example, that "MSP will not deny an applicant that has a MCDV on their record if it is not already in the NICS indices." ECF No. 16-1 at PageID.103. MSP admits that its ability to make MCDV determinations is "limited," blaming—rather generally—"non-uniform or incomplete reporting" and complexities in the underlying law. *Id.* at PageID.104. MPS also insists that its duty to make final determinations as to the applicability of § 922(g)(9) is an "open question." *Id.*

do more than simply run a NICS check. For example, they may have to apply federal law to a criminal record returned by NICS (*e.g.*, a record indicating a potential MCDV). Thus, Defendants' interpretation ensures "parity" between firearm sales completed with a Brady alternate and those completed with a NICS check at the point of purchase—where the FBI, not state officials, are responsible for research.[18] *See* ECF No. 16-2 at PageID.257 (1998 BATF Chief Counsel Memo) ("In interpreting [§ 922(t)(3)], ATF has been careful to ensure that there is parity between the background check required of permittees and the NICS check undergone by other purchasers of firearms.").

Plaintiffs' interpretation, by contrast, is neither textually nor substantively sound. To begin, "the law of the State" does not refer to statutory law alone. Undefined terms in a statute must be given their "natural and ordinary meaning," for which "[d]ictionaries provide a helpful proxy." *United States v. Fitzgerald*, 906 F.3d 437, 442 (6th Cir. 2018). Unsurprisingly, Merriam-Webster offers an expansive definition of "law," which includes "a binding custom or practice of a community," "a rule of conduct or action prescribed . . . or formally recognized as binding or enforced by a controlling authority," and "the whole body of such customs, practices or rules." *Law*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/law [https://perma.cc/2MWC-PG6Y]. Accordingly, the ordinary meaning of "law" would seem to include the practices and interpretations of state officials charged with executing or implementing a statute. *See Michigan Beer & Wine Wholesalers Ass'n v. Attorney Gen.*, 370 N.W.2d 328, 331 (Mich. Ct. App. 1985) ("While [Michigan Attorney General] opinions do not have the force of

---

[18] Plaintiffs suggest this parity is false because "while the FBI will investigate and make final determinations for Michigan gun sales, it refuses to do the same for Michigan CPLs." ECF No. 17 at PageID.432. However, for purposes of a Brady alternate, the Brady Act specifically puts the responsibility on state officials, not the FBI. *See* 18 U.S.C. § 922(t)(3)(A)(ii).

law, and are therefore not binding on courts, they have been held to be binding on state agencies and officers.").

The purpose and design of the Brady Act support this interpretation. If "the law of the State" refers only to statutory law, then § 922(t)(3) would, in effect, allow states to feign compliance with the Brady Act by enacting statutes that they had no intention of enforcing—and, according to Plaintiffs, BATF would be powerless to intervene. Congress could not have intended such a helpless regime.[19] *See Fitzgerald*, 906 F.3d at 447 ("[C]ourts should not construe a statute to 'produce an absurd result that [they] are confident Congress did not intend.'") (quoting *United States v. Underhill*, 813 F.2d 105, 112 (6th Cir. 1987)); *United States v. Stauffer Chem. Co.*, 684 F.2d 1174, 1184 (6th Cir. 1982) ("A statute should be read and construed as a whole and, if possible, given a harmonious, comprehensive meaning."), *aff'd*, 464 U.S. 165 (1984).

Plaintiffs' reliance on *Wyoming ex. rel. Crank v. United States*, No. 06-CV-0111, 2007 WL 9735116, at *11 (D. Wyo. May 8, 2007), *aff'd sub nom. Wyoming ex rel. Crank v. United States*, 539 F.3d 1236 (10th Cir. 2008), is not warranted. In that case, Wyoming challenged BATF's decision that the Wyoming concealed weapon permit ("CCW") was not a valid Brady alternate. *Wyoming*, 2007 WL 9835116 at *3. The decision came after Wyoming refused to refrain from issuing CCWs to persons who had their criminal records "expunged" under Wyoming law but were nonetheless prohibited persons under § 922(g). *Id.* The court held that BATF's decision was statutorily authorized, rational, and constitutional, but briefly noted that "[t]he relevant 'law of the

