United States General Accounting Office

# GAO

Report to the Ranking Member, Committee on the Judiciary, House of Representatives

July 2002

# GUN CONTROL

# Opportunities to Close Loopholes in the National Instant Criminal Background Check System



**G A O**
Accountability * Integrity * Reliability

GAO-02-720

ATF000178

# Contents

| **Letter** | | | **1** |
|---|---|---|---|
| | Results in Brief | | 2 |
| | Background | | 4 |
| | Restoration of Gun Ownership Rights | | 7 |
| | Handgun Concealed Carry Permits | | 12 |
| | Domestic Violence Misdemeanor Convictions | | 17 |
| | Our Previous Observations on Delayed NICS Transactions | | 23 |
| | Conclusions | | 25 |
| | Recommendation for Executive Action | | 27 |
| | Matter for Congressional Consideration | | 28 |
| | Agency Comments and Our Evaluation | | 28 |

| **Appendix I** | **Objectives, Scope, and Methodology** | | **31** |
|---|---|---|---|
| | Objectives | | 31 |
| | Scope and Methodology | | 31 |

| **Appendix II** | **Eligibility to Possess Firearms under Federal or State Law** | | **40** |
|---|---|---|---|
| | Firearms Eligibility Restricted under Federal and State Law | | 40 |
| | Criminal History a Key Element in Determining Eligibility | | 42 |

| **Appendix III** | **Restoration of Gun Ownership Rights** | | **45** |
|---|---|---|---|
| | Federal Law Recognizes State Methods of Restoring Gun Ownership Rights | | 45 |
| | National Overview on State Methods to Restore Gun Ownership Rights | | 47 |
| | Information on Restoration of Gun Ownership Rights in Selected States | | 50 |

| **Appendix IV** | **Handgun Concealed Carry Permits** | | **57** |
|---|---|---|---|
| | National Overview of Concealed Carry Permit Programs | | 57 |
| | Screening, Monitoring, and Revocation Procedures for Concealed Carry Permits among Selected States | | 60 |

| **Appendix V** | **Domestic Violence Misdemeanor Convictions** | | **67** |
|---|---|---|---|
| | Complex Federal Definition of Domestic Violence | | 67 |
| | National Overview of Efforts to Identify Domestic Violence Offenders | | 69 |

| | Differences in Domestic Violence Laws and Procedures in Selected States | 71 |
|---|---|---|
| **Appendix VI** | **Comments from the Department of Justice** | **75** |
| **Appendix VII** | **Comments from the Bureau of Alcohol, Tobacco and Firearms** | **80** |
| **Appendix VIII** | **GAO Contacts and Staff Acknowledgments** | **83** |
| | GAO Contacts | 83 |
| | Acknowledgments | 83 |

**Tables**

| | | |
|---|---|---|
| | Table 1: Crimes Committed by Persons after Their Gun Ownership Rights Were Restored in Selected States | 11 |
| | Table 2: Reasons for Concealed Carry Permit Revocations in Selected States | 14 |
| | Table 3: Firearm-Retrieval Actions Referred to ATF Compared with Total FBI NICS Denials – by Prohibited Category | 19 |
| | Table 4: States Selected for Study of Firearms-Related Laws and Procedures | 32 |
| | Table 5: Reasons Why NICS Denied Firearms Purchases (Nov. 30, 1998 through Oct. 7, 2001) | 43 |
| | Table 6: Number of Criminal History Records in the United States (as of Dec. 31, 1999) | 44 |
| | Table 7: Summary Information on Laws and Procedures Regarding Restoration of Gun Ownership Rights in Selected States | 51 |
| | Table 8: Status of States with Regard to Concealed Carry of Firearms (as of June 2002) | 58 |
| | Table 9: Methods Used by Selected States to Screen Persons Applying for Concealed Carry Permits | 61 |
| | Table 10: Methods Used by Selected States to Monitor the Eligibility of Concealed Carry Permit Holders | 63 |
| | Table 11: Criteria Used by Selected States to Revoke Concealed Carry Permits | 65 |
| | Table 12: Selected State Laws and Procedures for Identifying Domestic Violence Offenders in Criminal Records | 72 |

ATF000180

**Abbreviations**

| | |
|---|---|
| ATF | Bureau of Alcohol, Tobacco and Firearms |
| BJS | Bureau of Justice Statistics |
| FBI | Federal Bureau of Investigation |
| NCHIP | National Criminal History Improvement Program |
| NICS | National Instant Criminal Background Check System |

ATF000181



**United States General Accounting Office**
**Washington, DC 20548**

July 12, 2002

The Honorable John Conyers, Jr.
Ranking Member
Committee on the Judiciary
House of Representatives

Dear Mr. Conyers:

This report responds to your request for information on states' firearms-related laws and procedures involving restoration of gun ownership rights, permits for concealed carry of firearms, and convictions for domestic violence. The National Instant Criminal Background Check System (NICS)—used by the Federal Bureau of Investigation (FBI) and states to perform presale firearms background checks—relies largely on searching state criminal history records to prevent the sale of firearms to prohibited persons.[1] The states' firearms-related laws and procedures—such as those mentioned above—may affect how such records are used by NICS in preventing the sale of firearms to persons who are ineligible under applicable federal and state law.

As agreed with your office, this report presents information on the following topics:

- **Restoration of gun ownership rights**, including any differences among the states in how such rights may be restored to persons with criminal convictions and the extent to which persons who had their gun ownership rights restored subsequently committed new crimes.
- **Handgun concealed carry permits**, including the extent to which concealed carry permits exempt permit holders from a NICS background check when purchasing firearms, any differences among

---

[1]Federal law prohibits persons from receiving or possessing a firearm if they (1) have been convicted of, or are under indictment for, a felony; (2) are fugitives from justice; (3) are unlawful drug users or are addicted to a controlled substance; (4) have been judged mentally incompetent or have been involuntarily committed to a mental institution; (5) are aliens illegally or unlawfully in the United States, or certain other aliens admitted under a nonimmigrant visa; (6) have been dishonorably discharged from the military; (7) have renounced their U.S. citizenship; (8) are under a domestic violence restraining order; or (9) have been convicted of a domestic violence misdemeanor. See 18 U.S.C. § 922(g) and 922(n).

GAO-02-720  Closing Loopholes in NICS

ATF000182

the states in how they issue permits and monitor permit holders, and what actions the states take to revoke permits if the permit holders subsequently commit new crimes.

- **Domestic violence misdemeanor convictions**, including any differences among the states in how they ensure that domestic violence convictions in state criminal history repositories are accessible to NICS, and the extent to which persons convicted of domestic violence purchased firearms without being identified by NICS.

To address these issues, we obtained overview information from federal agencies with firearms-related research experience and/or law enforcement responsibilities—the Bureau of Justice Statistics (BJS); the Bureau of Alcohol, Tobacco and Firearms (ATF); and the FBI. For more detailed or specific analyses, as agreed with your office, we focused our work on six states—California, Florida, Massachusetts, Michigan, Texas, and Utah—which we judgmentally selected to illustrate a variety of applicable state laws and procedures. In visiting these states, we discussed applicable laws and procedures with responsible state and local officials and reviewed relevant statistics and other firearms-related information. We performed our work between June 2001 and May 2002, in accordance with generally accepted government auditing standards. Appendix I presents more information about our objectives, scope, and methodology.

# Results in Brief

Each of the six states we visited offered at least one mechanism by which individuals who were ineligible to possess firearms because of a criminal conviction could have those rights restored. Of the four types of restoration mechanisms recognized under federal law—executive pardon, record expungement, conviction set-aside, and restoration of civil rights—pardons were universally available in all of the six states, while expungements were available only in Utah. The six states' criteria for restoration typically require a certain waiting period before application for relief, and persons convicted of some prior offenses are not eligible for restoration. Typically, individuals must petition the state or a county agency for relief (as in Florida and Michigan, for example), but some states—such as California and Massachusetts—automatically restore certain firearms rights lost after completion of sentence. On the basis of a review of limited data that were available from the selected states, we found that few persons who had their gun ownership rights restored were convicted of subsequent crimes.

In 26 states, ATF has determined that a concealed carry permit may exempt the permit holder from a NICS background check when

ATF000183

purchasing a firearm. As such, it is important that permit applicants be carefully screened and permit holders monitored to ensure they are eligible to possess firearms. The six states we visited screened permit applicants using federal and state criminal databases, monitored permit holders to ensure continued eligibility using automated and manual processes, and revoked permits when permit holders became ineligible to carry a concealed firearm. Based on a review of limited data that were available from the six states, the number of permits revoked ranged from 0.02 percent of permits issued (in Michigan) to 2.3 percent of permits issued (in Massachusetts). However, only two states—California and Massachusetts—took steps to recover revoked permits, and only one state—Massachusetts—had penalties available against persons who failed to voluntarily surrender their permits. In Florida and Texas—two states with NICS-exempt permit holders—state data show that over 3,200 permits were revoked after permit holders committed criminal offenses or became otherwise ineligible to carry a concealed firearm. However, state officials acknowledged they did not recover all revoked permits and, moreover, had no authority to enforce recovery of revoked permits. In these states, permit holders who became ineligible to possess firearms could have used their revoked permits to purchase firearms without a NICS background check. In contrast to Florida and Texas, Utah—a third state with NICS-exempt permit holders—requires gun dealers to verify the validity of all such permits before approving an NICS-exempt gun purchase, thereby preventing ineligible persons from using a revoked concealed carry permit to purchase firearms.

The six states we visited used various approaches to help make domestic violence misdemeanor convictions easier to identify in criminal history records—for example, by enacting domestic violence criminal statutes and flagging domestic violence offenses in their criminal history records. Despite these efforts, in the first 3 years of NICS operations, over 2,800 domestic violence offenders were able to purchase firearms without being identified by NICS. Moreover, almost 26 percent of NICS firearm-retrieval actions initiated by the FBI involved domestic violence offenders, even though overall this prohibiting category made up only about 14 percent of all NICS denials.[2] Various factors make it difficult to identify domestic violence misdemeanor offenses in a timely manner. For example, while

---

[2]Firearm-retrieval actions occur when a NICS background check is not completed within 3 business days, the firearms transfer legally proceeds, but the purchaser is later found to be ineligible to purchase firearms. In these cases, steps must then be taken to retrieve the firearm. Firearm-retrieval actions are also referred to as "delayed denials."

states continue to work to automate and improve the overall quality and accessibility of criminal history records, this process has been ongoing since the early 1990s and is still incomplete. Also, domestic violence offenses may not be clearly identified in criminal databases, and the complex federal definition of domestic violence misdemeanor requires obtaining information that may not be immediately available in the state criminal history record. Moreover, allowing firearms sales to proceed after 3 business days when the outcome of the NICS check is unresolved contributes to the difficulty in preventing domestic violence offenders from purchasing firearms. If federal law allowed more than 3 days—up to 30 days, for example—to research these types of delayed NICS background checks, the number of firearm-retrieval actions during the first 3 years of NICS operations could have been reduced by over 50 percent. And, allowing more time to research these delayed transactions would have affected a relatively small percentage of all NICS background checks.

This report includes a recommendation (with respect to concealed carry permits) and a matter for congressional consideration (with respect to domestic violence convictions) to help minimize the number of ineligible persons who purchase firearms under NICS. In commenting on a draft of this report, Justice did not specifically address the recommendation or the matter for congressional consideration. Rather, Justice provided information about its efforts to help states improve the completeness and accuracy of criminal history records, including those relating to domestic violence. In commenting on behalf of Treasury, ATF generally agreed with our recommendation on concealed carry permits, but noted it would first need to examine the extent to which there is a problem and then consider options for how best to address the issue.

## Background

Effective November 30, 1998, under the Brady Handgun Violence Prevention Act (Brady Act),[3] licensed gun dealers are required to obtain background checks on purchasers before transferring (i.e., selling) a firearm. These background checks generally are to be conducted using NICS, a computerized system which is managed by the FBI. Under NICS, firearms are not to be transferred until a background check determines that the transfer will not violate applicable federal and state laws.

---

[3]Public Law 103-159 (1993).

ATF000185

However, if the background check is not completed within 3 business days, the transfer is allowed to proceed by default.

A NICS background check provides an automated search of criminal and noncriminal records—including records in both state and national databases—to determine a person's eligibility to purchase a firearm. Specifically, a NICS check queries the following three information sources: (1) the National Crime Information Center, which provides access to fugitive arrest warrants and protective orders and information about deported felons; (2) the Interstate Identification Index, an index-pointer system that provides access to state criminal history records and FBI criminal history databases;[4] and (3) the NICS Index, which maintains records about other persons' ineligible to possess firearms, including mental defectives, illegal and unlawful aliens, and persons dishonorably discharged from the military. In practice, however, most NICS decisions about eligibility to purchase firearms are based on state criminal history records. During the first 3 years of NICS operations, over 90 percent of all firearms purchase denials were due to a disqualifying criminal history—primarily felony convictions (64 percent) and domestic violence misdemeanor convictions (14 percent). Because the vast majority—about 95 percent—of all criminal history records are state records, the capability of NICS to effectively screen firearms purchasers depends largely on the ability to access and interpret these state records.

As part of interpreting state criminal history records, NICS background check examiners consider post-conviction actions that may affect gun ownership rights.[5] For example, persons prohibited from possessing firearms due to state criminal convictions may subsequently apply to the states for relief from these disabilities, and state actions to provide such relief may be recognized under federal law as restoring gun ownership rights.[6] This avenue of relief arises out of the meaning of the term "conviction," which is found within the federal definitions of felony and

---

[4]The Interstate Identification Index currently contains about 90 percent of the records checked by NICS.

[5]Federal firearms law prohibits certain persons from possessing or receiving firearms. For the purposes of this report, we use the terms "gun ownership rights" and "firearms rights" interchangeably to refer to the possession or receipt of a firearm.

[6]In order to relieve federal firearms disabilities, a state restoration action must restore a person's civil rights—that is, the right to vote, the right to hold public office, and the right to serve on a jury.

ATF000186

domestic violence misdemeanor.[7] Federal firearms law generally provides that a conviction will not be considered for purposes of determining firearms eligibility if the conviction "has been expunged, or set aside or [is an offense] for which a person has been pardoned or has had civil rights restored … unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not … possess, or receive firearms." Prior to October 1992, relief from firearms disabilities imposed by federal laws could be granted, based on a petition to the Treasury Department, under provisions enacted at 18 U.S.C. § 925(c). However, beginning with the fiscal year 1993 Treasury appropriations act,[8] Congress has prohibited Treasury from expending any appropriated funds to act upon such applications for relief.

The Brady Act, in general, provides that any transaction in which a person presents to a licensed gun dealer a valid state permit that allows the purchaser to possess or acquire a firearm is exempt from a NICS check when purchasing firearms. Specifically, a firearms purchase is exempt from NICS if the purchaser presents a state permit that (1) allows the permit holder to possess or acquire a firearm and (2) was issued not more than 5 years earlier by the state in which the transfer is to take place. NICS regulations specify further that the purchaser must present a valid permit that was issued only after verifying that the permit holder was not ineligible to possess firearms under federal, state, and local law. In addition, after November 30, 1998, permits would qualify as exempt only if the information available to the state authority that issued the permit included NICS.[9] In developing the NICS regulations, ATF concluded that a "permit to possess" a firearm would include a permit to carry concealed weapons. Thus, if a concealed carry permit meets the criteria described above, the permit holder would be exempt from a NICS background check when purchasing firearms, unless state law otherwise required such a check.

As noted previously, NICS denials are based largely on criminal history records—not only felonies but certain misdemeanors as well. Most notably, in the so-called Lautenberg amendment, Congress banned the

---

[7]18 U.S.C. § 921(a)(20) applies the meaning of conviction to crimes punishable for a term exceeding 1 year (i.e., felonies). Similarly, subsection (a)(33) applies this meaning to misdemeanor crimes of domestic violence.

[8]Public Law 102-393 (1992).

[9]27 C.F.R. 178.102(d).

ATF000187

possession of firearms by individuals convicted of a misdemeanor crime of domestic violence.[10] As defined in the law, a domestic violence misdemeanor involves the use or attempted use of physical force or the threatened use of a deadly weapon by any of the following: a current or former spouse, parent, or guardian of the victim; a person with whom the victim shares a child in common; a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian; or a person similarly situated to a spouse, parent, or guardian of the victim. Implementing regulations provide that such definition includes any federal, state, or local misdemeanor that meets the criteria, irrespective of whether it is defined or labeled as "domestic violence." Federal law further provides that a person generally is not considered convicted of a domestic violence misdemeanor under the following circumstances: (1) if the person was not represented at trial by counsel (unless he or she waived the right to counsel); (2) if the person was entitled to a jury trial, but the case was not tried by jury (unless he or she waived the right to a jury trial); or (3) if the conviction was expunged or set-aside, or the person was pardoned or had civil rights restored; and the person is not otherwise prohibited from possessing firearms.

Appendix II presents more information about the categories of persons ineligible to purchase firearms and the extent to which criminal history records are used to determine an individual's eligibility to purchase firearms. Also, more details on NICS implementation and operation may be found in our February and April 2000 reports.[11]

## Restoration of Gun Ownership Rights

As mentioned previously, while federal restoration of firearms rights is no longer readily available, persons who are ineligible to possess firearms because of state criminal convictions may be able to have their gun ownership rights restored by the state.[12] Following a state restoration

---

[10]Section 658 of Public Law 104-208 (1996), commonly known as the Lautenberg amendment.

[11]U.S. General Accounting Office, *Gun Control: Implementation of the National Instant Criminal Background Check System*, GAO/GGD/AIMD-00-64 (Washington, D.C.: Feb. 29, 2000) and *Gun Control: Options for Improving the National Instant Criminal Background Check System*, GAO/GGD-00-56 (Washington, D.C.: Apr. 12, 2000).

[12]However, federal criminal offenders can have their gun ownership rights restored only by a federal—not a state—procedure (*Beecham v. United States*, 511 U.S. 368 (1994)).

ATF000188

action, such persons would generally be recognized by the states and the federal government as once again being eligible to possess firearms.

Each of the four restoration methods recognized in federal firearms law can have a different effect on the underlying disqualifying record and the extent to which rights are restored. For example:

- **Pardon** – A pardon is, in general, an executive action that typically mitigates the punishment the law demands for an offense and restores any or all of the rights and privileges forfeited on account of the offense. Generally, the original criminal record is to be retained, with the pardon being noted on the record.
- **Expungement** – An expungement is a procedure in which the record of a criminal offense or conviction is typically destroyed or sealed. For example, arrest records may be expunged where the arrested person is acquitted at trial or the arrest is found to be unlawful; or expungement may be allowed after the passage of time. In some cases, expunged records may be retained and used by the state for certain limited purposes.
- **Set-aside** – A set-aside is an action that annuls or revokes a previously issued court judgment or order—such as a criminal conviction. To set aside a judgment is to make it void or of no effect and to deprive it of all force and operation as to future transactions. Set-asides are generally noted in the criminal record, which is retained.
- **Restoration of civil rights** – States may have procedures to restore any civil rights or other privileges that were lost upon a criminal conviction. These rights may be restored automatically upon completion of sentence or the passage of time; or restoration of rights may require an administrative or judicial process. Generally, restorations of civil rights are noted in the criminal record, which is retained.

## Differences among Selected States' Restoration Laws and Procedures

Each of the six states we visited provided for one or more of the four methods described above for restoring gun ownership rights lost as a result of a state criminal conviction. Differences among the states primarily involved the number of such methods available, the conditions under which a person would be eligible for relief, and the process of applying for and receiving relief. Pardons were universally available in all six of the states we visited, while expungements were readily available in only one state—Utah. The states' criteria for restoration typically required a certain waiting period before being eligible to apply for relief. In Florida, for example, applicants had to wait 10 years following completion of

sentence to apply for a full pardon or 8 years to apply for a restoration of firearms authority. Also, persons convicted of some prior offenses—felonies involving a firearm, for example, in California—were not eligible for any restoration at all. In some states—such as Florida and Michigan—certain individuals are required to petition the state or a county agency for relief; other states—such as California and Massachusetts—have laws that automatically restore certain lost firearms rights after completion of sentence.

Appendix III presents more information about the states' laws and procedures dealing with restoration of gun ownership rights.

## Crimes Committed by Persons Whose Gun Ownership Rights Were Restored

To determine if persons who had their gun ownership rights restored subsequently committed crimes, we obtained and analyzed available data on restoration actions in the six selected states. Our analysis was largely dependent on the availability of state data for each method of restoration and, as such, was generally based on limited data or data on small numbers of cases. On the basis of our limited review, we found that few persons whose gun ownership rights had been restored by the states were later convicted of additional crimes. Summary information for the six states is as follows. (See table 1.)

- In California, 71 persons received pardons between 1990 and 2000 that restored gun ownership rights. Of these, none had subsequently been convicted of a crime.

- In Florida, 79 persons received pardons (78 full pardons, 1 conditional pardon) between 1999 and 2001 that restored gun ownership rights. Of these, 1 person was subsequently convicted of a felony. In addition, 1 other person was arrested, but the record did not reflect whether the charge was a felony or a misdemeanor and no disposition was found. Another 51 persons received restorations of firearms authority between 1999 and 2001. Of these, none was subsequently convicted of a crime.

- In Massachusetts, 49 persons received pardons between 1990 and 2000 that restored gun ownership rights. Of these, none was subsequently convicted of a crime.

- In Michigan, 26 persons received pardons between 1969 and 1995 that restored gun ownership rights. Our review of 9 of these individuals found that none had subsequently been convicted of a crime. Another 2,006 persons had convictions set aside during 2000 and 2001. Our

ATF000190

review of 200 of these individuals found that 1 person had subsequently been convicted of misdemeanor domestic violence; 1 other person was arrested and charged with misdemeanor domestic violence, but no disposition was found. Also, 378 persons received restorations of gun ownership rights by county gun licensing boards between 1992 and 2001. Our review of 38 of these individuals found that 1 person was subsequently convicted of a crime—in this case, a misdemeanor.

- In Texas, 54 persons received pardons between 1992 and 2001 that restored gun ownership rights. Our review of 35 of these individuals found that none had subsequently been convicted of a crime. However, 3 of the individuals had subsequently been arrested—2 of the arrests involved misdemeanor charges and 1 involved felony charges. No dispositions were found for any of these cases.

- In Utah, 7 persons received pardons between 1990 and 2001 that restored gun ownership rights. Our review of 6 of these individuals found that none had subsequently been convicted of a crime.

ATF000191

**Table 1: Crimes Committed by Persons after Their Gun Ownership Rights Were Restored in Selected States**

| States and type of restoration action | Time period | Restoration of gun ownership rights | | Number of subsequent convictions |
| | | Total number of actions | Number reviewed by GAO | |
|---|---|---|---|---|
| California | | | | |
| • Pardon | 1/1/90 – 12/31/00 | 71 | 71 | 0 |
| Florida | | | | |
| • Pardon | 7/1/99 – 6/30/01 | 79 | 79 | 1 |
| • Restoration | 7/1/99 – 6/30/01 | 51 | 51 | 0 |
| Massachusetts | | | | |
| • Pardon | 1/1/90 – 12/31/00 | 49 | 49 | 0 |
| Michigan | | | | |
| • Pardon | 3/7/69 – 7/12/95 | 26 | 9 | 0 |
| • Set-aside | 9/1/00 – 11/30/01 | 2,006 | 200 | 1 |
| • Restoration | 10/13/92 – 6/30/01 | 378 | 38 | 1 |
| Texas | | | | |
| • Pardon | 1/1/92 – 12/31/01 | 54 | 35 | 0 |
| Utah | | | | |
| • Pardon | 1/1/90 – 12/31/01 | 7 | 6 | 0 |
| • Expungement | 1/1/00 – 3/31/01 | 1,623 | [a] | [a] |

[a]Action provided for by state, but data not available for review.

Source: GAO analysis of state data and discussions with state officials. Appendix I provides more details about the state data reviewed and our analysis.

As mentioned previously, our analysis was largely dependent on the availability of state data for each method of restoration and, as such, was generally based on limited data or data on small numbers of cases. In some cases, statewide data were not available, and in other cases only certain time periods were covered. Where selected cases were analyzed—in Michigan, Texas, and Utah—the cases we reviewed were not randomly generated. As a result, this analysis is intended solely to illustrate what we found from the data we reviewed in each of the six states, and the results cannot be generalized beyond the timeframes and locations from which the data were collected.

ATF000192

# Handgun Concealed Carry Permits

ATF has periodically reviewed each state's concealed carry permit program to determine whether it meets the criteria laid out in the Brady Act and NICS regulations for exempting permit holders from NICS background checks.[13] As indicated below, as of January 2002, ATF determined that 26 states issued concealed carry permits that qualify to exempt permit holders from NICS background checks when purchasing firearms:

- In 16 states, all concealed carry permit holders are exempt from NICS background checks. Texas and Utah fall into this category.
- In 8 states, only certain permits issued before the implementation of NICS exempt permit holders from NICS background checks. In these states, permits issued after NICS was implemented (Nov. 30, 1998) do not qualify as exempt. Permits issued prior to NICS are "grandfathered" as exempt because, under interim provisions of the Brady Act, ATF had recognized these permits as a valid alternative to the interim Brady background check. Florida and Massachusetts fall into this category.
- In 2 states, only grandfathered permits were initially considered exempt. However, these states later made changes to their permit programs, bringing them into compliance with NICS regulations, and permits issued after the date of these program changes are now exempt from NICS.

In the other 24 states, no concealed carry permits are exempt from NICS background checks. In some cases, ATF has determined the state program does not qualify as exempt under NICS regulations (Michigan); in other cases, the permits do not qualify as exempt under state law (California).

# Differences among Selected States' Procedures for Issuing and Monitoring Concealed Carry Permits

The six states we visited had several similarities in their background screening and processing of concealed carry permit applicants. In each state, for example, permit applicants were subject to a screening process involving a review of criminal justice and other data in federal and state databases. This screening process included both name-based and fingerprint-based checks performed by the states and the FBI. In addition to federal and state sources of data, Texas and Michigan routinely reviewed local records as part of the screening process. Some of the states were limited in the amount of time allowed to complete the background check and issue or deny the concealed carry permit. In Florida, a

---

[13]In addition to concealed permits, ATF reviewed state permits governing the purchase or possession of firearms to determine if any of these permits would qualify as exempt from NICS.

ATF000193

concealed carry permit must be issued within 90 days unless the applicant is determined to be ineligible or has a potentially disqualifying arrest without disposition information.

In addition to screening concealed carry permit applicants, the states monitored active permit holders to determine if and when any of them became ineligible to have a permit. For example, five of the six states (all except Massachusetts) had formal mechanisms in place for detecting whether permits holders had committed a disqualifying criminal offense. These methods included electronic matching of permit holders' names against state criminal records databases (Utah and Florida), as well as manual notifications to the state's permit authority by the courts when a concealed carry permit holder is convicted of a crime (Michigan). Once a permit holder is determined to be ineligible, all of the states have procedures in place for revoking the permit. But in only two states— California and Massachusetts—do authorities actively seek out permit holders and seize revoked permits if the individuals do not surrender their permits to the issuing agency.

Appendix IV presents more information about the states' laws and procedures involving issuing, monitoring, and revoking concealed carry permits.

## Number of Concealed Carry Permits Revoked and Reasons for Revocation

The six states we visited reported that some concealed carry permit holders subsequently committed crimes that resulted in permit revocation, as shown in table 2. When compared to the total number of permits issued, the revocation rate of permit holders ranged from 0.02 percent in Michigan to 2.3 percent in Massachusetts—with the two "may-issue" states (California and Massachusetts) revoking a higher percentage of permits than the four "shall-issue" states (Florida, Michigan, Texas, and Utah).[14] In the states where data on offense type were available (Michigan, Texas, and Utah), the vast majority of offenses that led to revocation were misdemeanors. Some states (Florida, Texas, and Utah) also reported a significant number of revocations due other disqualifying factors—such as mental disability (in Florida and Utah) and delinquent taxes (in Texas). Only Florida and Utah tracked the number of revocations that involved

---

[14]In shall-issue states, a permit must be issued if no statutory reason for denial is revealed during a background check. In may-issue states, a permit may be issued to eligible individuals after considering additional subjective prohibitors, such as the applicant's history and personal character.

firearms—specifically, firearms-related offenses accounted for about 9 percent (145 out of 1,593) of Florida's revocations and about 7 percent (39 out of 584) of Utah's revocations.

**Table 2: Reasons for Concealed Carry Permit Revocations in Selected States**

| States and type of permit | Time period covered[b] | Permits issued | Reasons for permit revocation[a] | | | Percent of issued permits revoked |
|---|---|---|---|---|---|---|
| | | | Felony offense | Misdemeanor offense | Other disqualifier | |
| California (may-issue) | 1/1/00 – 12/31/00 | 1,890 | | 42 | | 2.2% |
| Florida (shall-issue) | 10/1/87 – 12/31/01 | 785,563 | | 1,430[c] | 163 | 0.2 |
| Massachusetts (may-issue) | 1/1/99 – 12/31/01 | 177,572 | | 4,046 | | 2.3 |
| Michigan (shall-issue) | 7/1/01 – 3/11/02 | 34,712 | | 9 | | 0.02 |
| Texas (shall-issue) | 1/6/96 – 10/25/01 | 270,971 | 187 | 926 | 546 | 0.6 |
| Utah (shall-issue) | 1/1/94 – 12/31/01 | 46,148 | 70 | 431 | 83 | 1.3 |

[a] State officials in California, Florida, Massachusetts, and Michigan could not separate revocation offenses into felonies and misdemeanors. They are categorized here as misdemeanors for purposes of general analysis.

[b] Except for slight differences in time periods between Massachusetts and Texas, the time periods in this column correspond directly with the data under "permits issued" and "reasons for permit revocation" data. In Massachusetts, the data for permits issued is from the time period 10/10/98 to 2/8/02. In Texas, the data for permits issued is from the time period 1/1/96 to 11/30/01.

[c] Florida also reported an additional 461 revocations that resulted from crimes committed prior to permit issuance, which the state had not discovered during the permit application background check.

Source: GAO summary of data provided by state officials.

## Revoked Permits Could Be Used by Ineligible Persons to Purchase Firearms

More significant than the number of revocations, some states had no assurance of recovering permits from permit holders after revocation. As a result, revoked permits could be used by ineligible persons to purchase firearms without a NICS background check. As mentioned previously, among the six states, only California and Massachusetts actively seek out permit holders to recover revoked permits that have not been voluntarily surrendered. In addition, only Massachusetts has criminal penalties available for use against permit holders who do not surrender revoked permit. Regarding the other states, we noted the following issues regarding revoked permits:

- In Florida—a state where grandfathered permits exempt permit holders from NICS background checks when purchasing firearms—

ATF000195

state officials acknowledged they did not recover all revoked permits and the state had no civil or criminal authority to force the surrender of revoked permits. Between October 1987 and December 2001, Florida revoked 1,593 permits, the vast majority because of crimes committed by permit holders after the permits were issued.  Another 461 permits were revoked because of crimes committed before the permits were issued. Because permits issued prior to the implementation of NICS exempted permit holders from NICS background checks, permits that were revoked and not recovered could have been used by ineligible permit holders to purchase firearms without a NICS check. To illustrate the extent to which revoked permits are not recovered by the state, Florida officials provided data on permits revoked in fiscal year 2001 as a result of crimes committed before the permits were issued. Of the 18 permits that were revoked for that reason, state officials told us that 7 of the 18 permits were not recovered.

- In Texas—a state where all concealed carry permit holders are exempt from a NICS check when purchasing firearms—state officials also acknowledged they do not recover all revoked permits and have no civil or criminal authority to force the surrender of revoked permits. State officials estimated that about 2 out of every 10 revoked permits are not voluntarily surrendered back to the state. Thus, based on the total number of revocations reported (1,659) between January 1996 and October 2001, this represents an estimated 332 revoked permits that were not recovered upon revocation. These ineligible permit holders could have used their revoked permits to purchase firearms without having a NICS background check.

- Two other states—California and Utah—have laws or procedures in place that prevent persons from using revoked permits to purchase firearms without a NICS background check. In California, for example, state law requires concealed carry permit holders to have a separate NICS background check when purchasing a firearm, thus preventing ineligible permit holders from purchasing firearms regardless of the status of their permit. Utah—another NICS-exempt state for permit holders—requires gun dealers to verify the validity of a concealed carry permit by contacting the state issuing authority before approving a NICS-exempt gun purchase. Rather than requiring another background check at the time of purchase, this verification simply requires gun dealers to visually inspect the permit, and then call the state's Department of Public Safety to verify that the permit is still valid—that is, that it has not been suspended or revoked. According to Utah officials, this process helps the state monitor the legal status of permit

ATF000196

holders, and it prevents persons from using revoked permits to purchase firearms without a NICS background check.

According to ATF officials, after the Brady Act was passed in 1993, the states became responsible for conducting firearms purchase background checks. Because some states already required permits and background checks in order to purchase firearms, it seemed redundant to require another identical state background check just to comply with Brady. As a result, the law exempted permit holders from having a separate background check when purchasing firearms. When NICS became operational in 1998, the FBI and the states began sharing responsibility for firearms background checks, but the permit exemption continued based on criteria laid out in the Brady Act and NICS regulations for exempting permit holders from NICS background checks. Even so, ATF officials noted that some states require their concealed carry permit holders to undergo a separate background check at the time they make a firearms purchase. The officials went on to say that permit holders may sometimes commit crimes that disqualify them from possessing firearms, although the state has not yet taken action to revoke the permits. In such instances, a NICS background check at the time of purchase serves to identify permit holders who may be disqualified from purchasing a firearm and prevent those persons from obtaining firearms simply by presenting their permits.

Regarding Utah's permit-verification process that requires gun dealers to verify the current validity of concealed carry permits, ATF officials told us it is not clear whether ATF could require all states to have a similar process. Generally, ATF can set regulations for states to meet as prerequisites to exempting their permit holders from NICS background checks, provided these regulations are consistent with congressional intent. Among other things, ATF regulations already specify that exempt permits must be valid, issued no more than 5 years earlier, and must be issued only after verifying that the permit holder was not ineligible to possess firearms under federal, state, and local law. Regarding an additional regulation requiring point-of-purchase verification of the validity of exempt permits, ATF officials noted that this could raise concerns as an unfunded mandate, particularly in those states that do not participate in NICS and have no existing infrastructure at state agencies or licensed gun dealers for performing such verification. Nonetheless, ATF would consider such a regulation if there was compelling evidence to suggest that a problem did exist (e.g., data indicating that ineligible persons used revoked permits to purchase firearms without a NICS check), and that any new regulation was consistent with congressional intent under the Brady Act.

ATF000197

# Domestic Violence Misdemeanor Convictions

The six states we visited used various approaches to help ensure that domestic violence misdemeanor convictions were identified in state criminal history repositories and were accessible to NICS. These approaches included establishing a specific domestic violence offense in the state's criminal code, defining domestic violence in other state statutes, enacting domestic violence penalty enhancement statutes, and flagging domestic violence offenses in the criminal records. For example, two of the states we visited—California and Michigan—had enacted specific criminal offenses related to domestic violence, which clearly differentiates these offenses from other misdemeanor assaults. Four states—California, Michigan, Texas, and Utah—had amended general criminal statutes (such as assault or battery) to create a separate penalty enhancement when the circumstances involved a family member or other relation. Florida, Michigan, and Utah also "flag" domestic violence offenses by notating the criminal record to clearly identify the offenses as domestic violence-related. Only Massachusetts had no mechanism for specifically identifying domestic violence offenses in the state's criminal history records.

