# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

GUN OWNERS OF AMERICA,
*et al.*

Plaintiffs,

v.

U.S. DEPARTMENT OF JUSTICE,
*et al.*,

Defendants.

Case No.  1:20-cv-10639-TLL-PTM

Hon. Thomas L. Ludington

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................. vi

ISSUES PRESENTED ................................................................................................. ix

INTRODUCTION ......................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ............................................. 2

I.   Federal Law ............................................................................................................. 2

II.  Michigan Law ......................................................................................................... 6

PROCEDURAL BACKGROUND ............................................................................... 12

STANDARD OF REVIEW .......................................................................................... 14

ARGUMENT ................................................................................................................ 15

I.   Plaintiffs Lack Article III Standing to Challenge the 2020 PSA. ....................... 15

II.  The Issuance of the 2020 PSA Is Within ATF's Statutory Authority
     Under the Brady Act. ........................................................................................... 18

     A.   The Statutory Text Demonstrates That ATF Correctly Interprets
          Section 922(t)(3) to Require an Evaluation of "Information
          Available" to State Officials. ....................................................................... 19

     B.   The Structure and Purpose of the Brady Act Confirm that ATF's
          Interpretation Is Correct. ............................................................................. 21

III. The 2020 PSA Correctly Reflects That Michigan Law Has Changed. ............... 24

     A.   Michigan Now Interprets State Law Not to Require that State
          Officials "Verif[y]" that "Information Available" to Them "Does
          Not Indicate" that CPL Permit Applicants Are Barred from
          Firearms Possession. .................................................................................... 24

     B.   In the 2020 PSA, ATF Appropriately Deferred to Michigan's
          Interpretation of its Own State Law. ........................................................... 28

CONCLUSION ............................................................................................................. 29

i

# TABLE OF AUTHORITIES

## CASES

*Abramski v. United States,*
  573 U.S. 169 (2014) ................................................................................. 1, 22, 24

*Alexander v. Merits Sys. Prot. Bd.,*
  165 F.3d 474 (6th Cir. 1999) ................................................................. 14

*Ass'n of Am. Physicians & Surgeons v. FDA,*
  13 F.4th 531 (6th Cir. 2021) ................................................................. 16, 18

*Atrium Med. Ctr. v. HHS,*
  766 F.3d 560 (6th Cir. 2014) ................................................................. 14

*Bangura v. Hansen,*
  434 F.3d 487 (6th Cir. 2006) ................................................................. 14

*Christensen v. Harris Cnty.,*
  529 U.S. 576 (2000) ............................................................................... 14

*City of Bangor v. Citizens Commc'ns Co.,*
  532 F.3d 70 (1st Cir. 2008) ................................................................... 28

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................................................... 16

*Gun Owners of Am., Inc. v. U.S. Dep't of Just.,*
  No. 21-1131, 2021 WL 5194078 (6th Cir. Nov. 9, 2021) ........................ 12, 13, 20, 26

*Inner City Contracting, LLC v. Charter Twp. of Northville,*
  87 F.4th 743 (6th Cir. 2023) ................................................................. 15

*KPK Techs., Inc. v. Cuccinelli,*
  No. 19-10342, 2019 WL 4416689 (E.D. Mich. Sept. 16, 2019) ................ 14

*Lansing Dairy, Inc. v. Espy,*
  39 F.3d 1339 (6th Cir. 1994) ................................................................. 24

*Lee v. Department of Justice,*
  554 F. Supp. 3d 1228 (N.D. Ala. 2021) ................................................. 17, 18

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ............................................................................. 15, 16

*Macias v. N.M. Dep't of Labor,*
   21 F.3d 366 (10th Cir. 1994) ...................................................................... 28

*Morgan v. ATF,*
   509 F.3d 273 (6th Cir. 2007) ...................................................................... 28

*Morgan v. U.S. Dep't of Just.,*
   473 F. Supp. 2d 756 (E.D. Mich. 2007), *aff'd in part sub nom.*
   *Morgan v. ATF,* 509 F.3d 273 (6th Cir. 2007) ................................................ 28

*Nat'l Rifle Ass'n of Am., Inc. v. Reno,*
   216 F.3d 122 (D.C. Cir. 2000) ................................................................ 21, 22

*Resolute Forest Prods. v. USDA,*
   187 F. Supp. 3d 100 (D.D.C. 2016) ............................................................. 14

*Robinson v. Sessions,*
   721 F. App'x 20 (2d Cir. 2018) ............................................................... 17, 18

*Rust v. Sullivan,*
   500 U.S. 173 (1991) .................................................................................. 24

*S. Rehab. Grp., PLLC v. Sec'y of HHS,*
   732 F.3d 670 (6th Cir. 2013) ...................................................................... 15

*Simms v. NHTSA,*
   45 F.3d 999 (6th Cir. 1995) ....................................................................... 14

*Singh v. Johnson,*
   No. 15-cv-12957, 2016 WL 3476701 (E.D. Mich. June 27, 2016) ..................... 14

*United States v. Cassidy,*
   899 F.2d 543 (6th Cir. 1990) ...................................................................... 28

*United States v. Mills,*
   850 F.3d 693 (4th Cir. 2017) ...................................................................... 23

*United States v. Shepherd,*
   922 F.3d 753 (6th Cir. 2019) ...................................................................... 20

*United States v. Zabawa*,
 719 F.3d 555 (6th Cir. 2013) ...................................................................... 20

**FEDERAL STATUTES**

5 U.S.C. § 706 ............................................................................................... 14

18 U.S.C. Chapter 44 ...................................................................................... 3

18 U.S.C. §§ 921 *et seq.* ................................................................................. 3

18 U.S.C. § 921 ............................................................................................... 3

18 U.S.C. § 922 ......................................................................................... *passim*

34 U.S.C.A. § 40901 ..................................................................................... 23

Brady Handgun Violence Prevention Act,
 Pub. L. No. 103-159, 107 Stat. 1536 (1993) ............................................. 2, 3

Bipartisan Safer Communities Act,
 Pub. L. No. 117-159, 136 Stat. 1313 (2022) ................................................ 23

**STATE STATUTES**

MCL § 28.421 ................................................................................................... 6

MCL § 28.422 ................................................................................................... 6

MCL § 28.425 ............................................................................................... 6, 25

MCL § 28.426 ........................................................................................... *passim*

**REGULATIONS**

27 C.F.R. § 478.102 ......................................................................................... 5

28 C.F.R. § 25.4 .............................................................................................. 4

28 C.F.R. § 25.6 ........................................................................................... 4, 22

63 Fed. Reg. 8379 (Feb. 19, 1998) .................................................................. 5

63 Fed. Reg. 58,272 (Oct. 29, 1998) ............................................................ 5, 19

**OTHER AUTHORITIES**

AVAILABLE (4.), OED Online,
  https://www.oed.com/dictionary/available_adj?tab=meaning_and_use
  #32375337 ........................................................................................................... 21

H.R. Rep. No. 103-344 (1993) ....................................................................... 3, 22

S. Rep. No. 89-1866 (1966) ................................................................................. 3

VERIFY (4a.), OED Online,
  https://www.oed.com/dictionary/verify_v?tab=meaning_and_use#15737705 .... 20

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The parties have previously agreed, through their counsel, to submit the following Statement of Undisputed Facts in Support of both parties' briefing on their respective motions for summary judgment. These facts are agreed to as undisputed solely for the purposes of summary judgment in the above-captioned litigation and not for any other purposes.