---

[19] Plaintiffs argue that the existence of Brady alternates and the fact that they are valid for five years undermines the notion that Congress intended an "airtight" background check system. ECF No. 23 at PageID.530. They also point to a 1998 BATF memo opining that the five-year period would "inevitably" result in prohibited persons obtaining firearms. ECF No. 16-2 at PageID.262. However, a permit is a Brady alternate only if it "allows [the permitee] to possess or acquire a firearm." 18 U.S.C. § 922(t)(3)(A)(i)(I). It seems quite unlikely that Congress expected states to allow convicted felons or other prohibited persons to keep their permits. Michigan, for example, requires the county clerk to suspend or revoke a CPL upon information of a change in the licensee's eligibility and further requires MSP to notify the county clerk of such a change. M.C.L. § 28.428. Furthermore, BATF's opinion that certain violations were "inevitable" does not require BATF to ignore the intent of Congress or excuse obvious noncompliance.

state' [] is Wyoming's CCW permitting statute." *Id.* at *14. Contrary to Plaintiffs' suggestion, this sentence does not support the proposition that "the law of the State" exclusively means the language of the state statutory provision alone. Indeed, M.C.L. § 28.428 is part of the relevant "law of the State," though it is not the *only* such law. Furthermore, *Wyoming* did not consider or decide the interpretive issue raised here, and to the extent that the opinion is persuasive, *Wyoming* ultimately agreed with BATF: "If an applicant is ineligible to possess a firearm under § 922(g), then he cannot obtain a CCW permit." *Id.*

Plaintiffs also argue that the PSA exceeds statutory authority because it unlawfully commandeers Michigan officials in violation of the Tenth Amendment. ECF No. 17 at PageID.420–21 (citing *Printz v. United States*, 521 U.S. 898 (1997)). Specifically, Plaintiffs contend that BATF "seeks to force Michigan officials to investigate and gather information outside the NICS system about the ambiguous record, . . . make legal determinations about the potentially disqualifying record and, if disqualifying, add new prohibiting records into NICS." *Id.* (emphasis omitted). Many commenters raised similar concerns following BATF's notice of proposed rulemaking in 1998. *See* ECF No. 16-2 at PageID.244. BATF's position now is the same as it was then:

> The issuance of regulations setting standards for permits that meet the criteria of the statute in no way implicates Tenth Amendment or Federalism concerns. Neither the Brady law nor the regulations require States to establish or administer permit systems at all. However, the law does set forth certain standards that State permit must meet in order to be recognized as valid Brady alternatives.

*Id.* BATF's rationale is convincing. *Printz* only concerned the interim provisions of the Brady Act which required state officials to determine whether a transferee was prohibited from possessing a firearm.[20] *See Printz*, 521 U.S. at 933. The Supreme Court found the interim requirements

---

[20] The Supreme Court made only a passing reference to Brady alternates. *See Printz*, 521 U.S. at 903.

unconstitutional, holding that the federal government cannot "command" state officials to "administer or enforce a federal regulatory program." *Id.* at 935. Here, neither the Brady Act, nor any other federal law or regulation, commands states to establish a permit system. By enacting § 922(t)(3), Congress merely offered a path by which states could qualify permits as Brady alternates. *Printz* does not prohibit federal agencies from enforcing federal law against states that voluntarily avail themselves of the Brady alternate but then stray from its requirements.[21] *C.f. Wyoming*, 2007 WL 9735116, at *15 ("The BATF's action neither conscripts a state official, nor requires the State to enact legislation to enforce a federal regulatory program. The agency's action here is properly characterized as giving Wyoming a choice between two alternatives, which does not constitute unlawful commandeering.").

Accordingly, the PSA was not issued "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 702(2)(C). Count I will be dismissed.