Appendix V presents more information about the states' laws and procedures to help ensure that domestic violence convictions are accessible to NICS.

## Some Domestic Violence Offenders Purchased Firearms under NICS

From November 1998 through September 2001, ATF data indicate that the agency received 10,945 referrals from the FBI requesting retrieval of firearms that had been sold to ineligible persons.[15] These firearm-retrieval actions were the result of NICS background checks that could not be completed by the FBI within the 3 business days allowed under federal law. When this occurs—that is, the sale is allowed to proceed—that is, the gun dealer may legally transfer the firearm without a response from the FBI as to the purchaser's eligibility. The FBI continues to research these transactions, even after 3 days have passed, to ensure that the purchasers were not prohibited individuals. Regarding the referrals noted above, after the firearms were legally transferred the FBI discovered that the purchasers should have been denied. Once the FBI made these determinations, ATF was notified so steps could be taken to investigate

---

[15]FBI data show that 11,847 firearm-retrieval actions were referred to ATF during this same time period. According to an ATF official, the difference represents firearm-retrieval actions that were later purged from ATF systems in June 2001 because the FBI had subsequently overturned the underlying denials.

ATF000198

the transactions, retrieve the firearms, and refer any appropriate cases for prosecution.

As shown in table 3, about 26 percent of the firearm-retrieval actions referred to ATF during roughly the first 3 years of NICS were in the prohibited category of domestic violence misdemeanor. By comparison, in looking at all FBI NICS denials during approximately this same period,[16] the category of domestic violence misdemeanor made up only about 14 percent of the total number of NICS denials. As shown by this comparison, the percentage of NICS firearm-retrieval actions involving domestic violence misdemeanors was disproportionately large—almost double— when compared with the percentage of all NICS denials that involved domestic violence misdemeanors. These transactions create concerns because they represent domestic violence offenders who were allowed to purchase firearms and who may pose risks to public safety.

---

[16]The ATF data on firearm-retrieval actions covers roughly the first 3 years of NICS operations—November 30, 1998, through September 30, 2001. The FBI data on all NICS denials covers approximately the same time period—from November 30, 1998, through October 7, 2001.

ATF000199

**Table 3: Firearm-Retrieval Actions Referred to ATF Compared with Total FBI NICS Denials – by Prohibited Category**

| Prohibited category | Firearm-retrieval actions referred to ATF (Nov. 30, 1998 – Sept. 30, 2001) | | Total FBI NICS denials (Nov. 30, 1998 – Oct. 7, 2001) | |
|---|---|---|---|---|
| | Total | Percent of total | Total | Percent of total |
| Fugitive warrant 18 U.S.C. § 922(g)(2) | 600 | 5.5% | 5,620 | 2.8% |
| Mental defective 18 U.S.C. § 922(g)(4) | 100 | 0.9 | 716 | 0.4 |
| Domestic violence restraining order 18 U.S.C. § 922(g)(8) | 132 | 1.2 | 7,647 | 3.8 |
| Domestic violence misdemeanor 18 U.S.C. § 922(g)(9) | 2,815 | 25.7 | 27,845 | 13.9 |
| Other prohibited categories[a] | 7,298 | 66.7 | 157,892 | 79.1 |
| **Total** | **10,945[b]** | **100%** | **199,720** | **100%** |

[a]ATF and FBI did not report sufficient detail to allow analysis of the other prohibited categories.

[b]During this same time period, FBI data show that 11,847 firearm-retrieval actions were referred to ATF. According to an ATF official, the difference represents firearm-retrieval actions that were later purged from ATF systems in June 2001 because the FBI had subsequently overturned the underlying denials.

Source: GAO analysis of ATF and FBI NICS data.

It should be noted that the actual number of domestic violence offenders who purchased firearms under NICS may be larger than shown in table 3. We previously reported that roughly 1.7 percent of NICS background checks could not be completed within 21 days because the FBI was not able to obtain sufficient information to verify the purchaser's eligibility.[17] Based on the number of NICS background checks processed by the FBI through fiscal year 2001, an estimated 204,000 transactions would have fallen into this unresolved category. Even if only 1.6 percent (the average NICS denial rate for this time period) of these transactions involved prohibited persons, this would represent an estimated 3,200 additional prohibited persons who purchased firearms without being identified by NICS—over 800 of which would have been domestic violence offenders (based on the percentage of domestic violence misdemeanor firearm-retrieval actions shown in table 3). Furthermore, this number could be

---

[17]GAO/GGD-00-56, p.17. Although gun dealers are allowed to transfer firearms after 3 days if the NICS check is not completed, FBI examiners continue to research these unresolved transactions for up to 21 days to determine whether the transactions should have been approved or denied.

ATF000200

much higher, because the FBI has previously reported that delayed transactions are much more likely to involve prohibited persons than the average NICS checks.

According to FBI officials, researching domestic violence offenses can often take more than the 3 days allowed under the Brady Act. In a typical transaction, the NICS background check identifies an arrest for a misdemeanor assault but no matching disposition. The NICS examiner must then go back—in some cases to original police reports—to verify what happened and who was involved, in order to determine whether the offense meets the federal criteria for domestic violence misdemeanor. Furthermore, the information needed to confirm the conviction may not be in the automated record, and manual research is then required. If the offense was tried in a so-called court of non-record (e.g., a magistrate or justice of the peace court), the case may not have been reported to the state repository. Thus, the FBI may have to contact the local court or the original arresting agency to document the outcome.

## Barriers to the Timely Identification of Domestic Violence Convictions

Various other factors contribute to the difficulty in identifying domestic violence convictions within 3 business days and, thus, preventing the associated firearm-retrieval actions. These factors include (1) the overall accessibility and completeness of state criminal history records, (2) the complex federal definition of domestic violence misdemeanor, and (3) the difficulty in identifying domestic violence offenses in the criminal history records.

Regarding the first factor, states are continuing to automate and otherwise improve the completeness and accessibility of their criminal history records. However, this process has been ongoing since the early 1990s and is still far from complete. For example, BJS recently reported on the status of efforts to improve criminal history records for background check purposes.[18] According to the report:

- By mid-2001, a total of about 64 million records were held in state criminal history repositories. However, approximately 7 million (about 11 percent) of these were manual records and, thus, not instantly accessible to NICS.

---

[18] Department of Justice, BJS, *Improving Criminal History Records for Background Checks*, NCJ-192928 (Washington, D.C.: Feb. 11, 2002).

ATF000201

- Of the remaining 57 million automated records, an estimated 16 million records (28 percent) were not accessible through the Interstate Identification Index for background check purposes. That is, these 16 million records were instantly accessible only to the state holding the respective records.
- Of the 41 million records that were automated and accessible through the Interstate Identification Index, the most recent BJS data indicate that perhaps 37 percent may not be fully useful for an instant check due to a lack of data on arrest dispositions.

To assist BJS in reporting on the completeness of criminal records, the FBI analyzed a sample of delayed NICS background checks that resulted from an open arrest with no disposition. Overall, the FBI found that these delayed transactions typically involved older arrest records—mostly ranging from over 5 years old to more than 15 years old. Specifically, more than 75 percent of the open arrests had occurred before 1995 and about 50 percent were found to have occurred before 1984.[19]

A second factor—the complex federal definition of domestic violence misdemeanor—further increases the difficulty of using state criminal history records to determine if an individual is ineligible to purchase firearms. As mentioned previously, FBI NICS officials acknowledged that researching domestic violence misdemeanor convictions often involves manual research using original court records—and possibly arresting agency reports—to verify what happened and who was involved, in order to determine whether the offense meets the federal criteria for domestic violence misdemeanor. These same issues were previously raised in congressional testimony following passage of the Lautenberg amendment. According to a representative of the research consortium SEARCH:[20]

"Even in states where the criminal history record on its face will indicate … an element of domestic violence, research … will still be necessary to determine if the offender was represented by counsel…or had the opportunity for a jury trial [before firearms eligibility can be determined]. Because this type of information is not always recorded in original

---

[19]BJS NCJ-192928.

[20]Testimony of Gerry Wethington, Director, Information Systems, Missouri Highway Patrol, on behalf of SEARCH, before the Subcommittee on Crime, House Committee on the Judiciary, March 5, 1997. SEARCH is the National Consortium for Justice Information and Statistics and was closely involved in all of the criminal history record information and other information aspects of the Brady Act and NICS.

ATF000202

records of entry, it may simply never be possible in many states to obtain this information or to make this determination."

The SEARCH representative concluded that there may be a certain, but unknown, percentage of misdemeanor convictions that resist any attempt to determine whether they meet the Lautenberg test, because records are not available or do not indicate whether the offender had access to counsel or the right to a jury trial.

A third complicating factor is that misdemeanor criminal history records may not be clearly identified as domestic violence-related, thus requiring additional—sometimes manual—research. As BJS noted in a February 2000 report on improving criminal history records,[21] identifying domestic violence misdemeanor convictions for purposes of a firearms background check presents a unique challenge. Domestic violence incidents have historically been categorized simply as assaults, making it difficult to segregate them from other criminal history records. Further, where additional research is necessary, misdemeanor criminal records may be more difficult to track down than felony records. In its recent report on the use and management of criminal history records,[22] BJS noted that most state criminal repositories collect information only about the most serious classes of misdemeanor offenses. And, the general lack of comprehensive misdemeanor arrest and disposition data has previously been identified as one of the major deficiencies in state criminal history record systems.

In response to passage of the Lautenberg amendment, the FBI's automated system for identifying persons with felony convictions was modified in May 2001 so that domestic violence offenders (and other ineligible persons) could be more readily identified. Under the new system, a "flag" can be set in the automated criminal history to indicate whether an individual is disqualified from purchasing firearms (signified by the letter D), cleared to purchase firearms (the letter C), or unknown or pending status (the letter X).[23] When a firearms background check identifies a

---

[21]Department of Justice, BJS, *Continuing Criminal History Records Improvement Evaluation: Final 1994-1998 Report*, NCJ-179768 (Washington, D.C.: Feb. 2000).

[22]Department of Justice, BJS, *Use and Management of Criminal History Record Information: A Comprehensive Report, 2001 Update*, NCJ-187670 (Washington, D.C.: Dec. 2001).

[23]The previous flagging system, implemented in 1992, identified only whether an individual had felony or misdemeanor convictions.

ATF000203

person with a disqualifying flag, the transaction can be immediately denied with no additional research required. Flags have historically been used to mark persons that have a felony conviction in their criminal record. However, for purposes of quickly identifying domestic violence misdemeanors, some questions remain. For example, while most states flag some or all felony convictions in their criminal history databases, only 19 states currently participate in the FBI's new flagging system for identifying domestic violence and other firearms disqualifiers. Also, as reported in a 1997 study sponsored by the Bureau of Justice Assistance,[24] several state central repository officials expressed concern over the reliability and consistency of flags set in criminal history records, and one state official said he would not trust a flag set by another state and would need to look at the offender's rap sheet before determining the applicant's firearm eligibility. In Michigan, for example, an FBI NICS audit found that felony flags were not always removed from state criminal history records when individuals had their firearms rights restored. The audit also concluded that certain domestic violence offenses were flagged as disqualifying the individual from purchasing firearms, even though the offenses did not meet the criteria for disqualification.

## Our Previous Observations on Delayed NICS Transactions

In April 2000, we reported on the FBI's inability to complete certain NICS background checks within the 3 days allowed under the Brady Act.[25] In our report, we presented to the Congress as a matter for consideration three options for minimizing the number of these transactions that occur—(1) improve state criminal history records; (2) encourage states' participation in NICS; and (3) allow additional time for certain NICS background checks. These three options bear further discussion here in the context of preventing the sale of firearms to domestic violence offenders. However, given the long-term nature of improving state criminal records, and the reluctance of states to conduct their own NICS background checks, the third option—amending the Brady Act to allow more time to complete NICS background checks before allowing firearms sales to proceed— would have a more immediate effect on reducing the incidence of firearm-retrieval actions—including those involving domestic violence offenders.

---

[24]Department of Justice, Bureau of Justice Assistance, *Early Experiences With Criminal History Records Improvement: Monograph*, NCJ-152977 (Washington, D.C.: May 1997).

[25]GAO/GGD-00-56, p.15-21.

ATF000204

- **Improve state criminal history records**. The first option was to continue providing grants to states for improving their criminal history records. During fiscal years 1995 through 2001, the National Criminal History Improvement Program (NCHIP) provided over $350 million in grant funds to assist states to improve the quality and accessibility of their criminal history records, in order to support the implementation of NICS and enhance the effectiveness of NICS background checks. Among the five program priorities for fiscal year 2002, three directly relate to NICS: (1) establishing infrastructure to support the full implementation of NICS, including full state participation in the Interstate Identification Index; (2) supporting state court efforts to improve the completeness of criminal history records; and (3) encouraging states to focus on developing domestic violence record systems that are complete and accessible to NICS. NCHIP is a long-term approach that has resulted in many improvements to state criminal history records. However, our analysis of NICS firearm-retrieval actions indicates that existing criminal records systems are still not sufficient to ensure that ineligible persons—particularly domestic violence offenders—are prevented from purchasing firearms under NICS. Furthermore, in the most recent BJS summary of states' NCHIP grant programs, none of the six states we visited reported any specific activities or accomplishments on improving the access to or quality of domestic violence misdemeanor records.

- **Encourage state participation in NICS**. The second option was to encourage increased state participation in NICS. The FBI originally envisioned that most, if not all, states would conduct their own NICS background checks; however, half the states continue to rely on the FBI to conduct NICS checks for their states. In terms of access to records and expertise in interpreting criminal history records, FBI officials believe that states no longer necessarily have an advantage over FBI examiners. On the other hand, states typically have access to automated and manual records—including arrest dispositions—that are not accessible through NICS. Furthermore, states that conduct their own NICS background checks may have laws that make domestic violence (and other) firearm-retrieval actions less likely to occur. In Utah, for instance, state law prohibits gun dealers from selling a firearm until an affirmative response is provided by the state agency conducting the background check. In California, if background research reveals unresolved questions about a purchaser's eligibility, the transaction can be put on hold until these questions are resolved.

- **Allow additional time for certain NICS background checks**. The third option was to amend the Brady Act to allow more than 3 business days to research unresolved NICS background checks before allowing

GAO-02-720  Closing Loopholes in NICS

ATF000205

firearms sales to proceed. FBI data indicate that, depending on how much additional time is allowed, such a change could significantly reduce the incidence of firearm-retrieval actions—including those involving domestic violence offenders. For example, data for roughly the first 3 years of NICS operations (Nov. 30, 1998 through Oct. 19, 2001) show that allowing up to 30 calendar days for background research would have reduced the number of firearm-retrieval actions by about 54 percent.[26] Although this is somewhat less than the 77 percent reduction we previously reported based on the first year of NICS operations, it represents a significant improvement nonetheless.[27] Furthermore, in terms of the burden on firearms purchasers, allowing more time to research unresolved transactions would affect a relatively small percentage of all NICS background checks. According to an FBI analysis of August 2001 NICS data, the vast majority—over 96 percent—of NICS background checks were completed in 5 calendar days or less. Because a significant number of firearm-retrieval actions involve domestic violence misdemeanors, reducing the total number of such actions would, in turn, help reduce the number of domestic violence offenders who are able to purchase firearms under NICS.

## Conclusions

As required under the Brady Act, a firearms purchase generally may not proceed until the gun dealer has contacted NICS to determine whether the transfer of the firearm would violate federal firearms law and any applicable state law.[28] As a result, state laws and procedures—such as those discussed previously—can have a significant effect on NICS operations, particularly in how NICS examiners interpret state criminal history records to establish a purchaser's eligibility. Because of the variations in states' firearms laws, NICS examiners are challenged to identify the applicable federal and state laws for any particular transaction and make a decision to approve or deny the purchase within the 3 business days allowed under the Brady Act. In looking at the differences in how states restore gun ownership rights, issue concealed carry permits, and identify domestic violence convictions in their criminal history records, it is, therefore, important to consider how these actions may affect the operations of a federal program such as NICS.

---

[26]By comparison, allowing up to 20 days would have reduced the number of firearm-retrieval actions by 38 percent; allowing up to 60 days would have reduced the number of firearm-retrieval actions by 87 percent.

[27]GAO/GGD-00-56, p.23.

[28]18 U.S.C. § 922(t).

Regarding the restoration of gun ownership rights, there is little doubt that persons who have their gun ownership rights restored by a state action may sometimes commit subsequent crimes—perhaps even crimes that would make them ineligible to possess firearms. Based on the limited number of cases we reviewed from the six selected states, we found few instances where such persons subsequently committed additional crimes. However, regarding how such actions may affect NICS, any such persons would, in all likelihood, be identified by a NICS background check if they later attempted to purchase a firearm. Although some observers may question whether it is appropriate to allow any restoration of gun ownership rights after such rights have been lost through commission of a crime, that issue is not relevant here for purposes of the potential effect on NICS' ability to screen prospective purchasers and prevent ineligible persons from purchasing firearms.

On the other hand, state concealed carry permits—because they may exempt the permit holder from a NICS background check when purchasing firearms—can have a significant effect on NICS ability to prevent the purchase of firearms by ineligible persons. If states do not monitor their permit holders for continuing eligibility, and revoke the permits of persons who become ineligible to possess firearms, it is possible that ineligible persons could use revoked permits to purchase firearms—avoiding a NICS check that might have prevented the sale. ATF has determined that four of the states we visited issue concealed carry permits that exempt permit holders from a NICS check when purchasing firearms. In two of these four states, state officials told us they do not recover all revoked permits and, in fact, they have no authority to force such recovery. In these states, revoked permits could used by ineligible persons to purchase firearms without a NICS check. States could avoid this potential problem by requiring all permit holders to have a separate background check at the time of purchase. A simpler solution—which is practiced in one of these four states—is to require gun dealers to verify the validity of the permit itself before approving a NICS-exempt gun purchase. This procedure allows the NICS exemption for active permit holders, while ensuring that ineligible persons cannot use revoked permits to avoid a NICS check when purchasing firearms.

The inability of NICS to access domestic violence misdemeanor records in a timely manner is particularly troubling, since these offenses represent individuals who should be prevented from purchasing firearms. Yet, during roughly the first 3 years of NICS operations, the percentage of NICS firearm-retrieval actions involving domestic violence misdemeanors (representing over 2,800 persons) was disproportionately large—almost

ATF000207

double—when compared with the percentage of all NICS denials involving domestic violence misdemeanors. Various factors make domestic violence misdemeanors difficult to identify in a timely manner. For example, while states continue to work to automate and improve the overall quality and accessibility of their criminal history records, this process has been ongoing since the early 1990s and is still far from complete. Also, domestic violence offenses may not always be clearly labeled as domestic violence, and the complex federal definition of domestic violence misdemeanor requires information that may not be immediately available in the state criminal history record. Allowing unresolved NICS transactions to proceed after 3 business days, when combined with these other factors, has resulted in numerous domestic violence offenders being able to purchase firearms without being identified by NICS. These are issues that have been known for years, yet they continue to pose problems for NICS.

FBI data suggest that allowing additional time to research unresolved NICS background checks before allowing firearms sales to proceed would significantly reduce the number of firearm-retrieval actions—including those involving domestic violence offenders. For example, based on data for roughly the first 3 years of NICS operations, firearm-retrieval actions would have been reduced by 54 percent if up to 30 days of research were allowed. And, based on the FBI's recent analysis of NICS transaction data, most background checks would not be affected by such a change—in fact, over 88 percent of the background checks were completed within 1 hour, about 95 percent were completed within 3 calendar days, and over 96 percent were completed within 5 calendar days. Thus, allowing additional time to research unresolved NICS background checks would affect a relatively small percentage of firearms purchasers, while at the same time helping to minimize the number of firearm-retrieval actions.

## Recommendation for Executive Action

To minimize the possibility of ineligible persons using revoked concealed carry permits to purchase firearms without a NICS background check, we recommend that the Secretary of the Treasury consider developing regulations requiring states to implement point-of-purchase verification procedures, whereby the current validity of concealed carry permits must be verified by licensed gun dealers before transferring firearms to permit holders.

ATF000208

## Matter for Congressional Consideration

To reduce the number of NICS firearm-retrieval actions and improve the ability of NICS to prevent domestic violence offenders from purchasing firearms, the Congress should consider amending the Brady Act to allow more than 3 business days to complete unresolved NICS background checks before firearms sales are allowed to proceed.

## Agency Comments and Our Evaluation

We requested comments on a draft of this report from the Departments of Justice and the Treasury. On June 28, 2002, Justice's Assistant Attorney General for the Office of Legal Policy provided us written comments. The comments did not specifically address our report's recommendation or the matter for congressional consideration. However, Justice acknowledged that the problem of NICS delayed denials (which can lead to firearm-retrieval actions) primarily stems from incomplete or inaccurate state criminal history records. Justice also identified steps it is taking, principally through the NCHIP grant program, to reduce the NICS error rate and achieve the most complete and accurate criminal history record system possible. These steps include (1) directing NCHIP grant funding to assist states to automate and improve their criminal history record systems, (2) encouraging states to use NCHIP funds to flag records of misdemeanor domestic violence convictions, and (3) directing BJS to study and recommend ways to target NCHIP grants to improve the accuracy of criminal history records, including those relating to domestic violence.

We acknowledge that using NCHIP grant funds to improve the accuracy and completeness of state criminal history records is an appropriate and reasonable long-term strategy for reducing the number of NICS delayed denials and resulting firearm-retrieval actions. However, as we have noted in the report, these efforts have been ongoing since 1995, and yet significant numbers of firearm-retrieval actions have occurred during each year of NICS operations. Moreover, preliminary results from the BJS study noted above indicate that millions of state criminal history records remain incomplete or inaccessible by NICS. This suggests that a different approach is needed—if not permanently, then at least in the short term— to immediately reduce the number of domestic violence offenders and other ineligible persons who are able to purchase firearms under NICS. Allowing additional time to research unresolved NICS background checks before firearms sales can proceed would significantly reduce the number of NICS firearm-retrieval actions. At the same time, Justice could continue working with the states to achieve the long-term goal of improving state criminal history records to the extent that delayed denials and firearm-retrieval actions no longer posed a significant problem.

ATF000209

On June 24, 2002, Treasury provided us written comments by the Director of ATF. Generally, ATF agreed with the report's recommendation to consider developing regulations requiring states to verify the validity of concealed carry permits before allowing firearms transfers to proceed without a NICS background check. ATF noted, however, that it would first need to examine the extent to which persons with revoked permits have, in fact, been able to purchase firearms without NICS background checks. If a real problem is found to exist, then ATF would consider what options are available under current law to deal with the issue. The states that we studied were not maintaining data to facilitate determining to what extent, if any, that revoked permits have been used to purchase firearms without a NICS check. However, in our view, the fact that such a loophole exists and could be abused by persons legally prohibited from purchasing firearms is sufficient reason for ATF to take administrative action to foreclose the possibility of such transfers and, in turn, possibly prevent a firearm-related crime of violence.

ATF also commented that certain language in the report could be misinterpreted to imply that ATF favors repeal of the permit alternative under NICS, that ATF believes the rationale for allowing permit holders to avoid a background check at the time of sale is weaker now than it was when the Brady Act was passed in 1993, or that ATF believes holders of valid permits should be required to undergo a separate NICS check at the time of purchase. ATF reiterated that its mandate is to enforce the statute as enacted by Congress and enforce the permit provisions of the Brady Act in a manner consistent with the plain language of the statute as well as congressional intent. We modified our discussion of the permit alternative under NICS in order to clarify ATF's comments on this issue.

The full texts of Justice's and ATF's written comments are presented in appendixes VI and VII, respectively. In addition to these written comments, FBI and ATF officials provided us various technical clarifications, which have been incorporated into the report where appropriate.

We are sending copies of this report to the Attorney General, the Secretary of the Treasury, and interested congressional committees. Copies will be provided to other parties upon request. This report will also be available at no charge on the GAO Web site at http://www.gao.gov.

If you have any questions about this report or wish to discuss the matter further, please contact me at (202) 512-8777 or Danny R. Burton at

ATF000210

(214) 777-5600. Other key contributors to this report are acknowledged in appendix VIII.

Sincerely yours,

Laurie E. Ekstrand
Director, Justice Issues

ATF000211

# Appendix I: Objectives, Scope, and Methodology

## Objectives

Representative John Conyers, Jr., Ranking Member, House Committee on the Judiciary, requested that we provide information about state laws and procedures regarding restoration of gun ownership rights, issuance of concealed carry handgun permits, and convictions for domestic violence. As agreed with the requester, our work focused on the following questions:

- **Restoration of gun ownership rights**, including differences among the states in how such rights may be restored to persons with criminal convictions, and the extent to which persons who had their gun ownership rights restored subsequently committed new crimes.

- **Handgun concealed carry permits**, including the extent to which concealed carry permits exempt permit holders from a National Instant Criminal Background Check System (NICS) check when purchasing firearms, differences among the states in how they issue permits and monitor permit holders, and what actions the states take to revoke permits if the permit holders subsequently commit new crimes.

- **Domestic violence misdemeanor convictions**, including differences among the states in how they ensure that domestic violence convictions in state criminal history repositories are accessible to NICS, and the extent to which persons convicted of domestic violence purchased firearms without being identified by NICS.

## Scope and Methodology

To obtain nationwide perspectives on the three objectives, we met with Federal Bureau of Investigation (FBI) officials from the FBI's NICS Program Office in West Virginia, and the Bureau of Alcohol, Tobacco and Firearms (ATF) officials from ATF's Firearms Programs Division and Office of Chief Counsel in Washington, D.C. We obtained and reviewed federal reports prepared by the Department of Justice's Bureau of Justice Statistics (BJS), as well as relevant studies published in professional journals and studies prepared by private sector interest groups.

To obtain additional details about specific state laws and procedures, we met with state or local officials in six states—California, Florida, Massachusetts, Michigan, Texas, and Utah. As shown in table 4, and as discussed with the requester, we judgmentally selected these states in order to illustrate the range of state laws and procedures that address restoration of gun ownership rights, handgun concealed carry permits, and domestic violence misdemeanor convictions. Because these three issues may affect NICS' capability to identify persons ineligible to purchase

ATF000212

Appendix I: Objectives, Scope, and
Methodology

firearms, we also selected the states to reflect a mix of state participation
types under NICS—full participant, partial participant, and
nonparticipant.[1]

**Table 4: States Selected for Study of Firearms-Related Laws and Procedures**

| | State laws and procedures | | | |
|---|---|---|---|---|
| | Restoration of gun ownership rights | Handgun concealed carry permit[a] | Domestic violence misdemeanors | State participation in NICS |
| California | • Pardon<br>• Automatic restoration | • May-issue state<br>• Local law enforcement agencies issue permits | • Specific criminal offense<br>• Penalty enhancement statute | • State conducts checks for all firearms purchases |
| Florida | • Pardon<br>• Restoration by petition | • Shall-issue state<br>• State non-law enforcement agency issues permits | • Definition statute<br>• Flag set in criminal records | • State conducts checks for all firearms purchases |
| Massachusetts | • Pardon<br>• Restoration by petition<br>• Automatic restoration | • May-issue state<br>• Local law enforcement agencies issue permits | • No laws or procedures identified | • FBI conducts checks for all firearms purchases |
| Michigan | • Pardon<br>• Set-aside<br>• Automatic restoration<br>• Restoration by petition | • Shall-issue state<br>• Local law enforcement agencies issue permits | • Specific criminal offense<br>• Penalty enhancement statute<br>• Flag set in criminal records | • State conducts checks for handgun permits<br>• FBI conducts checks for long gun purchases |
| Texas | • Pardon<br>• Set-aside<br>• Automatic restoration | • Shall-issue state<br>• State law enforcement agency issues permits | • Penalty enhancement statute | • FBI conducts checks for all firearms purchases |
| Utah | • Pardon<br>• Expungement | • Shall-issue state<br>• State law enforcement agency issues permits | • Definition statute<br>• Penalty enhancement statute<br>• Flag set in criminal record | • State conducts checks for all firearms purchases |

[a]In shall-issue states, a permit must be issued if no statutory reason for denial is revealed during a
background check. In may-issue states, a permit may be issued to eligible individuals after
considering additional subjective prohibitors, such as the applicant's history and personal character.

Source: GAO's analysis of various federal, state, and private sector information sources.

---

[1]States that conduct all NICS firearms checks are known as full participant states. States
that conduct NICS checks only for handguns are known are partial-participant states.
States in which the FBI conducts all firearms checks are known as nonparticipant states.

ATF000213

Generally, in performing our work, we relied on testimonial and documentary evidence provided by the states, as well as similar evidence provided by the FBI and ATF. In using state and federal statistical data, we discussed the sources and accuracy of the data with appropriate officials. We also worked with the officials to reconcile any discrepancies we identified in the data.

The following sections present more details about our scope and methodology for each of the three objectives.

## Scope and Methodology Regarding Restoration of Gun Ownership Rights

Our work focused on (1) summarizing nationwide perspectives and information on state laws and procedures dealing with the restoration of gun ownership rights, (2) comparing and contrasting specific restoration laws and procedures in selected states, and (3) determining the extent to which restorees subsequently committed new crimes.

### Nationwide Perspectives

To obtain nationwide perspectives on restoration of gun ownership rights, we first obtained background information from relevant reports prepared by government agencies and studies published in professional journals about the various ways in which states restore a person's civil rights and gun ownership rights once those rights have been lost through a criminal conviction. Sources of information included BJS, the Department of Justice's Office of the Pardon Attorney, and the *International Journal of Comparative and Applied Criminal Justice*.

We also met with FBI NICS Operations Center officials to discuss (1) the extent to which restoration of rights is documented in state criminal history records and (2) how restoration of rights can affect NICS operations—specifically, how the FBI determines in a timely manner whether a particular state action restores an individual's right to purchase a firearm under applicable federal and state law.

### Selected States' Restoration Actions

To obtain more detailed information about specific state restoration laws and procedures, we met with officials at various state and local agencies in California, Florida, Massachusetts, Michigan, Texas, and Utah. We obtained information about relevant state laws, regulations, and procedures that govern the restoration of gun ownership rights, focusing on the four methods recognized in federal firearms law—executive pardons, expungement of criminal records, set-aside of criminal convictions, and restoration of civil rights.

ATF000214

Appendix I: Objectives, Scope, and
Methodology

| | |
|---|---|
| **Subsequent Criminal Activity** | To determine the extent to which restorees have been subsequently involved in criminal activity, we first obtained background information from relevant reports prepared by government agencies, studies published in professional journals, and reports prepared by private interest groups. Sources of information included the Department of the Solicitor General (Canada), the *Journal of the American Medical Association*, and the Violence Policy Center. We also met with officials from ATF's Firearms Programs Division and Office of Chief Counsel to discuss ATF's federal restoration of rights issues.[2] |

From the six selected states, we analyzed data on state pardons, expungements, set-asides, and restorations of civil rights to determine whether persons whose firearms rights were restored in these states later committed criminal offenses. The following data were obtained from the six states:

- **California** – Data on pardons granted between calendar years 1990 and 2000.
- **Florida** – Data on pardons and restorations of firearms authority granted between July 1999 and June 2001.
- **Massachusetts** – Data on pardons granted between calendar years 1990 and 2000.
- **Michigan** – Data on pardons granted between March 1969 and July 1995, conviction set-asides granted between September 2000 and November 2001, and county restorations of firearms rights granted between October 1992 and June 2001.
- **Texas** – Data on pardons granted between calendar years 1992 and 2001.
- **Utah** – Data on pardons granted between calendar years 1990 and 2001 and expungements granted between January 2000 and March 2001.

We then had our Office of Special Investigations, or in some cases the state agencies themselves, check the names through criminal history

---

[2]As mentioned previously, persons who have lost the right to possess firearms—for example, because of a criminal conviction—can petition ATF for relief from firearms disabilities imposed by federal laws. However, since October 1992 Congress has prohibited ATF from using any appropriated funds to process such petitions, essentially leaving the states primarily responsible for restoring firearms rights.

ATF000215

Appendix I: Objectives, Scope, and
Methodology

databases to determine whether any of those persons had been convicted
of additional crimes since the event that restored their rights.[3]

The selection of restoration data used in our analysis was largely
dependent on the availability of state data for each method of restoration.
In some cases, statewide data were not available and in other cases only
data from certain time periods were available. In some states, the analysis
was based on a review of a small number of cases, in order to facilitate
cooperation from the states in helping to analyze the data. For example:

- None of the states had data available for analysis if gun ownership
  rights had been restored automatically (in California, Massachusetts,
  Michigan, and Texas) or through expungement (in Utah).

- Some pardon data (in Michigan and Texas) did not have sufficient
  identifying detail to enable us to perform a check of criminal history
  databases and, as a result, the cases we examined were limited to the
  number of pardons that had sufficient detail. In other instances
  (Florida pardons and Michigan set-asides), the number of cases we
  examined was limited in order to facilitate cooperation from the states
  in helping to gather and analyze the data.

As a result of these limitations, the analysis of the state restoration data is
intended solely to illustrate what we found from the cases we reviewed in
the six states we visited, and the results cannot be generalized beyond the
timeframes and locations from which the data were collected.

## Scope and Methodology Regarding Handgun Concealed Carry Permits

Our work focused on (1) determining the extent to which concealed carry
permits exempt permit holders from NICS background checks when
purchasing firearms; (2) comparing and contrasting laws and procedures
for issuing, monitoring, and revoking concealed carry permits in selected
states; and (3) determining the extent to which states revoke concealed
carry permits when permit holders subsequently commit new crimes.

## Exemptions from NICS Checks

To determine the extent to which concealed carry permits exempt permit
holders from NICS background checks, we first reviewed the Brady Act
and its implementing regulations to identify any relevant provisions

---

[3]Because expungement actions may, in most cases, destroy the record or make it
unavailable for review, we did not do any subsequent analysis on the extent to which
persons who obtained expungements later committed crimes.

ATF000216

Appendix I: Objectives, Scope, and
Methodology

exempting permit holders from NICS checks. We obtained ATF Brady permit exemption lists for 1999 and 2002 identifying which states issued permits that ATF had determined would exempt the permit holders from a NICS background check. We also met with officials from ATF's Firearms Programs Division and Office of Chief Counsel to discuss ATF's interpretation of the permit exemption language in the Brady Act and reasons for exempting permits in some states and not others. In the six selected states, we discussed the permit-exemption issue with state officials and identified any state laws affecting the exemption of state permit holders from firearms background checks.

**Selected States' Laws and Procedures**

To obtain more detailed information about specific state laws and procedures for concealed carry permits, we met with officials at various state and local agencies in California, Florida, Massachusetts, Michigan, Texas, and Utah. We obtained information about state laws, regulations, and procedures dealing with concealed carry permits—including (1) how the states screen and approve permit applicants, (2) how the states monitor active permit holders to ensure they remain eligible to possess firearms, and (3) what actions the states take to revoke permits when permit holders become ineligible.

**Subsequent Criminal Activity**

To determine the extent to which concealed carry permit holders subsequently commit crimes or other infractions that lead to permit revocation, we first obtained background information from relevant reports prepared by private interest groups. Sources of information included the Cato Institute and the Violence Policy Center.

From the six selected states, we obtained and analyzed available data on the number of concealed carry permits issued, the number of permits revoked, and the extent to which states recovered revoked permits from permit holders. Regarding revoked permits, we also obtained available data on the criminal offenses that led to the revocations—including whether these offenses were felonies or misdemeanors and whether they involved a firearm. The following data were obtained from the six states:

- **California** – Data on permits issued and revoked during calendar year 2000.
- **Florida** – Data on permits issued and revoked between October 1987 (program inception) and December 2001.
- **Massachusetts** – Data on permits issued and revoked between October 1998 (major program revision) and February 2002.
- **Michigan** – Data on permits issued and revoked between July 2001 (major program revision) and March 2002.