1. Plaintiff, Donald J Roberts, II, is a United States citizen.

2. The events or omissions giving rise to this suit occurred in Roscommon County, Michigan, a county within this district.

3. As of March 7, 2020, Mr. Roberts had no disqualification that would prevent him from acquiring, keeping, or bearing arms.

4. Mr. Roberts is a member of Gun Owners of America, Inc.

5. Mr. Roberts is a resident of McBain, Michigan.

6. Mr. Roberts possesses a valid unexpired Michigan CPL expiring February 24, 2026.

7. On March 7, 2020, Mr. Roberts visited a federal firearms licensee doing business as H&H Fireworks, Guns and Sporting Goods at 8979 W. Houghton Lake Dr., Houghton Lake, MI 48629.

8. Mr. Roberts visited said FFL for the purpose of purchasing a shotgun with his unexpired Michigan CPL.

vi

9.      Upon inquiry and presentment of his CPL, Mr. Roberts was advised that sale of the firearm using his unexpired Michigan CPL could not be completed unless he submitted to a FBI NICS background check, consistent with the ATF's March 3, 2020, Michigan Public Safety Advisory.

10.     Consistent with ATF instructions, the FFL refused to make the sale, and Mr. Roberts left the store without purchasing the firearm.

11.     Were it not for the challenged agency action, Mr. Roberts would be able to use his Michigan CPL in lieu of a background check to purchase firearms at a federally licensed firearms dealer, as authorized by 18 U.S.C. § 922(t)(3).

12.     Plaintiff, Gun Owners of America, Inc. ("GOA") is a California non-stock corporation with its principal place of business at 8001 Forbes Place, Springfield, VA 22151.

13.     GOA is organized and operated as a non-profit membership organization that is exempt from federal income taxes under IRC § 501(c)(4).

14.     GOA was incorporated in 1976 to preserve, protect, and defend the Second Amendment rights of gun owners.

15.     GOA has thousands of members and supporters, including residents of the Eastern District of Michigan, who possess Michigan CPLs, and who would use them to purchase firearms, subject to the discretion of FFLs, but for the challenged agency action.

16.     On October 29, 1998, ATF sent an "OPEN LETTER TO ALL MICHIGAN FEDERAL FIREARMS LICENSEES," stating that "[t]he Michigan permit to purchase a handgun ... will [] qualify as an alternative to the NICS check...."

17.     On March 24, 2006, Defendant ATF issued an "Open Letter to Michigan Federal Firearms Licensees" ("2006 Open Letter") which stated that, "Michigan's Concealed Pistol Licenses (CPLs) issued on or after November 22, 2005 will qualify as an alternative to a [NICS] check."

18.     ATF's 2006 Open Letter instructed Michigan FFLs that, when transferring firearms, they would be permitted to accept Michigan CPLs in lieu of running a NICS check.

19.     On March 3, 2020, ATF issued a "PUBLIC SAFETY ADVISORY TO ALL MICHIGAN FEDERAL FIREARMS LICENSEES," which states that ATF's "March 24, 2006 [letter] is rescinded as of the date of this letter...."

## ISSUES PRESENTED

1.      Does Michigan law meet the requirements of 18 U.S.C. § 922(t)(3)?

       Defendants answer: No.

2.      Did ATF act within its authority in issuing the March 3, 2020 Public Safety Advisory?

       Defendants answer: Yes.

# INTRODUCTION

Federal law requires that a federal firearms licensee ("FFL") not transfer a firearm until after a background check is completed through the National Instant Criminal Background Check System ("NICS").  This statutory requirement forms a crucial part of a "comprehensive scheme" designed to "keep guns out of the hands of criminals and others who should not have them, and to assist law enforcement authorities in investigating serious crimes." *Abramski v. United States*, 573 U.S.169, 180 (2014).  The requirement may be satisfied by alternative means, namely, if the person acquiring the firearm presents to the FFL a state-issued firearms permit—but only if "the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law." 18 U.S.C. § 922(t)(3)(A)(ii).

In 2006, Michigan informed ATF that a new state law governing Michigan's concealed pistol license ("CPL") satisfied these requirements, and ATF notified Michigan FFLs that they could accept CPLs as alternatives to NICS checks.  Since then, however, Michigan officials have reinterpreted state law and determined that state law does not require them to "verif[y] that the information available" does not "indicate that possession of a firearm" would be unlawful under all federal prohibitions. *Id.*  State law has thereby changed, and accordingly, in March 2020, ATF issued a Public Safety

Advisory to Michigan FFLs ("2020 PSA"), explaining that CPL holders are not exempt from NICS checks.

ATF's action is lawful, and this Court should reject Plaintiffs' challenge to the Public Safety Advisory. As a threshold matter, Plaintiffs lack standing to challenge the 2020 PSA. The individual plaintiff fails to establish injury because he does not show that he would be delayed or denied in his purchase of a firearm, or that a background check would have caused him any other legally cognizable harm. For similar reasons, the organizational plaintiff also lacks standing. Even if the Court reaches the merits of Plaintiffs' claims, it should enter summary judgment for Defendants because the issuance of the 2020 PSA is within ATF's statutory authority. The Gun Control Act's text, structure, and purpose confirm that ATF correctly interprets Section 922(t)(3) to require an evaluation of information that is available to Michigan officials. And the 2020 PSA correctly reflects that Michigan law has changed, as the state does not presently interpret state law to require that state officials verify that the information available to them does not indicate that CPL applicants are prohibited from firearms possession. The Court should therefore enter summary judgment for Defendants.

## STATUTORY AND REGULATORY BACKGROUND

### I.    Federal Law

Congress enacted the Brady Handgun Violence Prevention Act ("Brady Act") to, *inter alia*, "provide for . . . a national instant criminal background check system to be contacted by firearms dealers before the transfer of any firearm." Pub. L. No. 103-159,

2

107 Stat. 1536 (1993); Supplemental Administrative Record, ECF No. 46, at ATF000135.[1]  The Act's purpose is "to prevent convicted felons and other persons who are barred by law from purchasing guns from licensed gun dealers, manufacturers or importers." H.R. Rep. No. 103-344, at 7 (1993); ATF000106.