## B.

The next issue is whether the PSA was arbitrary and capricious. "The arbitrary-and-capricious standard is a narrow one inasmuch as [this Court is] 'not to substitute [its] judgment for that of the agency.'" *Nat'l Truck Equip. Ass'n v. Nat'l Highway Traffic Safety Admin.*, 711 F.3d 662, 667 (6th Cir. 2013) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Th[e] inquiry is principally concerned with the agency decision-making process." *Id.*

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

---

[21] Plaintiffs' reasoning also proves too much. If *Printz* forbids Congress from requiring state officials to apply federal law for purposes of the Brady alternate system, then, presumably, it would also prohibit a requirement that state officials even run a NICS check.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. Accordingly, federal courts must look to the administrative record and "determine whether there exists a 'rational connection between the facts found and the choice made.'" *All. for Cmty. Media v. F.C.C.*, 529 F.3d 763, 786 (6th Cir. 2008) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43).

Plaintiffs argue that the PSA is premised on nothing more than "mere speculation." ECF No. 17 at PageID.434. The 2019 FBI audits, according to Plaintiffs, "found a grand total of zero evidence that any prohibited person had ever used a Michigan CPL to obtain a firearm." *Id.* (emphasis omitted). For instance, Plaintiffs claim that while Michigan issued 50 CPLs to applicants with "potentially disqualifying records," these applicants were only "potentially prohibited." *Id.* at PageID.434 n. 17.

Even if these 50 CPLs ended up in lawful hands, a recent NICS audit revealed several instances where a prohibited person tried using a Michigan CPL to purchase a firearm and was only stopped by an FFL's internal controls:

> In addition to NICS re-checks performed during an ATF compliance inspection, one FFL which was not under ATF inspection voluntarily provided information on 6 customers who had recently presented CPLs in an attempt to purchase firearms but were denied by NICS. This FFL requires all customers to undergo a NICS check regardless of CPL status but documents a CPL if one is presented by the customer. ATF performed re-checks on these 6 CPL holders and received 2 initial Proceed responses, 3 Delay responses, and one Deny response . . .
>
> While ATF's limited sampling of CPLs did not identify a prohibited CPL holder using a CPL to circumvent a NICS check . . . , some prohibited persons have managed to obtain a CPL while under GCA disability . . . Only through an FFL's robust internal controls . . . were firearm transfers to prohibited persons averted.

ECF No. 16-1 at PageID.149–50 (November 2019 BATF Detroit Field Division memo).

Plaintiffs' argument appears to miss the relevant point. The Brady Act provides an exception for state permits issued after a state official "verified that the information available to

such official does not indicate that possession of a firearm by such [applicant] would be in violation of law." 18 U.S.C. § 922(t)(3)(A)(ii). There is no exception for permits issued after state officials verified that possession would not violate *some* laws. BATF is tasked with enforcing the Brady Act and cannot excuse Michigan's noncompliance. *See United States v. Atandi*, 376 F.3d 1186, 1189 (10th Cir. 2004) (noting that BATF "ha[s] been delegated authority to implement § 922(g)"). And BATF's decision to enforce the plain requirements of § 922(t)(3) is not, as Plaintiffs suggest, tantamount to "forc[ing] involuntary POC status on Michigan." ECF No. 17 at PageID.429. Similarly, federal authorities were not required to go the extra step and determine whether the 50 CPLs issued resulted in a prohibited person acquiring a firearm.[22] While Michigan can elect not to take advantage of the Brady alternate—and, indeed, leave all NICS inquiries to the FBI—its CPL holders will unfortunately bear the consequences.[23]

Plaintiffs also argue that the PSA represents a "new standard for measuring compliance with [§ 922(t)(3)(A)]," suggesting that the BATF has advanced inconsistent guidance over the years. ECF No. 17 at PageID.420. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."). Defendants, in contrast, contend that Michigan—not BATF—has changed its position, particularly with respect to whether MSP is required to apply federal law under § 922(g). ECF No. 21 at PageID.469–71.

---

[22] Plaintiffs elsewhere suggest that BATF could make determinations of federal law where MPS refuses. ECF No. 23 at PageID.531. Plaintiffs identify no legal authority in support and, as already indicated, § 922(t)(3)(A)(ii) allocates the duty to verify to authorized state officials.