ATF000217

Appendix I: Objectives, Scope, and
Methodology

- **Texas** – Data on permits issued and revoked between January 1996
  (program inception) and October 2001.
- **Utah** – Data on permits issued and revoked between January 1994 and
  December 2001.

Our analysis was largely dependent on the availability of state data. In
some cases, statewide data were not available, and in other cases only
data from certain time periods were available. For example:

- California permit data were available only for calendar year 2000;
  Michigan data were available only since July 2001, when the state's new
  shall-issue permit law went into effect; and Massachusetts data were
  available only since October 1998, when a major permit program change
  took place.

- Only Florida and Utah data contained detail about whether the crime
  leading to revocation had involved a firearm, and only Texas and Utah
  data identified whether the crime committed was a misdemeanor or
  felony.

As a result of these limitations, the analysis of the state concealed carry
permit data is intended solely to illustrate what we found from the
information we reviewed in the six states we visited, and the results
cannot be generalized beyond the timeframes and locations from which
the data were collected.

## Scope and Methodology Regarding Domestic Violence Misdemeanor Convictions

Our work focused on (1) summarizing nationwide perspectives and
information on state laws and procedures dealing with domestic violence,
(2) comparing and contrasting selected states' laws and procedures for
ensuring domestic violence convictions are identified and reported to state
criminal history repositories, and (3) determining the extent to which
persons with domestic violence convictions are able to purchase firearms
because such records were not accessible to NICS.

### Nationwide Perspectives

To obtain nationwide perspectives and background information on
domestic violence laws and procedures, we reviewed relevant reports by
government agencies and private research groups about the various ways
in which state criminal codes address domestic violence, as well as the
general quality and accessibility of state criminal history records. Sources
of information included BJS, the Bureau of Justice Assistance, the
National Institute of Justice, the Justice Research and Statistics
Association, and the Institute for Law and Justice.

ATF000218

Appendix I: Objectives, Scope, and
Methodology

| | |
|---|---|
| **Selected States' Laws and Procedures** | To obtain more detailed information about specific state laws and procedures, we met with officials at various state and local agencies in California, Florida, Massachusetts, Michigan, Texas, and Utah. We obtained information about relevant state laws, regulations, and procedures dealing with domestic violence—including (1) how the states treat domestic violence in their criminal codes or other state statutes and (2) whether the states impose special identification or reporting requirements on domestic violence records. |
| **Firearms Purchases by Domestic Violence Offenders** | To determine the extent to which domestic violence offenders are able to purchase firearms under NICS, we first reviewed relevant studies and reports published in professional journals or private interest groups. Sources of information included the *Journal of the American Medical Association* and the Americans for Gun Safety Foundation. |

We met with officials from the FBI's NICS Operations Center and ATF's Firearms Program Division and Office of Chief Counsel to discuss the extent to which domestic violence criminal history records cannot be obtained within 3 business days under NICS (as prescribed under the Brady Act) and the reasons why such records cannot be obtained. We obtained the following FBI and ATF data for roughly the first 3 years of NICS operations (Nov. 30, 1998 through Sept. 30, 2001):[4]

- We obtained FBI data on the number of NICS firearm-retrieval actions—those where the FBI took more than 3 days to determine the purchaser was ineligible and the firearms then had to be retrieved. We also obtained FBI data on the total number of NICS denials and the reason for these denials—broken out by each of the federal disqualifying factors (including domestic violence).

- We obtained ATF data on (1) the number of NICS firearm-retrieval actions referred to ATF for retrieval of firearms and (2) the number of these firearm-retrieval actions that had been denied because of a domestic violence misdemeanor conviction.

We used the FBI and ATF data to quantify the number of persons with domestic violence convictions who were able to purchase firearms when such records were not accessible to NICS within 3 business days. The federal data allowed a more comprehensive, nationwide analysis of such

---

[4] The FBI data on total NICS denials and disqualifying factors covered the time period November 30, 1998, through October 7, 2001.

ATF000219

**Appendix I: Objectives, Scope, and
Methodology**

transactions, whereas data from the selected states were more limited. For example, some states tracked the number of such transactions but not the disqualifying factors involved, while other states had laws which allowed additional time to complete transactions where the purchaser's eligibility could not be determined within 3 business days.

ATF000220

# Appendix II: Eligibility to Possess Firearms under Federal or State Law

In determining whether a person is ineligible to possess firearms, applicable federal and state laws must be considered. While federal eligibility restrictions generally apply in all the states, states may place additional restrictions on possessing or purchasing firearms. Although other factors come into play, decisions about a person's eligibility to possess firearms largely are based on an assessment of state criminal history records.

## Firearms Eligibility Restricted under Federal and State Law

Under federal firearms law, the factors that make a person ineligible to possess (or receive) firearms are generally described in Title 18, Chapter 44, of the United States Code[1]—primarily Sections 922(g) and 922(n). Ineligible persons include the following categories:

- **Convicted felons and persons under felony indictment or information**. A felony is generally defined as any federal, state, or foreign offense punishable by imprisonment for a term exceeding 1 year. It does not include state offenses classified as misdemeanors and for which the punishment is 2 years or less in prison. In addition, what constitutes a conviction is to be determined by the laws of the jurisdiction in which the criminal proceedings were held.
- **Fugitives from justice**. A fugitive is generally defined as any person who has fled from any state, either to avoid prosecution or to avoid giving testimony in a criminal case. This definition includes persons who, knowing criminal charges are pending, leave the state of prosecution.
- **Unlawful drug users or persons addicted to a controlled substance**. This category includes persons who use controlled substances and have lost the power of self control and persons currently using controlled substances in a manner not prescribed by a licensed physician. An inference of current use may be demonstrated by a drug conviction or positive drug test within the past year, or by multiple drug arrests during the past 5 years.
- **Illegal or unlawful aliens**. This category includes aliens who are in the United States without a valid immigrant, nonimmigrant, or parole status, including aliens who entered the country without inspection and authorization or whose authorized period of stay has expired. In addition, certain other aliens lawfully admitted in nonimmigrant status are also ineligible, unless they meet certain exceptions defined in federal firearms law.

---

[1]The Gun Control Act of 1968, Public Law 90-618 (as amended).

ATF000221

- **Persons adjudicated mentally defective or committed to a mental institution**. Mental defectives are generally defined as persons who have been determined by a court or other lawful authority to be a danger to themselves or others or who lack the mental capacity to manage their own affairs, including persons who have been found to be insane by a court in a criminal case. Commitment to a mental institution is generally defined as a formal commitment by a court or other lawful authority, including commitment for mental illness or other reasons such as drug use. It does not include persons voluntarily admitted to a mental institution.

- **Persons who have renounced their U.S. citizenship**. Persons ineligible under this category must have renounced their citizenship before a U.S. diplomatic or consular officer in a foreign country or before an officer designated by the U.S. Attorney General when the United States is at war.

- **Persons dishonorably discharged from the military**. This category includes separation from the U.S. armed forces by a dishonorable discharge or dismissal adjudged by a general court-martial. It does not include separation resulting from any other type of discharge.

- **Persons subject to a domestic violence restraining order**. This category includes persons who are subject to a court order that prohibits harassing, stalking, or threatening an intimate partner or child of an intimate partner, or placing such persons in reasonable fear of bodily injury. The order must have been issued after a hearing for which the person had actual notice and an opportunity to participate, and the order must either find a credible threat to the intimate partner or child, or by explicit terms prohibit the use, attempted use, or threatened use of physical force.

- **Persons convicted of a domestic violence misdemeanor**. This category includes any federal, state, or local misdemeanor where the offense involves the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian. To be considered ineligible, such persons must have had counsel and a jury trial (if applicable), unless those rights were waived.

In addition to federal law, states may have their own specific laws dealing with eligibility to possess or purchase firearms. In some states, only the federal eligibility restrictions apply; in other states, eligibility may go beyond what is required under federal law. In the six states we visited, for example:

- California, a state which conducts all firearms checks under NICS, prohibits the purchase of a firearm by persons convicted of certain

ATF000222

misdemeanors—such as assault, battery, and criminal possession of a firearm—for 10 years following the conviction.

- Massachusetts, a nonparticipant state under NICS, prohibits possession of firearms by anyone convicted of certain state-defined violent crimes—whether felonies or misdemeanors.

- Texas, a nonparticipant state under NICS, places no additional state eligibility restrictions on prospective firearms purchasers.

- Utah, a state which conducts all firearms checks under NICS, prohibits any juvenile adjudicated as delinquent within the past 7 years for an offense that would have been a felony if committed by an adult from purchasing a firearm.

## Criminal History a Key Element in Determining Eligibility

In practice, federal and state determinations about eligibility to possess firearms hinge largely upon a person's criminal history, primarily whether the individual has been convicted of a felony or a domestic violence misdemeanor or has been arrested and/or convicted for drug-related offenses. For example, according to FBI data, NICS denied 199,720 firearms purchases during roughly its first 3 years of operation (from Nov. 1998 to Oct. 2001). As shown in table 5, the vast majority of these denials—almost 92 percent—were due to the purchasers' criminal histories.

ATF000223

Table 5: Reasons Why NICS Denied Firearms Purchases (Nov. 30, 1998 through Oct. 7, 2001)

| Disqualifying factor | Total number of FBI NICS denials | Percent of total |
|---|---|---|
| Criminal history | 182,817 | 91.5% |
| Felony | 126,945 | 63.6 |
| Domestic violence misdemeanor | 27,845 | 13.9 |
| Drug abuse | 9,898 | 5.0 |
| Other criminal history[a] | 18,129 | 9.1 |
| Fugitive from justice | 5,620 | 2.8 |
| Mental defective | 716 | 0.4 |
| Illegal/unlawful alien | 1,178 | 0.6 |
| Dishonorable discharge | 117 | 0.06 |
| Citizenship renounced | 14 | 0.01 |
| Domestic violence restraining order | 7,647 | 3.8 |
| Other disqualifying factor[b] | 1,611 | 0.8 |
| Total | 199,720 | 100% |

Note: Percentages may not equal 100 due to rounding.

[a]"Other criminal history" includes denials due to (1) a state prohibitor, (2) multiple convictions for driving under the influence, and (3) arrest warrants that were not in the FBI's National Crime Information Center database.

[b]"Other disqualifying factor" includes denials due to other noncriminal prohibitors, such as state protection orders.

Source: FBI NICS Program Office.

In a July 2001 report on the implementation of the Brady Act and NICS, BJS reported similar data for state and local agencies that conduct firearms purchase background checks.[2] Specifically, during the year 2000, just over 66 percent of all state and local firearms purchase denials were denied due to felony convictions, felony indictments, or domestic violence convictions.

The number of criminal history records maintained by the FBI and the states is enormous—and continues to grow. As shown in table 6, according to BJS, there were over 62 million criminal history records in the United States as of December 1999.[3] The vast majority of these

---

[2]Department of Justice, BJS, *Background Checks for Firearm Transfers, 2000*, NCJ-187985 (Washington, D.C.: July 2001).

[3]Department of Justice, BJS, *Survey of State Criminal History Information Systems, 1999*, NCJ-184793 (Washington, D.C.: Oct. 2000).

ATF000224

records—about 95 percent—were generated by the states.[4] Furthermore, the total number of criminal history records increased by over 23 percent between 1993—the year the Brady Act was passed—and 1999.

**Table 6: Number of Criminal History Records in the United States (as of Dec. 31, 1999)**

|  | Total criminal history records | Percent of total |
| --- | --- | --- |
| U.S. total | 62,389,214 |  |
| State | 59,183,600 | 94.9% |
| Federal | 3,152,069 | 5.1 |
| Foreign[a] | 53,545 | 0.1 |
| Selected states |  |  |
| California | 6,166,000 | 9.9% |
| Florida | 3,754,200 | 6.0 |
| Massachusetts | 2,530,000 | 4.1 |
| Michigan | 1,259,500 | 2.0 |
| Texas | 6,157,100 | 9.9 |
| Utah | 392,800 | 0.6 |

Note: Percentages may not equal 100 due to rounding.

[a]Includes records on foreign fugitives and deported felons.

Source: BJS.

As noted previously, most NICS denials are based on criminal history records. As table 6 indicates, these criminal history records are generated predominantly by the states and are maintained in state criminal history repositories. As such, NICS must rely on the accuracy of state criminal history records in making decisions about the eligibility of prospective firearms purchasers.

[4]More recently, BJS reported that the total number of state criminal history records had increased to almost 64 million, as of July 2001.

ATF000225

# Appendix III: Restoration of Gun Ownership Rights

This appendix discusses (1) how federal firearms law recognizes certain state methods of restoring gun ownership rights, (2) national overview information on the availability of these methods throughout the states, and (3) the extent to which these methods have been used by the six states we studied—California, Florida, Massachusetts, Michigan, Texas, and Utah.

## Federal Law Recognizes State Methods of Restoring Gun Ownership Rights

Persons prohibited from possessing firearms due to a state criminal conviction may, under state laws, have those rights restored by the state in which the criminal offense occurred.[1] Certain types of state actions that serve to restore firearms rights are also recognized under federal law as a restoration of the federal right to possess firearms. This recognition arises out of the meaning of the term conviction—that is, federal law states that what constitutes a conviction is to be determined by the law of the jurisdiction in which the criminal proceedings were held. More importantly, federal law specifies that any conviction that has been expunged or set aside, or for which the person has been pardoned or has had his civil rights restored, is not considered a conviction for firearms eligibility purposes unless the expungement, pardon, or restoration expressly prohibits the person from possessing firearms.[2] Thus, federal firearms law recognizes state use of any of the four specified restoration methods to restore gun ownership rights to persons disqualified due to a state criminal conviction.[3]

Because relief from firearms disabilities is no longer readily available at the federal level,[4] individuals convicted of disqualifying criminal offenses

---

[1]Regarding federal criminal convictions, in *Beecham v. United States* 511 U.S. 368 (1994), the U.S. Supreme Court held that federal offenders can have their firearms rights restored only through a federal restoration action, such as a presidential pardon, and not a state restoration action.

[2]18 U.S.C. § 921(a)(20) applies this definition to felony convictions (i.e., crimes punishable for a term exceeding 1 year); subsection (a)(33) applies this definition to domestic violence misdemeanor convictions.

[3]The provisions of 18 U.S.C. § 921 regarding restoration of firearms rights apply only to criminal convictions, as previously defined. Section 921 does not address state restoration for noncriminal firearms disqualifiers, such as mental disability or drug addiction.

[4]Since October 1992, Congress has prohibited Treasury from expending appropriated funds to act upon petitions for relief from federal firearms disabilities under its authority at 18 U.S.C. § 925. Regarding federal crimes, however, relief from firearms disabilities may be obtained through a presidential pardon, under Article II, Section 2, of the United States Constitution.

ATF000226

turn to the states for restoration of gun ownership rights, through one of the four methods recognized by federal law—pardon, expungement, set-aside, or restoration of civil rights. States use these methods to restore firearms rights, as well as any civil rights—such as the right to vote, hold office, and serve on a jury—lost as a result of criminal offenses. Each of these methods can have a different impact on the disqualifying record, as well as the extent to which firearms or civil rights are restored, as described in the next section.

- **Pardon** – A pardon is, in general, an executive action that typically mitigates the punishment the law demands for an offense and restores any or all of the rights and privileges forfeited on account of the offense. The power to pardon for state crimes is generally vested in state governors or delegated to state pardon boards. An unconditional or full pardon generally absolves the offender from all legal consequences, direct or collateral, of the crime and conviction and generally restores civil rights.[5] A conditional or partial pardon may require certain actions on the part of the offender or may absolve only a portion of the legal consequences of the crime. States vary in how they document pardon actions in their criminal history record systems. Most states retain records on the original offense, noting the pardon on the criminal history record, while some destroy or seal all records pertaining to the offense.

- **Expungement** – An expungement (or erasure) is a procedure whereby a court orders the annulment or destruction of arrest records or other court proceedings, such as a criminal conviction, provided certain conditions are met. When a conviction record is expunged, it may allow the offender to say, under certain circumstances, that he or she has never been convicted; expungement may not, however, automatically restore the offender's firearms rights. Expungement can also result in the sealing of a record, but whereas certain parties can still examine an erased record, a sealed record can generally be examined only by court order. Expungement and sealing of records are usually provided for by statute for juvenile records, but may also apply to less serious records, such as arrest records for persons acquitted at trial or whose arrest was deemed by a court to be unlawful. Some states require the passage of a certain period of time before an offender can apply for

---

[5]A pardon does not necessarily overcome licensing qualifications for employment or occupation purposes, such as the requirement of "good moral behavior." Thus, pardoned offenders may still be barred from employment in certain occupations (e.g., law, contracting) that have such licensing requirements.

ATF000227

expungement. Some states destroy expunged criminal records, while others note the action in the record or seal the record.

- **Set-Aside** – A set-aside is an action that annuls or revokes a previously issued judgment or order—such as a felony conviction. To set-aside a judgment is to make it void or of no effect and to deprive it of all force and operation as to future transactions. The majority of states note a set-aside in the offender's criminal record; a few destroy the criminal record.

- **Restoration of Civil Rights** – Just as state law may impose certain civil and collateral disabilities on criminal offenders, it may also make available procedures to remove those disabilities and restore any rights that were lost upon conviction. In some states, civil and collateral (e.g., firearms) rights may be restored automatically upon completion of sentence or upon the passage of time, as provided for by statute; in other states, restoration of rights may require an administrative or judicial act, which may be based on evidence of rehabilitation. Most states note the restoration in the offender's criminal record, while a few may destroy the record.

## National Overview on State Methods to Restore Gun Ownership Rights

As mentioned previously, persons prohibited from possessing firearms due to a state criminal conviction may have those rights restored by the state in which the offense occurred, through any of four specified methods prescribed in federal firearms law—pardon, expungement, set-aside, and restoration of civil rights. Each of these four methods can have a different effect on a prohibited person's underlying criminal conviction and the extent to which firearms rights are restored. Recent studies have shown that states vary in terms of (1) the restoration methods they employ, (2) the laws and procedures they have in place to implement those restoration methods, and (3) the underlying effect they impose on the criminal record.

In 1996, the U.S. Office of the Pardon Attorney reported on the availability of restoration methods among states for felony offenders[6] and found that states vary in terms of the methods available for relief as well the laws they have in place to govern these methods. The variation in procedures was so great that the Office of the Pardon Attorney characterized state laws as a national "crazy-quilt" of disqualifications and restoration

---

[6]Department of Justice, Office of the Pardon Attorney, *Civil Disabilities of Convicted Felons: A State-by-State Survey* (Washington, D.C.: Oct. 1996).

ATF000228

procedures. The report also identified disagreement among agencies as to how the laws in particular jurisdictions should be interpreted and applied. Moreover, the Office of the Pardon Attorney found that a restoration of civil rights under state law—even through a governor's pardon—does not necessarily restore firearms privileges.

Despite considerable variation among states, the Office of the Pardon Attorney determined that state laws regarding the loss and restoration of civil rights could be characterized in terms of the following five patterns:

- Civil rights are not lost upon conviction, or civil rights are lost when the offender is incarcerated and automatically restored upon release.
- Rights are lost upon conviction, then are automatically restored after completion of sentence, either through passage of time or by obtaining a certificate of discharge from the sentence.
- Rights are restored through judicial or administrative procedure, which typically requires completion of sentence and a waiting period and may also require proof of rehabilitation.
- Rights are restored only by pardon.
- Rights are permanently lost and cannot be restored.

Other studies of restoration of civil rights provide context as to the range and use of restoration methods by states and the effect these methods have on disqualifying criminal convictions. For example, a 1997 study regarding the legal consequences of felony convictions compared the availability of restoration methods among states in 1996 with the availability of methods 10 years earlier in 1986.[7] Researchers found that, during those 10 years, states did not increase the number of restoration methods available to former offenders to restore civil rights. The study reported that in 1996 the availability of restoration methods among states was as follows:

- All 50 states allowed for pardons. In 22 states, the decision to pardon rested with the governor; in 16 states, the decision was shared between the governor and a board of pardons; in 11 states the decision rested with the board of pardons; and in 1 state, the decision required an act of the state's general assembly.

---

[7]"Reducing the Legal Consequences of a Felony Conviction: A National Survey of State Statutes Ten Years Later," *International Journal of Comparative and Applied Criminal Justice*, Vol. 21, No. 1 (Spring 1997).

ATF000229

Appendix III: Restoration of Gun Ownership
Rights

- 27 states had some method of felony record expungement (including
  sealing, annulment, and withheld or deferred judgments). In 9 of the 27
  states, the law provided for general expungement or related legal
  actions. In the other 18 states, the expungement statutes contained
  specific eligibility requirements for the sealing of criminal records.
- 42 states statutorily provided for automatic restoration of all or some
  civil rights for felony offenders. In 22 of the 42 states, the law restored
  one or more civil rights after completion of sentence. In the other 20
  states, an existing general statute restored civil rights.

In October 2000, BJS reported on the status of state criminal history
information systems.[8] In its report, BJS included the results of a survey,
taken in 1999, on the policies and practices of state criminal history
repositories with respect to the four restoration methods, showing how
each of the methods affected states' treatment of the underlying criminal
history record. This survey showed that in 1999:

- 49 states reported statutes that provided for the granting of pardons. In
  43 of the states, the pardon was to be noted in the criminal history
  record; in 3 states, the record was to be destroyed; in 1 state, the record
  was to be sealed; and 2 states did not indicate how pardons were
  treated in terms of criminal history records.
- 21 states had statutes providing for the expungement of felony
  convictions. In 9 of the states, an expunged criminal history record was
  to be destroyed; in 7 states, the expungement was to be noted in the
  criminal record; and in 5 states, the record was to be sealed. In two
  other states, state law did not specifically provide for expungement,
  but allowed records to be destroyed or sealed based on a court order.
- 40 states had statutes that provided for the set aside of felony
  convictions. In 33 of the states, the set-aside was to be noted in the
  criminal record; in 3 states, the record was to be destroyed; in 1 state,
  the record was to be sealed; and 3 states did not indicate how set-aside
  records were to be treated by the state repository.
- 41 states had legal provisions that provided for the restoration of a
  convicted felon's civil rights. In 33 of the states, the restoration was to
  be noted in the criminal history record; in 3 states, the record was to be
  destroyed; in 1 state, the record was to be sealed; in 2 states,
  restoration was not tracked or no action was taken; and 2 states did not
  indicate how restoration records were to be treated.

---

[8]Department of Justice, BJS, *Survey of State Criminal History Information Systems,
1999*, NCJ-184793 (Washington, D.C.: Oct. 2000).

ATF000230

Appendix III: Restoration of Gun Ownership
Rights

## Information on Restoration of Gun Ownership Rights in Selected States

To obtain more detailed information regarding restoration of gun ownership rights, we reviewed state laws and procedures in six states—California, Florida, Massachusetts, Michigan, Texas, and Utah. Each of the six states we visited provided for the restoration of gun ownership rights through one or more of the four specified methods.[9] Pardon was the most commonly utilized method, with all six states employing some form of pardon—either full or conditional—that restored gun ownership rights to previously ineligible persons. Expungement—available only in Utah—was the least commonly available method of restoring gun ownership rights.

For purposes of our study, we identified state laws and procedures to restore state firearms rights that may, in turn, also restore federal firearms rights by means of the four methods recognized under 18 U.S.C § 921.[10] In addition to identifying state actions that fully restore state and federal gun ownership rights, we also identified certain state restoration actions that only partially restore such rights. In the category of "restoration of civil rights," some actions that restore state gun ownership rights do not restore federal firearms rights, because they do not provide full relief from disabilities—that is, they do not also restore civil rights (as prescribed in 18 U.S.C. § 921). Other state restoration actions do not restore federal firearms rights because civil rights were lost as a result of a noncriminal disqualifier (such restorations are not recognized under 18 U.S.C. § 921). Nevertheless, we present the information here in order to illustrate the complexity of state restoration laws and procedures and the interaction between state and federal firearms laws.

Regarding the specific state laws and procedures for restoring gun ownership rights, the six states differed primarily in three areas: (1) the processes for application of and approval for relief, (2) the conditions or criteria under which a prohibited person was eligible to receive relief, and (3) the effect restoration methods have on firearms rights. Table 7 shows the differences among the six states in these three areas.

---

[9]We focused on those restoration methods provided for by state statute. Gun ownership rights may also be restored by court actions—most notable, where convictions are "set aside" by an appellate court for reasons of procedural or substantive error, which would nullify the conviction and restore any rights lost as a result of the conviction.

[10]In some cases, these four restoration methods may also be used to restore other rights—such as civil rights—lost as a result of a state criminal conviction.

GAO-02-720  Closing Loopholes in NICS

ATF000231

Appendix III: Restoration of Gun Ownership
Rights

**Table 7: Summary Information on Laws and Procedures Regarding Restoration of Gun Ownership Rights in Selected States**

| State | Method of restoration | Selected eligibility criteria | Application and approval process | Effect on gun ownership rights |
|---|---|---|---|---|
| California[a] | • Full pardon | Available 10 years after completion of sentence, but time limit may be waived by governor. | Residents apply to the court for a certificate of rehabilitation, which is reviewed by the governor, or apply directly to the governor; out-of-state applicants apply directly to the governor's office. | For misdemeanors and felonies not involving a dangerous weapon, restores all state and federal firearms rights. |
| | | Available for felonies and certain registrable misdemeanor sex offenses. | | For felonies involving a dangerous weapon, does not restore state or federal firearms rights. |
| | | Must have a clean criminal record subsequent to offense and good moral character. | All applicants subject to background checks. | Pardons without certificate of rehabilitation must include specific language restoring firearms rights. |
| | • Restoration of civil rights | Available 5 years following release from confinement for certain mental health disqualifications. | Automatic—no application or approval required. | Restores state firearms rights.<br><br>Does not restore federal firearms rights. |
| | | Available 10 years after completion of sentence for certain misdemeanors. | Automatic—no application or approval required. | Restores state firearms rights.<br><br>Does not restore federal firearms rights. |
| Florida[b] | • Full pardon | Available 10 years after completion of sentence for felonies and domestic violence misdemeanors. | Applicants apply to state pardon board and are subject to background check and screening. | Restores all state and federal firearms rights. |
| | | Must be a Florida resident; cannot have more than $1,000 in criminal or traffic infraction penalties. | All pardons, except in cases of treason, are approved by state review panel led by the governor. | |
| | | Not available for impeachment; available for treason by legislative approval. | | |
| | • Restoration of civil rights | Available for felonies, 8 years after completion of sentence. | Same as full pardon. | Restores all state and federal firearms rights. |
| | | All other criteria same as full pardon. | | |

ATF000232

Appendix III: Restoration of Gun Ownership
Rights

| State | Method of restoration | Selected eligibility criteria | Application and approval process | Effect on gun ownership rights |
|---|---|---|---|---|
| Massachusetts[c] | • Full pardon | Pardons usually not available for certain felony offenses.<br><br>Must show compelling need, have a clean criminal record subsequent to offense, and demonstrate good citizenship. | Applicants apply to state parole board and are subject to background check; must demonstrate that police will grant a firearms permit.<br><br>Pardons approved by governor-led review panel. | Restores all state and federal firearms rights. |
| | • Restoration of civil rights | After release from confinement for mental health disqualifier, with affidavit from physician. | Applicants apply to local police for state handgun permit, with physician's affidavit. | Restores state firearms rights.<br><br>Does not restore federal firearms rights. |
| | | 5 years after completion of sentence for nonviolent felonies and misdemeanors.<br><br>Not available for crimes involving trafficking of controlled substances. | Automatic—no application or approval required. | Restores state firearms rights for long guns only.<br><br>Does not restore federal firearms rights. |
| Michigan | • Full pardon | Not available for impeachment. | Applicants apply to state and are subject to a background check.<br><br>Pardons approved by the governor. | Restores all state and federal firearms rights. |
| | • Set-aside | 5 years after completion of sentence for misdemeanor and specified felony convictions.<br><br>Cannot have more than one felony conviction. | Applicants petition court of record and are subject to a background check. | For misdemeanors, restores all state and federal firearms rights.<br><br>For felonies, restores state rights to purchase and possess firearms; does not restore federal firearms rights. |
| | • Restoration of civil rights | 3 years after completion of sentence for low-grade or nonviolent felonies. | Automatic—no application or approval required. | Restores state firearms rights.<br><br>Does not restore federal firearms rights. |
| | | 5 years after completion of sentence for specified felonies (e.g., arson). | Applicants apply to County Concealed Weapons Licensing Board. | Restores state firearms rights.<br><br>Does not restore federal firearms rights. |
| Texas[d] | • Full pardon and pardon for innocence | Full pardon not available for impeachment; available for treason with legislative approval. | Applicants apply to state pardon board and undergo a background check.<br><br>Pardons approved by governor with board recommendation. | Restores all state and federal firearms rights. |

ATF000233

Appendix III: Restoration of Gun Ownership
Rights

| State | Method of restoration | Selected eligibility criteria | Application and approval process | Effect on gun ownership rights |
|-------|----------------------|------------------------------|----------------------------------|-------------------------------|
| | • Firearms authority pardon | 3 years after completion of sentence, only in extreme conditions that prevent livelihood.<br><br>Not available for offenses involving violence, drugs, or firearms. Must have clean record, other than the offense in question.<br><br>Applicants must obtain or apply for a state pardon and apply to U.S. Secretary of the Treasury for federal relief from disabilities. | Applicants can apply to local sheriff or state pardon board.<br><br>Approved by the governor. | Restores all state and federal firearms rights. |
| | • Set-aside | Must fulfill conditions of probation.<br><br>Not available for registered sex offenders, intoxication convictions, and state jail felonies. | Applicants apply to court of jurisdiction. | Restores all state and federal firearms rights. |
| | • Restoration of civil rights | 5 years after completion of sentence for felonies and domestic violence misdemeanors. | Automatic—no application or approval required. | For misdemeanors, restores state firearms rights. Does not restore federal firearms rights.<br><br>For felonies, restores state firearms rights only for possession in the home. Does not restore federal firearms rights. |
| Utah[e] | • Full pardon | 5 years after completion of sentence, after all other judicial remedies, including expungement, have been exhausted. | Applicants apply to and are approved by state board, and are subject to background checks. | Restores all state and federal firearms rights. |
| | • Expungement | 3 to 15 years after completion of sentence, depending on offense.<br><br>Cannot have more than two convictions—only one felony—or prior expungements.<br><br>Not available for registrable sex offenses and serious felonies. | Applicants apply to original court of record for approval, subject to background check by state agency. | Restores all state and federal firearms rights. |

ATF000234

Note: "Completion of sentence" generally refers to completion of incarceration or release from supervision or probation, whichever occurs later.

[a]California recognizes expungements only for criminal records expunged before September 15, 1961.

[b]Florida also restores firearms rights in cases of deferred adjudication or suspended sentence—for felonies and domestic violence misdemeanors—3 years after completion of probation or other court-imposed condition.

[c]Massachusetts also allows sealing of records—and the restoration of firearms rights—for a first-time misdemeanor drug (possession) conviction.

[d]In Texas, persons who are pardoned are also entitled to have records related to the pardoned conviction expunged.

[e]Utah also allows criminal records to be set aside under certain circumstances, which make the records eligible for expungement and the individual eligible for restoration of gun ownership rights.

Source: GAO's analysis of state documents and discussions with state officials.

The six states we reviewed differed in the processes they have in place for restoring firearms rights. Most of the states either provide for automatic restoration of firearms rights for certain criminal disqualifications, or require an administrative or judicial petition to restore those rights. For example, California employs automatic restoration for persons convicted of certain misdemeanor offenses, 10 years following completion of sentence. Michigan, on the other hand, employs both procedures: persons convicted of low-grade or nonviolent offenses have their rights restored automatically 3 years after completing their sentence, while persons convicted of more serious felonies—such as arson or drug-related felonies—must apply to their County Concealed Weapons Licensing Board for relief 5 years after completing their sentence. In contrast, Utah has no separate provision for restoring firearms rights—individuals in that state must apply for a pardon or an expungement. States also differed in the processes they use for reviewing and awarding pardons. For example, in California, pardons are approved by the governor; in Utah, pardons are approved by a state pardon board; and in Massachusetts, pardons are approved by a review panel, which includes the governor.

All of the six states we visited require applicants to meet certain eligibility criteria—depending on the type of restoration method—to qualify for firearms relief, such as the passage of time or the absence of additional convictions. For example, persons in Florida must wait 10 years following the completion of their sentence to apply for a full pardon or 8 years to apply for a restoration of firearms authority. Persons convicted in Michigan of specific felonies—for example, arson—must wait 5 years after the completion of their sentence to apply for relief from their County Concealed Weapons Licensing Board. Many of the states also restrict the types of offenses for which the state will grant relief. For example,

ATF000235

Appendix III: Restoration of Gun Ownership
Rights

California automatically restores firearms rights to offenders convicted of certain misdemeanors—but not felonies—10 years after completion of sentence. Some of the states also require that an applicant have no additional convictions other than the offense in question. In Utah, only certain offenders with two or fewer convictions—only one of which can be a felony—can apply to have their criminal history record expunged.

In four of the states we reviewed—California, Massachusetts, Michigan, and Texas—certain state restoration actions restore state gun ownership rights, but do not restore federal firearms rights. As a result, persons in these states who are authorized under state law to possess a firearm are still prohibited from doing so under federal law. In California, for example, state law automatically restores the state right to possess or purchase firearms to certain persons who have been involuntarily committed to a mental institution, 5 years after their release from confinement.[11] This restoration does not, however, restore federal firearms rights to persons prohibited under this category. Under 18 U.S.C. § 921, state actions to restore firearms rights are recognized as a restoration of federal firearms rights only for persons who lost those rights as a result of criminal disqualifiers (such as a felony conviction), as opposed to noncriminal disqualifiers such as confinement to a mental institution.

In Massachusetts, ATF officials have determined that the operation of state law is inconsistent with federal law in terms of restoring firearms rights—both handgun and long gun rights—to persons who have been adjudicated as mentally defective or involuntarily committed to a mental institution. Under Massachusetts statute, persons prohibited under the mental defectives category can seek to regain their state firearms rights if they provide an affidavit from a registered physician attesting that they are not disabled in a manner that should prevent them from possessing firearms. However, according to ATF officials, the same principle that prevents recognition of California's mental health restoration statute under federal firearms law also prevents recognition of Massachusetts' mental health restoration statute. That is, the specified methods of restoring firearms rights under 18 U.S.C. § 921 do not include state restoration of firearms rights lost as a result of noncriminal disqualifications.

---

[11]California allows this restoration for persons who have been involuntarily committed for 14 days or less to a mental institution, which is a state firearms disqualification.

ATF000236

Also in Massachusetts, state law restores the right to possess certain long guns, but not handguns, to nonviolent offenders 5 years following the completion of sentence. According to ATF officials, because this restoration does not apply equally to both handgun and long gun rights, it cannot be recognized under federal law as restoring firearms rights. This stems from a ruling by the U.S. Supreme Court, *Caron v. United States*, in which the court held that a state restoration action would not restore federal firearms rights, if <u>any</u> restriction on an individual's right to possess firearms remained following the restoration.[12] Similarly, in Michigan, persons convicted of a nonviolent felony have their firearms rights automatically restored 3 years after completion of sentence, subject to certain conditions. However, the state's concealed carry law prohibits anyone convicted of a felony from ever obtaining a concealed carry permit. According to ATF officials, because of this restriction on the right to obtain a concealed carry permit, Michigan's restoration only partially restores firearms rights to persons convicted of a felony. As a result, Caron also applies, and such restorations cannot be recognized as restoring federal firearms rights.