The Brady Act amended the Gun Control Act of 1968 ("GCA"), 18 U.S.C. Chapter 44.  The GCA operates to "regulate more effectively interstate commerce in firearms" to reduce crime and misuse and "help combat . . . the incidence of serious crime." *See* 18 U.S.C. §§ 921 *et seq.*; S. Rep. No. 89-1866, at 1 (1966).  Among its provisions, the GCA designates several categories of persons for whom it is unlawful to "receive" or "possess" "any firearm," including those convicted of felonies, fugitives from justice, and those who have been convicted of a misdemeanor crime of domestic violence ("MCDV").   18 U.S.C. § 922(g).[2]  These prohibitions are paired with a prohibition on the transfer of firearms to such persons.  *See id.* § 922(d).

---

[1]  All references in this brief to items formatted "ATF_____" refer to this Supplemental Administrative Record.

[2]  A "misdemeanor crime of domestic violence" under the GCA, with certain exceptions, is an offense that "(i) is a misdemeanor under Federal, State, Tribal, or local law; and (ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, by a person similarly situated to a spouse, parent, or guardian of the victim, or by a person who has a current or recent former dating relationship with the victim." *Id.* § 921(a)(33)(A).

3

A core part of the Brady Act is 18 U.S.C. § 922(t)(1), which requires that an FFL not transfer a firearm to a non-licensee until after a background check is conducted through NICS (which is administered by a unit of the FBI) to confirm that the transfer would not violate federal or state law.  Under the Brady Act, an FFL is not required to contact NICS before transferring a firearm to another person if:

> (A)(i) such other person has presented to the licensee a permit that—
>
> (I) allows such other person to possess or acquire a firearm; and
>
> (II) was issued not more than 5 years earlier by the State in which the transfer is to take place; and
>
> (ii) the law of the State provides that such a permit is to be issued only after an authorized government official has *verified* that the *information available* to such official does not indicate that possession of a firearm by such other person would be in violation of law.

18 U.S.C. § 922(t)(3) (emphases added).  This provision is commonly known as the "alternate permit" requirement because state permits that satisfy 18 U.S.C. § 922(t)(3) serve as alternatives on which FFLs can rely instead of carrying out a background check through NICS.[3]

_____

[3] States with NICS-alternate permits have a state statute that authorizes access to the NICS Indices, which is one of three national databases searched by NICS during a background check.  The other two databases queried are the National Crime Information Center and the Interstate Identification Index.  *See* 28 C.F.R. §§ 25.4, 25.6.  The states run a search, and information (not the actual records) from the three systems is returned to the state to review, conduct additional research if necessary, and make a determination.  The FBI does not investigate or determine whether the permit holder is prohibited, but simply provides access to the databases.  *See id.* § 25.6(d), (f).

Prior to the November 30, 1998 effective date of Section 922(t), ATF issued a Notice of Proposed Rulemaking ("Notice") regarding the implementation of the NICS background check requirement.  *See* 63 Fed. Reg. 8379 (Feb. 19, 1998); ATF000146.  In the Notice, ATF explained that "the information available" as referenced in section 922(t)(3)(A)(ii) would include the NICS databases and therefore, permits issued on or after November 30, 1998 would be valid alternatives "only if the State officials conduct a NICS check on all permit applicants."  63 Fed. Reg. at 8381; ATF000147.  The Notice also explained that for alternate permits, the "critical issue is . . . whether the State has conducted a background check on that individual to ensure that the individual is not prohibited from possessing a firearm."  *Id.*  The Notice further stated that "[i]f a State does not disqualify all individuals prohibited under Federal law, the permits issued by that State would not be accepted as alternatives," and committed that "ATF will notify licensees in each State whether or not permits issued by that State will suffice as alternatives."  *Id.*  After considering comments to the Notice, ATF issued a final rule adopting the requirement that a NICS check be performed, *see* 63 Fed. Reg. 58,272 (Oct. 29, 1998); 27 C.F.R. § 478.102(d)(1)(iii); ATF000154, and reaffirming that if the State "did not disqualify all individuals prohibited under Federal law," "the permits issued by that State would not be accepted as alternatives under the permanent provisions of the Brady Law."  ATF000157.

## II.   Michigan Law

Michigan law provides for two types of firearms permits.  Michigan Compiled Law ("MCL") § 28.422(3) authorizes local police to issue "licenses to purchase, carry, possess, or transport pistols" ("LTPs"), which are not at issue in this case because they have been continuously recognized by ATF as valid alternate permits since 1998.  *See* ATF000098, ATF000273.  Michigan law also provides for "concealed pistol licenses" ("CPLs"), *see* MCL §§ 28.421, 28.425, and MCL § 28.426 explains the requirements for issuance of a CPL:

> (2) A county clerk shall not issue a license to an applicant . . . unless both of the following apply:
>
> (a) The department of state police, or the county sheriff . . . , has determined through the federal national instant criminal background check system that the applicant is not prohibited under federal law from possessing or transporting a firearm.
>
> (b) If the applicant is not a United States citizen, the department of state police has verified through the United States Immigration and Customs Enforcement databases that the applicant is not an illegal alien or a nonimmigrant alien.

Michigan enacted the NICS background check requirement in MCL § 28.426(2)(a) in November 2005.  In February 2006, the state Attorney General ("AG") requested that ATF determine that a Michigan CPL would qualify as an alternate permit, explaining, as ATF later recounted, that MCL § 28.426 required:

> (1) "A full NICS check be[] conducted by an authorized Michigan government official"; (2) "A determination made by that official that the permit holder is not prohibited under federal or state law from possessing

firearms"; and (3) "The permit being denied if the individual is prohibited from possessing a firearm under federal (or state) law."

ATF000056 (Aug. 2019 briefing paper discussing Michigan alternate permits and describing AG letter). In response, ATF issued a March 2006 "Open Letter to Michigan FFLs" ("2006 Open Letter") informing them that Michigan CPLs now qualified as alternate permits under 18 U.S.C. § 922(t)(3). ATF000065.

In 2017, however, ATF and FBI learned that Michigan had revised its interpretation of MCL § 28.426. Specifically, the agencies learned that, although the Michigan State Police ("MSP") was accessing NICS databases, MSP was not conducting the necessary follow-up to determine whether a CPL applicant was in fact prohibited from possessing firearms if the NICS Indices showed a potential (but not definitive) federal prohibition for which no state law equivalent existed. Second Decl. of Eric M. Epstein ¶ 6, ECF No. 58-1 ("Second Epstein Decl."). In particular, an MSP legal advisor opined in a May 2017 email and during a June 2017 teleconference that MSP was not legally required by state law to "unilaterally investigate, make, and report federal firearms disqualifications on behalf [of] the federal government" or otherwise interpret federal law. *Id.* A Michigan Assistant Attorney General participated in the 2017 teleconference and appeared to support MSP's legal position. *Id.*

Under Michigan's new view, as reflected in ATF and FBI summaries of that view as described to FBI by MSP officials, Michigan had decided that MSP officials need not take the information returned by a NICS search and conduct any additional research or

7

analysis needed to "determin[e] . . . whether a CPL applicant was prohibited by federal law from possessing a firearm." *See* ATF000098 (ATF's Michigan CPL talking points), ATF000103 (Mar. 3, 2020 letter from ATF to Michigan AG); *cf.* ATF000056 (ATF briefing paper on Michigan CPLs). FBI and ATF worked to persuade MSP to resume making such determinations, including by "assist[ing] Michigan officials in applying Federal law" and "giv[ing] MSP case specific guidance upon request." ATF000104 (Mar. 3, 2020 Letter from ATF to Michigan AG). In July 2018, FBI and ATF's cooperative efforts with MSP appeared to succeed, as MSP advised FBI that the Michigan AG had "granted MSP the authority" to complete the process of determining whether NICS check information indicated a disqualification from firearms possession. *See id.*; Second Epstein Decl. ¶ 9.