[23] It should be noted that, despite its involvement in the underlying facts, Michigan has not filed an appearance in the case. Furthermore, there is no indication that Plaintiffs are authorized to speak on Michigan's behalf or otherwise represent the interests of the State. Consequently, any inference about Michigan's position on the Brady Act is strictly limited to what can be gleaned from the administrative record. While this fact requires caution in attributing any position to Michigan, it does not impair this Court's ability to render a decision on the merits. Ultimately, this case turns on whether BATF made a reasoned decision in evaluating Michigan's compliance with the Brady exception, not whether Michigan's position is justifiable.

As indicated above, the administrative record is unequivocal. When BATF issued its final rule implementing the NICS check requirement, it clarified that "if a State did not disqualify all individuals prohibited under Federal law, the permits issued by that State would not be accepted as alternatives under the permanent provisions of the Brady law." ECF No. 16-2 at PageID.244 (63 FR 58272). Similarly, in the 2006 Open Letter, BATF reiterated to Michigan FFLs why initially the LTP, but not the CPL, was a valid Brady alternate. For the LTP, "Michigan conducted background checks through NICS prior to the issuance or renewal . . . , and denied anyone prohibited under Federal, State, or local law." ECF No. 16-1 at PageID.91. "This process was not followed before the issuance of a CPL, and therefore the CPL did not qualify for the exception." *Id.* Indeed, BATF records reflect that, prior to the issuance of the 2006 Open Letter, Michigan Attorney General Michael Cox informed BATF that under M.C.L. § 28.426, a CPL could be issued only after "a full NICS check by an authorized Michigan government official" and "[a] determination made by that official that the permit holder is not prohibited under federal or state law from possessing firearms." *Id.* at PageID.143.

At some point, Michigan's position changed. While Plaintiffs reject this notion as the result of cross-agency hearsay, ECF No. 23 at PageID.524, their position is inconsistent with MSP's representations. In its response to the 2019 FBI audit, MSP confirmed that, at some point, "internal concerns were raised regarding the scope of MSP's duties and responsibilities in the CPL process with respect to making and entering final determinations restraining an individual's right to possess a firearm by interpreting and applying federal law under [18 U.S.C. § 922]." ECF No. 16-1 at PageID.97 (2019 NICS Audit Findings and Response). Indeed, MSP now openly disputes prior guidance from the BATF:

> The MSP remains committed to engaging in every reasonable effort to ensure its legal responsibilities are not only met but exceeded in order to effectuate legislative

and congressional directives. These laws have presumably contemplated the appropriate burden of a state agency performing duties under a license or permit process in a non-POC state, like the MSP's role in the CPL process, to reduce the "potential of a [federally] disqualified individual obtaining a firearm" when "federally disqualified information may be available." To that end, the MSP has not been made aware of federal law requiring a state agency in our position to make a final determination of factual and legal issues in applying federal law under 18 USC 922(g) and (n) or, as discussed in response to the final audit finding, any federal law making such a determination a condition to the "alternative permit" status established under 27 CFR 478.102(d) or to be granted access to NICS.

*Id.* Accordingly, it can hardly be maintained that the PSA represents some sudden change in BATF guidance.

Plaintiffs also criticize the four "corrective measures" that BATF outlined in a letter to Michigan Attorney General Dana Nessel. The measures are as follows:

1. The State must ensure that CPLs are only issued after an authorized government official has conducted a full NICS check, including the Immigration Alien Query (IAQ), conducts the necessary research, and if the official determines that there exists a federal prohibitor, the prohibited applicant does not receive a CPL, as required by MCL 28.426;

2. A full NICS check, including the IAQ, must be completed by an authorized Michigan official on all individuals previously issued CPLs without a full NICS check or without conducting the necessary research and make an updated prohibited person determination;

3. All CPLs previously issued to individuals found to be prohibited from receiving or possessing firearms under Federal or State law must be revoked, pursuant to MCL 28.428 or other applicable law, and recovered from those individuals; and

4. Should you determine that an individual is in possession of a firearm in violation of Federal, but not State law, those cases should immediately be referred to the local ATF field office.