Texas' law restores—to varying degrees—state firearms rights that were lost as a result of domestic violence misdemeanor and felony convictions. The law automatically restores, 5 years after completion of sentence, all state firearms rights to persons convicted of a domestic violence misdemeanor. The law also allows persons convicted of a felony to possess a firearm in their home 5 years after completion of sentence. However, according to ATF officials, the state law does not restore federal firearms rights for either category of offense—felony or misdemeanor—because it does not also restore the offenders' civil rights, as specified under 18 U.S.C. § 921(a)(20).

---

[12]*Caron v. United States*, 524 U.S. 308 (1998).

ATF000237

# Appendix IV: Handgun Concealed Carry Permits

This appendix presents (1) a national overview of concealed carry permit programs and (2) information about selected states' permit programs—including how states screen permit applicants, how they monitor the eligibility of permit holders, and what actions states take to revoke permits if the permit holders commit crimes.

## National Overview of Concealed Carry Permit Programs

Concealed carry laws allow gun owners, under certain conditions, to carry a concealed loaded firearm in public. While there is no federal law specifically addressing the issuance of concealed carry permits, 42 states have passed laws allowing citizens to carry certain concealed firearms in public after obtaining a permit from state or local law enforcement authorities. As shown in table 8:

- Twenty-nine states are commonly known as "shall-issue" states, where a concealed carry permit must be issued if no statutory reason for denial is revealed during a background check of the applicant.
- Thirteen states are known as "may-issue" states, where the police have discretion to grant concealed carry permits to eligible individuals after considering additional subjective prohibitors, such as the applicant's history, character, and intended purpose for carrying a firearm.
- One state allows any legal gun owner to carry a concealed firearm without a permit, under most circumstances.
- In the remaining seven states, carrying a concealed firearm is generally prohibited.

ATF000238

Appendix IV: Handgun Concealed Carry
Permits

**Table 8: Status of States with Regard to Concealed Carry of Firearms (as of June 2002)**

| | Concealed carry allowed | | | Concealed carry prohibited |
|---|---|---|---|---|
| | Shall-issue permit required | May-issue permit required | No permit required | |
| Alabama | | ● [a] | | |
| Alaska | ● | | | |
| Arizona | ● | | | |
| Arkansas | ● | | | |
| California | | ● | | |
| Colorado | | ● | | |
| Connecticut | | ● [a] | | |
| Delaware | | ● | | |
| Florida | ● | | | |
| Georgia | ● | | | |
| Hawaii | | ● | | |
| Idaho | ● | | | |
| Illinois | | | | ● |
| Indiana | ● | | | |
| Iowa | | ● | | |
| Kansas | | | | ● |
| Kentucky | ● | | | |
| Louisiana | ● | | | |
| Maine | ● | | | |
| Maryland | | ● | | |
| Massachusetts | | ● | | |
| Michigan | ● | | | |
| Minnesota | | ● | | |
| Mississippi | ● | | | |
| Missouri | | | | ● |
| Montana | ● | | | |
| Nebraska | | | | ● |
| Nevada | ● | | | |
| New Hampshire | ● | | | |
| New Jersey | | ● | | |
| New Mexico | | | | ● |
| New York | | ● | | |
| North Carolina | ● | | | |
| North Dakota | ● | | | |
| Ohio | | | | ● |
| Oklahoma | ● | | | |
| Oregon | ● | | | |
| Pennsylvania | ● | | | |
| Rhode Island | | ● | | |
| South Carolina | ● | | | |

ATF000239

Appendix IV: Handgun Concealed Carry
Permits

| | Concealed carry allowed | | | |
|---|---|---|---|---|
| | **Shall-issue permit required** | **May-issue permit required** | **No permit required** | **Concealed carry prohibited** |
| South Dakota | • | | | |
| Tennessee | • | | | |
| Texas | • | | | |
| Utah | • | | | |
| Vermont | | | • | |
| Virginia | • | | | |
| Washington | • | | | |
| West Virginia | • | | | |
| Wisconsin | | | | • |
| Wyoming | • | | | |
| **Total** | **29** | **13** | **1** | **7** |

ªSources differ somewhat as to whether Alabama and Connecticut should be classified as "shall-issue" or "may-issue" states. On the basis of our analysis of these states' permit laws, we classified these states as "may-issue" states.

Source: GAO's analysis of state laws and information from The Brady Campaign to Prevent Gun Violence, the National Rifle Association, the Firearms Law Center, and www.packing.org.

Federal law does not mandate that states establish certain eligibility criteria for issuing concealed carry permits. As such, state laws generally define the eligibility criteria that individuals must meet in order to obtain and maintain a concealed carry permit. To better understand the differences among states' concealed carry laws, we visited six states. As noted in table 8, four of the six states we visited—Florida, Michigan, Texas, and Utah—were "shall-issue" permit states. The other two—California and Massachusetts—were "may-issue" states. The following sections provide a more detailed description of each state's permit laws and procedures for screening permit applicants, monitoring the eligibility of permit applicants, and revoking permits if disqualifying offenses are detected.

ATF000240

Appendix IV: Handgun Concealed Carry
Permits

# Screening, Monitoring, and Revocation Procedures for Concealed Carry Permits among Selected States

In the six states we visited, the concealed carry permit programs were administered either at the state level or by local officials, depending on the state. Administrative procedures generally included permit application, applicant screening, and permit issuance, as well as permit monitoring and revocation. All the states we visited had formal procedures for performing background checks of permit applicants before issuing concealed carry permits. However, the thoroughness and types of databases used during background checks varied slightly. The states also had procedures in place for revoking permits once officials became aware, through monitoring efforts, that a permit holder had committed a disqualifying offense or otherwise became ineligible to have a permit. However, once a permit was revoked, only two of the states would ensure that permit holders returned the permits to the revoking authority by seizing the permits. Also, only one of the states provided for any enforcement penalties for failure to surrender a revoked permit.

## Screening Permit Applicants

Each of the states we visited requires applicants to fill out a form with background information and previous criminal history, if any. In addition to the information presented by the applicant, each state performs independent background screening using a variety of federal and state criminal and noncriminal information sources. To determine eligibility to obtain a concealed carry permit, each state screened applicants based on various disqualifiers outlined in federal and state law. In addition to the federal firearms disqualifiers, such as prohibitions against convicted felons and illegal aliens, the concealed carry laws in these states identified additional disqualifiers—such as certain violent or firearms-related misdemeanors (California and Michigan), driving under the influence (Michigan), or the inability to demonstrate competency with a firearm in an approved safety course (all states visited).[1]

As shown in table 9, in screening permit applicants for eligibility, the permit-issuing entity in each state is to consult both state and state sources of criminal justice data. In all the selected states except Florida, the issuing entity is either a state or local law enforcement agency; Florida's Department of State issues the permits, while the background screening is performed by Florida's Department of Law Enforcement. In

---

[1]The screening disqualifiers also may provide grounds to revoke a permit once it has been issued. Additional examples of state permit disqualifiers are discussed below in the section on revoking permits.

ATF000241

Appendix IV: Handgun Concealed Carry
Permits

addition to name-based searches using both federal and state information sources, the states' screening procedures also include fingerprint-based checks performed by the state and the FBI.

**Table 9: Methods Used by Selected States to Screen Persons Applying for Concealed Carry Permits**

| State and type of permit | Issuing entity | Information sources used for background screenings | | | | Screening process time limits |
|---|---|---|---|---|---|---|
| | | Nationwide databases | State criminal databases | Other state records | Local records | |
| California (may-issue) | County sheriffs and police departments | • | • | • | | 90 days |
| Florida (shall-issue) | Department of State Division of Licensing | • | • | • | | 90 days |
| Massachusetts (may-issue) | Police departments | • | • | • | | 40 days |
| Michigan (shall-issue) | County gun boards | • | • | • | • | 30 days |
| Texas (shall-issue) | Department of Public Safety | • | • | | • | 60 days[a] |
| Utah (shall-issue) | Department of Public Safety | • | • | • | | 60 days |

[a]This period can be extended to 180 days for good cause. If no decision is reached within 30 days of the 180-day limit, the application is effectively denied.

Source: GAO's analysis of state documents and discussions with state officials.

Specifically, with regard to nationwide sources of criminal and other disqualifying data, each state screens permit applicants against the three databases that make up the NICS system—the Interstate Identification Index, the National Crime Information Center, and the NICS Index. In addition, each state we visited queried its own state criminal history repository in reviewing permit applicants. The states also maintained other information sources that they consulted during the screening process. For example, all the states we visited reviewed records of fugitive warrants. In addition, most states reviewed listings of protection orders and mental health records. Also, some of the states consulted information sources unique to their respective states when screening permit applicants. California, for example, queried records on persons under supervisory release (i.e., on probation or parole), and Utah reviewed driver's license records.

Only two of the six states we visited included a check of local records as a routine portion of the permit-screening process. For instance, Texas law enforcement officials examine records kept at the local (county) level as a routine part of the concealed carry permit background investigation. A

ATF000242

Texas Department of Public Safety officer is to physically visit the local courthouse in the county where the applicant resides to examine local records. Also, local officials in Michigan are to check local records for pending charges and ongoing investigations, in addition to records in previous counties of residence if the concealed carry permit applicant has lived in the present county only a short period of time. The remaining states generally seek details from local records only when an automated records search reveals a possible problem with incomplete data—for example, a potentially disqualifying arrest without a disposition.

Another example of a difference in background screening processes concerns time limits. All the states we visited have some time limitation for the background check process specified in the state's law. However, Florida's concealed carry permit law requires the state to issue the permit after 90 days—even if the background check has not been completed—unless the applicant is ineligible or has a potentially disqualifying arrest without disposition information. According to Florida officials, this situation could and does occur when the state does not receive fingerprint results back from the FBI within the 90-day time limit. During fiscal year 2001, for example, 1,065 concealed carry permits were issued without a completed background check. In these situations, if the permit holders are later determined to be ineligible, the state must take action to revoke the permits—which occurred 461 times between 1987 and 2001. In the other states we visited, officials could use discretion in deciding whether or not to issue a permit when the background screening could not be completed within the time frames established by the respective state's concealed carry law.

## Monitoring Permit Holders

Once concealed carry permits are issued, the states are to monitor permit holders to ensure continued eligibility and, if needed, revoke the permits of persons who become ineligible. Five of the six states we visited had formal mechanisms in place for detecting a disqualifying criminal offense or other disqualifying factors committed by permit holders. As shown in table 10, these mechanisms include computerized matching of names of concealed carry permit holders against state criminal records (Utah and Florida), manual notifications to the state's permit authority by the courts when a concealed carry permit holder is convicted of a criminal offense (Michigan), and point-of-purchase verification of a permit's validity (Utah).

ATF000243

Appendix IV: Handgun Concealed Carry
Permits

**Table 10: Methods Used by Selected States to Monitor the Eligibility of Concealed Carry Permit Holders**

| | Permit-monitoring methods | | | |
| --- | --- | --- | --- | --- |
| | Automated database checks | Formal reporting of offenses[a] | Permit verification before NICS-exempt firearms purchase | Informal monitoring |
| California | • | | [b] | |
| Florida | • | | | |
| Massachusetts | | | | • |
| Michigan | | • | [b] | |
| Texas | • | | | |
| Utah | • | | • | |

[a]Generally, on an informal basis, law enforcement officials in all six states can report offenses by permit holders to other state or local officials. However, this column refers to a formal, structured mechanism for reporting such offenses to the permit-issuing authority.

[b]As mentioned previously, in California and Michigan, a concealed carry permit does not exempt the permit holder from a NICS background check when purchasing firearms. Therefore, no verification of the permit is necessary.

Source: GAO's analysis of state documents and discussions with state officials.

With regard to automated database checks, two states—California and Texas—have procedures to continually match permit holders' names against state criminal records. In Texas, for example, new criminal records are automatically matched against existing state records (including the database of permit holders) as they are added to the state criminal records repository. In two other states—Florida and Utah—state criminal records and other potentially disqualifying records are matched against the names of active permit holders on a periodic basis. Florida, for example, conducts periodic matches of permit holders against a variety of state databases and records, including criminal histories (weekly), protection orders and repeat violent offenders (daily), corrections records (monthly), and motor vehicle records (monthly). Utah conducts a daily computer check by matching records in the state criminal repository to the list of permit holders to determine if any of them have been charged with or convicted of a disqualifying offense. After Utah began daily matching in February 2000, the number of permits identified for revocation increased over 240 percent—from 75 revocations in 1999 to 256 revocations in 2000.

Rather than automated monitoring processes, Michigan depends on a formal process of reporting offenses committed by concealed carry permit holders. That is, when a permit holder is charged with an offense that could potentially result in revocation of his or her permit, the applicable prosecutor is to notify the county gun board that issued the individual's permit. Following prosecution, a court official is to notify the county gun

ATF000244

Appendix IV: Handgun Concealed Carry
Permits

board about the results, including information about any disqualifying conviction.

Massachusetts, on the other hand, has no formal statewide mechanism for monitoring concealed carry permit holders for continued eligibility. Rather, monitoring is done on an ad hoc basis, such as when one local law enforcement entity requests information on a suspicious permit holder from another locality. Local permit-issuing authorities (police departments) have informal agreements regarding the sharing of criminal records on permit holders to help facilitate this process. Massachusetts officials told us they expect to have an automated system in place in the future to more closely monitor permit holders.

Among the states we visited, Utah uniquely monitors its concealed carry permit holders at the time of purchase of a firearm. That is, before selling firearms to a permit holder, a gun dealer is required to verify the validity of the permit presented, in order to allow the purchase to proceed without a NICS background check (ATF has determined that Utah permits qualify to exempt the permit holders from a NICS background check when purchasing firearms). In the other states we visited—Florida, Massachusetts, and Texas—where ATF allows certain concealed carry permits to be presented in lieu of a NICS check, the gun dealer performs only a visual inspection of the permit. In Utah, the dealer is to visually inspect the permit and call the state's Bureau of Criminal Identification to verify that the permit is still valid and has not been revoked. Florida and Texas officials commented that, without this provision in their state laws, an individual conceivably could present a revoked concealed carry permit and purchase a firearm without a NICS check.

## Revoking Permits

After detecting a disqualifying criminal offense or other disqualifying factor, all six states have similar procedures in place for revoking a concealed carry permit. In addition to criminal offenses, a revocation could also be warranted if the individual had developed a noncriminal prohibition against carrying a concealed firearm (e.g., diagnosed with a mental illness or subject to a domestic violence restraining order). As shown in table 11, firearms prohibitions in all the states we visited included federal disqualifiers, such as felony convictions, along with additional prohibitions put in place by the states.

ATF000245

Appendix IV: Handgun Concealed Carry
Permits

**Table 11: Criteria Used by Selected States to Revoke Concealed Carry Permits**

| | Firearms prohibitors leading to permit revocation | | | | Revocation enforcement mechanisms | |
| | Federal prohibitors | Violent crimes | Misdemeanor crimes[a] | Other prohibitors[b] | Civil or criminal penalties | Permit seizure |
|---|---|---|---|---|---|---|
| California | • | | • | | | • |
| Florida | • | • | • | | | |
| Massachusetts | • | • | • | • | • | • |
| Michigan | • | | • | • | | |
| Texas | • | | • | • | | |
| Utah | • | • | • | | | |

[a]These are misdemeanors other than domestic violence, which is one of the federal prohibitors.

[b]These are other criminal or noncriminal activities not addressed under the federal prohibitors.

[c]Massachusetts observes the federal prohibitors; however, state law is silent with regard to renunciation of citizenship and dishonorable discharge as criteria for revocation.

Source: GAO's analysis of state documents and discussions with state officials.

Regarding additional prohibitors, three of the six states visited revoke a concealed carry permit for any violent offense—whether a felony or misdemeanor. In addition, all six states identified certain misdemeanor offenses that would result in revocation. Michigan, for example, designates specific misdemeanors as revocable offenses upon conviction—including driving under the influence, assault, child abuse, and various firearms-related offenses. Some of the states had other unique disqualifiers that could lead to revocation for their permit holders. For example, in Michigan, the concealed carry permit law generally provides that pending felony charges in any state or federal jurisdiction can result in permit suspension and revocation. Massachusetts is similar in that an arrest warrant in any jurisdiction—whether in state or out of state—will result in permit revocation.[2] Texas also revokes permits for certain noncriminal activities—such as delinquency on taxes, student loans, or child support.

Of the six states we visited, only Massachusetts had laws establishing any civil or criminal penalties if an individual failed to return a revoked permit to state authorities. If a person fails to return his or her revoked permit, as required by Massachusetts state law, the state may charge the individual

---

[2]In contrast, to be considered a fugitive under federal firearms law—and thus prohibited from purchasing or possessing firearms—an individual must have fled the jurisdiction (i.e., the state).

GAO-02-720  Closing Loopholes in NICS

ATF000246

with a misdemeanor offense punishable by a fine of up to $1,000 or a jail term of up to 2-½ years. Massachusetts was also one of only two states (California was the other) where we found that local permit-issuing authorities would actively seek out and seize permits once they had been revoked. Massachusetts law generally requires that revoked permits be surrendered to the permit-issuing agency and, if not surrendered, the licensing authority is to take possession of the permit and the permit holders may be subject to civil or criminal penalties. In California, although not a requirement in state law, local law enforcement officials also told us that revoked permits are seized.

In contrast, state officials in Florida and Texas—two states with large numbers of concealed carry permit holders—told us that they did not actively seek out and recover revoked permits. Furthermore, neither state has sanctions in place to force the return of revoked permits or otherwise penalize permit holders who do not voluntarily surrender their revoked permits. Data from Florida and Texas illustrate the extent to which revoked permits are not surrendered.

- In fiscal year 2001, Florida issued over 25,000 concealed carry permits. Due to the 90-day limit on application processing mandated by state law, 1,065 of these permits were issued before the background check was completed. State officials later found that 18 of these persons were ineligible to have a concealed carry permit and these permits were then revoked. However, state officials told us that 7 of these persons did not voluntarily surrender their revoked permits.
- Although Texas officials did not have specific data, they estimated that about 20 percent of all revoked permits are not recovered by the state. Based on the total number of revocations (1,659) in Texas between January 1996 and October 2001, this would represent an estimated total of about 332 revoked permits that were not recovered.

ATF000247

# Appendix V: Domestic Violence Misdemeanor Convictions

Among the federal firearms prohibitors, identifying domestic violence misdemeanor convictions for purposes of firearms background checks presents a unique challenge. Although the law establishing this prohibitor was retroactive, domestic violence offenses have historically been categorized as assaults, making it difficult to isolate domestic violence misdemeanors from other nondisqualifying misdemeanors. In particular, the complex federal definition of domestic violence misdemeanor requires information about court proceedings that may not be immediately available in automated criminal history records. Thus, additional manual research may be necessary to determine whether a misdemeanor offense constitutes a federal firearms prohibitor.

This appendix (1) provides details about the complex federal definition of domestic violence misdemeanor; (2) presents national overview information about the laws and procedures states have developed regarding domestic violence offenses; and (3) summarizes specific laws and procedures used in the six states we reviewed—California, Florida, Massachusetts, Michigan, Texas, and Utah.

## Complex Federal Definition of Domestic Violence

In September 1996, as part of the 1997 Omnibus Consolidated Appropriations Act, Congress banned the possession of firearms by individuals convicted of a misdemeanor crime of domestic violence.[1] The so-called Lautenberg Amendment amended the Gun Control Act of 1968 to make it unlawful for any person convicted of a misdemeanor crime of domestic violence to possess or receive firearms. As defined in the law, a misdemeanor crime of domestic violence is an offense that is a misdemeanor under federal or state law and has, as an element, the use or attempted use of physical force or the threatened use of a deadly weapon, committed by (1) a current or former spouse, parent, or guardian of the victim; (2) a person with whom the victim shares a child in common; (3) a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian; or (4) a person similarly situated to a spouse, parent, or guardian of the victim.

In addition to the detailed definitional criteria and elements of the offense, the Lautenberg Amendment also prescribed a series of more complex exceptions to the firearms prohibition. Under these exceptions, a person is

---

[1]Section 658 of Public Law 104-208 (1996).

ATF000248

not considered to be convicted of a domestic violence misdemeanor under any of the following circumstances:

- The person was not represented at trial by counsel (unless he or she waived the right to counsel).
- The person was entitled to a jury trial but the case was not tried by jury (unless he or she waived the right to a jury trial).
- The conviction was expunged or set-aside, or the person was pardoned or had his or her civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) and the person is not otherwise prohibited from possessing firearms or ammunition.

Federal firearms regulations provide that the definition of domestic violence includes any misdemeanor that meets the criteria, regardless of whether the applicable state statute or local ordinance does or does not define the offense as "domestic violence." For example, a person convicted of misdemeanor assault against his or her spouse would be prohibited from receiving or possessing firearms under the law. Also, the firearms prohibition applies to any disqualifying misdemeanor, regardless of the court of record (federal, state, or local) where the conviction occurred. In practice, most criminal history records are generated by the states, not the federal government. As such, with respect to domestic violence misdemeanors, the determination of a person's eligibility to purchase firearms is based largely on review of state criminal history records and related documents.

As BJS stated in its February 2000 report on improving criminal history records,[2] identifying domestic violence misdemeanor convictions for purposes of a firearms background check presents a unique challenge. Although the law establishing this prohibiting category was retroactive, domestic violence incidents have historically been categorized simply as assaults, making it difficult to isolate them from other criminal history records. In addition, where additional research is necessary, information about misdemeanors may be more difficult to track down than felonies. In its recent report on the use and management of criminal history records,[3]

---

[2] Department of Justice, BJS, *Continuing Criminal History Records Improvement Evaluation: Final 1994-1998 Report*, NCJ-179768 (Washington, D.C.: Feb. 2000).

[3] Department of Justice, BJS, *Use and Management of Criminal History Record Information: A Comprehensive Report, 2001 Update*, NCJ-187670 (Washington, D.C.: Dec. 2001).

ATF000249

BJS noted that most state criminal repositories collect information only about the most serious classes of misdemeanor offenses. Moreover, BJS noted that the general lack of comprehensive misdemeanor arrest and disposition data has already been identified as one of the major deficiencies in state criminal history record systems. FBI NICS officials confirmed that researching domestic violence misdemeanor convictions can be laborious. It often involves manual research going back to the original court records—and in some cases to arresting agency reports—to verify what happened and who was involved, in order to determine whether the offense constitutes a federal firearms prohibitor.

## National Overview of Efforts to Identify Domestic Violence Offenders

In general, domestic violence misdemeanor conviction records are maintained, along with all other types of criminal records, in state criminal history repositories. Some states have developed specific systems or procedures for identifying and collecting data on domestic violence offenders, with the effect of making such records more easily identifiable for law enforcement and for other purposes.

## National Institute of Justice

In a July 1996 report to Congress,[4] the National Institute of Justice reported that many states were collecting data (or implementing systems to collect data) on domestic and sexual violence offenses. According to state survey results, 35 of 47 responding states and territories collected domestic violence statistics annually; however, there was wide variation among states with regard to what information was collected and how it was gathered—reflecting the differences in how states approached these issues and their existing structures for collecting general crime data. For example, some states enacted specific domestic or family violence statutes that clearly defined this as an offense; some states had not designated domestic violence as a separate offense but had instituted reporting systems for cases that could be characterized as such; in states with an incident-based crime reporting system, some had derived domestic violence crime statistics from the existing system; and in states lacking incident-based capability, some had created domestic violence reporting systems.

[4]Department of Justice, National Institute of Justice, *Domestic and Sexual Violence Data Collection: A Report to Congress under the Violence Against Women Act*, NCJ-161405 (Washington, D.C.: July 1996).

ATF000250

**Appendix V: Domestic Violence Misdemeanor Convictions**

An October 1999 update to the 1996 report[5] on domestic and sexual violence expanded on the original findings. With respect to law enforcement databases—which collect data on offenses reported to or arrests by local law enforcement agencies—34 states reported having some type of law enforcement data collection system for domestic violence. In discussing the key components of law enforcement databases, the report stated that domestic violence offenses in these systems can be identified through a number of methods—including relationship and offense codes, flags, specific offense codes, and specific crime statutes. For example, "flags"—typically a special line entry or box that is checked—clearly designate an offense in the state's criminal history records as domestic violence, thus making these offenses easier to identify for law enforcement purposes. Recognizing the advantages of these systems, the report recommended, among other things, that states should implement incident-based reporting systems that use nationally compatible offense and relationship codes.

## Institute for Law and Justice

In October 2000, the Institute for Law and Justice—under a grant from the National Institute of Justice—reported on state domestic violence laws from a law enforcement perspective.[6] The report noted that criminal code provisions for addressing domestic violence include both traditional common law offenses—such as assault and battery—as well as provisions that specifically criminalize domestic violence and related offenses. Specifically, 37 states had enacted domestic battery laws to complement common law assault and battery laws. These offenses can be classified as misdemeanors or felonies, depending on the circumstances. According to the report, the primary purpose of these laws is to provide enhanced penalties, especially for repeat offenses. However, the laws also provide a basis to more clearly identify domestic violence-related offenses within a state's criminal history records.

The report concluded that the states had adopted widely variant statutory models for addressing domestic violence and that state legislation making domestic violence a crime was "largely a hodge-podge of differing provisions." To address these issues, the report identified certain model

---

[5]Justice Research and Statistics Association, *Domestic Violence and Sexual Assault Data Collection Systems in the States* (Washington, D.C.: Oct. 1999).

[6]Institute for Law and Justice, *A Review of State Domestic Violence-Related Legislation: A Law Enforcement and Prosecution Perspective* (Alexandria, Va.: Oct. 31, 2000).

ATF000251

**Appendix V: Domestic Violence Misdemeanor Convictions**

legislative guidelines that states could follow in revamping their domestic violence laws. With respect to criminal law provisions, these guidelines included, among other things, the establishment of specific state domestic violence assault and battery offenses.

## Bureau of Justice Statistics

In April 2002, BJS issued its latest in a series of surveys of state procedures for firearms sales.[7] Among other things, BJS surveyed the states to determine what automated or manual databases maintained by state agencies were normally available to checking agencies during the course of firearms background checks. As of June 2001, BJS found that all 50 states had established criminal history databases containing—at a minimum—felony arrests and convictions and, in some cases, dispositions and other data on domestic violence and other misdemeanors. In addition to these general criminal history databases, BJS further reported that 33 of the states surveyed had misdemeanor conviction databases that could also be accessed during firearms background checks. However, the report did not indicate whether these databases were automated or manual, nor the extent to which they included domestic violence convictions.

## Differences in Domestic Violence Laws and Procedures in Selected States

In the six states we visited, we looked for various approaches used by the states that could make it easier to identify domestic violence convictions in state criminal history records for purposes of NICS background checks. As shown in table 12, these approaches included establishing a specific domestic violence criminal offense, defining domestic violence as an element of certain general criminal offenses, enacting penalty enhancement statutes for domestic violence offenses, and flagging domestic violence offenses in the criminal history records.

---

[7]Department of Justice, BJS, *Survey of State Procedures Related to Firearms Sales, Midyear 2001*, NCJ-192065 (Washington, D.C.: Apr. 2002).

ATF000252

**Table 12: Selected State Laws and Procedures for Identifying Domestic Violence Offenders in Criminal Records**

| | Specific criminal offense | Definition statute | Penalty-enhancement statute | Flagged in criminal history records |
|---|---|---|---|---|
| California | • | | • | |
| Florida | | • | | • |
| Massachusetts | | | | |
| Michigan | • | | • | • |
| Texas | | | • | |
| Utah | [a] | • | • | • |

[a]Utah has enacted a domestic violence criminal offense, but the statute covers only domestic violence committed in the presence of a child.

Source: GAO's analysis of state statutes, agency documents, and discussions with state officials.

As table 12 shows, two of the six states we visited—California and Michigan—have specific statutes that make domestic violence a criminal offense. In California, the state penal code has a separate citation for misdemeanor battery, when the violence involves a spouse or other similar relationship (Sec. 243e). In addition, the state penal code contains another statute that makes certain offenders—that is, persons who willfully inflict a traumatic injury on their spouse, former spouse, cohabitant, former cohabitant, or the mother or father of their child—guilty of a felony (Sec. 273.5). When a person is convicted of domestic violence under these statutes, California law enforcement personnel are to enter the appropriate citation in the criminal history record, thus making the offenses clearly identifiable as domestic violence for NICS background check purposes. Similarly, in Michigan, the state penal code statute for assault and battery includes a separate provision for domestic violence misdemeanor when the assault involves a family member or other close relationship (Sec. 750.81(2)).

Two states—Florida and Utah—define domestic violence in noncriminal statutes, rather than within the context of a specific domestic violence criminal offense. For example, Florida's statutes on domestic relations define domestic violence to mean offenses such as assault, battery, false imprisonment, or any criminal offense resulting in physical injury or death of one family or household member by another who is or was residing in the same home (Sec. 741.28). Florida also requires a minimum level of punishment when any of the specified domestic violence-related offenses are committed. Similarly, Utah's code of criminal procedure contains the Cohabitant Abuse and Procedures Act, which

ATF000253

includes a definition of domestic violence (Sec. 77-36-1). Within this
definitional statute, certain crimes are identified—such as assault and
harassment—which, if they involve one cohabitant assaulting another, are
considered to be domestic violence offenses. In both states, however, the
offenses themselves are still charged under general criminal statutes and,
thus, they may not be easily identified in the criminal records during the
course of a NICS background check.

Four states—California, Michigan, Texas, and Utah—have penalty-
enhancement statutes that provide for additional punishment when
convicted domestic violence offenders are subsequently convicted of
another domestic violence offense. For example, under the Michigan
domestic violence statute, a convicted first-time offender is guilty of a
misdemeanor punishable by up to 93 days in prison, making this a less
serious misdemeanor. However, second-time offenders are guilty of a
misdemeanor punishable by up to 1 year in prison (Sec. 750.81(3)), and
third-time offenders are guilty of a felony punishable by up to 2 years in
prison (Sec. 750.81(4)). These enhancements increase the penalty for the
domestic violence offense, but also—because they are considered more
serious than first-time offenses—make them subject to more stringent
reporting procedures to the state's criminal history repository. Texas, has
a penalty-enhancement statute for familial assault (Sec. 22.01(b)), which is
a separate citation under the state's penal code for general assault. A
misdemeanor offense normally charged under the assault statute is
enhanced to a felony if the defendant has previously been convicted of an
assault involving the offender's spouse or other member of the household.
While felony enhancements would be easily identifiable in the criminal
records as disqualifying offenses during a NICS background check, first-
time misdemeanor offenders charged under the general assault statute
may not be as easily identified, since this part of the statute includes not
only domestic assaults, but other types of assaults as well.

Finally, three of the six states—Florida, Michigan, and Utah—identify
domestic violence offenses in their criminal history database by using an
automated flag. According to Florida officials, 2 years ago the Florida
Department of Law Enforcement implemented an automated fingerprint
system that allows users to check a "yes/no" box when submitting a
domestic violence offense to the state's criminal history repository. In
addition, this system provides a narrative field that allows users to enter
details of the domestic violence incident. The "yes/no" box and narrative

ATF000254

**Appendix V: Domestic Violence Misdemeanor Convictions**

field allow anyone conducting a NICS background check to quickly see from the criminal history record if the person has a domestic violence offense on his or her record.[8] In Michigan, any time the offense code for a domestic violence offense is entered into the criminal history record, the system automatically places a flag in the record indicating that it is a disqualifying domestic violence offense.

One of the states we visited—Massachusetts—has no specific domestic violence criminal offense statute, nor other mechanism for easily identifying domestic violence offenses in the state's criminal history records. In February 2002, the state amended its criminal statutes (Chap. 265, Sec. 13A) in order to create two new types of offenses—assault or battery against pregnant women and assault or battery in violation of certain protective orders. Although both provisions could be used to prosecute domestic violence-related offenses, the former provision could also be used to prosecute an assault where there is no family or household relationship involved. Also, this provision does not define or include any reference to the offender-victim relationship as a required element of the offense. As such, a conviction under the new statute, in and of itself, would not always be an indicator that the offense is domestic violence-related.

---

[8]Historically, flags have been used to mark persons that have a felony conviction in their criminal record, thus making felony firearms disqualifiers more easily identifiable by law enforcement officials.

ATF000255

# Appendix VI: Comments from the Department of Justice



**U.S. Department of Justice**

Office of Legal Policy

_Washington, D.C. 20530_

June 28, 2002

Ms. Laurie Eckstrand
Director of Justice Issues
General Accounting Office
441 G Street, N.W.
Washington, D.C. 20548

Re:    GAO Review of Ways to Improve the National Instant Criminal Background Check System

Dear Ms. Eckstrand:

Thank you for the opportunity to review the final draft of the General Accounting Office ("GAO") report entitled "Gun Control: Opportunities to Close Loopholes in the National Instant Criminal Background Check System, GAO-02-720." This letter constitutes the formal comments of the Department of Justice, and I request that it be included with that report.

The report observes that in the first thirty-four months of NICS operations, approximately 2,800 NICS transactions involving persons convicted of domestic violence misdemeanors were referred to the Bureau of Alcohol, Tobacco, and Firearms (ATF) for the retrieval of a firearm. These referrals were made because the NICS did not obtain information showing the person to be disqualified until after the expiration of the three business days allowed for NICS checks. The Brady Act allows gun dealers to transfer a firearm to a prospective purchaser, if the NICS does not advise the dealer within three business days that it has determined, based on available information, that the person is prohibited. Transactions determined by the NICS to be prohibited after the time allowed under the Brady Act are referred to as "delayed denials." As your report notes, delayed denials occur with other categories of prohibited persons as well, the largest category involving persons convicted of a felony. We believe that all delayed denials are a cause for concern and, for that reason, the FBI immediately refers such cases to the ATF for a firearm retrieval investigation.

As your report notes, the problem of delayed denials stems from incomplete or inaccurate state criminal history records. The Department of Justice has been directing substantial resources, authorized by Congress, to address this problem through the National Criminal History Improvement Program (NCHIP) to assist the states in improving their criminal history record systems. The Department has awarded nearly $40 million in NCHIP funds to the states in FY 01 and will award $39 million in FY02. For FY03, the President's budget requests $63 million for this purpose. Since its inception in 1996, NCHIP has provided over $350 million to the states to automate and improve the completeness of their criminal history record systems. Through these efforts, the problem of incomplete criminal history records should diminish over time.

ATF000256

Appendix VI: Comments from the Department
of Justice

Ms. Laurie Eckstrand
June 28, 2002
Page 2

In the area of domestic violence, the NCHIP has focused in particular on getting states to promptly enter domestic violence protection orders into the National Protection Order File in the Federal Bureau of Investigation's ( FBI's) National Crime Information Center (NCIC).  Since persons subject to these orders have been found by a court to pose a threat to the physical safety of an intimate partner or child, we believe it is particularly important to ensure that information on such persons is available for a NICS check.  This file was first established by the FBI in May 1997, and has grown from 3 states entering 126 protection orders at the outset, to 42 states that have entered over 678,000 protection orders today.  Between 1995 and 2001, the Department awarded approximately $16.5 million in NCHIP funds to 46 states and the District of Columbia addressing domestic violence, targeting directly the development of databases of protection orders that can be made available to the NICS.