However, in March 2019, Michigan legal counsel again revised their interpretation of Michigan law, apparently due to the election of a new state AG, and relayed that view to FBI. *See* Second Epstein Decl. ¶ 10; ATF000023-000024, ATF000079. Specifically, on March 19, 2019, an MSP official informed FBI:

> Based on new guidance from our legal staff regarding Michigan CPLs, we have been advised that until further notice the MSP will not be making federal MCDV determinations and will not be entering federal MCDV disqualifications into the NICS Indices. We are authorized to refer suspected MCDVs to the NICS for review and determination.

Decl. of Brian Allen Barker ¶¶ 5-6, ECF No. 57-2 ("Barker Decl."). The result of this revised interpretation was significant: in early 2019, Michigan approved the issuance of 50 CPLs for individuals with potentially disqualifying misdemeanor convictions for

domestic violence, without evaluating whether those convictions were in fact disqualifying.  *See* Second Epstein Decl. ¶ 11, ATF000028 (FBI email to ATF describing conversation with MSP official), ATF000038-000044 (spreadsheet of potentially prohibited persons who received CPLs), ATF000058 (ATF briefing paper).

In April 2019, FBI and ATF again attempted to cooperatively resolve the issue with Michigan officials, inviting state officials to discuss the CPL issuance process on a conference call.  *See* Second Epstein Decl. ¶ 12, ATF000026 (email correspondence between FBI and ATF), ATF000058.  However, instead of engaging in discussion, Michigan "refus[ed] to meet with [ATF Deputy Assistant Director] Curtis [Gilbert]," ATF000047 (ATF internal email thread discussing Michigan CPLs), and reiterated the state's view that state law requires the MSP only to "request the documentation needed to research" whether a person is prohibited, not to actually assess that information to determine whether it indicates that an individual is a prohibited person.  ATF000034-35 (email correspondence between FBI and ATF); *see also* ATF000058.  FBI informed ATF that an MSP official "indicated th[at] MSP legal counsel spoke with their AG and they are not interested in having a call to discuss matters that have been previously talked about.  They are standing firm that they do not have to conduct research for MCDV.  They are more interested in waiting to receive an opinion and direction from their AG."  ATF000026; Second Epstein Decl. ¶ 12; Barker Decl. ¶ 9.  On April 30, 2019, FBI advised ATF that Michigan representatives were "not amenable to a discussion on the permit research issue."  Barker Decl. ¶ 10.

During a May 16, 2019 call, an MSP legal advisor informed ATF's Detroit Field Division that MSP had "solicited inputs from [the Michigan] AG," that the Michigan AG had "provided guidance to MSP on CPLs," and that MSP was "not doing federal firearms determinations." Second Epstein Decl. ¶ 17, McQuillan Notes, ECF No. 58-2. On May 22, 2019, an MSP official confirmed to FBI that fifty CPLs had been issued without MSP officials having researched whether an MCDV prohibitor existed. Barker Decl. ¶ 11; ATF000036. Specifically, in response to the question "Does this mean that no research would be conducted on charges that appear on a criminal history record, whether in state or out of state, would not be researched for domestic violence criteria and only those in the NICS Index would be used to determine if the subject was not eligible for the CPL?," the MSP official responded: "Yes, mostly. This is a long story that I'm happy to discuss with you. The NICS Section staff and the ATF are well aware of the MSP's stance. We are currently waiting on direction from the Michigan Attorney General." *Id.* The MSP official also stated:

> We are no longer holding on any applications pending federal determinations. We are processing them all. For applications that indicate a possible MCDV, we are obtaining a police report for the particular offense. If the police report documents a MCDV qualifying relationship, we process it and log it pending the outcome of the MI AG opinion. We will follow up or pass along to NICS/ATF, depending on the MI AG opinion.

Barker Decl. ¶ 11; ATF000037. Later that month, in response to a question posed by ATF to FBI regarding whether MSP was pulling police reports to check for prohibiting MCDV convictions, FBI responded: "Yes. MSP has advised they will request the

documentation needed to research the [MCDV] prohibition[;] however[,] they are not finalizing any research as they believe the FBI or ATF should review the documentation and determine if it meets the federal prohibition. They have admitted to issuing permits when there is a potential prohibition that has not been established or cleared." Second Epstein Decl. ¶ 19; ATF000034-000035.

A follow-up conference was scheduled in June 2019 between federal and state officials. Second Epstein Decl. ¶ 20. However, on June 17, 2019, FBI informed ATF that an MSP official "was not ready to meet with the ATF until the [Michigan] AG came back with an opinion on the matter," and that MSP legal staff "have a meeting scheduled this week with the AG but do not anticipate any opinion coming out of it." *Id.* ¶ 21. FBI further stated: "If the AG's office is not represented [at the follow-up conference], the state representative(s) most likely will fall back on the fact they are waiting for an opinion from the AG on the matter." *Id.*; *see also* Barker Decl. ¶ 13.

ATF determined that in light of Michigan officials' refusal to meet, and the public safety risk of issuing Michigan CPLs to potentially prohibited persons, ATF should begin the process of rescinding Michigan's CPL as a NICS alternative. Second Epstein Decl. ¶ 23. Accordingly, in light of Michigan's interpretation of state law as not requiring that a state official "verif[y]" whether NICS information "indicates" that a CPL applicant is prohibited from acquiring or possessing firearms under all federal prohibitions, ATF decided that its March 2006 open letter was no longer valid. *See* ATF000105 (letter from ATF to Michigan AG). ATF thus issued the 2020 PSA, which

11

informed FFLs that they could no longer accept Michigan CPLs as alternate permits, and must instead carry out a NICS check before transferring a firearm to the holder of a Michigan CPL.  *See* ATF000100-ATF000101.

## PROCEDURAL BACKGROUND

Plaintiffs initiated this action on March 9, 2020.  ECF No. 1.  After Defendants filed the administrative record, ECF No. 16, the parties cross-moved for summary judgment.  ECF Nos. 17, 21, 23, 24.  The Court entered summary judgment for Defendants, ECF No. 25, and Plaintiffs appealed to the Sixth Circuit.  ECF No. 27.