ECF No. 16-1 at PageID.192. Plaintiffs essentially argue that these corrective measures require Michigan officials to take actions that exceed the scope of § 922(t)(3) and thus commandeer Michigan resources.

Plaintiffs' argument is unconvincing. First, as a threshold matter, BATF's letter to the Michigan Attorney General is a separate document that is not referenced nor included in the PSA. In fact, Plaintiffs do not even mention the letter in their Complaint or Motion for Summary Judgment. The letter and its corrective measures are first challenged in Plaintiffs' combined response and reply brief. *See* ECF No. 23 at PageID.518. Relief cannot be granted based on the letter when Plaintiffs have not even pled that it constitutes a "final agency action" reviewable under 5 U.S.C. § 704.

Second, notwithstanding the absence of a challenge to the letter, Plaintiffs' allegations are wrong on the merits. As Defendants' correctly note, the first corrective measure is just a restatement of the statutory requirements under § 922(t)(3). The other three requirements pertain to "curing" CPLs that were previously issued outside the scope of § 922(t)(3). It would seem well within BATF's discretion to ensure that such CPLs are not possessed by prohibited persons before qualifying them as valid Brady alternates. Indeed, BATF has long stated that "if a State d[oes] not disqualify all individuals prohibited under Federal law, the permits issued by that State w[ill] not be accepted as alternatives under the permanent provisions of the Brady law." ECF No. 16-2 at PageID.244 (63 FR 58272). The notion that the letter commandeers Michigan resources is also without merit for the same reasons discussed in Section III.A., *supra*.

Accordingly, the PSA is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Count II will be dismissed.

## C.

The final issue is whether the PSA required notice and comment. The APA provides a three-step procedure for "notice-and-comment rulemaking" whereby agencies are required to (1) issue a general notice of proposed rulemaking, (2) allow interested persons an opportunity to

participate, and (3) include in the final rule a "concise general statement of [its] basis and purpose." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (discussing the notice and comment procedure in 5 U.S.C. § 553). However, "[n]ot all 'rules' must be issued through the notice-and-comment process . . . [T]he notice-and-comment requirement 'does not apply' to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'" *Perez*, 575 U.S. at 96 (quoting 5 U.S.C. § 553(b)).

Simply put, "legislative rules" require notice and comment, and "interpretive rules" do not. The distinction, however, is not always clear. Generally, "a rule that 'intends to create new law, rights or duties' is legislative, while a rule that 'simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties' is interpretive." *Tennessee Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) (quoting *Michigan v. Thomas*, 805 F.2d 176, 182–83 (6th Cir. 1986)). "If an agency attempts to issue a legislative rule without abiding by the APA's procedural requirements, the rule is invalid." *Tennessee Hosp. Ass'n*, 908 F.3d at 1042.

The PSA merely rescinds prior guidance regarding M.C.L. § 28.426 and reminds Michigan FFLs of their Brady Act obligations. It creates no new rights, duties, or obligations. Therefore, the PSA is a "textbook interpretive" rule. *C.f. Wilson v. Lynch*, 835 F.3d 1083, 1100 (9th Cir. 2016) (holding that BATF Open Letter notifying FFLs that marijuana users were prohibited from possessing firearms regardless of state law authorizing medicinal marijuana was exempt from notice and comment). Plaintiffs' assertion that "the PSA imposes additional affirmative requirements on Michigan" is simply false. ECF No. 23 at PageID.532.

Accordingly, the PSA is an interpretive rule and therefore exempt from notice and comment rulemaking. Count III will be dismissed.

**IV.**

Accordingly, it is **ORDERED** that Plaintiffs' Motion for Summary Judgment, ECF No. 17, is **DENIED**.

It is further **ORDERED** that Defendants' Cross-Motion for Summary Judgment, ECF No. 21, is **GRANTED**

It is further **ORDERED** that Plaintiffs' Complaint, ECF No. 1, is **DISMISSED**.


Dated: December 17, 2020                                     s/Thomas L. Ludington
                                                            THOMAS L. LUDINGTON
                                                            United States District Judge