In addition, the FBI NICS has allowed states to enter into the NICS database information about protection orders that do not meet the criteria for entering records into the NCIC, thereby providing the states an additional avenue for making this information available for NICS checks. The FBI has also developed a special training program that it regularly presents to state officials to promote the prompt entry of protection orders in the National Protection Order File.  For misdemeanor crimes of domestic violence, the FBI is encouraging states to flag records of misdemeanor domestic violence convictions, and states have begun using NCHIP money for this purpose.

Even with this progress, however, the Attorney General recognized a year ago that more needs to be done to achieve greater completeness in the criminal history record system, and directed the Bureau of Justice Statistics (BJS) to study and recommend ways to target these grants to improve the accuracy of state criminal history records, including records relating to domestic violence.  A copy of the Attorney General's directive, dated June 28, 2001, is attached.   The BJS recommendations will assist the states in making the most of their NCHIP grants to improve the completeness and accuracy of their criminal history records.

Finally, we think it is important to put the scope of the problem of delayed denials into perspective.  In the time frame covered by your report (November 30, 1998 – September 30, 2001), the FBI's NICS Operations Center processed over 12 million background checks.   The approximately 11,000 firearm retrieval referrals by the FBI cited in the report constitute .09 percent of the total transactions processed, which is a very low error rate for a system of this size and complexity.  That being said, we are still taking affirmative steps, with the support of Congress, to reduce this error rate by continuing our efforts to achieve the most complete and accurate criminal history record system possible.

ATF000257

Appendix VI: Comments from the Department
of Justice

Ms. Laurie Eckstrand
June 28, 2002
Page 3

We appreciate the GAO's review of these issues and thank the Congress for its support in our continuing efforts to improve the NICS to effectuate fully the requirements of the Brady Act.

Sincerely,

Viet D. Dinh
Assistant Attorney General

Appendix VI: Comments from the Department
of Justice



## Office of the Attorney General
### Washington, D.C. 20530

June 28, 2001

MEMORANDUM FOR MARY LOU LEARY
        ACTING ASSISTANT ATTORNEY GENERAL
        OFFICE OF JUSTICE PROGRAMS

FROM:      THE ATTORNEY GENERAL

SUBJECT: Improving Access to and Integrity of Criminal History Records

    I hereby direct the Bureau of Justice Statistics (BJS) to conduct a study and review of the problem of missing dispositions in criminal history records. This process should include a comprehensive review of the factors that are responsible for incomplete criminal history records, and their impact on public and private entities which utilize these records, including, but not limited to, the National Instant Criminal Background Check System (NICS). It is my hope and expectation that this process will begin immediately and be completed expeditiously.

    In order to achieve this goal, I further direct that the review and study should include, among other considerations, the following elements:

1.    A collection and review of relevant data from the National Instant Criminal Background Check System as it relates to missing dispositions in NICS background checks. Accordingly, the Federal Bureau of Investigation's National Instant Criminal Background Check System program is instructed to cooperate in providing BJS with the necessary data to conduct said review;

2.    The Bureau of Justice Statistics shall conduct a survey of the states in order to determine the level of record completeness and the relevant technological infrastructure needed to support State Criminal History Repositories. This study should include information and data from all federal and state agencies with involvement in criminal history records, including the court systems, law enforcement agencies and prosecutors' offices;

3.    The Bureau of Justice Statistics shall also conduct a review of the current requirements, usage, targets, and restrictions of the NCHIP grant program. This review should focus on what continuing and further efforts can be made by the NCHIP program to bring states up to a higher level of criminal history record completeness;

ATF000259

Appendix VI: Comments from the Department
of Justice

Memorandum for Mary Lou Leary
Subject: Improving Access to and Integrity of Criminal
         History Records
Page 2

4.   As a part of this study the Bureau of Justice Statistics shall also review the
     availability of state records relating to categories of prohibited persons, including
     adjudicated mental health and domestic violence records.

     Please coordinate this review and study in conjunction with the Office of Legal Policy.
Upon completion of the review, please report to me developed recommendations for a national,
coordinated effort to solve the problem of missing records for criminal histories and other
prohibited categories.

ATF000260

# Appendix VII: Comments from the Bureau of Alcohol, Tobacco and Firearms



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, DC 20226

JUN 24 2002

DIRECTOR

CC-73,334   FE:SRR

Mr. Dan Burton
Assistant Director
U.S. General Accounting Office
Washington, DC 20548

Dear Mr. Burton:

This is in response to your request for comments on
the draft General Accounting Office (GAO) report
entitled "Gun Control:  Opportunities to Close
Loopholes in the National Instant Criminal Background
Check System (NICS)."  The Bureau of Alcohol, Tobacco
and Firearms (ATF) appreciates the opportunity to
comment on the findings and recommendations of the GAO
with respect to this issue.

The draft report provides information on differences
in State laws regarding restoration of firearms rights
and criteria for issuance of concealed weapons
permits.  The report also examines ways in which the
States ensure that convictions for misdemeanor crimes
of domestic violence are accessible to NICS.  The
report focuses on the laws of six States:  California,
Florida, Massachusetts, Michigan, Texas, and Utah.

The draft report contains two recommendations, only
one of which pertains directly to ATF.  The
recommendation that is outside of our jurisdiction
suggests that Congress should consider an amendment to
the Brady Act that would allow the Federal Bureau of
Investigation (FBI) more than three business days to
process background checks, to ensure that prohibited
persons are not allowed to purchase guns from firearms
dealers.  ATF has no comment on this legislative
proposal, and would defer to the views of the Justice
Department on this issue.

**WWW.ATF.TREAS.GOV**

ATF000261

Appendix VII: Comments from the Bureau of
Alcohol, Tobacco and Firearms

-2-

Mr. Dan Burton

The draft report also recommends that ATF consider
amending its regulations to require Federal firearms
licensees to contact State permit authorities to
ensure that a State concealed weapons permit is still
valid before accepting that permit as an alternative
to the background check otherwise required under the
Brady Act.  ATF will take this recommendation under
consideration.  However, as noted in the draft report,
ATF would first need to examine whether there is a
real problem to address here - in other words, whether
individuals with revoked permits have, in fact, been
able to purchase firearms without background checks.
If ATF determines that a problem exists, we will
consider what options are available under current law
to deal with this issue.

We would reiterate our prior comments that the
language on pages 15-16 may be misinterpreted to imply
that ATF favors repeal of the permit alternative under
the permanent provisions of the Brady law, or that ATF
officials believe that the rationale for allowing
permit holders to avoid a background check at the time
of sale is weaker now than it was when interim Brady
was enacted in 1993.  Furthermore, ATF did not express
the view that holders of valid permits that qualify as
alternatives to a background check should be required
to undergo a NICS check at the time of purchase.  It
is ATF's mandate to enforce the statute as enacted by
Congress, and we are enforcing the permit provisions
of the Brady Act in a manner consistent with the plain
language of the statute as well as Congressional
intent.  To the extent that the discussion on these
pages is intended to reflect the views of GAO rather
than ATF, we request that the language be modified to
clarify this point.

ATF has already provided you with technical comments
on the draft report's analysis of Federal and State
laws.  Rather than repeat those comments at this
point, we would simply incorporate them by reference.

GAO-02-720  Closing Loopholes in NICS

ATF000262

**Appendix VII: Comments from the Bureau of
Alcohol, Tobacco and Firearms**

-3-

Mr. Dan Burton

You should also note that on page 49, it is stated
that a set aside of a Michigan felony conviction would
restore Federal firearms rights.  While this issue is
under consideration by the Michigan Attorney General's
office, it is ATF's current position that since
individuals who have had their Michigan felony
convictions set aside are still subject to State
firearms restrictions.  The set aside does not remove
Federal firearms disabilities.

We appreciate the opportunity to provide you comments
on this report.  We also appreciate the profession-
alism displayed by your audit team in conducting the
research necessary for preparing it.  We hope that you
will find our comments useful in preparing your final
document.

Sincerely yours,

Bradley A. Buckles
Director

ATF000263

# Appendix VIII: GAO Contacts and Staff Acknowledgments

## GAO Contacts

Laurie E. Ekstrand, (202) 512-8777
Danny R. Burton, (214) 777-5600

## Acknowledgments

In addition to the above, David Alexander, Philip Caramia, Marco Gomez, Barbara Guffy, Geoffrey Hamilton, Michael Harmond, William McDaniel, and Ellen Wolfe made key contributions to this report.

ATF000264

## GAO's Mission

The General Accounting Office, the investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability.

## Obtaining Copies of GAO Reports and Testimony

The fastest and easiest way to obtain copies of GAO documents at no cost is through the Internet. GAO's Web site (www.gao.gov) contains abstracts and full-text files of current reports and testimony and an expanding archive of older products. The Web site features a search engine to help you locate documents using key words and phrases. You can print these documents in their entirety, including charts and other graphics.

Each day, GAO issues a list of newly released reports, testimony, and correspondence. GAO posts this list, known as "Today's Reports," on its Web site daily. The list contains links to the full-text document files. To have GAO e-mail this list to you every afternoon, go to www.gao.gov and select "Subscribe to daily E-mail alert for newly released products" under the GAO Reports heading.

## Order by Mail or Phone

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. General Accounting Office
441 G Street NW, Room LM
Washington, D.C. 20548

To order by Phone:      Voice:      (202) 512-6000
                        TDD:        (202) 512-2537
                        Fax:        (202) 512-6061

## To Report Fraud, Waste, and Abuse in Federal Programs

Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470

## Public Affairs

Jeff Nelligan, managing director, NelliganJ@gao.gov (202) 512-4800
U.S. General Accounting Office, 441 G Street NW, Room 7149
Washington, D.C. 20548

PRINTED ON ♲ RECYCLED PAPER



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Office of Field Operations*

www.atf.gov

JUN 0 6 2019

CC:FEL:ELH
9730 FEL-19-245026

Ms. Julie Bumgardner
Attorney
Federal Bureau of Investigation
Criminal Justice Information Law Unit

RE:  ATF Use of the National Instant Criminal Background Check System in Connection With
Federal Firearms License Inspections

Dear Ms. Bumgardner:

I am writing in reference to your email discussion of April 10, 2019, with Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Associate Chief Counsel Barry Orlow.  More specifically, this is to confirm ATF's position that the use of the National Instant Criminal Background Check System (NICS) in the course of an ATF inspection to conduct background checks of employees of Federal firearms licensees (FFLs) constitutes an inquiry in connection with a civil enforcement activity relating to the Gun Control Act (GCA).

The GCA, Title 18, United States Code, Chapter 44, authorizes the issuance of Federal firearms licenses to qualified applicants.  *See* 18 U.S.C. § 923(c).  Pursuant to section 923(d)(1)(B), qualification for a license requires the applicant not be prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under section 922(g) and (n).  The term "applicant" includes, in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association.[1]

For purposes of section 922(g), possession of firearms or ammunition can be actual or constructive. Constructive possession is established by a showing of ownership, dominion, or control over the firearm or ammunition itself, or the location where the firearm or ammunition is found.  *See United States v.*

---

[1] The ATF Form 7(5310.12)/7CR(5310.16) refers to individuals possessing, directly or indirectly, the power to direct or cause the direction of the management, policies, and practices of a corporation, partnership, or association, insofar as they pertain to firearms, as "responsible persons" as are sole proprietors.  *See* Definitions, number 3.

*2*

*Booker*, 131 Fed. Appx. 234, 244 (11ᵗʰ Cir. 2005) (citing *United States v. Wright*, 392 F.3d 1269, 1273 (11ᵗʰ Cir. 2004)); *United States v. Mann*, 195 Fed. Appx. 430, 436 (6ᵗʰ Cir. 2006). Firearms and ammunition are "received" when taken or accepted, that is, when there is a transfer of possession. *See United States v. Laurent*, 861 F. Supp. 2d 71, 84-85 (E.D.N.Y. 2011); *United States v. Williams*, 986 F. Supp. 1445, 1446 (D. Kan. 1997).

Once issued, licenses are subject to revocation if the FFL has willfully violated any provision of the GCA or its implementing rules or regulations. *See* 18 U.S.C. § 923(e). ATF, the agency responsible both for issuing FFLs and inspecting licensees, has an interest in ensuring that individuals who receive and possess firearms and ammunition pursuant to employment with an FFL do not willfully violate or aid and abet violations of section 922(g) or (n).

As you well know, FBI regulations, 28 CFR § 25.6(j) authorizes limited access to the NICS Index by ATF, in pertinent part, "in connection with a civil or criminal law enforcement activity relating to the Gun Control Act (18 U.S.C. Chapter 44) or the National Firearms Act (26 U.S.C. Chapter 53)."[2] As section 25.6(j)(1) clearly authorizes access to the NICS Index in association with the issuance of FFLs, ATF has utilized the NICS Index for purposes of determining if an applicant is qualified for licensing; more specifically, whether individuals identified on an Application for Federal Firearms License, ATF Form 7(5310.12)/7CR(5310.16), as "responsible persons" are subject to firearms disabilities under section 922(g) or (n) for purposes of section 923(d)(1)(B). However, once an FFL has been issued, section 25.6(j)(1) no longer provides a basis for ATF to access the NICS Index[3], raising the question of whether ATF may access the NICS Index pursuant to section 25.6(j)(2) to conduct background checks on employees of a licensee during an inspection of that licensee.

As noted above, ATF is authorized to revoke a firearms license for willful violations of any provision of the GCA or its implementing regulations. A violation of the GCA is "willful" where a licensee knew of his legal obligation, and purposefully disregarded or was plainly indifferent to the requirements. *See Simpson v. Att'y Gen. United States,* 913 F.3d 110, 114 (3d Cir. 2019) (noting eight other Courts of Appeals have held the same). Where an FFL, or person acting on behalf of an FFL, affirmatively helps an employee who is prohibited from possessing or receiving firearms or ammunition possess or receive firearms or ammunition in violation of section 922(g) or (n), the licensee has willfully violated the GCA. *See Harris News Agency, Inc. v. Bowers*, 809 F.3d 411, 414 (8ᵗʰ Cir. 2015) and *Armament Services, Int'l v. Att'y Gen. United States*, 2019 WL 277440 (3d Cir. 2019). ATF's civil enforcement of the GCA includes ATF determining whether an FFL or employee thereof: 1) is subject to Federal firearms disabilities under section 922(g) or (n), in order to assess whether the FFL willfully violated those provisions; or 2) affirmatively helped an individual violate section 922(g) or (n), as such activity provides a basis for civil action under the GCA to revoke the license pursuant to section 923(e).

Based on the above, ATF has concluded that access to the NICS Index during any ATF inspection for purposes of conducting background checks on employees of an FFL, whether or not the employee is identified as responsible persons of the licensee, is access "in connection with a civil ... enforcement activity relating to the Gun Control Act (18 U.S.C. Chapter 44)... ." Therefore, section 25.6(j)(2),

---

[2] Section 25.6(j) was amended in 2014 to also allow access to the NICS Index for disposing of firearms in the possession of Federal, state, tribal, or local criminal justice agencies. *See* 79 Fed. Reg. 69047 (Nov. 20, 2014).

[3] Any instance in which a person seeks issuance of a firearms license would permit access to the NICS Index pursuant to section 25.6(j)(1), such as renewal of an existing license or a request to change the address of an existing license. Section 25.6(j)(1) would not authorize ATF access to the NICS Index, however, during the current term of an existing license where no renewal or change to the license is sought by the licensee.

*3*

authorizes ATF's access to the NICS Index to conduct background checks on responsible persons and employees of an FFL in the course of inspecting that licensee.

Should you have any questions or need additional information, please contact Eileen Husselbaugh, Firearms and Explosives Law Division, at ▮▮▮▮▮▮▮▮▮.

Sincerely yours,

William P. McMullan
Assistant Director
Office of Field Operations



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Field Operations*

January 16, 2020

700000:ARG
5350

MEMORANDUM TO:     All Directors, Industry Operations

FROM:     Deputy Assistant Director (IO)
Office of Field Operations

SUBJECT:     NICS Alternative Permit Sampling Initiative

The Gun Control Act at 18 U.S.C. § 922(t), generally requires FFLs to initiate a NICS background check before transferring a firearm to an unlicensed person. Under section 922(t)(3), the law allows an exception to the NICS check requirement for holders of qualifying State-issued permits to possess, carry, or acquire firearms. Permits issued within the past 5 years by the State in which the transfer is to take place qualify as alternatives to a NICS check if the law of the State provides that such a permit is to be issued only after an authorized State or local government official has verified that the information available to such official, including NICS check results, does not indicate that possession of a firearm by the applicant would be in violation of Federal, State, or local law. *See* 27 C.F.R. § 478.102(d)(1).

ATF has issued Open Letters recognizing that certain permits issued in 25 States meet the requirements of 922(t)(3). While ATF established criteria for these States to prevent the issuance of NICS alternative permits to prohibited persons, it is important for ATF to evaluate whether prohibited persons have still been able to obtain and use them to acquire firearms without a NICS background check. In order to address this important public safety issue, Field Operations is initiating a program in which IOIs, during inspections of FFLs, will conduct a NICS re-check of a sampling of transactions where a State permit was used as an alternative to a NICS check to acquire firearms.

The sampling will be conducted under the following guidance:

1.  The sampling will be only be conducted in States where ATF has issued an Open Letter recognizing a permit as an alternative to conducting a NICS check under 922(t)(3).

-2-

All Directors, Industry Operations

2. The sampling will be conducted during all firearms compliance inspections initiated between January 21 and April 24, 2020, where the FFLs conduct transfers to non-licensees.

3. The sampling will only occur during inspections already identified through domain assessments. Area offices should not alter their plans addressing how they will complete their domain assessment priorities.

4. During inspections, IOIs will use a systematic sampling method by reviewing ATF Forms 4473 and identifying 5 percent of transactions during the inspection period where firearms were acquired using a NICS alternative permit in lieu of the FFL conducting a background check. IOIs should always round upward when calculating the 5 percent sample size.

5. IOIs will conduct NICS re-checks through the LEEP portal for the sample of transactions identified. If the NICS re-check results in a denial or requires further research, IOIs will do the necessary research and work with counsel to determine if the transferee is prohibited.

6. If a transferee is found to be prohibited, the IOI will generate a suspicious activity report to their CGIC group for further investigation and, if appropriate, send a referral to the State authority that issued the permit in accordance with the procedures outlined in the IO Manual.

7. The CGIC shall provide the suspicious activity report and supporting investigative documentation to the NICS coordinator who shall proceed following the same protocol, per ATF O 3140.1A, as in a delayed denial with a substantiated disability. However, if the prohibition is a state violation only, the CGIC should refer the matter to the appropriate local law enforcement authority.

8. IOIs should not enter purchaser or transaction information into Spartan if the purchaser is not found to be prohibited.

9. No later than May 30th, 2020, each field division will send consolidated results in digital format using the worksheets provided to fmsisb@atf.gov. Field divisions should also inform FMS of any significant findings as they are identified.

Your assistance in completing this sampling is appreciated and will help Field Operations better identify possible concerns related to issuance and use of NICS alternate permits to acquire firearms without a NICS check. Questions regarding this sampling initiative should be directed to FMS Deputy Chief Kyle Lallensack.

Andrew R. Graham

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **NICS Alternate Permit Sampling Results** | | | | | | | | | |
| Enter summary totals for each FCI conducted during the sampling period | | | | | | | | | |
| **Division** | **State of Transfer** | **FCI #** | **Total # 4473 reviewed** | **Total # trans w/qualifying permit** | **Total # rechecks run (5%)\*** | **Total # rechecks resulting in system Proceed** | **Total # rechecks needing further research** | **Total # rechecks resulting in system Denial** | **Total # purchasers confirmed prohibited\*\*** |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

*if there are less than twenty 4473s meeting the criteria, recheck one random selection meeting the criteria.

**tab 2 "Prohibited results" must be completed for each prohibited person identified

****Only include results from the systematic sampling of transactions. Results from background checks initiated based on suspicious activity etc. should not be included in the sample data.****

# Permanent Brady Permit Chart

**Prepared by:** ATF Office of Enforcement Programs and Services

**Last updated:** March 3, 2020

**Note:** Notwithstanding the dates set forth below, permits qualify as alternatives to the background check requirements of the Brady law for no more than 5 years from the date of issuance. The permit must be valid under state law in order to qualify as a Brady alternative.

| State / Territory | Qualifying Permits |
|---|---|
| Alabama | None |
| Alaska | Concealed weapons permits marked NICS-Exempt |
| American Samoa | None |
| Arizona | Concealed weapons permits qualify. |
| Arkansas | Concealed weapons permits issued on or after April 1, 1999 qualify. * |
| California | Entertainment Firearms Permit only |
| Colorado | None |
| Connecticut | None |
| Delaware | None * |
| District of Columbia | None * |
| Florida | None * |
| Georgia | Georgia firearms licenses qualify. |
| Guam | None * |
| Hawaii | Permits to acquire and licenses to carry qualify. |

| State / Territory | Qualifying Permits |
|---|---|
| **Idaho** | Concealed weapons permits qualify. |
| **Illinois** | None |
| **Indiana** | None |
| **Iowa** | Permits to acquire and permits to carry concealed weapons qualify. |
| **Kansas** | Concealed handgun licenses issued on or after July 1, 2010 qualify as alternatives to the background check. |
| **Kentucky** | Concealed Deadly Weapons License (CDW) and Judicial Special Status CDW issued on or after July 12, 2006 qualify. |
| **Louisiana** | Concealed handgun permits issued on or after March 9, 2015 qualify. |
| **Maine** | None * |
| **Maryland** | None * |
| **Massachusetts** | None * |
| **Michigan** | Licenses to Purchase a Pistol (LTP) are the only permits that qualify as a NICS alternative. |
| **Minnesota** | None |
| **Mississippi** | License to carry concealed pistol or revolver issued to individuals under Miss. Stat. Ann. § 45-9-101 qualify. (NOTE: security guard permits issued under Miss. Stat. Ann. §97-37-7 do not qualify). |
| **Missouri** | None * |
| **Montana** | Concealed weapons permits qualify. |
| **Nebraska** | Concealed handgun permit qualifies as an alternative. Handgun purchase certificates qualify. |
| **Nevada** | Concealed carry permit issued on or after July 1, 2011, qualify. |

ATF000273

| State / Territory | Qualifying Permits |
|---|---|
| New Hampshire | None |
| New Jersey | None |
| New Mexico | None |
| New York | None |
| North Carolina | Permits to purchase a handgun and concealed handgun permits qualify. |
| North Dakota | Concealed weapons permits issued on or after December 1, 1999 qualify. * |
| Northern Mariana Islands | None |
| Ohio | Concealed weapons permits issued on or after March 23, 2015, qualifies as an alternative to the background check requirements. |
| Oklahoma | None * |
| Oregon | None * |
| Pennsylvania | None |
| Puerto Rico | None |
| Rhode Island | None |
| South Carolina | Concealed weapons permits qualify. |
| South Dakota | Gold Card Concealed Pistol Permits and Enhanced Permits to Carry a Concealed Pistol issued on or after January 1, 2017. |
| Tennessee | None |
| Texas | Concealed weapons permits qualify. |
| U.S. Virgin Islands | None |
| Utah | Concealed weapons permits qualify. |

ATF000274

| State / Territory | Qualifying Permits |
| --- | --- |
| Vermont | None |
| Virginia | None |
| Washington | None |
| West Virginia | Concealed handgun license issued on or after June 4, 2014 qualify. |
| Wisconsin | None |
| Wyoming | Concealed weapons permits qualify. |

\* While certain permits issued in these states prior to November 30, 1998 were "grandfathered" as Brady alternatives, none of these grandfathered permits would still be valid under State law as of November 30, 2003.

- 

*Last Reviewed March 3, 2020*

https://www.atf.gov/rules-and-regulations/permanent-brady-permit-chart

ATF000275

## GUIDANCE: QUALIFYING STATE NICS ALTERNATE PERMITS (MAY 2018)
Law and Policy Division & Senior Policy Counsel (Firearms and Explosives)
Office of Chief Counsel
Bureau of Alcohol, Tobacco, Firearms and Explosives

---

### INTRODUCTION

When ATF receives inquiries from a State entity regarding its existing or proposed National Instant Criminal Background Check System (NICS) alternate permit, field counsel in that State will serve as the Field ATF NICS Alternate Permit Point of Contact (POC). Field counsel will correspond with the State entity and conduct an analysis of the permit to determine whether the permit qualifies as a NICS alternate permit. Field counsel will also send their analysis and proposed final response to the State entity to the Law and Policy Division (LPD).

LPD will serve as the HQ ATF NICS Alternate Permit POC. LPD – in coordination with the Field ATF NICS Alternate Permit POCs and with the assistance and expertise of the Senior Policy Counsel (Firearms and Explosives) – will ensure that field counsel's analysis and proposed final response to the State entity reflect a nationally consistent interpretation of the applicable laws and implementing regulations. In addition, LPD will coordinate with the Office of Enforcement Programs and Services (EPS) at ATF Headquarters to finalize and send responses to the States.

### BACKGROUND

**Gun Control Act of 1968**

The Gun Control Act of 1968 (GCA), 18 U.S.C. Chapter 44, regulates interstate and foreign commerce in firearms, including importation, "prohibited persons," and licensing provisions.

**Brady Handgun Violence Prevention Act of 1993**

Since 1998, ATF has issued open letters to FFLs as valid permits in their State qualify as alternatives to the background check requirements of the Brady Law for no more than 5 years from the date of issuance. *See* ATF, Firearms Open Letters, *https://www.atf.gov/rules-and-regulations/firearms-open-letters*; Permanent Brady Permit Chart, https://www.atf.gov/rules-and-regulations/permanent-brady-permit-chart; *see also* CC_ALL (P: Shared Drive) → COUNSEL → NICS Alternate Permits.[1]

The Brady Law contains exceptions to the NICS check requirement, including an exception for holders of certain State permits to possess or acquire firearms.  *See* 18 U.S.C. § 922(t)(3)(A); 27 C.F.R. § 478.102(d)(1). ATF interprets the Brady Law and implementing regulations to provide

---

[1] Efforts are currently underway to place relevant documents maintained in the Office of Chief Counsel Law Library in the appropriate folders on our directorate shared drive. *See* CC_ALL (P: Shared Drive) → COUNSEL → NICS Alternate Permits. These documents will ultimately be added to SharePoint.

ATF000276

that a State permit may qualify as an alternative to the NICS check if the permit meets the 3 criteria below.[2]

- The State law must authorize a person to possess or acquire a firearm with the permit.

- The State law or permit application must provide that the permit indicate the issuance date or expiration date, so that the FFL may verify that it was issued within 5 years before the date of transfer.

- The State law must authorize a qualified government official to conduct a full NICS background check to verify that the possession of a firearm by the applicant would not violate Federal, State, or local law.

**Immigration Alien Query (IAQ)**

On February 5, 2002, ATF published temporary regulations implementing the statutory provisions prohibiting the possession or receipt of firearms by nonimmigrant aliens, subject to certain exceptions. *See* 67 FR 5422 (amending in part 27 C.F.R. § 178.124 to reflect changes to ATF Form 4473, "Firearms Transaction Record," to require every person to list various information, if applicable, such as country of citizenship, and alien or admission number).

On July 23, 2002, ATF issued an open letter, advising permit States that certain queries must be initiated for non-U.S. citizen applicants as part of the NICS check performed prior to the issuance of a qualifying permit. Specifically, if the applicant was not a U.S. citizen, the issuing authority was instructed to obtain information about the applicant's country of citizenship, place of birth, and alien or admission number. In the fall of 2002, ATF contacted qualifying permit States to verify their compliance with the procedures set forth in the July 23, 2002 open letter.

---

[2] 18 U.S.C. § 922(t) states, in relevant part:

(3) Paragraph (1) shall not apply to a firearm transfer between a licensee and another person if –

(A) (i) such other person has presented to the licensee a permit that –

(I) allows such other person to possess or acquire a firearm; and

(II) was issued not more than 5 years earlier by the State in which the transfer is to take place; and

(ii) the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law; ....

18 U.S.C. § 922(t)(3).

ATF000277

In 2004, ATF issued a Letter to States with Permits that Appear to Qualify as Alternatives to NICS Checks, asking permit States to send a written response to ATF, explaining how the State licensing authority complies with the minimum requirements for qualifying permits under the Brady Law and its implementing regulations.

## ANALYSIS

**Document Review**

As part of the field counsel analysis,



**Other Considerations**



**Criteria**

For a State permit to qualify as a valid alternative to the NICS check, the relevant State law and/or permit application must meet the minimum criteria below.

1. **The State law must authorize a person to possess or acquire a firearm with the permit.**

    In a State where a person may openly carry a firearm or possess a concealed firearm without a permit, the FFL would have to conduct a NICS check.

2. **The State law or permit application form must provide that the permit indicate the issuance date <u>or</u> expiration date.**



. The FFL must be able to verify that the permit was issued within 5 years before the date of transfer.

3. **The State law must authorize a <u>qualified government official</u> to conduct a full NICS background check to verify that the possession of a firearm by the applicant would not violate Federal, State, or local law.**

4. **The State law must provide that a <u>full NICS check</u> will be required that covers all Federal firearms disabilities.**

   A fingerprint based check alone is insufficient.

5. **The State law must provide that the permit be denied to any person prohibited by Federal law from possessing firearms.**

6. **The State permit application must require the applicant to submit the requisite information for an Immigration Alien Query (IAQ) check: place of birth, country of citizenship, <u>and</u> alien or admission number.**



ATF000279



7. **The State law must provide that a NICS check will be conducted for <u>every</u> permit applicant.**



8. **The State law cannot require issuance of the permit within a specified time period (e.g., 45 days) if NICS check results have not been received.**



9. **The State law must require a <u>full</u> NICS check for permit <u>renewals</u>.**

<u>**RESPONSE LETTER**</u>





**RESOURCES**

There are a variety of resources for field counsel. To name a few –

- Brady Law
  https://www.atf.gov/rules-and-regulations/brady-law

- National Instant Criminal Background Check System (NICS)
  https://www.fbi.gov/services/cjis/nics

- ███████████████ █ ██████ █ ███████████

- Field ATF NICS Alternate Permit POCs

  o Field Division Counsel and/or

  o Field Staff Attorneys

- HQ ATF NICS Alternate Permit POC

  o Sophia Y. Kil
    Senior Attorney
    Law and Policy Division
    Office of the Chief Counsel
    Bureau of Alcohol, Tobacco, Firearms and Explosives
    99 New York Avenue, NE, Room 6E353
    Washington, DC 20226
    Office: (202) 648-7003
    iPhone: ████████
    Fax: (202) 648-9584
    E-mail: ███████@atf.gov

| | |
|---|---|
| **From:** | Browne, Stuart |
| **To:** | Orlow, Barry S.; Lieberman, David C. |
| **Cc:** | Epstein, Eric M.; Vann, James P.; Suettinger, Mary H.; Kenrick, Brian C. |
| **Subject:** | RE: ██████ revocation |
| **Date:** | Tuesday, April 23, 2019 12:17:23 PM |

Thanks, that's very helpful.

Stuart R. Browne
Division Counsel
Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)
Denver Field Division
950 17th Street, Suite 1800
Denver, CO 80202
Office (303) 575-██
Cell ████████
Fax (303) 575-7601

---

**From:** Orlow, Barry S. ████████████
**Sent:** Tuesday, April 23, 2019 10:15 AM
**To:** Lieberman, David C. ████████████; Browne, Stuart ████████████
**Cc:** Epstein, Eric M. ████████████ Vann, James P. ████████████ Suettinger, Mary H. ████████████ Kenrick, Brian C. ████████████
**Subject:** RE: ██████ revocation

████████████████████████████
█████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████
██████████████████████

Barry Orlow
Associate Chief Counsel (Law and Policy)
Bureau of Alcohol, Tobacco, Firearms and Explosives
U.S. Department of Justice
99 New York Ave. NE
Rm. 6E-441
Washington, DC 20226
202-648-███-desk
████████-cell
202-648-9620-fax

WARNING: This electronic transmission is intended only for the person(s) named above. It may contain information that is confidential and protected from disclosure by the attorney-client privilege and/or work product doctrine or

exempt from disclosure under other applicable laws. Any use, distribution, copying or other disclosure by any other person is strictly prohibited. Do not forward or re-transmit without the permission of sender or ATF Chief Counsel's Office. If you have received this transmission in error, please notify the sender at the number or e-mail above.

<span style="color:red">**ATTORNEY WORK PRODUCT PRIVILEGED DOCUMENT**</span>
<span style="color:red">**ATTORNEY-CLIENT PRIVILEGED COMMUNICATION**</span>

**\*\*\*\*\*\*\***

NOTICE: This e-mail message and any attached files are intended solely for the use of the addressee(s) named above in connection with official business.  This communication may contain Sensitive But Unclassified information that may be statutorily or otherwise prohibited from being released without appropriate approval.  Any review, use, or dissemination of this e-mail message and any attached file(s) in any form outside of the Bureau of Alcohol, Tobacco, Firearms & Explosives or the Department of Justice without express authorization is strictly prohibited.

**From:** Lieberman, David C. ███████████████
**Sent:** Tuesday, April 23, 2019 11:50 AM
**To:** Browne, Stuart <████████████████████
**Cc:** Epstein, Eric M. ████████████████  Vann, James P. ████████████████; Orlow, Barry S. ████████████

**Subject:** RE: ████████ revocation

Not sure who the expert on the topic would be – punting to Barry, James and Eric to see if one of them knows the answer off the top of his head.

**From:** Browne, Stuart ████████████████
**Sent:** Tuesday, April 23, 2019 11:48 AM
**To:** Lieberman, David C. ████████████████
**Subject:** ████████ revocation

For the 922(t) charge, I checked the convictions ████████ with Pat Cangemi and Paul Ware and they believe they are prohibiting. ██████████████████████████

██████████████████████████████████

████████████  Who do you think would be the expert in this area?

Stuart R. Browne
Division Counsel
Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)
Denver Field Division
950 17th Street, Suite 1800
Denver, CO 80202
Office (303) 575-████
Cell ████████
Fax (303) 575-7601

On Jan 22, 2020, at 10:07 AM, Cohen, Jeffrey A. ████████████ wrote:

Hi Eric.



Sent from my iPhone

On Jan 22, 2020, at 9:52 AM, Epstein, Eric M. ████████████ wrote:



- Eric

Eric M. Epstein, Senior Policy Counsel

Bureau of Alcohol, Tobacco, Firearms and Explosives

United States Department of Justice

99 New York Ave., NE, Room 6E-363

Washington, D.C.  20226

Tel:  202-648-

From: Cohen, Jeffrey A. ███████████████

Sent: Tuesday, January 21, 2020 4:30 PM

To: Epstein, Eric M. ████████████████ Ritt, Erika L. ██████████████; Lieberman, David C. ████████████████; Husselbaugh, Eileen L. ███████████████

Cc: Paskalis, Anne Marie ████████████████; Orlow, Barry S. ████████████████ Kenrick, Brian C. ███████████

Subject: RE: **FMS NOTIFICATION MESSAGE - #20-0117.1 - PRIORITY: ROUTINE - **NICS ALTERNATIVE SAMPLING INITIATIVE**

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

███████████████████████████████████
███████████████████████████████████
██████████████.

From: Epstein, Eric M. ███████████████

Sent: Tuesday, January 21, 2020 11:53 AM

To: Cohen, Jeffrey A. ████████████████ Ritt, Erika L. ███████████████; Lieberman, David C. ████████████████████████ Husselbaugh, Eileen L. ████████████

Cc: Paskalis, Anne Marie ████████████████; Orlow, Barry S. ██████████████ Kenrick, Brian C. ████████████████

Subject: RE: **FMS NOTIFICATION MESSAGE - #20-0117.1 - PRIORITY: ROUTINE - **NICS ALTERNATIVE SAMPLING INITIATIVE**

Jeff - the purpose of this sampling is to ensure that prohibited persons do not come into possession of firearms though the use of alternate permits, and use them to commit violent crimes.  As you know, that is one of the primary purposes of the Gun Control Act.