The Sixth Circuit rejected Plaintiffs' argument that the federal government and courts must consider only the face of state law in determining whether "the law of the state" complies with 18 U.S.C. § 922(t)'s requirements to serve as an alternate permit. *Gun Owners of Am., Inc. ("GOA") v. U.S. Dep't of Just.*, No. 21-1131, 2021 WL 5194078, at *3 (6th Cir. Nov. 9, 2021) (recognizing that "[w]hat looks to be true" on the face of a state statute "may not be true").  But the Sixth Circuit explained that it was left with "several follow-up questions" that were not addressed on the existing record and that the court believed "preclude[d] an affirmance of the decision below."  *Id.* at *4, 5. Specifically, the Sixth Circuit explained:

> The requirements of state law, to start, remain unclear. As for the requirements of federal law, there are gaps as well, some legal, some administrative.  The record would benefit from more detail about what the NICS database reveals when it comes, for example, to identifying disqualifying domestic-violence misdemeanor convictions and what kinds of resources are needed to go beyond that information to identify potential matches.  At the same time, it is not clear from the ATF

> advisory—or the kind of process involved in issuing that advisory—what the agency's legal position is when it comes to the Brady Act's obligation on state officials.

*Id.* at *5 (internal punctuation omitted). The Sixth Circuit "remand[ed] the case to allow both sides to account for" its opinion and "supplement the record" if appropriate. *Id.*

On remand, this Court directed the parties to file briefs addressing the issue of supplementing the record. ECF No. 34. The Court later directed the parties to send a letter to the Michigan AG inviting her to file an amicus brief stating her position on the MSP's duties under 18 U.S.C. § 922(t), and ordered Defendants to file a supplemental administrative record. ECF No. 39. The Michigan AG filed her amicus brief stating her position on the MSP's duties. ECF No. 45. Defendants later filed the supplemental record, which included declarations from ATF and FBI. ECF No. 46. Plaintiffs moved to strike portions of the record and to permit leave to supplement the record. ECF No. 47. The Court granted Plaintiffs' motion in part, and directed Defendants to "supplement the record with at least one additional affidavit from a knowledgeable ATF or FBI employee addressing" when and how ATF became aware of the Michigan AG's changed position on the legal issue, what communication (if any) the FBI and/or ATF had with the Michigan AG between January 2019 and March 2020 regarding this issue, and whether ATF ever received communication from anyone that the Michigan AG had rendered a final decision on the issue. ECF No. 55. Defendants filed supplemental declarations from ATF and FBI addressing these issues. ECF No. 58. Plaintiffs then filed a renewed motion for summary judgment ("Pls.' MSJ"). ECF No. 60.

## STANDARD OF REVIEW

"When a federal court is reviewing a final agency action, the usual rules and standards governing summary judgment do not apply." *KPK Techs., Inc. v. Cuccinelli*, No. 19-10342, 2019 WL 4416689, at *3 (E.D. Mich. Sept. 16, 2019) (citing *Alexander v. Merits Sys. Prot. Bd.*, 165 F.3d 474, 480-81 (6th Cir. 1999)). "[S]ummary judgment [is] the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Singh v. Johnson*, No. 15-cv-12957, 2016 WL 3476701, at *3 (E.D. Mich. June 27, 2016) (quoting *Resolute Forest Prods. v. USDA*, 187 F. Supp. 3d 100, 106 (D.D.C. 2016)).

"The court's function in reviewing final agency action" is "prescribed by the APA." *Simms v. NHTSA*, 45 F.3d 999, 1003 (6th Cir. 1995). A court may set aside or hold unlawful only "agency action that is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.* (citation omitted).

"In addition to arbitrary and capricious review, the APA authorizes courts to review agency actions for conformity with law," *Bangura v. Hansen*, 434 F.3d 487, 502 (6th Cir. 2006) (citing 5 U.S.C. § 706(2)(A)), including whether an agency's reading of the statute is consistent with the statutory text. Such readings that are "contained in policy statements . . . and were not promulgated via notice and comment rulemaking" are "'entitled to respect . . . to the extent that they have the power to persuade.'" *Atrium Med. Ctr. v. HHS*, 766 F.3d 560, 567 (6th Cir. 2014) (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000)). To determine whether the agency's reading is persuasive,

14

courts "look to the statute's text and design, . . . including whether the regulation is consistent with the congressional purpose." *S. Rehab. Grp., PLLC v. Sec'y of HHS*, 732 F.3d 670, 685 (6th Cir. 2013) (citations omitted).

## ARGUMENT

## I.   Plaintiffs Lack Article III Standing to Challenge the 2020 PSA.

"Standing is a threshold issue for bringing a claim in federal court and must be present at the time the complaint is filed." *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 750 (6th Cir. 2023) (citation omitted). "Without standing, a federal court has no jurisdiction to hear the case." *Id.* As the party "invoking federal jurisdiction," Plaintiffs "bear[] the burden of establishing" standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To do so, they must demonstrate: (1) "an 'injury in fact'—an invasion of a legally protected interest which is [both] . . . concrete and particularized . . . and [ ] actual or imminent, not conjectural or hypothetical"; (2) that the injury is "traceable to the challenged action of the defendant and not . . . the result of the independent action of some third party"; and (3) that it is "likely," not "speculative, that the injury will be redressed by a favorable decision." *Id.* at 560-61 (internal quotations omitted). To have standing on behalf of its members, an organization like GOA must show that (1) its "members would otherwise have standing to sue in their own right"; (2) the "interests" that the suit "seeks to protect are germane to the organization's purpose" and (3) "neither the claim asserted nor the relief

15

requested requires the participation of individual members in the lawsuit." *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 537 (6th Cir. 2021) (citation omitted).

Initially, because Plaintiff Roberts is not a subject of the 2020 PSA—which regulates Michigan FFLs and Michigan law enforcement officials responsible for issuing CPLs, *see* ATF000100-ATF000101—"much more" is required of Plaintiff Roberts to show that he has standing to bring this action. *Lujan*, 504 U.S. at 562. He alleges that, if not for the 2020 PSA, he "would be able to use his Michigan CPL in lieu of a background check to purchase firearms at a federally licensed firearms dealer." Compl. ¶ 3. This allegation, on its own, does not give rise to any injury because Plaintiff Roberts neither alleges he will be denied or delayed in his purchase of a firearm as a result of the NICS background check, nor that a federal background check would have caused him any other legally cognizable burden or inconvenience. Plaintiff Roberts states in the Complaint that he is "a law-abiding person [who] has no disqualification that would prevent him" from passing a NICS background check. *Id.* If so—and Defendants do not contest this for the purposes of this motion—there is no reason to believe that his ability to acquire a firearm would be impaired—or even delayed—as a result of his inability to use a Michigan CPL to purchase a firearm. Because Plaintiff Roberts alleges that he would be eligible to purchase a firearm if he underwent a NICS check, he may not establish Article III injury by merely refusing to do so and then alleging he cannot obtain a firearm. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiffs

"cannot manufacture standing merely by inflicting harm on themselves"). Plaintiff Roberts has not met his burden to show he is "injured" in any meaningful way.