If a State is not running proper and complete NICS background checks when issuing alternate permits, then States may be issuing them to prohibited persons who, in turn, may be using them to purchase firearms from FFLs without a background check.  We have seen this in Alabama, Minnesota, Michigan, and elsewhere. ████████████████████████████████████████████████████████████████████████████████████████████████████

The purpose of the program is not to generate crime gun intelligence, but to ensure compliance with the requirements of the Brady Law, section 922(t)(3) - that FFLs have properly recorded the NICS alternate permit, that the permits they are accepting are not being presented by a prohibited person, and that they are not accepting permits that are invalid.

- Eric

Eric M. Epstein, Senior Policy Counsel

Bureau of Alcohol, Tobacco, Firearms and Explosives

United States Department of Justice

99 New York Ave., NE, Room 6E-363

Washington, D.C.  20226

Tel:  202-648-████

From: Cohen, Jeffrey A. ▮▮▮▮▮▮▮▮▮▮▮

Sent: Tuesday, January 21, 2020 11:26 AM

To: Epstein, Eric M. ▮▮▮▮▮▮▮▮▮▮▮; Ritt, Erika L. ▮▮▮▮▮▮▮▮▮▮▮; Lieberman, David C. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Husselbaugh, Eileen L. ▮▮▮▮▮▮▮▮▮

Cc: Paskalis, Anne Marie ▮▮▮▮▮▮▮▮▮▮▮▮; Orlow, Barry S. ▮▮▮▮▮▮▮▮▮▮; Kenrick, Brian C. ▮▮▮▮▮▮▮▮▮

Subject: RE: **FMS NOTIFICATION MESSAGE - #20-0117.1 - PRIORITY: ROUTINE - **NICS ALTERNATIVE SAMPLING INITIATIVE**

From: Epstein, Eric M. ▮▮▮▮▮▮▮▮▮

Sent: Tuesday, January 21, 2020 11:08 AM

To: Cohen, Jeffrey A. ▮▮▮▮▮▮▮▮▮▮; Ritt, Erika L. ▮▮▮▮▮▮▮▮▮▮▮; Lieberman, David C. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Husselbaugh, Eileen L. ▮▮▮▮▮▮▮▮▮

Cc: Paskalis, Anne Marie ▮▮▮▮▮▮▮▮▮▮▮▮; Orlow, Barry S. ▮▮▮▮▮▮▮▮▮▮; Kenrick, Brian C. ▮▮▮▮▮▮▮▮▮

Subject: RE: **FMS NOTIFICATION MESSAGE - #20-0117.1 - PRIORITY: ROUTINE - **NICS ALTERNATIVE SAMPLING INITIATIVE**

 Thanks Eric





The IOIs will ensure that the alternate permits are recorded properly and rechecks to determine that States are in compliance with the Brady Law regarding the use of State permits as an alternative to NICS.



No information is being retained by ATF regarding persons who are not found to be prohibited.

Criminal referrals are made only concerning persons found to be prohibited.

- Eric

Eric M. Epstein, Senior Policy Counsel

Bureau of Alcohol, Tobacco, Firearms and Explosives

United States Department of Justice

99 New York Ave., NE, Room 6E-363

Washington, D.C.  20226

Tel:  202-648

From: Cohen, Jeffrey A. ██████████████

Sent: Tuesday, January 21, 2020 10:37 AM

To: Epstein, Eric M. ████████████████; Ritt, Erika L.█████████████; Lieberman, David C. ████████████████; Husselbaugh, Eileen L.███████████

Subject: RE: **FMS NOTIFICATION MESSAGE - #20-0117.1 - PRIORITY: ROUTINE - **NICS ALTERNATIVE SAMPLING INITIATIVE**

Hi  Eileen and Eric.

████████████████████████████████████

██████████████████████

████████████████

████████████████████████████████████

██████████████████████████████

████████████████████████████████████

████████████████████████████████████

Thanks.

From: Lallensack, Kyle E. 

Sent: Friday, January 17, 2020 5:04 PM

To: Cohen, Jeffrey A. ████████████ Ritt, Erika L. ████████████ ; Lieberman, David C.
████████████

Subject: Fwd: **FMS NOTIFICATION MESSAGE - #20-0117.1 - PRIORITY: ROUTINE - **NICS ALTERNATIVE
SAMPLING INITIATIVE**

My apologies, I forgot to cc you all.  For your awareness as well.  Thanks!

Kyle Lallensack

Deputy Chief, Field Management Staff

(202)648 ████ (office)

████████ (cell)

Begin forwarded message:

From: "Lallensack, Kyle E." ████████████

Date: January 17, 2020 at 3:47:00 PM EST

To: ATF - FO - DIO ████████████ , ATF - FO - SES - FIELD ████████████ , ATF - FO - ASAC
████████████

Cc: ATF - FO - SES - HQ ████████████ , FMS-ISB ████████████ ,
"Mitchem, Marianna S." ████████████ , "Lange, Andrew R."
"Gilbert, Curtis W." ████████████

Subject: **FMS NOTIFICATION MESSAGE - #20-0117.1 - PRIORITY: ROUTINE - **NICS ALTERNATIVE
SAMPLING INITIATIVE**

THIS MESSAGE IS SENT ON BEHALF OF THE DEPUTY ASSISTANT DIRECTOR, INDUSTRY OPERATIONS

The attached memo establishes the parameters for a NICS Alternative Permit Sampling Initiative.  This
program is designed to evaluate whether prohibited persons have been able to obtain state issued
permits and use them to acquire firearms without a NICS background check.  During this 90 day initiative
IOIs will conduct a NICS re-check of a 5% sampling of transactions where a State permit was used as an
alternative to a NICS check to acquire firearms. The sampling will be conducted during all firearms
compliance inspections initiated between January 21 and April 24, 2020, where the FFLs conduct
transfers to non-licensees.  Your assistance in completing this sampling is appreciated and will help Field

Operations better identify possible concerns related to issuance and use of NICS alternate permits to acquire firearms without a NICS check.  Questions regarding this sampling initiative should be directed to FMS Deputy Chief Kyle Lallensack.


Thank you,


Kyle Lallensack

Deputy Chief, Field Management Staff

(202)648 ████ (office)

████████ (cell)

| | | | NICS Alternate Permit Sampling Results | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Enter summary totals for each FCI conducted during the sampling period | | | | | | |
| Division | State of Transfer | FCI # | Total # 4473 reviewed | Total # trans w/qualifying permit | Total # rechecks run (5%)* | Total # rechecks resulting in system Proceed | Total # rechecks needing further research | Total # rechecks resulting in system Denial | Total # purchasers confirmed prohibited** |
| Atlanta | GA | | 468 | 190 | 12 | 10 | 2 | 0 | 0 |
| Atlanta | GA | | 100 | 5 | 5 | 5 | 0 | 0 | 0 |
| Atlanta | GA | | 833 | 415 | 23 | 14 | 9 | 0 | 0 |
| Atlanta | GA | | 1360 | 756 | 38 | 27 | 11 | 0 | 0 |
| Atlanta | GA | | 49 | 31 | 5 | 3 | 2 | 0 | 0 |
| Atlanta | GA | | 1440 | 700 | 28 | 20 | 8 | 0 | 0 |
| Atlanta | GA | | 3494 | 1747 | 96 | 95 | 1 | 0 | 0 |
| Atlanta | GA | | 480 | 242 | 25 | 18 | 7 | 0 | 0 |
| Atlanta | GA | | 266 | 0 | 8 | 3 | 5 | 0 | 0 |
| Atlanta | GA | | 136 | 0 | 5 | 1 | 4 | 0 | 1 |
| Atlanta | GA | | 354 | 144 | 18 | 18 | 0 | 0 | 0 |
| Atlanta | GA | | 2 | 2 | 1 | 1 | 0 | 0 | 0 |
| Atlanta | GA | | 91 | 35 | 2 | 2 | 0 | 0 | 0 |
| Atlanta | GA | | 161 | 62 | 4 | 4 | 0 | 0 | 0 |
| Atlanta | GA | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Atlanta | GA | | 124 | 51 | 3 | 3 | 0 | 0 | 0 |
| Atlanta | GA | | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Atlanta | GA | | 1250 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charlotte | SC | | 17 | 10 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | SC | | 407 | 188 | 10 | 8 | 2 | 0 | 0 |
| Charlotte | SC | | 103 | 46 | 3 | 2 | 1 | 0 | 0 |
| Charlotte | SC | | 816 | 224 | 12 | 8 | 4 | 0 | 0 |
| Charlotte | SC | | 282 | 41 | 3 | 1 | 2 | 0 | 0 |
| Charlotte | SC | | 22 | 9 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | SC | | 145 | 47 | 3 | 1 | 2 | 0 | 0 |
| Charlotte | SC | | 1645 | 800 | 40 | 39 | 1 | 0 | 0 |
| Charlotte | SC | | 3600 | 1385 | 69 | 39 | 30 | 0 | 0 |
| Charlotte | NC | | 182 | 118 | 6 | 2 | 4 | 0 | 0 |
| Charlotte | NC | | 16 | 7 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | 3 | 3 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | 72 | 34 | 3 | 3 | 0 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Charlotte | NC | | | 58 | 48 | 3 | 3 | 0 | 0 | 0 |
| Charlotte | NC | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charlotte | NC | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charlotte | NC | | | 106 | 89 | 5 | 4 | 1 | 0 | 0 |
| Charlotte | NC | | | 51 | 46 | 3 | 3 | 0 | 0 | 0 |
| Charlotte | NC | | | 1028 | 785 | 40 | 25 | 15 | 0 | 0 |
| Charlotte | NC | | | 5 | 4 | 1 | 0 | 1 | 0 | 0 |
| Charlotte | NC | | | 141 | 65 | 4 | 2 | 2 | 0 | 0 |
| Charlotte | NC | | | 108 | 87 | 5 | 5 | 0 | 0 | 0 |
| Charlotte | NC | | | 64 | 19 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | | 511 | 425 | 26 | 23 | 3 | 0 | 0 |
| Charlotte | NC | | | 47 | 20 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | | 435 | 389 | 20 | 16 | 4 | 0 | 0 |
| Charlotte | NC | | | 223 | 174 | 9 | 8 | 1 | 0 | 0 |
| Charlotte | NC | | | 18 | 6 | 1 | 0 | 1 | 0 | 0 |
| Charlotte | NC | | | 141 | 50 | 3 | 2 | 1 | 0 | 0 |
| Charlotte | NC | | | 308 | 127 | 6 | 4 | 2 | 0 | 0 |
| Charlotte | NC | | | 346 | 207 | 10 | 8 | 2 | 0 | 0 |
| Charlotte | NC | | | 420 | 313 | 16 | 14 | 2 | 0 | 0 |
| Charlotte | NC | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charlotte | NC | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charlotte | NC | | | 17 | 15 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | | 10 | 8 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | | 958 | 468 | 24 | 20 | 4 | 0 | 0 |
| Charlotte | NC | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charlotte | NC | | | 234 | 119 | 6 | 6 | 0 | 0 | 0 |
| Charlotte | NC | | | 191 | 160 | 16 | 9 | 7 | 0 | 0 |
| Charlotte | NC | | | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charlotte | NC | | | 297 | 196 | 10 | 7 | 3 | 0 | 0 |
| Charlotte | NC | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charlotte | NC | | | 146 | 53 | 3 | 3 | 0 | 0 | 0 |
| Charlotte | NC | | | 4421 | 3623 | 181 | 147 | 34 | 0 | 0 |
| Charlotte | NC | | | 976 | 701 | 35 | 27 | 8 | 0 | 0 |
| Charlotte | NC | | | 302 | 222 | 11 | 9 | 2 | 0 | 0 |
| Charlotte | NC | | | 153 | 78 | 4 | 2 | 2 | 0 | 0 |
| Charlotte | NC | | | 22 | 14 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | | 4 | 0 | 0 | 0 | 0 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Charlotte | NC | | 560 | 28 | 28 | 24 | 4 | 0 | 0 |
| Charlotte | NC | | 235 | 67 | 4 | 2 | 2 | 0 | 0 |
| Charlotte | NC | | 3089 | 2254 | 113 | 90 | 23 | 0 | 0 |
| Charlotte | NC | | 9 | 6 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | 135 | 21 | 2 | 0 | 2 | 0 | 0 |
| Charlotte | NC | | 632 | 339 | 17 | 13 | 4 | 0 | 0 |
| Charlotte | NC | | 164 | 76 | 4 | 2 | 2 | 0 | 0 |
| Charlotte | NC | | 7 | 7 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | 128 | 76 | 4 | 4 | 0 | 0 | 0 |
| Charlotte | NC | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charlotte | NC | | 171 | 44 | 3 | 2 | 1 | 0 | 0 |
| Charlotte | NC | | 2180 | 1601 | 80 | 63 | 17 | 0 | 0 |
| Charlotte | NC | | 130 | 90 | 5 | 5 | 0 | 0 | 0 |
| Charlotte | NC | | 253 | 213 | 10 | 9 | 1 | 0 | 0 |
| Charlotte | NC | | 9 | 9 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | 22 | 6 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | 2102 | 1471 | 74 | 59 | 15 | 0 | 0 |
| Charlotte | NC | | 28 | 7 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | 39 | 39 | 2 | 2 | 0 | 0 | 0 |
| Charlotte | NC | | 6 | 6 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charlotte | NC | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charlotte | NC | | 17 | 17 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | 20 | 20 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | 15 | 15 | 1 | 1 | 0 | 0 | 0 |
| Charlotte | NC | | 347 | 79 | 4 | 2 | 2 | 0 | 0 |
| Charlotte | NC | | 70 | 15 | 15 | 14 | 1 | 0 | 0 |
| Charlotte | NC | | 81 | 60 | 4 | 4 | 0 | 0 | 0 |
| Charlotte | NC | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charlotte | NC | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charlotte | NC | | 810 | 40 | 40 | 26 | 14 | 0 | 0 |
| Columbus | OH | | 16 | 3 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 24 | 3 | 1 | 0 | 1 | 0 | 0 |
| Columbus | OH | | 332 | 4 | 1 | 0 | 1 | 0 | 0 |
| Columbus | OH | | 3 | 3 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 14 | 5 | 1 | 1 | 0 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Columbus | OH | | 147 | 71 | 4 | 4 | 0 | 0 | 0 |
| Columbus | OH | | 363 | 142 | 8 | 8 | 0 | 0 | 0 |
| Columbus | OH | | 1237 | 37 | 2 | 2 | 0 | 0 | 0 |
| Columbus | OH | | 176 | 100 | 5 | 5 | 0 | 0 | 0 |
| Columbus | OH | | 129 | 43 | 2 | 2 | 0 | 0 | 0 |
| Columbus | OH | | 17 | 1 | 1 | 0 | 1 | 0 | 0 |
| Columbus | OH | | 191 | 99 | 5 | 3 | 2 | 0 | 0 |
| Columbus | OH | | 15 | 1 | 1 | 0 | 1 | 0 | 0 |
| Columbus | OH | | 21 | 10 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 81 | 27 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 95 | 26 | 2 | 2 | 0 | 0 | 0 |
| Columbus | OH | | 193 | 84 | 4 | 3 | 1 | 0 | 0 |
| Columbus | OH | | 96 | 59 | 3 | 2 | 1 | 0 | 0 |
| Columbus | OH | | 2853 | 721 | 41 | 35 | 6 | 0 | 0 |
| Columbus | OH | | 51 | 35 | 2 | 2 | 0 | 0 | 0 |
| Columbus | OH | | 659 | 350 | 20 | 20 | 0 | 0 | 0 |
| Columbus | OH | | 2577 | 1184 | 60 | 40 | 20 | 0 | 0 |
| Columbus | OH | | 30 | 7 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 9 | 0 | 0 | 0 | 0 | 0 | 0 |
| Columbus | OH | | 266 | 97 | 5 | 5 | 0 | 0 | 0 |
| Columbus | OH | | 35 | 17 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 6214 | 2911 | 146 | 123 | 23 | 0 | 0 |
| Columbus | OH | | 7 | 7 | 1 | 0 | 1 | 0 | 0 |
| Columbus | OH | | 208 | 96 | 5 | 4 | 1 | 0 | 0 |
| Columbus | OH | | 4 | 4 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 24 | 22 | 2 | 1 | 1 | 0 | 0 |
| Columbus | OH | | 4 | 2 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 30 | 21 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 987 | 296 | 15 | 15 | 0 | 0 | 0 |
| Columbus | OH | | 2 | 1 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 47 | 15 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 16 | 5 | 1 | 0 | 1 | 0 | 0 |
| Columbus | OH | | 11 | 6 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 27 | 3 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 50 | 20 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 1,240 | 50 | 3 | 3 | 0 | 0 | 0 |
| Columbus | OH | | 25 | 10 | 1 | 1 | 0 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Columbus | OH | | 64 | 38 | 2 | 2 | 0 | 0 | 0 |
| Columbus | OH | | 37 | 31 | 2 | 2 | 0 | 0 | 0 |
| Columbus | OH | | 2405 | 625 | 32 | 29 | 3 | 0 | 0 |
| Columbus | OH | | 36 | 20 | 2 | 2 | 0 | 0 | 0 |
| Columbus | OH | | 87 | 50 | 3 | 1 | 2 | 0 | 0 |
| Columbus | OH | | 461 | 186 | 10 | 10 | 0 | 0 | 0 |
| Columbus | OH | | 26 | 6 | 2 | 2 | 0 | 0 | 0 |
| Columbus | OH | | 2329 | 806 | 41 | 28 | 13 | 0 | 0 |
| Columbus | OH | | 14 | 1 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 54 | 33 | 2 | 2 | 0 | 0 | 0 |
| Columbus | OH | | 6 | 2 | 1 | 0 | 1 | 0 | 0 |
| Columbus | OH | | 5 | 4 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 49 | 18 | 1 | 1 | 0 | 0 | 0 |
| Columbus | OH | | 15 | 2 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | 3499 | 720 | 36 | 23 | 13 | 0 | 0 |
| Dallas | TX | | 86 | 27 | 5 | 5 | 0 | 0 | 0 |
| Dallas | TX | | 94 | 34 | 3 | 3 | 0 | 0 | 0 |
| Dallas | TX | | 5 | 1 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | 210 | 78 | 4 | 1 | 3 | 0 | 0 |
| Dallas | TX | | 41 | 19 | 1 | 0 | 1 | 0 | 0 |
| Dallas | TX | | 536 | 117 | 6 | 3 | 3 | 0 | 0 |
| Dallas | TX | | 169 | 38 | 2 | 1 | 1 | 0 | 0 |
| Dallas | TX | | 7 | 2 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | 3 | 1 | 1 | 0 | 1 | 0 | 0 |
| Dallas | TX | | 598 | 300 | 15 | 11 | 4 | 0 | 0 |
| Dallas | TX | | 851 | 400 | 20 | 13 | 7 | 0 | 0 |
| Dallas | TX | | 25 | 17 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | 2 | 2 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | 4 | 2 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | 93 | 32 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | 1030 | 412 | 25 | 23 | 2 | 0 | 0 |
| Dallas | TX | | 150 | 21 | 7 | 7 | 0 | 0 | 0 |
| Dallas | TX | | 12 | 7 | 4 | 4 | 0 | 0 | 0 |
| Dallas | TX | | 168 | 60 | 3 | 3 | 0 | 0 | 0 |
| Dallas | TX | | 13 | 7 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | 45 | 19 | 4 | 4 | 0 | 0 | 0 |
| Dallas | TX | | 52 | 17 | 2 | 2 | 0 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Dallas | TX | | | 13 | 5 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 9 | 3 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 16 | 6 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 460 | 407 | 20 | 20 | 0 | 0 | 0 |
| Dallas | TX | | | 22 | 12 | 3 | 1 | 2 | 0 | 0 |
| Dallas | TX | | | 33 | 30 | 3 | 3 | 0 | 0 | 0 |
| Dallas | TX | | | 66 | 50 | 3 | 2 | 1 | 0 | 0 |
| Dallas | TX | | | 14 | 5 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 34 | 21 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 5 | 3 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 5 | 4 | 0 | 0 | 0 | 0 | 0 |
| Dallas | TX | | | 82 | 25 | 3 | 1 | 2 | 0 | 0 |
| Dallas | TX | | | 3 | 1 | 0 | 0 | 0 | 0 | 0 |
| Dallas | TX | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dallas | TX | | | 5 | 1 | 0 | 0 | 0 | 0 | 0 |
| Dallas | TX | | | 16 | 11 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 74 | 53 | 3 | 2 | 1 | 0 | 0 |
| Dallas | TX | | | 6 | 1 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 16 | 10 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 66 | 30 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 15 | 8 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 113 | 30 | 2 | 0 | 2 | 0 | 0 |
| Dallas | TX | | | 10 | 9 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 714 | 202 | 10 | 6 | 4 | 0 | 0 |
| Dallas | TX | | | 2 | 1 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 17 | 7 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 73 | 13 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 42 | 22 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 114 | 36 | 2 | 1 | 1 | 0 | 0 |
| Dallas | TX | | | 937 | 120 | 6 | 6 | 0 | 0 | 0 |
| Dallas | TX | | | 44 | 36 | 2 | 0 | 2 | 0 | 0 |
| Dallas | TX | | | 12 | 10 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 254 | 69 | 4 | 3 | 1 | 0 | 0 |
| Dallas | TX | | | 250 | 160 | 8 | 8 | 0 | 0 | 0 |
| Dallas | TX | | | 937 | 120 | 6 | 6 | 0 | 0 | 0 |
| Dallas | TX | | | 76 | 13 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 694 | 221 | 11 | 8 | 3 | 0 | 0 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Dallas | TX | | | 16 | 1 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 46 | 17 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 337 | 94 | 5 | 3 | 2 | 0 | 0 |
| Dallas | TX | | | 12 | 5 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 7 | 2 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 40 | 10 | 3 | 3 | 0 | 0 | 0 |
| Dallas | TX | | | 288 | 132 | 7 | 7 | 0 | 0 | 0 |
| Dallas | TX | | | 14 | 10 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 40 | 18 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 42 | 24 | 3 | 2 | 1 | 0 | 0 |
| Dallas | TX | | | 52 | 25 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 4 | 2 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 146 | 66 | 3 | 3 | 0 | 0 | 0 |
| Dallas | TX | | | 101 | 5 | 5 | 5 | 0 | 0 | 0 |
| Dallas | TX | | | 11 | 2 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 5 | 1 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 14 | 2 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 116 | 51 | 3 | 3 | 0 | 0 | 0 |
| Dallas | TX | | | 194 | 95 | 5 | 5 | 0 | 0 | 0 |
| Dallas | TX | | | 2 | 2 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 40 | 24 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 28 | 7 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 76 | 31 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 136 | 31 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 59 | 16 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 58 | 17 | 1 | 0 | 1 | 0 | 0 |
| Dallas | TX | | | 886 | 389 | 20 | 17 | 3 | 0 | 0 |
| Dallas | TX | | | 534 | 265 | 14 | 14 | 0 | 0 | 0 |
| Dallas | TX | | | 20 | 7 | 1 | 0 | 1 | 0 | 0 |
| Dallas | TX | | | 12 | 5 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 513 | 124 | 6 | 6 | 0 | 0 | 0 |
| Dallas | TX | | | 55 | 23 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dallas | TX | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dallas | TX | | | 23 | 14 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 12 | 7 | 1 | 0 | 1 | 0 | 0 |
| Dallas | TX | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

ATF000299

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Dallas | TX | | | 151 | 3 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 68 | 29 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 23 | 6 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 124 | 51 | 2 | 1 | 1 | 0 | 0 |
| Dallas | TX | | | 4 | 4 | 1 | 0 | 1 | 0 | 0 |
| Dallas | TX | | | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dallas | TX | | | 511 | 179 | 9 | 6 | 3 | 0 | 0 |
| Dallas | TX | | | 921 | 419 | 21 | 16 | 5 | 0 | 0 |
| Dallas | TX | | | 10 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dallas | TX | | | 245 | 123 | 6 | 5 | 1 | 0 | 0 |
| Dallas | TX | | | 3 | 3 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 73 | 19 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 1557 | 443 | 23 | 10 | 13 | 0 | 0 |
| Dallas | TX | | | 3461 | 1305 | 66 | 49 | 17 | 0 | 0 |
| Dallas | TX | | | 51 | 27 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 36 | 20 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 37 | 19 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 12 | 7 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 10 | 7 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 20 | 9 | 1 | 0 | 1 | 0 | 0 |
| Dallas | TX | | | 3 | 2 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 773 | 307 | 16 | 13 | 3 | 0 | 0 |
| Dallas | TX | | | 3 | 1 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 2664 | 1000 | 50 | 38 | 12 | 0 | 0 |
| Dallas | TX | | | 3 | 2 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 335 | 134 | 7 | 1 | 6 | 0 | 0 |
| Dallas | TX | | | 161 | 60 | 3 | 3 | 0 | 0 | 0 |
| Dallas | TX | | | 4 | 3 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 70 | 38 | 3 | 3 | 0 | 0 | 0 |
| Dallas | TX | | | 472 | 116 | 7 | 1 | 6 | 0 | 0 |
| Dallas | TX | | | 12 | 6 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 96 | 27 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 13 | 1 | 1 | 0 | 1 | 0 | 0 |
| Dallas | TX | | | 24 | 14 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 26 | 26 | 2 | 1 | 1 | 0 | 0 |
| Dallas | TX | | | 1668 | 600 | 31 | 23 | 8 | 0 | 0 |
| Dallas | TX | | | 32 | 3 | 1 | 1 | 0 | 0 | 0 |

ATF000300

| Dallas | TX | | | 95 | 54 | 3 | 1 | 2 | 0 | 0 |
|--------|----|--|--|------|------|-----|-----|-----|---|---|
| Dallas | TX | | | 23 | 11 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 166 | 47 | 3 | 3 | 0 | 0 | 0 |
| Dallas | TX | | | 1735 | 633 | 32 | 32 | 0 | 0 | 0 |
| Dallas | TX | | | 351 | 96 | 5 | 5 | 0 | 0 | 0 |
| Dallas | TX | | | 53 | 17 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 306 | 74 | 4 | 4 | 0 | 0 | 0 |
| Dallas | TX | | | 572 | 179 | 9 | 9 | 0 | 0 | 0 |
| Dallas | TX | | | 274 | 58 | 3 | 3 | 0 | 0 | 0 |
| Dallas | TX | | | 5946 | 2400 | 120 | 93 | 27 | 0 | 0 |
| Dallas | TX | | | 29 | 13 | 1 | 0 | 1 | 0 | 0 |
| Dallas | TX | | | 32 | 21 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 21 | 10 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 303 | 59 | 3 | 3 | 0 | 0 | 0 |
| Dallas | TX | | | 2876 | 958 | 50 | 50 | 0 | 0 | 0 |
| Dallas | TX | | | 2087 | 313 | 16 | 14 | 2 | 0 | 0 |
| Dallas | TX | | | 1757 | 844 | 42 | 38 | 4 | 0 | 0 |
| Dallas | TX | | | 245 | 132 | 7 | 5 | 2 | 0 | 0 |
| Dallas | TX | | | 263 | 22 | 2 | 0 | 2 | 0 | 0 |
| Dallas | TX | | | 41 | 26 | 2 | 1 | 1 | 0 | 0 |
| Dallas | TX | | | 229 | 62 | 4 | 3 | 1 | 0 | 0 |
| Dallas | TX | | | 84 | 27 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | | 117 | 45 | 3 | 3 | 0 | 0 | 0 |
| Dallas | TX | | | 79 | 12 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 22 | 15 | 2 | 1 | 1 | 0 | 0 |
| Dallas | TX | | | 14 | 6 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 22 | 11 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 4 | 1 | 1 | 0 | 1 | 0 | 0 |
| Dallas | TX | | | 1348 | 370 | 19 | 15 | 4 | 0 | 0 |
| Dallas | TX | | | 31 | 12 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 308 | 16 | 4 | 4 | 0 | 0 | 0 |
| Dallas | TX | | | 5 | 5 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 720 | 50 | 10 | 7 | 3 | 0 | 0 |
| Dallas | TX | | | 8 | 8 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 4 | 2 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | | 54 | 22 | 3 | 2 | 1 | 0 | 0 |
| Dallas | TX | | | 939 | 400 | 20 | 7 | 13 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Dallas | TX | | 87 | 35 | 3 | 2 | 1 | 0 | 0 |
| Dallas | TX | | 8 | 7 | 1 | 1 | 0 | 0 | 0 |
| Dallas | TX | | 62 | 3 | 2 | 2 | 0 | 0 | 0 |
| Dallas | TX | | 27 | 5 | 1 | 1 | 1 | 0 | 0 |
| Dallas | TX | | 10 | 2 | 1 | 1 | 0 | 0 | 0 |
| Denver | UT | | 10 | 5 | 1 | 1 | 0 | 0 | 0 |
| Denver | UT | | 162 | 79 | 16 | 16 | 0 | 0 | 0 |
| Denver | UT | | 3 | 1 | 1 | 1 | 0 | 0 | 0 |
| Denver | UT | | 46 | 14 | 1 | 1 | 0 | 0 | 0 |
| Denver | UT | | 2 | 2 | 1 | 1 | 0 | 0 | 0 |
| Denver | UT | | 37 | 13 | 1 | 0 | 1 | 0 | 0 |
| Denver | MT | | 7 | 6 | 1 | 1 | 0 | 0 | 0 |
| Denver | MT | | 37 | 10 | 2 | 2 | 0 | 0 | 0 |
| Denver | MT | | 138 | 73 | 14 | 10 | 4 | 0 | 0 |
| Denver | UT | | 37 | 28 | 5 | 4 | 1 | 0 | 0 |
| Denver | UT | | 1126 | 508 | 25 | 23 | 2 | 0 | 0 |
| Denver | WY | | 127 | 25 | 2 | 2 | 0 | 0 | 0 |
| Denver | WY | | 491 | 98 | 5 | 5 | 0 | 0 | 0 |
| Denver | MT | | 2486 | 545 | 79 | 78 | 1 | 0 | 0 |
| Denver | MT | | 1028 | 332 | 20 | 18 | 2 | 0 | 0 |
| Denver | UT | | 20 | 11 | 1 | 1 | 0 | 0 | 0 |
| Denver | WY | | 209 | 20 | 5 | 5 | 0 | 0 | 0 |
| Denver | MT | | 1169 | 360 | 18 | 14 | 4 | 0 | 1 |
| Denver | UT | | 97 | 23 | 2 | 2 | 0 | 0 | 0 |
| Denver | UT | | 2 | 2 | 1 | 1 | 0 | 0 | 0 |
| Detroit | MI | | 9 | 7 | 1 | 1 | 0 | 0 | 0 |
| Detroit | MI | | 83 | 35 | 2 | 2 | 0 | 0 | 0 |
| Detroit | MI | | 1102 | 647 | 34 | 25 | 9 | 0 | 0 |
| Detroit | MI | | 14 | 11 | 1 | 1 | 0 | 0 | 0 |
| Detroit | MI | | 1 | 1 | 1 | 1 | 0 | 0 | 0 |
| Detroit | MI | | 6 | 6 | 1 | 1 | 0 | 0 | 0 |
| Detroit | MI | | 209 | 144 | 8 | 6 | 2 | 0 | 0 |
| Detroit | MI | | 132 | 10 | 1 | 1 | 0 | 0 | 0 |
| Detroit | MI | | 44 | 21 | 1 | 1 | 0 | 0 | 0 |
| Detroit | MI | | 89 | 68 | 4 | 3 | 1 | 0 | 0 |
| Detroit | MI | | 30 | 25 | 2 | 2 | 0 | 0 | 0 |
| Detroit | MI | | 4 | 1 | 1 | 1 | 0 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Detroit | MI | | | 930 | 465 | 24 | 18 | 6 | 0 | 0 |
| Detroit | MI | | | 166 | 39 | 2 | 2 | 0 | 0 | 0 |
| Detroit | MI | | | 764 | 500 | 25 | 18 | 7 | 0 | 0 |
| Detroit | MI | | | 98 | 4 | 3 | 3 | 0 | 0 | 0 |
| Houston | TX | | | 846 | 200 | 10 | 6 | 4 | 0 | 0 |
| Houston | TX | | | 360 | 180 | 9 | 8 | 1 | 0 | 0 |
| Houston | TX | | | 1542 | 354 | 19 | 13 | 6 | 0 | 0 |
| Houston | TX | | | 983 | 236 | 12 | 5 | 7 | 0 | 0 |
| Houston | TX | | | 10 | 10 | 1 | 1 | 0 | 0 | 0 |
| Houston | TX | | | 9 | 7 | 1 | 1 | 0 | 0 | 0 |
| Houston | TX | | | 13 | 0 | 0 | 0 | 0 | 0 | 0 |
| Houston | TX | | | 279 | 67 | 3 | 2 | 1 | 0 | 0 |
| Houston | TX | | | 352 | 102 | 5 | 3 | 2 | 0 | 0 |
| Houston | TX | | | 638 | 193 | 9 | 4 | 5 | 0 | 0 |
| Houston | TX | | | 3 | 3 | 1 | 1 | 0 | 0 | 0 |
| Houston | TX | | | 930 | 264 | 13 | 6 | 7 | 0 | 0 |
| Houston | TX | | | 47 | 12 | 1 | 0 | 1 | 0 | 0 |
| Houston | TX | | | 2928 | 1260 | 63 | 40 | 23 | 0 | 0 |
| Houston | TX | | | 242 | 60 | 3 | 3 | 0 | 0 | 0 |
| Houston | TX | | | 291 | 85 | 5 | 2 | 3 | 0 | 0 |
| Houston | TX | | | 85 | 18 | 1 | 1 | 0 | 0 | 0 |
| Houston | TX | | | 371 | 89 | 6 | 1 | 5 | 0 | 0 |
| Houston | TX | | | 3615 | 1151 | 58 | 58 | 0 | 0 | 0 |
| Houston | TX | | | 2079 | 558 | 28 | 20 | 8 | 0 | 0 |
| Houston | TX | | | 129 | 20 | 1 | 1 | 0 | 0 | 0 |
| Houston | TX | | | 252 | 53 | 3 | 3 | 0 | 0 | 0 |
| Houston | TX | | | 6 | 1 | 1 | 1 | 0 | 0 | 0 |
| Houston | TX | | | 617 | 77 | 4 | 3 | 1 | 0 | 0 |
| Houston | TX | | | 16 | 4 | 4 | 1 | 3 | 0 | 0 |
| Houston | TX | | | 53 | 16 | 4 | 2 | 2 | 0 | 0 |
| Houston | TX | | | 1272 | 292 | 14 | 9 | 5 | 0 | 0 |
| Houston | TX | | | 116 | 27 | 7 | 2 | 5 | 0 | 0 |
| Houston | TX | | | 128 | 56 | 8 | 6 | 2 | 0 | 0 |
| Houston | TX | | | 261 | 87 | 4 | 3 | 1 | 0 | 0 |
| Houston | TX | | | 139 | 21 | 1 | 1 | 0 | 0 | 0 |
| Houston | TX | | | 532 | 122 | 6 | 3 | 3 | 0 | 0 |
| Houston | TX | | | 50 | 34 | 5 | 4 | 1 | 0 | 0 |
| Houston | TX | | | 18 | 10 | 2 | 2 | 0 | 0 | 0 |
| Houston | TX | | | 635 | 183 | 10 | 5 | 5 | 0 | 0 |
| Houston | TX | | | 528 | 144 | 7 | 2 | 5 | 0 | 0 |
| Houston | TX | | | 118 | 24 | 1 | 0 | 1 | 0 | 0 |
| Houston | TX | | | 847 | 239 | 12 | 6 | 6 | 0 | 0 |
| Houston | TX | | | 1587 | 515 | 25 | 17 | 8 | 0 | 0 |

| Houston | TX | | 396 | 248 | 12 | 8 | 4 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|
| Houston | TX | | 309 | 67 | 4 | 4 | 0 | 0 | 0 |
| Houston | TX | | 510 | 218 | 11 | 11 | 0 | 0 | 0 |
| Houston | TX | | 1154 | 460 | 23 | 12 | 11 | 0 | 0 |
| Houston | TX | | 1627 | 873 | 44 | 44 | 0 | 0 | 0 |
| Houston | TX | | 9 | 6 | 1 | 1 | 0 | 0 | 0 |
| Houston | TX | | 89 | 23 | 2 | 1 | 1 | 0 | 0 |
| Houston | TX | | 340 | 38 | 2 | 0 | 2 | 0 | 0 |
| Houston | TX | | 1634 | 691 | 35 | 27 | 8 | 0 | 0 |
| Houston | TX | | 16 | 6 | 4 | 1 | 3 | 0 | 0 |
| Houston | TX | | 9 | 9 | 1 | 1 | 0 | 0 | 0 |
| Houston | TX | | 70 | 34 | 2 | 2 | 0 | 0 | 0 |
| Houston | TX | | 19 | 6 | 1 | 1 | 0 | 0 | 0 |
| Houston | TX | | 33 | 15 | 1 | 0 | 1 | 0 | 0 |
| Houston | TX | | 777 | 335 | 17 | 12 | 5 | 0 | 0 |
| Houston | TX | | 81 | 20 | 1 | 0 | 1 | 0 | 0 |
| Houston | TX | | 13 | 5 | 1 | 1 | 0 | 0 | 0 |
| Houston | TX | | 51 | 6 | 1 | 1 | 0 | 0 | 0 |
| Houston | TX | | 86 | 16 | 1 | 0 | 1 | 0 | 0 |
| Houston | TX | | 2806 | 560 | 28 | 13 | 15 | 0 | 0 |
| Houston | TX | | 308 | 46 | 3 | 2 | 1 | 0 | 0 |
| Houston | TX | | 811 | 196 | 10 | 4 | 6 | 0 | 0 |
| Houston | TX | | 163 | 75 | 5 | 4 | 1 | 0 | 0 |
| Houston | TX | | 628 | 102 | 8 | 6 | 2 | 0 | 0 |
| Houston | TX | | 28 | 17 | 1 | 1 | 0 | 0 | 0 |
| Houston | TX | | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Houston | TX | | 43 | 36 | 2 | 2 | 0 | 0 | 0 |
| Houston | TX | | 109 | 64 | 3 | 2 | 1 | 0 | 0 |
| Houston | TX | | 818 | 242 | 12 | 5 | 7 | 0 | 0 |
| Houston | TX | | 163 | 40 | 2 | 2 | 0 | 0 | 0 |
| Kansas City | IA | | 34 | 34 | 2 | 1 | 1 | 0 | 0 |
| Kansas City | IA | | 121 | 121 | 7 | 5 | 2 | 0 | 0 |
| Kansas City | IA | | 3 | 1 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | IA | | 7 | 3 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | IA | | 12 | 2 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | IA | | 4 | 4 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | IA | | 23 | 23 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | IA | | 2 | 1 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | IA | | 1768 | 1621 | 82 | 61 | 21 | 0 | 0 |
| Kansas City | NE | | 10 | 10 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | NE | | 12 | 12 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | NE | | 14 | 13 | 1 | 1 | 0 | 0 | 0 |