The conclusion that Plaintiff Roberts has not suffered an injury is reinforced by the conclusions of other courts that, unless a firearms transaction is delayed or denied, the mere act of undergoing a background check itself cannot give rise to standing. In *Lee v. Department of Justice*, 554 F. Supp. 3d 1228 (N.D. Ala. 2021), a closely analogous case, the individual plaintiff was a firearms owner who alleged that, if not for an ATF PSA rescinding Alabama concealed-carry permits as a permissible alternative to NICS checks under 18 U.S.C. § 922(t)(3), she would be able to use her Alabama permit in lieu of a NICS check to purchase a firearm from an Alabama dealer. *Id.* at 1232-33. The court held that the plaintiff lacked standing. *Id.* at 1234-35. First, the court explained, the plaintiff had not "adduced any facts showing that she was denied a firearm," but only "that she was refused the ability to purchase a firearm the way she wanted." *Id.* at 1234. Merely alleging that "her preferred method of purchase was off the table," the court determined, did not constitute injury in fact. *Id.* Second, the court rejected the plaintiff's contention that "she faces an imminent injury-in-fact due to a mandatory NICS background check should she purchase a firearm from an Alabama FFL" as insufficient to allege injury, explaining that "[s]uch an argument has been found unavailing elsewhere and the Court finds that reasoning persuasive." *Id.* at 1235 (citing *Robinson v. Sessions*, 721 F. App'x 20, 23-24 (2d Cir. 2018), for the principle that "plaintiffs suffered no injury-in-fact where their information was submitted to NICS

background check and cross-referenced across several databases and none were delayed or denied a firearm purchase").

For similar reasons, Plaintiff GOA—an organization existing "to preserve, protect, and defend the Second Amendment rights of gun owners," Compl. ¶ 4—cannot satisfy the requirements of organizational standing. As explained above, Plaintiff Roberts lacks standing, and Plaintiff GOA does not provide any specific evidence of injury to any other GOA member. Although GOA alleges that it has "many" members "who are residents of the Eastern District of Michigan, who possess Michigan CPLs, and who would use them to purchase firearms, but for the challenged agency action," Compl. ¶ 4, this claim, like Plaintiff Roberts' allegations, does not demonstrate that any member has been injured. As explained above, the mere fact that a person is subject to a background check, without disruption to his or her ability to purchase a firearm, does not constitute injury-in-fact. *Lee*, 554 F. Supp. 3d at 1235; *Robinson*, 721 F. App'x at 22. Because Plaintiff GOA has not shown that any of its members would have standing to sue in their own right, it cannot establish standing. *See Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 537.

## II.    The Issuance of the 2020 PSA Is Within ATF's Statutory Authority Under the Brady Act.

The 2020 PSA explains that, in light of Michigan's change in legal interpretation, ATF concluded that Michigan CPLs issued pursuant to MCL § 28.426 are not issued pursuant to a State law that "provides that such a permit is to be issued only after an

authorized government official has *verified* that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law."  18 U.S.C. § 922(t)(3)(A)(ii) (emphasis added).  Issuance of the 2020 PSA fulfills ATF's 1998 commitment to "notify licensees . . . whether or not permits issued by [a] State will suffice as alternatives under the Brady Act."  ATF000147.  Thus, contrary to Plaintiffs' claim that the 2020 PSA is *ultra vires*, *see* Compl. ¶ 64, the 2020 PSA is within ATF's authority and sets forth the correct understanding of the statute.

A.    **The Statutory Text Demonstrates That ATF Correctly Interprets Section 922(t)(3) to Require an Evaluation of "Information Available" to State Officials.**

ATF's longstanding understanding of 18 U.S.C. § 922(t)(3) is that, to qualify as an alternate permit, the information available to state officials upon issuance of that permit must include information obtained through a NICS check, and the state must "disqualify all individuals prohibited under Federal law" if those persons are flagged by NICS.  63 Fed. Reg. at 58,275; ATF000157.  This is a straightforward reading of the statutory text, which announces that state law must compel state government officials to "*verif[y]*" that the information they have "*available*" "does not indicate" that "possession of a firearm . . . would be in violation of law." 18 U.S.C. § 922(t)(3)(A)(ii) (emphasis added).  This means that where state officials have "information available" to them, including conviction records and police reports, the officials must review that information in determining whether a permit applicant is prohibited from firearms possession.   Second Epstein Decl. ¶ 13.  By contrast, under Plaintiffs' proposed

19

interpretation, as long as a state statute on its face "honors the relevant language of the federal law," *GOA*, 2021 WL 5194078, at *3, it is irrelevant whether in practice, state officials wholly disregard the requirement to verify that information available to them does not indicate that a permit applicant is prohibited from firearms possession.  *See also* Compl. ¶¶ 52, 55, 64.  Such an interpretation cannot be squared with the text, structure, and purpose of the GCA.

"To determine ordinary meaning" of the statutory terms "verify" and "available," "dictionaries are a good place to start."  *United States v. Shepherd*, 922 F.3d 753, 758 (6th Cir. 2019) (quoting *United States v. Zabawa*, 719 F.3d 555, 559 (6th Cir. 2013)).  The relevant definition of "verify" in the online version of the Oxford English Dictionary is "[t]o ascertain or test the accuracy or correctness of something), esp. by examination or by comparison with . . . some standard; to check or correct in this way."[4] This definition illustrates that, by using "verify," the statute requires an affirmative act on the part of the state official: to review the NICS information and to "ascertain" whether, pursuant to that and other "information available" to the official, the individual is prohibited by law from possessing a firearm.  In the specific case of Michigan, the "information available" to MSP comprises results from NICS and similar state law enforcement databases, and available items such as conviction reports or police records.  Here, because Michigan no longer interprets its law to require MSP to

---

[4] VERIFY (4a.), OED Online, https://www.oed.com/dictionary/verify_v?tab=meaning_and_use#15737705 (last visited Jan. 25, 2024).

review such information before issuing CPLs, Michigan law does not "provide[] that [a CPL] is to be issued only after an authorized government official has verified" an applicant's status as non-prohibited.  18 U.S.C. § 922(t)(3)(A)(ii).

The dictionary definition of "available" underscores this conclusion.  The relevant definition of this term is "[a]ble to be used, obtained, or selected; at one's disposal."[5]  State officials have readily "at [their] disposal" information provided to them by a NICS check, as well as information such as conviction records and police reports.  Also readily "[a]ble to be . . . obtained" are pertinent records that appear to be missing but the provenance of which is known, for example, an individual's conviction record from a specific state court.  Such information is "[a]ble to be used" by state officials to determine whether federal law prohibits a permit applicant from possessing firearms.  *Id.*  The statutory text thus shows that ATF has correctly read 18 U.S.C. § 922(t)(3)(A)(ii) to require an evaluation of "information available" to Michigan officials.