ATF000304

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Kansas City | NE | | 303 | 267 | 14 | 12 | 2 | 0 | 0 |
| Kansas City | NE | | 254 | 201 | 10 | 4 | 5 | 1 | 1 |
| Kansas City | NE | | 527 | 430 | 23 | 16 | 7 | 0 | 0 |
| Kansas City | NE | | 756 | 677 | 41 | 30 | 11 | 0 | 0 |
| Kansas City | NE | | 89 | 87 | 4 | 4 | 0 | 0 | 0 |
| Kansas City | NE | | 2 | 2 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | NE | | 67 | 16 | 2 | 1 | 1 | 0 | 0 |
| Kansas City | NE | | 7 | 5 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | NE | | 392 | 370 | 19 | 9 | 10 | 0 | 0 |
| Kansas City | NE | | 139 | 120 | 6 | 6 | 0 | 0 | 0 |
| Kansas City | NE | | 37 | 34 | 3 | 2 | 1 | 0 | 0 |
| Kansas City | KS | | 34 | 5 | 1 | 0 | 1 | 0 | 0 |
| Kansas City | KS | | 331 | 40 | 2 | 1 | 1 | 0 | 0 |
| Kansas City | KS | | 30 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 683 | 175 | 8 | 7 | 1 | 0 | 0 |
| Kansas City | KS | | 60 | 12 | 1 | 0 | 1 | 0 | 0 |
| Kansas City | KS | | 34 | 13 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | KS | | 22 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 19 | 5 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | KS | | 59 | 18 | 1 | 0 | 1 | 0 | 0 |
| Kansas City | KS | | 20 | 2 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | KS | | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 65 | 13 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | KS | | 19 | 2 | 1 | 0 | 1 | 0 | 0 |
| Kansas City | KS | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 17 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 8 | 7 | 2 | 2 | 0 | 0 | 0 |
| Kansas City | KS | | 43 | 9 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | KS | | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 725 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 744 | 80 | 4 | 2 | 2 | 0 | 0 |
| Kansas City | KS | | 4 | 4 | 1 | 0 | 1 | 0 | 0 |
| Kansas City | NE | | 387 | 331 | 16 | 10 | 6 | 0 | 0 |
| Kansas City | KS | | 522 | 163 | 5 | 3 | 2 | 0 | 0 |
| Kansas City | NE | | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 64 | 35 | 2 | 1 | 1 | 0 | 0 |
| Kansas City | KS | | 1681 | 336 | 16 | 11 | 5 | 0 | 0 |

ATF000305

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Kansas City | KS | | 4 | 2 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | NE | | 86 | 70 | 3 | 3 | 0 | 0 | 0 |
| Kansas City | KS | | 51 | 9 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | KS | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 6 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | NE | | 39 | 33 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | NE | | 2 | 1 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | NE | | 22 | 22 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | KS | | 7 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 87 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 51 | 26 | 3 | 3 | 0 | 0 | 0 |
| Kansas City | KS | | 18 | 7 | 1 | 0 | 1 | 0 | 0 |
| Kansas City | NE | | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 2662 | 643 | 29 | 21 | 8 | 0 | 0 |
| Kansas City | KS | | 128 | 26 | 2 | 1 | 1 | 0 | 0 |
| Kansas City | KS | | 444 | 158 | 8 | 6 | 2 | 0 | 0 |
| Kansas City | KS | | 30 | 6 | 1 | 0 | 1 | 0 | 0 |
| Kansas City | KS | | 16 | 4 | 1 | 0 | 1 | 0 | 0 |
| Kansas City | KS | | 2555 | 383 | 19 | 16 | 3 | 0 | 0 |
| Kansas City | KS | | 132 | 13 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | KS | | 45 | 9 | 2 | 2 | 0 | 0 | 0 |
| Kansas City | NE | | 370 | 300 | 15 | 12 | 3 | 0 | 0 |
| Kansas City | NE | | 128 | 60 | 3 | 3 | 0 | 0 | 0 |
| Kansas City | NE | | 12 | 10 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | NE | | 12 | 2 | 2 | 2 | 0 | 0 | 0 |
| Kansas City | KS | | 35 | 3 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | KS | | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | NE | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | NE | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | NE | | 29 | 17 | 1 | 1 | 0 | 0 | 0 |
| Kansas City | KS | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | KS | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas City | NE | | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisville | KY | | 760 | 180 | 9 | 5 | 4 | 0 | 0 |
| Louisville | KY | | 7 | 1 | 1 | 1 | 0 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Louisville | WV | | | 470 | 29 | 2 | 2 | 0 | 0 | 0 |
| Louisville | KY | | | 565 | 177 | 9 | 9 | 0 | 0 | 0 |
| Louisville | KY | | | 272 | 70 | 3 | 2 | 1 | 0 | 0 |
| Louisville | KY | | | 18 | 11 | 1 | 1 | 0 | 0 | 0 |
| Louisville | KY | | | 363 | 127 | 7 | 4 | 3 | 0 | 0 |
| Louisville | KY | | | 1 | 1 | 1 | 1 | 0 | 0 | 0 |
| Louisville | KY | | | 15 | 2 | 1 | 1 | 0 | 0 | 0 |
| Louisville | KY | | | 4 | 2 | 1 | 1 | 0 | 0 | 0 |
| Louisville | KY | | | 1 | 1 | 1 | 1 | 0 | 0 | 0 |
| Louisville | KY | | | 145 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisville | KY | | | 9 | 3 | 1 | 0 | 1 | 0 | 0 |
| Louisville | KY | | | 176 | 41 | 2 | 1 | 1 | 0 | 0 |
| Louisville | KY | | | 3765 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisville | KY | | | 1075 | 90 | 18 | 12 | 6 | 0 | 0 |
| Louisville | KY | | | 800 | 222 | 11 | 7 | 4 | 0 | 0 |
| Louisville | KY | | | 258 | 52 | 13 | 11 | 2 | 0 | 0 |
| Louisville | KY | | | 8 | 5 | 1 | 0 | 1 | 0 | 0 |
| Louisville | KY | | | 363 | 127 | 7 | 4 | 3 | 0 | 0 |
| Louisville | KY | | | 18 | 11 | 1 | 1 | 0 | 0 | 0 |
| Louisville | KY | | | 3765 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisville | KY | | | 1 | 1 | 1 | 1 | 0 | 0 | 0 |
| Louisville | KY | | | 145 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisville | KY | | | 9 | 3 | 1 | 0 | 1 | 0 | 0 |
| Louisville | KY | | | 565 | 177 | 9 | 9 | 0 | 0 | 0 |
| Louisville | KY | | | 106 | 29 | 2 | 1 | 1 | 0 | 0 |
| Louisville | WV | | | 1200 | 400 | 20 | 13 | 7 | 0 | 0 |
| Louisville | WV | | | 76 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisville | KY | | | 1733 | 611 | 31 | 26 | 5 | 0 | 0 |
| Louisville | KY | | | 211 | 78 | 4 | 4 | 0 | 0 | 0 |
| Louisville | KY | | | 462 | 174 | 9 | 7 | 2 | 0 | 0 |
| Louisville | KY | | | 217 | 89 | 5 | 2 | 3 | 0 | 0 |
| Louisville | KY | | | 510 | 202 | 10 | 9 | 1 | 0 | 0 |
| New Orleans | LA | | | 135 | 18 | 2 | 2 | 0 | 0 | 0 |
| New Orleans | MS | | | 1138 | 160 | 8 | 6 | 2 | 0 | 0 |
| New Orleans | LA | | | 2341 | 353 | 18 | 17 | 1 | 0 | 0 |
| New Orleans | LA | | | 119 | 32 | 2 | 2 | 0 | 0 | 0 |
| New Orleans | LA | | | 60 | 8 | 1 | 1 | 0 | 0 | 0 |

ATF000307

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| New Orleans | LA | | | 46 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Orleans | LA | | | 113 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Orleans | LA | | | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Orleans | LA | | | 40 | 1 | 1 | 0 | 1 | 0 | 0 |
| New Orleans | LA | | | 932 | 1 | 1 | 0 | 1 | 0 | 0 |
| New Orleans | LA | | | 265 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Orleans | LA | | | 3605 | 320 | 16 | 16 | 0 | 0 | 0 |
| New Orleans | MS | | | 3879 | 891 | 45 | 45 | 0 | 0 | 0 |
| New Orleans | LA | | | 3010 | 268 | 14 | 14 | 0 | 0 | 0 |
| New Orleans | LA | | | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Orleans | MS | | | 15 | 1 | 1 | 0 | 1 | 0 | 0 |
| New Orleans | MS | | | 47 | 12 | 1 | 1 | 0 | 0 | 0 |
| New Orleans | MS | | | 246 | 45 | 2 | 2 | 0 | 0 | 0 |
| New Orleans | AR | | | 197 | 89 | 5 | 3 | 2 | 0 | 0 |
| New Orleans | AR | | | 479 | 153 | 8 | 6 | 2 | 0 | 0 |
| New Orleans | AR | | | 12 | 2 | 2 | 1 | 1 | 0 | 0 |
| New Orleans | AR | | | 23 | 9 | 1 | 1 | 0 | 0 | 0 |
| New Orleans | AR | | | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Orleans | AR | | | 8 | 1 | 1 | 1 | 0 | 0 | 0 |
| New Orleans | AR | | | 30 | 7 | 3 | 2 | 1 | 0 | 0 |
| New Orleans | AR | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Orleans | AR | | | 25 | 20 | 1 | 1 | 0 | 0 | 0 |
| New Orleans | AR | | | 58 | 13 | 1 | 1 | 0 | 0 | 0 |
| New Orleans | AR | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Orleans | AR | | | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Orleans | AR | | | 196 | 85 | 4 | 4 | 0 | 0 | 0 |
| New Orleans | AR | | | 128 | 47 | 3 | 0 | 3 | 0 | 0 |
| New Orleans | AR | | | 75 | 52 | 3 | 3 | 0 | 0 | 0 |
| New Orleans | AR | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Orleans | AR | | | 6 | 2 | 1 | 1 | 0 | 0 | 0 |
| New Orleans | AR | | | 94 | 31 | 2 | 2 | 0 | 0 | 0 |
| New Orleans | AR | | | 28 | 13 | 1 | 1 | 0 | 0 | 0 |
| New Orleans | AR | | | 72 | 23 | 1 | 1 | 0 | 0 | 0 |
| New Orleans | AR | | | 86 | 11 | 1 | 1 | 0 | 0 | 0 |
| New Orleans | AR | | | 1 | 1 | 1 | 1 | 0 | 0 | 0 |
| New Orleans | AR | | | 339 | 134 | 7 | 6 | 1 | 0 | 0 |
| Phoenix | AZ | | | 912 | 220 | 11 | 8 | 3 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Phoenix | AZ | | | 5176 | 1120 | 56 | 29 | 27 | 0 | 0 |
| Phoenix | AZ | | | 171 | 32 | 5 | 0 | 5 | 0 | 0 |
| Phoenix | AZ | | | 916 | 280 | 14 | 8 | 6 | 0 | 0 |
| Phoenix | AZ | | | 989 | 320 | 16 | 14 | 2 | 0 | 0 |
| Phoenix | AZ | | | 673 | 60 | 3 | 1 | 2 | 0 | 0 |
| Phoenix | AZ | | | 50 | 13 | 1 | 1 | 0 | 0 | 0 |
| Phoenix | AZ | | | 689 | 162 | 9 | 9 | 0 | 0 | 0 |
| Phoenix | AZ | | | 35 | 4 | 1 | 1 | 0 | 0 | 0 |
| Phoenix | AZ | | | 171 | 32 | 5 | 0 | 5 | 0 | 0 |
| Phoenix | AZ | | | 2042 | 625 | 32 | 26 | 6 | 0 | 0 |
| Phoenix | AZ | | | 1234 | 347 | 18 | 9 | 9 | 0 | 0 |
| Phoenix | AZ | | | 1 | 1 | 1 | 0 | 1 | 0 | 0 |
| Phoenix | AZ | | | 12 | 2 | 1 | 0 | 1 | 0 | 0 |
| Phoenix | AZ | | | 5 | 1 | 1 | 1 | 0 | 0 | 0 |
| Phoenix | AZ | | | 1 | 1 | 1 | 1 | 0 | 0 | 0 |
| Phoenix | AZ | | | 89 | 19 | 1 | 1 | 0 | 0 | 0 |
| Phoenix | AZ | | | 2066 | 754 | 42 | 30 | 12 | 0 | 0 |
| Phoenix | AZ | | | 19 | 8 | 1 | 0 | 1 | 0 | 0 |
| Phoenix | AZ | | | 46 | 18 | 1 | 1 | 0 | 0 | 0 |
| Phoenix | AZ | | | 613 | 257 | 9 | 5 | 4 | 0 | 0 |
| Phoenix | AZ | | | 16 | 3 | 2 | 2 | 0 | 0 | 0 |
| Phoenix | AZ | | | 96 | 46 | 3 | 2 | 1 | 0 | 0 |
| Phoenix | AZ | | | 1105 | 567 | 29 | 19 | 10 | 0 | 0 |
| Phoenix | AZ | | | 167 | 8 | 2 | 0 | 2 | 0 | 0 |
| Phoenix | AZ | | | 520 | 138 | 8 | 5 | 3 | 0 | 0 |
| Phoenix | AZ | | | 29 | 16 | 1 | 0 | 1 | 0 | 0 |
| Phoenix | AZ | | | 126 | 5 | 2 | 1 | 1 | 0 | 0 |
| Phoenix | AZ | | | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Phoenix | AZ | | | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Phoenix | AZ | | | 1168 | 336 | 19 | 16 | 3 | 0 | 0 |
| Phoenix | AZ | | | 571 | 101 | 7 | 5 | 2 | 0 | 0 |
| Phoenix | AZ | | | 69 | 3 | 1 | 1 | 0 | 0 | 0 |
| Phoenix | AZ | | | 179 | 6 | 1 | 1 | 0 | 0 | 0 |
| Phoenix | AZ | | | 26 | 17 | 1 | 1 | 0 | 0 | 0 |
| Phoenix | AZ | | | 15 | 8 | 1 | 1 | 0 | 0 | 0 |
| Phoenix | AZ | | | 11 | 9 | 1 | 0 | 1 | 0 | 0 |
| Phoenix | AZ | | | 412 | 88 | 5 | 2 | 2 | 1 | 1 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Phoenix | AZ | | | 16 | 2 | 1 | 1 | 0 | 0 | 0 |
| Phoenix | AZ | | | 6 | 1 | 1 | 1 | 0 | 0 | 0 |
| Phoenix | AZ | | | 9 | 1 | 1 | 1 | 0 | 0 | 0 |
| Phoenix | AZ | | | 949 | 462 | 24 | 18 | 6 | 0 | 0 |
| Phoenix | AZ | | | 968 | 495 | 25 | 16 | 9 | 0 | 0 |
| Phoenix | AZ | | | 15 | 1 | 1 | 1 | 0 | 0 | 0 |
| Phoenix | AZ | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Phoenix | AZ | | | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Phoenix | AZ | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Phoenix | AZ | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Phoenix | AZ | | | 477 | 40 | 4 | 2 | 2 | 0 | 0 |
| Phoenix | AZ | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Phoenix | AZ | | | 80 | 48 | 4 | 4 | 0 | 0 | 0 |
| Phoenix | AZ | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Phoenix | AZ | | | 9 | 0 | 0 | 0 | 0 | 0 | 0 |
| Phoenix | AZ | | | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Phoenix | AZ | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Phoenix | AZ | | | 1200 | 175 | 10 | 2 | 8 | 0 | 0 |
| Phoenix | AZ | | | 7 | 2 | 2 | 2 | 0 | 0 | 0 |
| Phoenix | AZ | | | 26 | 4 | 2 | 1 | 1 | 0 | 0 |
| Phoenix | AZ | | | 1544 | 221 | 77 | 40 | 37 | 0 | 0 |
| San Francisco | NV | F | | 5456 | 2182 | 246 | 170 | 76 | 0 | 0 |
| Seattle | ID | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Seattle | ID | | | 38 | 22 | 22 | 22 | 0 | 0 | 0 |
| Seattle | ID | | | 84 | 18 | 18 | 16 | 2 | 0 | 0 |
| Seattle | ID | | | 1043 | 463 | 32 | 20 | 12 | 0 | 0 |
| Seattle | ID | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Seattle | ID | | | 9 | 3 | 3 | 3 | 0 | 0 | 0 |
| Seattle | ID | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Seattle | ID | | | 41 | 1 | 1 | 1 | 0 | 0 | 0 |
| Seattle | HI | | | 4 | 4 | 1 | 0 | 1 | 0 | 0 |
| Seattle | HI | | | 24 | 24 | 2 | 1 | 1 | 0 | 0 |
| Seattle | HI | | | 26 | 26 | 2 | 2 | 0 | 0 | 0 |
| Seattle | HI | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Seattle | HI | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Seattle | AK | | | 58 | 0 | 0 | 0 | 0 | 0 | 0 |

ATF000310

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Seattle | AK | | 2 | 2 | 2 | 2 | 0 | 0 | 0 |
| Seattle | AK | | 1160 | 153 | 8 | 7 | 1 | 0 | 0 |
| St. Paul | ND | | 591 | 134 | 7 | 6 | 1 | 0 | 0 |
| St. Paul | ND | | 1216 | 548 | 28 | 21 | 7 | 0 | 0 |
| St. Paul | SD | | 78 | 7 | 1 | 1 | 0 | 0 | 0 |
| NA | NA | NA | 252553 | 87397 | 5249 | 4010 | 1238 | 2 | 4 |

*if there are less than twenty 4473s meeting the criteria, recheck one random selection meeting the criteria.*

****Only include results from the systematic sampling of transactions.  Results from background checks initiated based on

ATF000311

| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **NICS Alternate Permit Sampling Results** | | | | | | | | | | | | | | | | | | |
| **\*\*Complete an individual line entry for each transfer of a firearm(s) to a prohibited person\*\* \*\*If multiple prohibitions are identified note the earliest confirmed prohibition information in columns J & K and list the additional prohibitions in the Remarks column\*\*** | | | | | | | | | | | | | | | | | | |
| Division | State | FCI # | Name of transferee | Date of firearm(s) transfer | Number of firearms transferred | Date permit issued *(if any)* | Permit expiration date *(if any)* | Permit number and type *(if any)* | Prohibition | Date of prohibition | Was transferee prohibited prior to permit issuance? | Was transferee prohibited prior to firearm(s) transfer? | Did transferee become prohibited after firearm(s) transfer? | Was a SUS submitted? | Was a SUS accepted? | Was a referral sent to permit issuing authority? | Has issuing authority revoked permit in their system? | Has permit been physically retrieved? | Remarks |
| Atlanta | GA | ▉▉ | | | 1 | | ▉▉▉ | ▉▉▉ | 18 U.S.C. 922(g)(3) | | No | Yes | No | Yes | | Yes | | | Revocation of Permit Unknown |
| Denver | MT | ▉▉ ▉▉ | ▉▉ | 1 | ▉▉ | ▉▉ | ▉▉ | 18 U.S.C. 922(g)(1) | ▉▉ | Yes | Yes | No | Yes | Yes | Yes | Yes | Yes | ▉▉▉▉▉▉▉▉▉ |
| Kansas City | NE | ▉▉▉ | ▉▉ | 1 | ▉▉ | ▉▉ | ▉▉ | 18 U.S.C. 922(n) | ▉▉ | Yes | Yes | Yes | Yes | Yes | No | No | No | ▉▉▉▉▉ |
| Phoenix | AZ | | | | 2 | | ▉▉ | State Prohibition | | No | Yes | No | No | No | No | No | No | NO SAR SUBMITTED CGC CURRENT |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |

ATF000312

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

DONALD J. ROBERTS, II, and )
GUN OWNERS OF AMERICA, INC., )
)
    Plaintiffs, )
)
    v. )    Civil Action No. 1:20-CV-10639
)
U.S. DEPARTMENT OF JUSTICE, et al., )
)
    Defendants. )
)

## DECLARATION OF ANDREW R. GRAHAM

1. This declaration is based on my personal knowledge as well as knowledge made available to me in the course of my official duties. I am providing this declaration to ensure that the administrative record in the above-captioned case reflects information and communications that are not captured in available documents. I am over 21 years of age and I am competent to give this declaration as part of this record.

2. From October 2014 through May 2020, including during the agency actions at issue in this case, I was the Deputy Assistant Director for Industry Operations in the Field Operations Directorate for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). As of June 2020, I transitioned to a new role as Deputy Assistant Director, Enforcement Programs and Services Directorate within ATF.

3. ATF's Field Operations Directorate is responsible for enforcing Federal criminal laws and regulating the firearms and explosives industries to reduce criminal activity involving violent crimes associated with firearms and explosives and acts of arson. The Industry Operations Group within Field Operations is responsible for licensing persons engaging in a firearm or explosive business, conducting inspections to ensure that licensees are in compliance with all applicable law and regulations, educating and monitoring the industry in regards to regulatory compliance, and preventing and detecting the diversion of firearms and explosives.

4. Each of ATF's twenty-five Field Divisions has a Director, Industry Operations (DIO) to supervise the regulatory duties described above in their area of responsibility.

5. The Gun Control Act, 18 U.S.C. § 922(t), generally requires Federal Firearms Licensees (FFLs) to initiate a background check through the National Instant Criminal Background Check System (NICS) before transferring a firearm to an unlicensed person.

6. However, under subsection 922(t)(3), the statute allows an exception to the NICS check requirement for holders of qualifying State-issued permits to possess, carry or acquire firearms. To qualify, the State must have issued permits in the past five years and the law of the issuing State must provide that such a permit may only be issued after an authorized State or local government official has verified that the information available, including a NICS check, does not indicate that possession of a firearm by the applicant would be in violation of Federal, State or local law.

7. A NICS audit of Michigan's Concealed Pistol License ("CPL") Program began in June 2019. The preliminary audit findings confirmed that MSP was no longer determining whether CPL applicants were prohibited under federal law from possessing firearms, particularly as to the prohibitions in 18 U.S.C. § 922(g)(9) and (g)(3), and that CPLs were being issued to applicants who were likely prohibited due to a conviction for a misdemeanor crime of domestic violence, and that CPLs were being issued to federally-prohibited habitual marijuana users. The final audit findings were released to the Michigan State Police in January 2020.

8. In November 2019, the results of a Detroit Field Division sampling (i.e., performing NICS re-checks on transferees who presented a CPL) of 231 transfers uncovered three active CPL holders who were federally prohibited.

9. Earlier in FY 2019 the FBI had identified through its own audit a shortfall in the State of Alabama's background check/vetting process of issuing CCW/CPL. To gauge if other alternate permit states were issuing permits to those potentially prohibited from possessing firearms, in violation of section 922(t)(3), on January 16, 2020, ATF issued a Memorandum to All Directors, Industry Operations announcing a NICS Alternative Sampling Initiative. Because it is important for ATF to be able to evaluate the potential for misuse of alternate permits, I directed that during inspections of FFLs, IOIs would conduct a NICS re-check of a sampling of transactions.

10. The sampling had several limitations: it was only to be conducted in states that had recognized alternate permits; it would be conducted from January 21, 2020 through April 24, 2020; it would only take place during inspections already scheduled to occur; it would only encompass five percent of transactions during the inspection period where an alternate permit was used to acquire firearms; and no purchaser or transaction information was to be entered into the Agency's case management system if the purchaser was not prohibited.

11. On an April 2, 2020 conference call with the DIOs for ATF's twenty-five Field Divisions, I announced that the NICS Sampling Initiative would be concluded as of April 3rd due to the Covid-19 pandemic. I asked the DIOs to compile the results (number of NICS rechecks, sample size and number of prohibited persons disclosed) and forward

ATF000314

them to ATF's Field Management Staff. No Personally Identifiable Information (PII), including for any person who purchased or attempted to purchase a firearm, is being retained by ATF.

12. During April and May 2020, ATF's Field Management Staff received the results of a sampling of transactions carried out in 24 states by 14 Field Divisions.

13. As of this date, no final report analyzing the sampling results has been issued.

14. Once the final report is issued, the retention of the sampling worksheets, other than the chart showing the prohibited purchaser count, will be discussed with ATF leadership, but as noted above, this chart does not contain personally identifiable information for any person who purchased or attempted to purchase a firearm and was not prohibited.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _4th_ day of July, 2020.

Andrew R. Graham

ATF000315

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GUN OWNERS OF AMERICA,
INC.; DONALD J. ROBERTS, II,

                    Plaintiffs

v

UNITED STATES DEPARTMENT
OF JUSTICE; BUREAU OF
ALCOHOL, TOBACCO, FIREARMS
AND EXPLOSIVES; REGINA
LOMBARDO,

                    Defendants.

_____/

Case No. 1:20-cv-10639

Honorable Thomas L.
Ludington
United States District Judge

**STATE OF MICHIGAN'S AMICUS CURIAE BRIEF**

Fadwa A. Hammoud (P74185)
Michigan Solicitor General
Counsel of Record

Jessica A. McGivney (P64533)
Assistant Attorney General
Attorneys for Amicus Curiae
Michigan Dep't of Attorney
General
State Operations Division
P.O. Box 30736
Lansing, MI 48909
(517) 335-7573

Dated: September 30, 2022

# TABLE OF CONTENTS

Page

Index of Authorities...................................................................ii

Statement of Jurisdiction......................................................... iii

Statement of Question Presented ............................................iv

Statutes Involved ..................................................................... v

Statement of *Amicus Curiae* ...................................................xiii

Introduction........................................................................... 1

Argument................................................................................ 4

I.   The Michigan Firearms Act only requires the Michigan State
     Police to conduct its verification using information that is
     contained in the Michigan law enforcement information
     network and in the national instant criminal background
     check system........................................................................ 4

Conclusion and Relief Requested ................................................. 9

i

ATF000317

# INDEX OF AUTHORITIES

Page

**Cases**

*Detroit Public Schools v. Conn,*
  863 N.W.2d 234 (Mich. Ct. App. 2014) ....................................................5

*South Dearborn Environmental Improvement Ass'n, Inc v. Dep't of Environmental Quality,*
  917 N.W.2d 603 (Mich. 2018)..................................................................5

*Tomecek v. Bavas,*
  759 N.W.2d 178 (Mich. 2008)..................................................................4

**Statutes**

Mich. Comp. Laws § 28.425b...................................................................3, 5

Mich. Comp. Laws § 28.426(2) ..............................................................2, 4

ATF000318

## STATEMENT OF JURISDICTION

In an opinion and order dated May 27, 2022, this court

ordered that:

> The parties are DIRECTED to meet and confer regarding a letter addressed to the Michigan Attorney General (AG). The letter must invite the AG to file briefing stating her position on the MSP's duties under the Brady alternate exception. The letter must also state that if the AG does not respond, Defendants will subpoena her for the production of relevant documents. . . . If approved, this Court will direct Defendants to serve a copy of the letter on the AG by first-class mail.

ATF000319

## STATEMENT OF QUESTION PRESENTED

1.  The Michigan Firearms Act provides that the Michigan Department of State Police (MSP) shall "verify" whether an applicant qualifies for a concealed pistol license relying on information from the Michigan law enforcement information network and the national instant criminal background check system. The federal agencies that oversee federal firearms regulations have determined that the MSP's review does not meet federal guidelines for bypassing federal background checks. Does the Michigan Firearms Act require the MSP to conduct its verification using information that is not contained in the criminal-information databases?

    State of Michigan's answer: No.

ATF000320

## STATUTES INVOLVED

Section 5b of the Michigan Firearms Act, MCL 28.425b provides in pertinent part:

(1) To obtain a license to carry a concealed pistol, an individual shall apply to the county clerk in the county in which the individual resides. The applicant shall file the application with the county clerk in the county in which the applicant resides during the county clerk's normal business hours. The application must be on a form provided by the director of the department of state police and allow the applicant to designate whether the applicant seeks an emergency license. The applicant shall sign the application under oath.

\* \* \*

(6) The department of state police shall verify the requirements of subsection (7)(d), (e), (f), (h), (i), (j), (k), and (m) through the law enforcement information network and the national instant criminal background check system and shall report to the county clerk all statutory disqualifications, if any, under this act that apply to an applicant.

(7) The county clerk shall issue and shall send by first-class mail a license to an applicant to carry a concealed pistol within the period required under this act if the county clerk determines that all of the following circumstances exist:

\*\*\*

(d) Based solely on the report received from the department of state police under subsection (6), the applicant is not the subject of an order or disposition under any of the following:

(i) Section 464a of the mental health code, 1974 PA 258, MCL 330.1464a.

v

ATF000321

(ii) Section 5107 of the estates and protected individuals code, 1998 PA 386, MCL 700.5107.

(iii) Sections 2950 and 2950a of the revised judicature act of 1961, 1961 PA 236, MCL 600.2950 and 600.2950a.

(iv) Section 6b of chapter V of the code of criminal procedure, 1927 PA 175, MCL 765.6b, if the order has a condition imposed under section 6b(3) of chapter V of the code of criminal procedure, 1927 PA 175, MCL 765.6b.

(v) Section 16b of chapter IX of the code of criminal procedure, 1927 PA 175, MCL 769.16b.

(e) Based solely on the report received from the department of state police under subsection (6), the applicant is not prohibited from possessing, using, transporting, selling, purchasing, carrying, shipping, receiving, or distributing a firearm under section 224f of the Michigan penal code, 1931 PA 328, MCL 750.224f.

(f) Based solely on the report received from the department of state police under subsection (6), the applicant has never been convicted of a felony in this state or elsewhere, and a felony charge against the applicant is not pending in this state or elsewhere at the time he or she applies for a license described in this section.

* * *

(h) Based solely on the report received from the department of state police under subsection (6), the applicant has not been convicted of a misdemeanor violation of any of the following in the 8 years immediately preceding the date of application and a charge for a misdemeanor violation of any of the following is not pending against the applicant in this

ATF000322

state or elsewhere at the time he or she applies for a license described in this section:

(i) Section 617a (failing to stop when involved in a personal injury accident), section 625 as punishable under subsection (9)(b) of that section (operating while intoxicated, second offense), section 625m as punishable under subsection (4) of that section (operating a commercial vehicle with alcohol content, second offense), section 626 (reckless driving), or a violation of section 904(1) (operating while license suspended or revoked, second or subsequent offense) of the Michigan vehicle code, 1949 PA 300, MCL 257.617a, 257.625, 257.625m, 257.626, and 257.904.

(ii) Section 185(7) of the aeronautics code of the state of Michigan, 1945 PA 327, MCL 259.185 (operating aircraft while under the influence of intoxicating liquor or a controlled substance with prior conviction).

(iii) Section 29 of the weights and measures act, 1964 PA 283, MCL 290.629 (hindering or obstructing certain persons performing official weights and measures duties).
(iv) Section 10 of the motor fuels quality act, 1984 PA 44, MCL 290.650 (hindering, obstructing, assaulting, or committing bodily injury upon director or authorized representative).

(v) Section 80176 as punishable under section 80177(1)(b) (operating vessel under the influence of intoxicating liquor or a controlled substance, second offense), section 81134 as punishable under subsection (8)(b) of that section (operating ORV under the influence of intoxicating liquor or a controlled substance, second or subsequent offense), or section 82127 as punishable under section 82128(1)(b) (operating snowmobile under the influence of

ATF000323

intoxicating liquor or a controlled substance, second offense) of the natural resources and environmental protection act, 1994 PA 451, MCL 324.80176, 324.80177, 324.81134, 324.82127, and 324.82128.

(vi) Section 7403 of the public health code, 1978 PA 368, MCL 333.7403 (possession of controlled substance, controlled substance analogue, or prescription form).