**B.    The Structure and Purpose of the Brady Act Confirm that ATF's Interpretation Is Correct.**

Both the purpose and the structure of 18 U.S.C. § 922(t) reinforce that ATF is correct to follow the plain text meaning of the statute's terms as defined above.  "[T]he very purpose of the Gun Control and Brady Acts. . . [is] to ensure that individuals not authorized to possess firearms are unable to purchase them."  *Nat'l Rifle Ass'n of Am.,*

---

[5] AVAILABLE (4.), OED Online, https://www.oed.com/dictionary/ available_adj?tab=meaning_and_use#32375337 (last visited Jan. 25, 2024).

*Inc. v. Reno*, 216 F.3d 122, 133 (D.C. Cir. 2000); *see* H.R. Rep. No. 103-344, at 7 (statute is designed "to prevent convicted felons and other persons who are barred by law from purchasing guns"). ATF's reading fulfills this purpose, in contrast to Plaintiffs' theory that it is only relevant whether the text of the state statute on its face complies with Section 922(t)(3).

The "statute establishes a detailed scheme to enable the [FFL] to verify . . . whether a potential buyer may lawfully own a gun," including by having the FFL "determine whether the potential purchaser is for any reason disqualified from owning a firearm" through a NICS check. *Abramski*, 573 U.S. at 172-73. The Brady Act accomplishes this purpose by generally requiring that, prior to a firearms sale, the FFL "contacts the [NICS] system," 18 U.S.C. § 922(t)(1)(A), and obtains a "Proceed" indicator, meaning that the NICS contains no information that the purchaser is prohibited.[6] In the event NICS cannot immediately provide information as to whether a purchaser is prohibited, the statute provides three business days for the FBI's NICS Section to obtain additional information or analyze the information available to it (during which time the FFL is prohibited from completing the transfer). 28 C.F.R. § 25.6(c)(1)(iv). Only if NICS does not provide a further response within three business

---

[6] A NICS check generates three possible responses: Proceed (allowing the transfer), Deny (instructing the FFL not to complete the transfer), or Delay. *See* 28 C.F.R. § 25.6(c)(1)(iv). A "Delay" occurs when the FBI is unable to provide immediately a definitive response of either Proceed or Deny, and further research is required. *See id.*

days does Section 922(t)(1) permit an FFL to carry out the transfer without a "Proceed" response.[7]

Like the background check requirement, the alternate permit provision is also situated in 18 U.S.C. § 922(t), and it directly references 18 U.S.C. § 922(t)(1). *See* 18 U.S.C. § 922(t)(3) ("Paragraph (1) [18 U.S.C. § 922(t)(1)] shall not apply to a firearm transfer . . . if"). These "subsections . . . should be read harmoniously," *United States v. Mills*, 850 F.3d 693, 698 (4th Cir. 2017) (discussing *in pari materia* canon of construction) (citations omitted), to provide comparable means of accomplishing the statutory purpose—that a background check be conducted prior to any firearms transfer from an FFL. The structure of the statute thereby suggests that the alternative background checks under Section 922(t)(3) should involve a review of NICS information similar to such checks under Section 922(t)(1). Thus, just as the FBI NICS section must analyze information that "indicates," but does not conclusively determine, that a person is prohibited, state officials should also carry out such analysis. As explained below, under Michigan's revised interpretation of state law, Michigan officials are not doing so.

Interpreting 18 U.S.C. § 922(t)(3) to require the analysis necessary to determine whether a person is prohibited is consistent with ATF's longstanding position that there be "parity between the background check required of permittees and the NICS check

---

[7] The Bipartisan Safer Communities Act, 136 Stat. 1313, 1323 (2022), imposes additional requirements relating to NICS checks involving proposed firearms transfers from FFLs to persons under 21. *See* 34 U.S.C.A. § 40901(l).

undergone by other purchasers of firearms." ATF Memorandum, Qualification of Permits as Alternatives to NICS Check (Oct. 8, 1998) at 2; ATF000170.  Under this approach, a state-issued permit qualifies as an alternate permit only if "the permittee has been subjected to the *same background check* that he would get if he attempted to purchase a firearm without a permit." *Id.* (emphasis added).  To find otherwise would create a significant loophole; Plaintiffs' proposed "reading would undermine—indeed, for all important purposes, would virtually repeal—the gun law's core provisions." *Abramski*, 573 U.S. at 179-80.

## III.   The 2020 PSA Correctly Reflects That Michigan Law Has Changed.

Michigan law has changed since 2006, when ATF informed Michigan that its CPLs qualified as alternate permits under 18 U.S.C. § 922(t)(3).  Because state law has changed, ATF acted correctly in issuing the 2020 PSA as the agency is obligated to "consider . . . the wisdom of its policy on a continuing basis." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1354 (6th Cir. 1994) (quoting *Rust v. Sullivan*, 500 U.S. 173, 186 (1991)). This includes ATF's actions here.

### A.   Michigan Now Interprets State Law Not to Require that State Officials "Verif[y]" that "Information Available" to Them "Does Not Indicate" that CPL Permit Applicants Are Barred from Firearms Possession.

As reflected in ATF's description of Michigan's 2005 letter, Michigan originally interpreted MCL § 28.426 to require that a CPL be issued only if, following a NICS check, the state official carrying out the check made "[a] determination . . . that the

permit holder is not prohibited under federal or state law from possessing firearms." ATF000056.  In "an informal opinion" in 2017, the Michigan AG reiterated that view, "recommending that the MSP make and enter determinations of federal firearms prohibitions." ATF000017.

But that interpretation has changed.  As confirmed by the Michigan AG in its amicus brief to this Court, Michigan currently interprets MCL §§ 28.425 and 28.426 to require state officials only to "query the prescribed criminal information databases and determine" solely "on the basis of that information, whether any of the listed" federal firearms "disqualifications apply."  Mich. Amicus Br. at 6, ECF No. 45.  Michigan does not interpret the law to utilize other "information available" to state officials to "verif[y]" that such information "does not indicate that possession of a firearm" violates federal law, despite the fact that 18 U.S.C. § 922(t)(3)'s text imposes this obligation.

This articulation of Michigan's position is consistent with ATF's understanding of Michigan's position—under the same Attorney General—before ATF issued the 2020 PSA.  *See supra* Statutory and Regulatory Background at II.  Specifically, ATF learned that Michigan interprets MCL § 28.426 to require state officials only to obtain information from a NICS check, but not to "conduct[] the necessary research or render[] a final determination as to whether a CPL applicant [is] prohibited by federal law from possessing a firearm."  ATF000049.  Indeed, in Michigan's view, MSP lacks the "authority to make and enter a final determination of factual and legal issues" regarding an applicant.  ATF000015; *see also* ATF000009.  And as this Court has noted,

"MSP purports to rely on guidance from the Michigan AG" as the basis for this position.  Op. & Order at 6, ECF No. 42.