(vii) Section 353 of the railroad code of 1993, 1993 PA 354, MCL 462.353, punishable under subsection (4) of that section (operating locomotive under the influence of intoxicating liquor or a controlled substance, or while visibly impaired, second offense).

(viii) Section 7 of 1978 PA 33, MCL 722.677 (displaying sexually explicit matter to minors).

(ix) Section 81 (assault or domestic assault), section 81a(1) or (2) (aggravated assault or aggravated domestic assault), section 115 (breaking and entering or entering without breaking), section 136b(7) (fourth degree child abuse), section 145n (vulnerable adult abuse), section 157b(3)(b) (solicitation to commit a felony), section 215 (impersonating peace officer or medical examiner), section 223 (illegal sale of a firearm or ammunition), section 224d (illegal use or sale of a self-defense spray), section 226a (sale or possession of a switchblade), section 227c (improper transportation of a loaded firearm), section 229 (accepting a pistol in pawn), section 232a (improperly obtaining a pistol, making a false statement on an application to purchase a pistol, or using false identification to purchase a pistol), section 233 (intentionally aiming a firearm without malice), section 234 (intentionally discharging a firearm aimed without malice), section 234d (possessing a firearm on prohibited premises), section 234e (brandishing a firearm in public), section 234f

viii

ATF000324

(possession of a firearm by an individual less than 18 years of age), section 235 (intentionally discharging a firearm aimed without malice causing injury), section 235a (parent of a minor who possessed a firearm in a weapon free school zone), section 236 (setting a spring gun or other device), section 237 (possessing a firearm while under the influence of intoxicating liquor or a controlled substance), section 237a (weapon free school zone violation), section 335a (indecent exposure), section 411h (stalking), or section 520e (fourth degree criminal sexual conduct) of the Michigan penal code, 1931 PA 328, MCL 750.81, 750.81a, 750.115, 750.136b, 750.145n, 750.157b, 750.215, 750.223, 750.224d, 750.226a, 750.227c, 750.229, 750.232a, 750.233, 750.234, 750.234d, 750.234e, 750.234f, 750.235, 750.235a, 750.236, 750.237, 750.237a, 750.335a, 750.411h, and 750.520e.

(x) Former section 228 of the Michigan penal code, 1931 PA 328.5

(xi) Section 1 (reckless, careless, or negligent use of a firearm resulting in injury or death), section 2 (careless, reckless, or negligent use of a firearm resulting in property damage), or section 3a (reckless discharge of a firearm) of 1952 PA 45, MCL 752.861, 752.862, and 752.863a.

(xii) A violation of a law of the United States, another state, or a local unit of government of this state or another state substantially corresponding to a violation described in subparagraphs (i) to (xi).

(i) Based solely on the report received from the department of state police under subsection (6), the applicant has not been convicted of a misdemeanor violation of any of the following in the 3 years immediately preceding the date of application unless the misdemeanor violation is listed under

ix

ATF000325

subdivision (h) and a charge for a misdemeanor violation of any of the following is not pending against the applicant in this state or elsewhere at the time he or she applies for a license described in this section:

(i) Section 625 (operating under the influence), section 625a (refusal of commercial vehicle operator to submit to a chemical test), section 625k (ignition interlock device reporting violation), section 625l (circumventing an ignition interlock device), or section 625m punishable under subsection (3) of that section (operating a commercial vehicle with alcohol content) of the Michigan vehicle code, 1949 PA 300, MCL 257.625, 257.625a, 257.625k, 257.625l, and 257.625m.

(ii) Section 185 of the aeronautics code of the state of Michigan, 1945 PA 327, MCL 259.185 (operating aircraft under the influence).
(iii) Section 81134 (operating ORV under the influence or operating ORV while visibly impaired), or section 82127 (operating a snowmobile under the influence) of the natural resources and environmental protection act, 1994 PA 451, MCL 324.81134 and 324.82127.

(iv) Part 74 of the public health code, 1978 PA 368, MCL 333.7401 to 333.7461 (controlled substance violation).
(v) Section 353 of the railroad code of 1993, 1993 PA 354, MCL 462.353, punishable under subsection (3) of that section (operating locomotive under the influence).

(vi) Section 167 (disorderly person), section 174 (embezzlement), section 218 (false pretenses with intent to defraud), section 356 (larceny), section 356d (second degree retail fraud), section 359 (larceny from a vacant building or structure), section 362 (larceny by conversion), section 362a (larceny--defrauding lessor), section 377a (malicious destruction of property),

x

ATF000326

section 380 (malicious destruction of real property), section 535 (receiving or concealing stolen property), or section 540e (malicious use of telecommunications service or device) of the Michigan penal code, 1931 PA 328, MCL 750.167, 750.174, 750.218, 750.356, 750.356d, 750.359, 750.362, 750.362a, 750.377a, 750.380, 750.535, and 750.540e.

(vii) A violation of a law of the United States, another state, or a local unit of government of this state or another state substantially corresponding to a violation described in subparagraphs (i) to (vi).

(j) Based solely on the report received from the department of state police under subsection (6), the applicant has not been found guilty but mentally ill of any crime and has not offered a plea of not guilty of, or been acquitted of, any crime by reason of insanity.

(k) Based solely on the report received from the department of state police under subsection (6), the applicant is not currently and has never been subject to an order of involuntary commitment in an inpatient or outpatient setting due to mental illness.

\* \* \*

(m) Based solely on the report received from the department of state police under subsection (6), the applicant is not under a court order of legal incapacity in this state or elsewhere.

Section 6 of the Michigan Firearms Act, MCL 28.426, provides in full:

(1) An issuing agency shall not issue a license to an applicant under section 21 unless both of the following apply:

xi

ATF000327

(a) The issuing agency has determined through the federal national instant criminal background check system that the applicant is not prohibited under federal law from possessing or transporting a firearm.

(b) If the applicant is not a United States citizen, the issuing agency has verified through the United States Immigration and Customs Enforcement databases that the applicant is not an illegal alien or a nonimmigrant alien.

(2) A county clerk shall not issue a license to an applicant under section 5b unless both of the following apply:

(a) The department of state police, or the county sheriff under section 5a(4), has determined through the federal national instant criminal background check system that the applicant is not prohibited under federal law from possessing or transporting a firearm.

(b) If the applicant is not a United States citizen, the department of state police has verified through the United States Immigration and Customs Enforcement databases that the applicant is not an illegal alien or a nonimmigrant alien.

ATF000328

# STATEMENT OF *AMICUS CURIAE*

The plaintiffs, Gun Owners of America, Inc., and one of its members, filed the underlying lawsuit in 2020 alleging that the federal agency defendants (Department of Justice or DOJ) unlawfully rescinded recognition of Michigan's concealed pistol licenses (CPL) as constituting an "alternative permit" for purposes of satisfying—and bypassing—certain federal firearms background check requirements.  This Court granted summary judgment in favor of DOJ; however, on appeal, the Sixth Circuit Court of Appeals remanded the case and vacated this Court's opinion, ruling in pertinent part that the parties needed to supplement the administrative record to address "several follow-up questions."

On remand, this Court directed the parties to "meet and confer regarding a letter addressed to the Michigan Attorney General [(AG)]." The Court further directed that the letter "must invite the AG to file briefing stating her position on the [Michigan Department of State Police's] [(MSP's)] duties under the Brady alternate exception" and must also "state that if the AG does not respond, Defendants will subpoena her for the production of relevant documents."

ATF000329

On August 2, 2022, the DOJ sent a letter to AG Dana Nessel inviting her to submit a statement pursuant to the court's order. Separately, the AG has acknowledged receipt of the DOJ's letter and indicated the intent to file a responsive statement by September 30, 2022.  The AG provides the following brief in support of their statement as an *amicus curiae* so as to apprise the Court of the State of Michigan's interpretation with respect to MSP's obligations under Michigan law to verify the eligibility of CPL applicants.

While respecting the Court's jurisdiction to adjudicate the underlying controversy, which involves federal questions, the AG wishes to alert the Court that the instant inquiry potentially implicates information that is protected from disclosure by the attorney-client privilege and the work-product doctrine, respectively.

Subject to those constraints, and while reserving the right to assert, or reassert, these privileges as may be necessary, the AG hereby offers this statement to: (1) provide clarity as to the State of Michigan's interpretation as to the Michigan Firearms Act; and (2) indicate the scope of MSP's obligations when conducting background checks in the verification of eligibility for applicants of CPLs under said statute.

ATF000330

# INTRODUCTION

This controversy arises due to a 2020 determination by federal authorities that Michigan CPLs no longer qualify as an alternative to federally conducted criminal background checks that are otherwise required by the Brady Handgun Violence Prevention Act for certain types of firearms purchases or transfers. Prior to this determination, which was communicated to the State of Michigan on March 3, 2020, Michigan CPLs could be used in certain circumstances to bypass federal background checks that would otherwise be required. The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), which administers the bypass program—in which certain state-issued firearms permits are designated as so-called "alternative permits"— explained that its determination was driven by the results of an audit it conducted relative to MSP's "compliance with the use of [the Law enforcement Information Network (LEIN) and the National Instant Criminal Background Check System (NICS)]" in the execution of its background checks of CPL applications."

In pertinent part, the audit found that the background checks that MSP conducted under the Michigan Firearms Act for CPL applicants,

1

which entail the verification of whether information available through LEIN and NICS indicates the presence of federal disqualifications, lacked the requisite thoroughness for use as an "alternative" to federally conducted criminal background checks. The audit concluded that for Michigan CPLs to again qualify as an "alternative permit," the State of Michigan would need to demonstrate that the background checks involve not only the review of information contained in the criminal information databases, but also any additional research and investigation that might otherwise be required for MSP to independently determine that the applicant "is not prohibited under federal law from possessing or transporting a firearm." Mich. Comp. Laws § 28.426(2).[1]

As is accurately depicted in the Sixth Circuit Court's November 9, 2021 opinion (slip opinion at p. 2), the crux of this controversy is whether the Michigan Firearms Act provision that MSP "verify" the presence of certain federally prescribed disqualifiers "through" certain

---

[1] As noted by the Sixth Circuit Court of Appeals, the additional investigation can be extensive, particularly in reviews involving a misdemeanor crime of domestic violence, which is not uniformly defined across the United States. In such instances, information contained in LEIN and NICS does not necessarily indicate the presence of a disqualification. Additional investigation would be required to verify that the circumstances of the underlying offense do not violate federal law.

ATF000332

criminal-information databases requires MSP to ascertain that the circumstances of the underlying offense(s) do not violate federal law, or whether said provision calls only for MSP to verify that the available information "does not indicate" the applicant is federally disqualified. As explained ahead, when considered in light of the statutory scheme as a whole and the language used by the Legislature, the most natural reading of the Michigan Firearms Act is that the Legislature intended, in pertinent part, for MSP to verify and determine *on the basis of information contained in LEIN and NICS*, respectively, whether the individual is disqualified under the provisions therein enumerated. Accordingly, Michigan law does not contemplate, let alone require, that MSP conduct additional inquiries beyond those sources in making the requisite determinations.

ATF000333

# ARGUMENT

I. **The Michigan Firearms Act only requires the Michigan State Police to conduct its verification using information that is contained in the Michigan law enforcement information network and in the national instant criminal background check system.**

This inquiry is governed by section 5b of the Firearms Act, Mich. Comp. Laws § 28.425b, which prescribes the requirements for obtaining a CPL. Subsection 5b(6) provides, in pertinent part, for MSP to verify whether the applicant meets certain requirements for licensure:

> The department of state police shall verify the requirements of subsection (7)(d), (e), (f), (h), (i), (j), (k) and (m) through the law enforcement information network and the national instant criminal background check system and shall report to the county clerk all statutory disqualifications, if any, under this act that apply to an applicant.[2]

The "requirements of subsection (7)(d), (e), (f), (h), (i), (j), (k), and (m)" encompass, *inter alia*, felony convictions and certain specified misdemeanor convictions. The LEIN and NICS are computerized non-

---

[2] Concomitantly, section 6(2) of the Firearms Act, Mich. Comp. Laws § 28.426(2), provides, in pertinent part: "A county clerk shall not issue a license to an applicant under section 5b unless . . . (a) [t]he department of state police . . . has determined *through the federal national instant criminal background check system* that the applicant is not prohibited under federal law from possessing or transporting a firearm." (Emphasis added.) Here, again, it is the State of Michigan's position that the Firearms Act does not require investigation of potential disqualifying offenses *beyond* that which is contained in the federal national instant criminal background check system.

ATF000334

public databases that contain criminal justice information concerning criminal activity and mental status adjudications.

When interpreting a statute, the primary rule of construction is to discern and give effect to the Legislature's intent, of which the most reliable indicator is the clear and unambiguous language of the statute. *Tomecek v. Bavas*, 759 N.W.2d 178, 185–186 (Mich. 2008). The language must be enforced as written, giving effect to every word, phrase, and clause. *South Dearborn Environmental Improvement Ass'n, Inc v. Dep't of Environmental Quality*, 917 N.W.2d 603, 608 (Mich. 2018). In *Detroit Public Schools v. Conn*, 863 N.W.2d 234, 381 (Mich. Ct. App. 2014), the Michigan Court of Appeals explained:

> [N]othing may be read into a statute that is not within the intent of the Legislature apparent from the language of the statute itself. Courts may not speculate regarding legislative intent beyond the words expressed in a statute. Hence, nothing may be read into a statute that is not within the manifest intent of the Legislature as derived from the act itself. [Quotation marks and citations omitted.]

A review of the plain language of subsection 5b(6) of the Firearms Act reveals the unambiguous requirement that MSP "shall verify" the presence of prescribed debarments through the use of LEIN and NICS and "shall report to the county clerk all statutory disqualifications."

5

Mich. Comp. Laws § 28.425b(6).  Accordingly, § 5b(6) specifies that, in conducting the requisite background check, MSP *must* query the prescribed criminal-information databases and determine, on the basis of that information, whether any of the listed disqualifications apply. The statute's plain language does not, however, reflect the intent that MSP is obligated to verify—by conducting *additional* research and investigation to independently determine the presence of federally disqualifying offenses—that the circumstances underlying reported offenses do not violate federal law.

Thus, for the instant inquiry, the question is whether the Michigan Firearms Act *requires* MSP to perform its verification as to the presence of federal disqualifications beyond that which is contained in LEIN and NICS.  The answer to that question is "no."

Beyond the matter of technical interpretation, it bears remembering that even aside from the fact that the statute does not direct the MSP to conduct external investigations and to make independent determinations, the duty if required to do so is not as straight-forward as it might first appear.  First, as already noted, the information contained in LEIN and NICS is neither complete nor is it

ATF000336

necessarily indicative as to whether an individual is federally disqualified from possessing a firearm.  As this Sixth Circuit Court of Appeals observed, inquiries of this nature create "difficult matching problems."  For instance, as it relates to the "misdemeanor crime of domestic violence," which is a federal firearms debarment, LEIN and NICS do not designate (or label) crimes thusly.  So, while a LEIN or NICS check might indicate a conviction of "assault" (or an offense-code corresponding with the same), a determination as to whether the offending conduct involved the federally prescribed definition of "misdemeanor crime of domestic violence" cannot necessarily be made solely on the basis of information contained in the criminal-information systems.  This is not merely a matter of having to cross-reference local criminal ordinances or codes, but rather it would necessitate ascertaining information underlying the offense (e.g., relationship of the victim to the offender or the degree to which physical force was involved) and exercising independent discretion in determining that the offending conduct meets the criteria for a federal debarment.

In addition, and with these systematic limitations in mind, it cannot be seriously questioned that the type and amount of work

ATF000337

involved would be significant considering that MSP processes over 200,000 CPL applications annually. These considerations shed new light on the question at hand: *where the Michigan Firearms Act provides for MSP to determine "through the federal national instant background check system that the applicant is not prohibited under federal law from possessing or transporting a firearm," does the statute contemplate MSP making those determinations independently with respect to external information?* Here, again, the answer is "no." There is nothing in the plain language of the Michigan Firearms Act that expressly empowers, let alone explicitly requires, MSP to make independent determinations based on external information or to marshal the resources that would be required to do so.

ATF000338

# CONCLUSION AND RELIEF REQUESTED

To comply with this order, the State of Michigan hereby provides this statement to explain the interpretation and application of the state firearms statute at issue.

Respectfully submitted,

Fadwa A. Hammoud (P74185)
Michigan Solicitor General
Counsel of Record


*/s/ Jessica A. McGivney*
Jessica A. McGivney (P64533)
Assistant Attorney General
Attorneys for *Amicus Curiae*
Michigan Dep't of Attorney
General
State Operations Division
P.O. Box 30754
Lansing, MI 48909
517-335-7573

Dated: September 30, 2022

ATF000339

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

GUN OWNERS OF AMERICA, INC.,

*et al.*

Plaintiffs,

v.

U.S. DEPARTMENT OF JUSTICE,

*et al.*,

Defendants.

Case No. 1:20-cv-10639-TLL-PTM

Hon. Thomas L. Ludington

## DECLARATION OF ERIC M. EPSTEIN

I, Eric M. Epstein, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am employed as the Senior Policy Counsel (Firearms and Explosives) for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice (DOJ). I have been in this position for seven years, and have been an ATF attorney for over 28 years. In this position, I review, draft, and interpret the laws and regulations within the authority of ATF, and make policy recommendations to executive staff within ATF and DOJ. This

ATF000340

-2-

declaration is based on my personal knowledge, as well as information conveyed to me by ATF and FBI personnel in the course of my official duties.

2. I am familiar with the Federal firearms laws and regulations, in particular, the Gun Control Act of 1968 (GCA), as amended, and the National Firearms Act of 1934 (NFA), as amended. I am also familiar with ATF's interpretations of the GCA and NFA, their implementing regulations, and ATF's policy positions regarding these laws and regulations.

3. Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General. *See* 28 U.S.C. 599A(b)(1); 28 C.F.R. 0.130(a)(1)–(2).

4. The GCA, as amended by the Brady Handgun Violence Prevention Act of 1993 (Brady Act), generally requires Federal Firearms Licensees (FFLs) to initiate a National Instant Criminal Background Check System (NICS) check before transferring a firearm to an unlicensed person. NICS is administered by the Federal Bureau of Investigation's (FBI) Criminal Justice Information Services Division (CJIS).

5. A NICS check conducted by the FBI requires CJIS to "[s]earch the relevant databases" and provide the appropriate response of proceed, deny, or delay. A delayed response is provided, "if the NICS search finds a record that requires more research to determine whether the prospective transferee is disqualified from possessing a firearm by Federal or state law." *See* 28 C.F.R. 25.6(c)(1).

-3-

6. However, FBI regulations at 28 C.F.R. 25.6 distinguish between a NICS check conducted by the FBI for an FFL prior to transferring a firearm to an unlicensed person, and access to the NICS database for "[p]roviding information to Federal, state, tribal or local criminal justice agencies in connection with the issuance of a firearm-related…permits or license…" 28 C.F.R. 25.6(j). For the latter, the FBI does not make a prohibited person determination, or provide a proceed, deny, or delay response to the agency; rather, it simply provides access to NICS so that the agency can determine whether the individual is eligible to receive the permit or license.

7. The Brady Act at 18 U.S.C. 922(t)(3)(A), and implementing regulations at 27 C.F.R. 478.102(d)(1), provide that a state permit may qualify as an exception or "alternative" to the NICS check if: (a) the permit allows the permit holder to possess or acquire a firearm; (b) the permit "was issued not more than 5 years earlier by the State in which the transfer is to take place;" and (c) "the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official," including the NICS, "does not indicate that possession of a firearm by such person would be in violation of" Federal, State, or local law.

8. In furtherance of its responsibility to administer and enforce the provisions of the Brady Act, upon the request of an authorized State official, ATF will evaluate a state firearm permit/license, the permit/license application, and applicable State law to determine whether the permit/license qualifies as an alternative to the "full" NICS check. ATF will then issue an Open Letter or

-4-

Public Safety Advisory to all FFLs in the State or U.S. Territory advising them whether the permit/license meets the Brady Act requirements, and whether they can accept them without running a NICS check at the point of sale.[1]

9. For a permit to qualify as an alternative under the Brady Act and implementing regulations, a valid permit must be issued by authorized State officials required by "the law of the State" to "verify" that the information made available to them, including NICS, does not indicate that possession of firearms by the applicant would violate Federal, State, or local law.  Thus, to be a true alternative to NICS, State officials must run the same full NICS check on a permit applicant that would have been conducted by FBI personnel—including an Immigration Alien Query (IAQ) —and deny the permit if the applicant cannot lawfully possess firearms.

10. ATF interprets the term "law of the State" in 18 U.S.C. 922(t)(3)(A) and 27 C.F.R. 478.102(d)(1) to include not only statutes, but also the practices and interpretations of State officials authorized to implement State law. According to the Merriam-Webster Dictionary, the term "law" means "a binding custom or practice of a community," "a rule of conduct or action prescribed ... or formally recognized as binding or enforced by a controlling authority," and "the whole body of such customs, practices or rules."[2]

---

[1] *See* 63 Fed. Reg. 58275 (Oct. 29, 1998) ("The proposed regulations also clarified that if a State did not disqualify all individuals prohibited under Federal law, the permits issued by that State would not be accepted as alternatives under the permanent provisions of the Brady law."); Brady Letters to FFLs | Bureau of Alcohol, Tobacco, Firearms and Explosives (atf.gov).

[2] https://www.merriam-webster.com/dictionary/law (last accessed Dec. 20, 2021).

-5-

11. ATF interprets the term "verified" in 18 U.S.C. 922(t)(3)(A)(ii) and 27 C.F.R. 478.102(d)(1)(iii) to mean more than merely accessing NICS. According to the Merriam-Webster Dictionary, the meaning of "verify" is "to establish the truth, accuracy, or reality of."[3] 18 U.S.C. 922(t)(3)(A) and 27 C.F.R. 478.102(d)(1)(iii) thus oblige State officials to establish that a license applicant is not, in reality, prohibited by reviewing available information to make that factual determination, including the information made available to them through NICS.

12. The information made available to an authorized State official through a NICS query includes the National Crime Information Center (NCIC), which contains information on wanted persons, protection orders, and other persons identified as relevant to the NICS searches; the Interstate Identification Index (III), which accesses criminal history records; and the NICS Indices, which contain information on prohibited persons as defined in the Gun Control Act of 1968, as amended. The NICS Indices include individuals who have been determined to be federally or state prohibited from possessing or receiving a firearm when disqualifying information may not be available through the NCIC or III databases.

13. However, ATF does not interpret the term "verified" to require a State to provide limitless resources to render such a determination. Instead, where a State has information available to it, including conviction records and police

---

[3] https://www.merriam-webster.com/dictionary/verify?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last accessed Dec. 20, 2021).

reports, an authorized State official must review that information to make a
determination whether the permit applicant is prohibited from possessing
firearms under Federal, State, or local law.

14. Furthermore, ATF interprets the term "verified" to require authorized State
officials to apply, *but not to interpret*, Federal law when determining whether
the applicant is prohibited from possessing firearms, even in the absence of a
State law equivalent.[4]  To assist State officials in applying Federal law, CJIS
routinely provides guidance and training to State officials concerning Federal
firearms prohibitions, which are known as Federal firearms "disabilities" or
"prohibitors."  Additionally, ATF field attorneys (Division Counsel) are
available by phone and email to interpret Federal law for State licensing
officials to help them make particular Federal prohibited person
determinations when a question may arise in a given case.

15. With respect to the issuance of concealed carry licenses in the State of
Michigan, the availability of the ATF Acting Division Counsel (Detroit Field
Division) for assistance was communicated to State officials, including a
representative of the Michigan Attorney General's Office, during a conference
call on June 27, 2017.  During that same call, CJIS also offered to conduct
Federal prohibitor training for Michigan licensing officials.

16. To determine whether a State permit continues to qualify as an alternative to a
NICS check, ATF relies on periodic audits conducted by CJIS.  These audits

---

[4] *See* 63 Fed. Reg. 8381 (Feb. 19, 1998) ("If a State does not disqualify all individuals prohibited under Federal law, the permits issued by that State would not be accepted as alternatives under the permanent provisions of the Brady law.")

-7-

evaluate, among other things, whether State officials are accessing the NICS

in accordance with law and making accurate decisions with respect to Federal,

State, and local firearms possession prohibitions. If a CJIS audit reveals that

State officials are interpreting State law as not requiring denial of persons who

are subject to Federal firearms disabilities, then ATF cannot continue to

recognize the permit as a valid alternative under the Brady Act. Otherwise,

federally prohibited persons would be able to acquire firearms from FFLs who

would otherwise have been denied if a full NICS check had been conducted.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __21st__ day of January, 2022.

**ERIC EPSTEIN** Digitally signed by ERIC EPSTEIN
Date: 2022.01.21 15:36:37 -05'00'
_____
Eric M. Epstein
Senior Policy Counsel (Firearms and Explosives)
Bureau of Alcohol, Tobacco, Firearms and Explosives
United States Department of Justice

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DONALD J. ROBERTS, II,
GUN OWNERS OF AMERICA, INC.,

Plaintiffs,

v.

U.S. DEPARTMENT OF JUSTICE,
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES,
REGINA LOMBARDO.

Defendants.

_____/

Case No. 20-CV-10639

Honorable Thomas L. Ludington

## AFFIDAVIT OF CELESTE M. COCHRAN

I, Celeste M. Cochran, hereby declare as follows:

1. I am a custodian of records for the Federal Bureau of Investigation (FBI), Criminal Justice
Information Services Division's National Instant Criminal Background Check System (NICS)
Section in Clarksburg, West Virginia. I have held this position for seven years. In this position, I
provide support to the NICS Section by researching, analyzing, evaluating, and interpreting matters
concerning the applicability of Federal, state, tribal and/or local statutes, laws, and/or regulations
to ensure adherence to the Brady Handgun Violence Prevention Act of 1993 (Brady Act) and other
limited, authorized uses of the NICS. This declaration is based on my personal knowledge, as well
as information conveyed to me in the course of my official duties.

1

2.  The Brady Act, Public Law No. 103-159, 107 Stat. 1536, was enacted on November 30, 1993, and is codified in part at 18 U.S.C. § 922(t) and 34 U.S.C. § 40901.  The Brady Act charges the Attorney General with establishing a system, the NICS, that federal firearms licensees (FFLs) are required to contact for a background check (NICS check) before transferring a firearm to a non-licensee to determine whether a prospective firearm transfer would violate 18 U.S.C. § 922(d), (g) or (n), as applicable, state, tribal or local (hereinafter, "Federal or state") law.[1]  The authority and power vested in the Attorney General to perform this function has been delegated to the FBI pursuant to 28 C.F.R. §§ 0.85 and 25.3.  28 C.F.R. §§ 25.1 through 25.11 set forth guidelines pertaining to the establishment, maintenance, and use of NICS.

3.  Subject to the 2022 statutory amendments noted in footnote 1, when an FFL contacts NICS to initiate a NICS background check  to determine if an individual is prohibited, the system searches three electronic databases. These databases contain Federal and state records which may indicate that the individual is prohibited from receipt or possession of firearms.  These three databases are: (1) the National Crime Information Center Index (NCIC), which contains (among other categories) warrants and other records of wanted persons, subjects of protection orders, and other persons who pose a threat to officer and public safety; (2) the Interstate

---

[1] In 2022, relevant to NICS, Congress passed the Bipartisan Safer Communities Act (BSCA) of 2022 (Pub. L. 117-159) and the Consolidated Appropriations Act (CAA) of 2022 (Pub. L. 117-103). The BSCA imposes enhanced background checks for persons under 21 years of age when a federal firearms licensee contacts NICS for the transfer of a firearm. 18 U.S.C. § 922(t); 34 U.S.C. § 40901(l). These expanded checks include several state and local contacts to determine if the person has a possibly disqualifying juvenile criminal or mental health record under 18 U.S.C. 922(d). *Id.* Such transactions can be delayed up to ten business days if cause is established that such a possibly disqualifying juvenile record exists. *Id.* The BSCA also amended 18 U.S.C. § 922(t) to include disqualification for juvenile prohibitions under 18 U.S.C. § 922(d).
The CAA also expanded traditional federal and state prohibitions in 18 U.S.C. § 922(t) to include categories of tribal and local prohibitions.

ATF000348

Identification Index (III), which provides access to criminal history records; and (3) the NICS Indices, which contain information on prohibited persons as defined in Federal or state law. Records contributed to these national databases are modified, cancelled, and added daily.

4. As a general matter, a NICS check will result in a response from the NICS to the FFL outlining three possible courses of action: (1) proceed with the transfer of the firearm; (2) deny the transfer of the firearm; or (3) delay the transfer of the firearm. *See* 28 C.F.R. § 25.6(c).

5. Before a record is entered into the NICS Indices, the submitting agency has verified that the individual is prohibited under Federal or state law from possessing a firearm. By contrast, records returned from NCIC and III do not always indicate definitively whether an individual is prohibited. Historically, 10 percent of all NICS checks have been delayed for NICS to conduct research based on information returned on an NCIC or III record. Most often, this delay occurs because a III record reveals that an arrest is potentially prohibiting but lacks information regarding a final disposition of that arrest and NICS needs to determine if a disqualifying conviction occurred.

6. Additionally, criminal history in the III database does not always contain sufficient information regarding the underlying incident to make a determination. For example, in the case of a "misdemeanor crime of domestic violence," as defined in 18 U.S.C. § 922(g)(9) and 18 U.S.C. § 921(a)(33), the relationship between the offender and the victim is not typically included within the NCIC or the III databases, but is instead generally found within police reports or court documentation. Additionally, NICS must review the specific state statute to determine if

ATF000349

it contains "an element the use or attempted use of force, or the threatened use of a deadly weapon." *See* 18 U.S.C. § 921(a)(33)(A)(ii).

7. Warrants entered into NCIC are another example of a record often needing further research. NICS personnel must determine if the subject of the warrant fled the state to avoid prosecution or testimony in a criminal proceeding. *See* 18 U.S.C. § 922(g)(2) (establishing a "fugitive from justice" as a prohibited person);18 U.S.C. § 921(a)(15) (defining "fugitive from justice").

8. As another example that may require further research, FFLs must provide information regarding the citizenship of a potential transferee, as reflected on the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Form 4473 (the "Firearm Transaction Record" which an FFL and prospective transferee must complete). When an FFL informs NICS that a prospective transferee is a not a U.S. citizen, NICS automatically submits an electronic request for a search of records held by the U.S. Immigration and Customs Enforcement (ICE)—referred to as a Immigration Alien Query (IAQ)—to determine if the individual is an alien "illegally or unlawfully in the United States" or is a nonimmigrant prohibited from shipping, transporting, possessing, or receiving firearms pursuant to 18 U.S.C. § 922(g)(5). The search of ICE records is conducted pursuant to the Attorney General's authority "to secure directly" from any federal agency "such information on persons for whom receipt of a firearm" would violate Federal law. *See* 34 U.S.C. § 40901(e)(1)(A).

9. For U.S. citizens, and except as required by the 2022 statutory amendments noted above, if the potential transferee's name does not match any record searched by NICS, then NICS generates

ATF000350

an automatic electronic response of "proceed." NICS will then provide the FFL with a unique electronically generated NICS transaction number (NTN) and provide the response of "proceed." *See* 18 U.S.C. § 922(t)(2). Such a NICS-generated response indicating that no records have been found is also referred to as an "immediate" proceed.

10. Upon confirmation that a record demonstrates an individual is prohibited from receiving a firearm under Federal or state law, NICS instructs the FFL to deny the transfer of the firearm. *See* 28 C.F.R. 25.6(c).

11. If a potential transferee's name is electronically matched with a record contained in any of the three databases or the prospective transferee has claimed non-U.S. citizenship and NICS cannot provide a definitive response of either proceed or deny, the transaction will be delayed for further research. At that time, NICS will provide the FFL with the NTN, a "delay" status for the transaction, and the date that the FFL may legally transfer the firearm if NICS does not provide a follow-up "denied" status. Except as required by the 2022 statutory amendments noted above, if NICS is unable to determine whether a delayed transaction should proceed or be denied within three business days of the initiation of the NICS check, then the FFL is not federally prohibited from transferring the firearm. *See* 18 U.S.C. § 922(t)(1). NICS continues to conduct this research even after the requisite number of days have elapsed.

12. When a potential prohibition is identified, NICS conducts a review of all applicable internal resources and databases. This review includes, but is not limited to, approved state websites,

ATF000351

Westlaw, the Document Disposition File (DDF), and ATF's Relief of Disability Database (ATFRDD).[2]

13. If NICS locates information that establishes or eliminates all potential prohibitions, NICS provides the FFL with the applicable final status. If NICS cannot determine a final status after completing research of internal resources and databases, NICS will contact all appropriate external agencies including prosecutors, courts, probation offices or law enforcement agencies to attempt to obtain missing information such as arrest reports, complaints, judgments, sentencing documents and probation terms. NICS contacts these external agencies through various methods such as phone, fax, or e-mail, depending on the agency's preferred method of contact.

14. When NICS obtains missing information from an external agency, NICS reviews the information to determine if it can apply a final status. NICS continues its research to attempt to establish or rule out all potential prohibitions until NICS exhausts all internal and external resources. Unless a prohibitor has been established or all potential prohibitions have been negated, the NICS transaction remains in a delay or open status.

---

[2] Approved state websites may provide additional information such as final disposition, conviction level, fugitive from justice or indictment status. Westlaw is utilized to determine the maximum punishment for a criminal offense. The DDF contains documentation that may have been obtained from research on a prior transaction that cannot be updated to an individual's criminal history record. ATFRDD houses individuals who have received relief from disabilities under 18 U.S.C. § 925(c) that would remove the federal prohibition.

ATF000352

15. NICS checks for the purposes of a firearm transfer may be conducted by either NICS personnel or by a state or local law enforcement agency serving as an intermediary between an FFL and the federal databases checked by the NICS. *See* 28 C.F.R. §§ 25.6(d), (f). These intermediaries are referred to as points of contact (POC). Michigan is not a POC state. Accordingly, Michigan FFLs contact NICS directly for a background check before transfering any long gun or handgun to a non-licensee.

16. The Brady Act includes exceptions to the NICS check requirement, including a provision allowing holders of certain state permits to possess, carry, or acquire firearms without a separate NICS check. 18 U.S.C. § 922(t)(3)(A). Under this provision, permits issued within the past five years may qualify as an alternative to the NICS check if certain other requirements are satisfied. ATF reviews state laws governing the issuance of such permits to ensure that, under 18 U.S.C. § 922(t)(3)(A)(ii), "such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law." The state authority issuing the permit must conduct a NICS background check and make the firearms eligibility determination. The state must deny a permit to anyone prohibited from possessing or receiving firearms under Federal or state law.

17. NICS regulations allow access to the NICS Indices for purposes other than a NICS background check involving transfer of a firearm only in very limited circumstances, including "[p]roviding information to Federal, state, tribal or local criminal justice agencies in connection with the issuance of a firearm-related ... permits or license[.]" 28 C.F.R. § 25.6(j)(1).

7

ATF000353

18. Accordingly, when NICS provides information to a state criminal justice agency such as the Michigan State Police in connection with the issuance of a state firearms permit, NICS does not process the background check. Instead, NICS merely serves as a conduit for passing search results from NCIC, III, and NICS Indices to the state criminal justice agency. The interpretation, application, and adjudication of the information/records received is conducted by the state criminal justice agency, and not by the FBI.

     In accordance with 28 U.S.C. § 1746, I affirm under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of October 2022

*Celeste M Cochran*

Celeste M. Cochran
Legal Administrative Specialist
Clarksburg, West Virginia

ATF000354