Michigan's treatment of potentially disqualifying MCDV convictions illustrates the consequences of current Michigan law.  When a NICS check indicates that a CPL applicant is potentially disqualified due to an MCDV, a Michigan official "pull[s] police reports . . . to check for qualifying prohibitors," thereby "request[ing] the documentation needed to research the prohibition."  ATF000034.  Once Michigan officials obtain that information, "however[,] they are not finalizing any research . . . [to] determine if it meets the federal prohibition."  _Id._, ATF000035.[8]  Instead, Michigan allows the CPL application to advance to a county clerk, for potential approval and issuance of the CPL.  _See_ ATF000025.  Michigan likewise forgoes analysis of information that "applicants . . . may have an active warrant" disqualifying them as fugitives from justice.  ATF000014.  Michigan's handling of NICS checks is not the result of a mistake or neglect: MSP has informed FBI that MSP is proceeding pursuant

---

[8] The Sixth Circuit was concerned that "[o]ne read on the ATF's position is that nothing short of the investigation by [MSP] of all facts that might bear on the mismatch problems between the definition of certain state-law misdemeanors and the nature of the federal ban on possessing a weapon—including for misdemeanors in all 50 States— would suffice."  2021 WL 5194078, at *4.  That is not ATF's position.  _See_ Defs.' Opp. to Pls.' MSJ at II.  The record establishes that Michigan does not object to "request[ing]" or "obtain[ing]" available information, but that it refuses to make a "determin[ation]" based on such information whether a CPL applicant is barred from possessing firearms. _See_ ATF000034, ATF000037.  ATF's position is that 18 U.S.C. § 922(t)(3) obliges MSP to "verif[y] that the information available" to its officials does not indicate that a CPL applicant is so barred.

to the instructions of MSP legal counsel interpreting state law.  *See* ATF000009-ATF000010 (MSP response to FBI audit); ATF000031.  MSP officials "have been directed to issue CPLs without conducting the research for MCDV," based on "information from MSP legal" counsel.  *Id.* (noting that no similar "direction was provided for the LTP"); *see also* ATF000028 (describing "guidance from the MSP legal counsel" that CPL applications be advanced without further "MCDV research").  Michigan officials have informed the FBI that this "decision on research" would not have been reached "without . . . guidance" from the Michigan Attorney General, ATF000028, and that MSP "legal counsel spoke with their AG and they are not interested in having a call to discuss [these] matters" with the FBI or ATF.  ATF000026.  Additionally, an MSP legal advisor opined in a May 2017 email and during a June 2017 teleconference that state law did not require MSP to "unilaterally investigate, make, and report federal firearms disqualifications on behalf [of] the federal government" or otherwise interpret federal law.  Second Epstein Decl. ¶ 6.  A Michigan Assistant Attorney General participated in the June 2017 teleconference and appeared to support MSP's position.  *Id.*  And during a May 2017 call, an MSP legal advisor informed ATF that MSP had "solicited inputs from [the Michigan] AG" that the Michigan AG had "provided guidance to MSP on CPLs," and that MSP was "not doing federal firearms determinations."  *Id.* ¶ 17; McQuillan Notes, ECF No. 58-2.

### B. In the 2020 PSA, ATF Appropriately Deferred to Michigan's Interpretation of its Own State Law.

In issuing the 2020 PSA, ATF "appropriately relied on" the state agency's "interpretation of its own [ ] laws," as "traditional federalism principle[s]" suggest is obligatory. *Morgan v. ATF*, 509 F.3d 273, 275-76 (6th Cir. 2007); *see Macias v. N.M. Dep't of Labor*, 21 F.3d 366, 369 (10th Cir. 1994) (federal courts should "give deference to a state administrative agency's interpretation and application of a state statute"); *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 94 (1st Cir. 2008) ("Federal courts generally defer to a state agency's interpretation of those statutes it is charged with enforcing"). "Just as this Court defers to the state courts and other relevant authorities as to issues of state and local law, [ATF] surely should be permitted to do so as well." *Morgan v. U.S. Dep't of Just.*, 473 F. Supp. 2d 756, 765-66 (E.D. Mich. 2007) (rejecting argument that ATF has a "duty" to "independently analyze and confirm the accuracy of a local government official's interpretation of local law") (internal quotations omitted), *aff'd in part sub nom. Morgan v. ATF*, 509 F.3d 273 (6th Cir. 2007).

Other provisions of the GCA likewise incorporate state interpretations of state law, demonstrating that Congress intended ATF to defer to states, as it has done here. For example, 18 U.S.C. § 922(b)(2) prohibits firearms sales that "would be in violation of any State law or any published ordinance." *See also United States v. Cassidy*, 899 F.2d 543, 546 (6th Cir. 1990) (explaining that in applying the GCA, "[i]t is axiomatic that if we must look to the *whole of state law* in order to determine whether a felon's civil rights

28

have been restored, as opposed to looking only to an order or certificate, we must also look to the *whole of state law* in order to determine if his firearms privileges have been expressly restricted.") (emphasis added).

ATF's reliance on Michigan's interpretations of state law is also consistent with the agency's longstanding practice in interpreting 18 U.S.C. § 922(t)(3). Prior to the effective date of that section, ATF directed its field offices to "quer[y]" states "to determine if their requirements for issuing permits will qualify the permit" as an alternative so that ATF could fulfill its "responsibility to determine whether" those permits satisfy the alternate permit exception. ATF000164, ATF000166-167. ATF explained at the time that this determination could be made only through "discuss[ions] . . . with the State representatives," and not "simply [by] examin[ing] the laws of the various States." ATF000167. Similarly, in 2004, ATF asked states with alternate permits "to send a written response to ATF, explaining how the State licensing authority complies with the minimum requirements" under 18 U.S.C. § 922(t)(3). ATF000278. And ATF reiterated in 2018 that its "[f]ield counsel" are to analyze alternate permits by "correspond[ing] with the State entity" about the requirements of State law. ATF000276; *see* ATF000276-ATF000281.

In short, Plaintiffs cannot succeed on a theory that Michigan law is unchanged.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter summary judgment for Defendants, and deny Plaintiffs' motion for summary judgment.

DATED: January 29, 2024                    Respectfully submitted,


                                           BRIAN M. BOYNTON
                                           Principal Deputy Assistant Attorney
                                           General

                                           LESLEY FARBY
                                           Assistant Branch Director

                                             _/s/ Daniel Riess_
                                           DANIEL RIESS (TX Bar #24037359)
                                           Trial Attorney
                                           U.S. Department of Justice, Civil Division
                                           1100 L Street, NW
                                           Washington, D.C. 200005
                                           Telephone: (202) 353-3098
                                           Fax: (202) 616-8460
                                           Email: Daniel.Riess@usdoj.gov

                                           Bradley Darling
                                           Assistant United States Attorney
                                           211 W. Fort Street, Suite 2001
                                           Detroit, Michigan 48226
                                           (313) 226-9100
                                           Bradley.Darling@usdoj.gov
                                           *Attorneys for Defendants*