**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION**

GUN OWNERS OF AMERICA,
*et al.*

Plaintiffs,

v.

U.S. DEPARTMENT OF JUSTICE,
*et al.*,

Defendants.

Case No.  1:20-cv-10639-TLL-PTM

Hon. Thomas L. Ludington

**DEFENDANTS' BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

ISSUES PRESENTED ............................................................................................... iv

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.   Plaintiffs Fail to Demonstrate that the Issuance of the 2020 PSA Falls Outside ATF's Authority. .................................................................................. 2

A.   Plaintiffs' Proposed Construction of Section 922(t)(3) Is Not Persuasive Because It Ignores the Text, Structure, and Purpose of the Statute. ................................................................................................ 3

B.   Plaintiffs' Contrary Arguments Depend Heavily on a Mistaken Characterization of the Sixth Circuit's Opinion. ....................................... 7

II.  None of Plaintiffs' Remaining Merits Arguments Has Merit ............................... 9

III. Defendants' Record Supplementation Does Not Conflict With the Record, and Plaintiffs Fail to Justify Striking ATF's Second Supplemental Declaration. ................................................................................ 14

A.   The Second Epstein Declaration Does Not Conflict With the Record. ....................................................................................................... 16

B.   Plaintiffs Provide No Legal or Factual Basis for Striking the Second Epstein Declaration .......................................................................... 21

CONCLUSION ........................................................................................................ 25

i

# TABLE OF AUTHORITIES

**CASES**

*Abramski v. United States*,
 573 U.S. 169 (2014) ........................................................................................... 7

*Chemical Mfrs. Ass'n v. Nat'l Res. Def. Council*,
 470 U.S. 116 (1985) ........................................................................................... 7

*Gun Owners of Am., Inc. v. U.S. Dep't of Just.*,
 No. 21-1131, 2021 WL 5194078 (6th Cir. Nov. 9, 2021) ................................... 4, 8, 10

*Kentucky Waterways Alliance v. Johnson*,
 540 F.3d 466 (6th Cir. 2008) ........................................................................... 14

*Makhamreh v. Att'y Gen. Dep't of Justice*,
 No. 3:18-cv-227, 2020 WL 6146593 ................................................................. 23

*Nat'l Rifle Ass'n of Am., Inc. v. Reno*,
 216 F.3d 122 (D.C. Cir. 2000) ........................................................................... 7

*NVE, Inc. v. Dep't of Health & Hum. Servs.*,
 436 F.3d 182 (3d Cir. 2006) ............................................................................. 22

*Omimex Energy Inc. v. Blohm*,
 374 F. App'x 643 (6th Cir. 2010) ..................................................................... 14

*S. Forest Watch, Inc. v. Jewell*,
 No. 3:13-116, 2015 WL 1457978 (E.D. Tenn. Mar. 30, 2015), *aff'd*,
 817 F.3d 965 (6th Cir. 2016) ............................................................................. 7

*Tenn. Hosp. Ass'n v. Azar*,
 908 F.3d 1029 (6th Cir. 2018) ......................................................................... 13

**FEDERAL STATUTES**

5 U.S.C. § 706 .................................................................................................... 14

18 U.S.C. § 921 .................................................................................................. 12

18 U.S.C. § 922 ............................................................................................. *passim*

**STATE STATUTES**

MCL § 14.32.............................................................................................................. 20

MCL § 28.426.........................................................................................................2, 3, 14

**REGULATIONS**

63 Fed. Reg. 58,272 (Oct. 29, 1998).................................................................................. 3

**RULES**

Fed. R. Evid. 1002.......................................................................................................... 16

**OTHER AUTHORITIES**

ATF, Permanent Brady Permit Chart,
    https://www.atf.gov/rules-and-regulations/permanent-brady-permit-chart............. 4

## ISSUES PRESENTED

1.  Have Plaintiffs demonstrated that ATF's March 3, 2020 Public Safety Advisory is contrary to law under the Administrative Procedure Act?

    Defendants answer: No.

2.  Have Plaintiffs demonstrated that the Second Declaration of Eric M. Epstein is contradicted by evidence in the administrative record or provided a legal or factual basis for striking this declaration?

    Defendants answer: No.

**INTRODUCTION**

As demonstrated in Defendants' cross-motion for summary judgment, filed concurrently, ATF's issuance of a PSA in 2020 determining that Michigan's CPL did not qualify as an alternative to NICS background checks was appropriate and consistent with the agency's statutory authority.[1]  Under federal law, NICS checks must be completed before every transfer of a firearm to a non-FFL.  And although federal law allows this requirement to be satisfied if the non-FFL presents a state-issued firearms permit, it mandates that "the law of the State" must "provide[] that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law." 18 U.S.C. § 922(t)(3)(A)(ii).  However, Michigan officials have determined that state law does not require them to "verif[y] that the information available" does not "indicate that possession of a firearm" would be unlawful under all federal prohibitions.  *Id.*  ATF thus appropriately issued the 2020 PSA, which explained that CPL holders are not exempt from NICS checks.

Defendants' cross-motion for summary judgment showed that the issuance of the 2020 PSA fell within ATF's statutory authority.  The 2020 PSA is consistent with Section 922(t)(3)'s text, purpose, and structure.  By contrast, as demonstrated below, Plaintiffs have failed to show that their proposed interpretation is persuasive.  Nor have

---

[1] The abbreviations in this brief are the same as those in Defendants' cross-motion for summary judgment.

Plaintiffs otherwise met their burden of demonstrating the invalidity of the 2020 PSA.

Finally, Plaintiffs fail in their challenge to Defendants' supplementation of the

administrative record.  Plaintiffs do not provide any evidence from that record that

contradicts ATF's second supplemental declaration, and they do not provide any legal

or factual basis for striking that declaration.  The Court should therefore deny Plaintiffs'

cross-motion for summary judgment and enter judgment for Defendants.

## ARGUMENT

**I.     Plaintiffs Fail to Demonstrate that the Issuance of the 2020 PSA Falls Outside ATF's Authority.**

When it issued the 2020 PSA, ATF explained that in light of Michigan's change

in legal interpretation, the agency had concluded that Michigan CPLs issued pursuant

to MCL § 28.426 are not issued pursuant to a state law that "provides that such a permit

is to be issued only after an authorized government official has *verified* that the

information available to such official does not indicate that possession of a firearm by

such other person would be in violation of law."  18 U.S.C. § 922(t)(3)(A)(ii) (emphasis

added).  And as shown in Defendants' cross-motion for summary judgment, filed

concurrently, the statutory text, purpose, and structure of the Brady Act all confirm that

the 2020 PSA is within ATF's authority and sets forth the correct understanding of the

statute.  Defs.' Cross-Mot. for Summ. J. at II, ECF No. 63 ("Defs.' MSJ").  By contrast,

Plaintiffs' proposed construction of Section 922(t)(3) is not persuasive because it

ignores the plain statutory text and is inconsistent with the structure and purpose of the

Brady Act.   Additionally, Plaintiffs' arguments depend heavily on a mistaken understanding of the Sixth Circuit's opinion in this case.

### A.     Plaintiffs' Proposed Construction of Section 922(t)(3) Is Not Persuasive Because It Ignores the Text, Structure, and Purpose of the Statute.

As shown in Defendants' motion for summary judgment, ATF has long read 18 U.S.C. § 922(t)(3) to provide that under an alternate permit, the information available to state officials upon issuance of that permit must include information obtained through a NICS check, and the State must "disqualify all individuals prohibited under Federal law" if those persons are flagged by NICS.  63 Fed. Reg. 58,272, 58,275 (Oct. 29, 1998); ATF000157.  This represents a straightforward reading of the statutory text, which announces that state law must compel state government officials to "*verif[y]*" that the information they have "*available*" "does not indicate" that "possession of a firearm . . . would be in violation of law," 18 U.S.C. § 922(t)(3)(A)(ii) (emphasis added), as confirmed by the ordinary meaning of the statutory terms "verify" and "available." Defs.' MSJ at II.A.

Plaintiffs' contention that MCL § 28.426(2)(a) satisfies 18 U.S.C. § 922(t)(3) without regard to Michigan's interpretation ignores the plain meaning of the terms "verified" and "available."   Plaintiffs' interpretation contradicts the statutory text, elevates form over substance, and differs from the interpretations of the other 20-plus

3

states that have permits that qualify as NICS alternatives. *See* ATF000272-000275.[2]  As

explained in Defendants' cross-motion for summary judgment, Defs.' MSJ at III.A,

Michigan actually obtains information indicating that certain CPL applicants may be

prohibited, but nonetheless declines to "verif[y]" whether that information means that

possession of a firearm by those applicants "would be in violation of law."  18 U.S.C. §

922(t)(3)(A)(ii).  This does not suffice.

Plaintiffs' challenge to ATF's implementation of the Brady Act proceeds under

two rubrics.  Initially, Plaintiffs suggest that federal law only looks to the text of

Michigan's CPL statute.  *See* Pls.' MSJ at 17-19.  But as the Court has already explained,

"the Sixth Circuit squarely rejected that argument in its remand opinion."  Op. & Order

at 7 n.2, ECF No. 42 (citing *Gun Owners of Am., Inc. ("GOA") v. U.S. Dep't of Just.*, No.

21-1131, 2021 WL 5194078, at *3 (6th Cir. Nov. 9, 2021)).  Next, Plaintiffs advance

three arguments comparing Section 922(t)(3) with a different GCA provision, Section

922(t)(4), which pertains to FFLs.[3]  Pls.' MSJ at 20-22.  These arguments lack merit.  It

is correct that Congress used slightly different language in these two provisions.  Section

---

[2] *See also* ATF, Permanent Brady Permit Chart, https://www.atf.gov/rules-and-regulations/permanent-brady-permit-chart (last visited Jan. 25, 2024).

[3] 18 U.S.C. § 922(t)(4) provides: "If the national instant criminal background check system notifies the licensee that the information available to the system does not demonstrate that the transfer of a firearm to or receipt of a firearm by such other person would violate [18 U.S.C. §§ 922] (d), (g), or (n) (as applicable) or State local, or Tribal law, and the licensee transfers a firearm to such other person, the licensee shall include in the record of the transfer the unique identification number provided by the system with respect to the transfer."

(t)(3) requires state officials to "verif[y] that the information available to such official[s] does not indicate" that an individual is prohibited from firearms possession, while Section (t)(4) requires FFLs to include certain information in their firearms transfer records if NICS "notifies the [FFL] that the information available to [NICS] does not demonstrate" that a potential firearms transferee is prohibited from such possession. But the inferences Plaintiffs attempt to draw from Congress's use of different language in these two different provisions are not logically sound.

First, nothing in the GCA's text suggests that Congress envisioned that lesser "information" would be "available" to state officials than to NICS. To the contrary, state officials are likely to have at their disposal both NICS results and materials NICS may lack, such as police reports or state conviction records. *See, e.g.*, Michigan Amicus Br. at 4-5, ECF No. 45 (stating that Michigan state officials have access to the Michigan Law Enforcement Information Network ("LEIN"), a computerized non-public database containing criminal justice information). Nothing in the text suggests that Congress intended to limit "information available to [state] official[s]" to NICS results. 18 U.S.C. § 922(t)(3)A)(ii). And while the duty imposed by Section (t)(3) on state officials to review the "information available" to them is not limitless, *see infra* pages 10-12, it cannot reasonably be construed as limited to only NICS checks, as Plaintiffs argue. Had Congress so intended, it could have instead used the language of Section 922(t)(4) and required state officials to verify that the "information available to the [NICS] system" does not indicate a firearms prohibition. But Congress chose not to do so.

5

Second, nothing suggests that Congress's use of the word "indicate" in Section (t)(3) and "demonstrate" in Section (t)(4) imposes a lesser burden on state officials. Had Congress intended to limit the information available to such state officials to NICS results, the GCA could have simply required these officials to verify that "information available in the [NICS] system" does not indicate that an applicant is prohibited from possessing firearms. Congress instead used the more general phrase "information available to such official[s]," without any such qualification. 18 U.S.C. § 922(t)(3)A)(ii). For this additional reason, Plaintiffs' argument regarding the presumption of consistent usage has no merit.

Third, the fact that Section (t)(3) requires officials to verify that information available to them does not indicate that firearms possession "would be" in violation of law does not limit the information available to such officials to NICS checks. As explained above, state officials have "available" to them information other than that contained in NICS. Plaintiffs' challenge to ATF's reading of the statute thus fails.

Furthermore, as demonstrated in Defendants' cross-motion for summary judgment, the purpose and the structure of 18 U.S.C. § 922(t) reinforce ATF's reading of the statutory text. See Defs.' MSJ at II.B. By contrast, Plaintiffs' proposed interpretation contradicts the structure of the statute and frustrates its purpose. By permitting FFLs to accept an alternate permit where state law requires a less-extensive background check than a NICS check performed at the time of purchase, Plaintiffs would incentivize prohibited persons who seek firearms to obtain alternate permits.

6

This would undercut the statute's purpose of "ensur[ing] that [those] not authorized to possess firearms are unable to purchase them." *Nat'l Rifle Ass'n of Am., Inc. v. Reno*, 216 F.3d 122, 133 (D.C. Cir. 2000). Plaintiffs' reading would improperly "undermine," or "virtually repeal . . . [the Brady Act's] core provisions," *Abramski v. United States*, 573 U.S. 169, 179-80 (2014), and should be rejected.

### B. Plaintiffs' Contrary Arguments Depend Heavily on a Mistaken Characterization of the Sixth Circuit's Opinion.

APA review of agency decisions "is a deferential standard of review that presumes the validity of agency actions." *S. Forest Watch, Inc. v. Jewell*, No. 3:13-116, 2015 WL 1457978, at *12 (E.D. Tenn. Mar. 30, 2015) (citing *Chemical Mfrs. Ass'n v. Nat'l Res. Def. Council*, 470 U.S. 116, 131 (1985)), *aff'd*, 817 F.3d 965 (6th Cir. 2016). Plaintiffs thus bear the burden of demonstrating the invalidity of ATF's decision, and they err in attempting to shift the burden to ATF to show the validity of its decision, based on selective quotation from the Sixth Circuit's opinion. *See* Pls.' MSJ at 1-5.

As this Court has explained, "the Sixth Circuit found itself 'unwilling to accept' either side's interpretation of the statute. Yet rather than decide the case on the record before it, the Sixth Circuit remanded 'to allow both sides to account for what [it] h[ad] said so far in pressing their respective legal arguments and, if appropriate, to supplement the record.'" Op. & Order at 7, ECF No. 55.

Contrary to Plaintiffs' contentions, Pls.' MSJ at 1-2, the Sixth Circuit did not hold that statutory text and history dictated a result in Plaintiffs' favor. Rather, after noting

that "[a]t one level, this case looks straightforward," discussing the statutory text, and explaining the relevant history, the Sixth Circuit explained: "But what looks straightforward is not. The relevant laws leave some essential questions unanswered, a few of which we can answer today, the rest of which require additional information on remand." *GOA*, 2021 WL 5194078, at *3. Plaintiffs' selective quotation changes the meaning of the Sixth Circuit's discussion by omitting this crucial caveat.

Also contrary to Plaintiffs' representation, the Sixth Circuit did not state that on remand, Defendants would not prevail unless they could identify a pertinent state court opinion or preexisting Michigan AG opinion. *See* Pls.' MSJ at 2-5, 17-19. Rather, the Sixth Circuit stated: "What looks to be true under a state statute may not be true. There could, *for example*, be a state-court decision that dilutes the apparent meaning of the statute or *perhaps* an opinion by the Michigan Attorney General that casts light on the statute. A State, in short, could not pass a seemingly compliant state statute, then ignore it for all time." *GOA*, 2021 WL 5194078, at *3 (emphasis added); *see also id.* at *4 (noting that "ATF has not shown a state-court decision that contradicts or undermines the state statute. It *has not obtained* an opinion of the Michigan Attorney General to like effect.") (emphasis added). The Sixth Circuit thus listed state court decisions or Michigan AG opinions as *examples* of state "law" that could be identified on remand because "[t]he requirements of state law. . . remain unclear." *Id.* at *5. Importantly, the Sixth Circuit did not state that only a preexisting Michigan AG opinion would shed light on state law. Had the court wished to specify this, it could easily have done so. Instead, it

8

observed that to date, ATF "has not obtained an opinion of the Michigan Attorney General to like effect." Defendants have now done so. *See* Michigan Amicus Br., ECF No. 45.

Indeed, this Court has previously explained why it ordered the parties to obtain the Michigan AG's opinion here:

> [T]he Michigan AG need not provide—and is not being asked to provide—a binding interpretation of Michigan law. She is being asked to clarify, if she so wishes, the opinion of her office on the requirements of the Brady Act, because the Sixth Circuit specifically faulted Defendants for relying on interagency hearsay. Because the MSP purports to rely on guidance from the Michigan AG, her opinion is directly relevant to whether the ATF acted within the scope of its authority.

Op. & Order at 6, ECF No. 42 (footnote and citation omitted). The purpose of consulting the Michigan AG was to obtain her office's opinion on the Brady Act's requirements, because the MSP purports to rely on guidance from the Michigan AG's office. And as demonstrated in Defendants' cross-motion for summary judgment, Defs.' MSJ at III.A, ATF's understanding of the Michigan AG's position prior to ATF's issuance of the 2020 PSA is consistent with the Michigan AG's current position. Plaintiffs have thus failed to show that the 2020 PSA is invalid.

## II. None of Plaintiffs' Remaining Merits Arguments Has Merit.

Plaintiffs argue in the alternative that even though the Michigan AG has now presented an opinion to this Court interpreting relevant state-law requirements, Defendants still cannot prevail on the merits. *See* Pls.' MSJ at 22-23. Plaintiffs also

contend that notice and comment was required prior to the 2020 PSA's issuance. *See id.* at 25 n.18. These arguments are meritless.

First, Plaintiffs selectively quote the Sixth Circuit's opinion to attribute a position to Defendants that they do not take. *See id.* at 22-23. The Sixth Circuit observed: "One read on [ ] ATF's position is that nothing short of the investigation by [MSP] of *all* facts that might bear on the mismatch problems between the definition of certain state-law misdemeanors and the nature of the federal ban on possessing a weapon—including for misdemeanors in all 50 States—would suffice." *GOA*, 2021 WL 5194078, at *4. The court also "reject[ed] the position that there is no limit—not even a reasonableness limitation—to a state official's duty to root out matches between federal prohibitions and state laws that do not appear on the face of the conviction." *Id.* Defendants do not take either position.

The GCA does not require a state to provide limitless resources when conducting a NICS alternative check. First Epstein Decl. ¶ 13, ATF000344-000345. Instead, where a state has "information available" to it, including conviction records and police reports, an authorized state official must review that information in determining whether a permit applicant is prohibited from firearms possession. *Id.* In the case of Michigan, if MSP officials have "information available" to them in the form of pertinent records related to the permit applicant wishing to buy a firearm—whether the records are results from the NICS or LEIN databases, or available items such as conviction reports or police records, the MSP officials must review those records. *See id.*; Decl. of Celeste M.

10

Cochran ¶ 18, ATF000354; *cf.* ATF000242 (2002 GAO survey of six states' concealed-carry permit programs showed that when screening permit applicants, "each state we visited queried its own state criminal history repository in reviewing permit applicants" as well as "other information resources" they maintained).  And if a pertinent record appears to be missing, but a state official knows where the record originated, the official must contact the agency or court where the record originated to ask for it.  For example, if NICS or LEIN indicates that an applicant has a battery conviction from a particular state court but does not include the conviction record, then the official must contact the state court to ask for a copy of that record.  *See* Cochran Decl. ¶ 13, ATF000352.  However, if that court does not have the record and does not know where it is, the state official's task is done.  These obligations are in parity with the obligations of NICS.  *See id.*  And there is a reasonableness limitation on the state official's obligations.  For example, if a state court record does not list the court from which it originated, and its provenance is not readily ascertainable (*e.g.*, via a simple search of the permit applicant's name in a state court database), a state official is not obliged to contact every possible court in that state to inquire whether a defendant with the CPL applicant's name appeared in that court.  Instead, the official may simply consider the record to be a flawed record.  As another example, if a pertinent record appears to be missing but the state official does not know where the record originated, the official is not obliged to contact every possible agency or court to locate the record, and may grant the permit. State officials are also not obliged to conduct additional law-enforcement investigations

11

of their own.  Notably, MSP previously represented to Defendants that they had agreed to request documentation necessary to make MCDV determinations, before subsequently stating that they did not believe they had the legal authority to do so.  *See* ATF000034 ("MSP has advised they will request the documentation needed to research the prohibition[;] however[,] they are not finalizing any research as they believe the FBI or ATF should review the documentation. . . ."); ATF000037 ("For applications that indicate a possible MCDV, we are obtaining a police report for the particular offense.").

There is likewise a reasonableness limitation on a state official's research obligations.  For example, in the case of MCDV prohibitions, as defined in 18 U.S.C. §§ 922(g)(9) and 921(a)(33), the research obligation typically comprises two steps.  For convictions such as assault or battery, the relationship between the offender and the victim is not typically located in databases such as NICS and LEIN but is instead generally found within police reports or court documentation.  Cochran Decl. ¶¶ 6, 13, ATF000349-000350, 000352.  Therefore, a state official must review such police reports and court documents.  Additionally, he or she must review the specific state statute to determine if it contains as an element "the use or attempted use of force or the threatened use of a deadly weapon."  *Id.*  This obligation is eased because to assist state officials in determining whether a conviction constitutes an MCDV, FBI routinely provides guidance and training to state officials, and ATF field attorneys are available by phone and email to help these officials make particular MCDV determinations when

12

a question may arise in a particular case.  First Epstein Decl. ¶ 14.  The obligations that the GCA imposes on state officials are thus bounded, limited, and reasonable.

Second, as explained in Defendants' cross-motion for summary judgment, the Michigan AG's position regarding state officials' duties under the GCA, as embodied in Michigan's amicus brief, is consistent with Defendants' understanding of that position prior to the issuance of the 2020 PSA.  *See* Defs.' Cross-MSJ at Statutory and Regulatory Background at II; III.A.  The burden rests on Plaintiffs to demonstrate otherwise, and they have not met this burden.

Third, as this Court has explained, it is irrelevant that the Michigan AG has not issued a *formal* opinion regarding state officials' duties.  As the Court made clear when Plaintiffs previously raised this issue, "[t]he Michigan AG need not provide—and is not being asked to provide—a binding interpretation of Michigan law" but is instead "being asked to clarify, if she so wishes, the opinion of her office on the requirements of the Brady Act, because the Sixth Circuit specifically faulted Defendants for relying on interagency hearsay."  Op. & Order at 6, ECF No. 42 (citation and footnote omitted).

Finally, as this Court has determined previously, the 2020 PSA was an interpretive rule that is exempt from notice and comment rulemaking.  Order at 24-25, ECF No. 25.  Generally, "a rule that 'intends to create new law, rights or duties' is legislative, while a rule that 'simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties' is interpretive." *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) (citation omitted).  The

13

2020 PSA "merely rescinds prior guidance regarding M.C.L. § 28.426 and reminds Michigan FFLs of their Brady Act obligations" but "creates no new rights, duties, or obligations." Order at 25, ECF No. 25. "Accordingly, the PSA is an interpretive rule and therefore exempt from notice and comment rulemaking." *Id.*[4] This Court's determination is the law of the case, and nothing in the Sixth Circuit's decision disturbed that determination. *See Omimex Energy Inc. v. Blohm*, 374 F. App'x 643, 652 (6th Cir. 2010) ("[A] decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation.") (citation omitted).

### III. Defendants' Record Supplementation Does Not Conflict With the Record, and Plaintiffs Fail to Justify Striking ATF's Second Supplemental Declaration.

In September 2023, the Court directed Defendants to supplement the record. Op. & Order at 15-17, ECF No. 55. Specifically, the Court noted that the Michigan AG's "legal position regarding what MSP's obligations were under the Brady Act between January 2019 and March 2020 is relevant" and that there remained "lingering questions" as to "what the Michigan Attorney General's legal opinion—and presumably corresponding directive to the MSP—*actually was* and *how* and *when* ATF became aware

---

[4] Additionally, Plaintiffs' contention that the 2020 PSA was arbitrary and capricious, Pls.' MSJ at 24-25, is redundant of their argument that the PSA falls outside ATF's statutory authority. That contention is therefore meritless for the same reasons explained in Defendants' motion for summary judgment. *See* Defs.' MSJ at 19-29. Moreover, *Kentucky Waterways Alliance v. Johnson*, cited by Plaintiffs, is inapposite here because that case involved "[a] court reviewing an agency's adjudicative action" and thus (unlike the present case) was governed by the APA's "substantial evidence" standard. 540 F.3d 466, 473 (6th Cir. 2008); *see also* 5 U.S.C. § 706(2)(E).

of it." *Id.* at 15. However, the Court explained, "those questions are difficult to answer" because the Michigan AG "is not a party to this case, and the record is notably devoid of any communication between the Michigan Attorney General and ATF;" "[i]ndeed, the record suggests the Michigan Attorney General had no interest in communicating with ATF about the issue at all." *Id.* at 16. The Court further observed that "the record is not clear about whether the Michigan Attorney General ever arrived at a final decision on the issue before the ATF issued the challenged PSA." *Id.* "In short," the Court concluded, "there is important background information regarding communications between the Michigan Attorney General and the FBI and ATF about Michigan's legal position and directive to the MSP that is necessary to meaningfully evaluate the basis for ATF's decision." *Id.* The Court found that the "'appropriate procedure' is to obtain an additional affidavit from ATF that provides additional explanation," and directed Defendants to "supplement the record with at least one additional affidavit from a knowledgeable ATF or FBI employee addressing the following four inquiries related to their understanding of the Michigan Attorney General's legal position:"

> 1. When ATF became aware of the Michigan Attorney General's changed position on the legal issue.
> 2. How ATF became aware of the Michigan Attorney General's changed position on the legal issue.
> 3. What communication, if any, the FBI and/or ATF had with the Michigan Attorney General between January 2019 and March 2020 regarding the issue;

4. Whether ATF ever received communication, from the FBI, MSP, the Michigan Attorney General, or anyone else, that the Michigan Attorney General had rendered a final decision on the issue.

*Id.* at 16-17 (citation omitted).

Defendants accordingly supplemented the record with affidavits from ATF and FBI addressing these questions. ECF Nos. 58-1, 58-2, 58-3. Plaintiffs' summary judgment motion argues that portions of the record contradict ATF's supplemental declaration, Pls.' MSJ at 7-15, and that that declaration should be stricken from the record, *id.* at 15-17. Neither argument has merit.[5]

### A. The Second Epstein Declaration Does Not Conflict With the Record.

Plaintiffs fail to show that any items in the record contradict specific paragraphs of the Second Epstein Declaration to which they object. Pls.' MSJ at 7-15. As an initial matter, Plaintiffs are incorrect that Defendants must show that the Michigan AG issued a formal written opinion setting forth her legal position as to MSP's obligations under the Brady Act between January 2019 and March 2020 in order to prevail. The relevant issue as to which the Court directed supplementation is "what the Michigan Attorney General's legal opinion—and presumably corresponding directive to the MSP—*actually was* and *how* and *when* ATF became aware of it." Op. & Order at 15, ECF No. 55.

---

[5] As an initial matter, Plaintiffs object to the Second Epstein Declaration as conflicting with the best evidence rule, Fed. R. Evid. 1002, to the extent that it describes the contents of various emails. Pls.' MSJ at 7-8. In response to Plaintiffs' objection, Defendants now produce these emails as an exhibit hereto.

Defendants have now provided this supplementation.  However, although the Court asked Defendants to explain, *inter alia*, "[w]hether ATF ever received communication, from the FBI, MSP, the Michigan Attorney General, or anyone else, that the Michigan Attorney General had rendered a final decision on the issue," *id.* at 17, the Court did not require Defendants to identify a formal written Michigan AG opinion.  Nor did the Sixth Circuit impose such a requirement.  Thus, Plaintiffs' objections—which are directed primarily at showing that no formal written Michigan AG opinion was issued— are largely irrelevant.

In any event, Plaintiffs neither show that any portions of the record conflict with the Second Epstein Declaration nor otherwise cast doubt on the testimony provided in that declaration.  First, Mr. Epstein declares, based on his personal knowledge of a June 17, 2017 teleconference "in which [he] participated," that "Assistant Attorney General Patrick Fitzgerald of the Michigan AG's Office participated in this teleconference and appeared to support MSP's legal position."  Second Epstein Decl. ¶ 6.  Although Plaintiffs purport to disbelieve Mr. Epstein's testimony, Pls.' MSJ at 8, they offer no basis for such disbelief apart from speculation.  Mr. Epstein further declares: "In July 2018, MSP informed CJIS and ATF that the then-Michigan AG had granted MSP the 'authority' to make determinations regarding whether a misdemeanor crime of domestic violence (MCDV) was prohibiting pursuant to 18 U.S.C. § 922(g)(9)."  Second Epstein Decl. ¶ 9.  However, contrary to Plaintiffs' assertion, this paragraph does not suggest that the position articulated by MSP in June 2017 "never had the [then-Michigan AG's]

17

blessing," Pls.' MSJ at 8; rather, it instead suggests that the Michigan AG had originally supported MSP's position but had then changed course by July 2018.  Moreover, Plaintiffs offer nothing but speculation that "it *would seem* MSP has a history of acting without AG input" or that "it *seems more than possible*" that the position articulated by MSP in 2019 was made "without seeking AG guidance."  *Id.* (emphasis added); *see also* ATF000028 (April 2019 statement from MSP official that "MSP legal counsel will not make a decision on research without the[] guidance" of the Michigan AG).  Thus, Plaintiffs fail to show that any portion of the record conflicts with the cited paragraphs of the Second Epstein Declaration.

Second, in April 2019, FBI informed ATF that an MSP official "indicated that MSP legal counsel spoke with their AG and they are not interested in having a call to discuss matters that have been previously talked about.  They are standing firm that they do not have to conduct research for MCDV.  They are more interested in waiting to receive an opinion and direction from their AG."  ATF000026.  It is thus reasonable for Mr. Epstein to infer from this email stating that "MSP legal counsel spoke with their AG" and are "standing firm that they do not have to conduct research MCDV" that "the Michigan Attorney General's Office had, at least informally, agreed with Mr. Beatty's legal position to revert back to the State of Michigan's May 2017 to July 2018 position that MSP could not lawfully conduct further research on MCDV convictions under Michigan state law."  Second Epstein Decl. ¶ 13.

18

Third, the Second Epstein Declaration is consistent with the notes of ATF Detroit Field Division attorney Stephen McQuillan regarding a May 16, 2019 phone call between Mr. McQuillan and an MSP legal advisor. *Contra* Pls.' MSJ at 9-11.[6] Under the heading of "AG opinions," those notes list the following bulleted items: "solicited inputs from AG" and "AG provided guidance to MSP on CPLs." McQuillan Notes at 1, ECF No. 58-2. Later on the same page, those notes further state: "not doing federal firearms determinations." *Id.* Because the call on which these notes were taken was with an MSP legal advisor, it is reasonable for Mr. Epstein to declare: "According to Mr. McQuillan's notes, . . . , [the MSP legal advisor] stated that: (a) MSP had 'solicited inputs from AG'; (b) 'AG provided guidance to MSP on CPLs'; (c) MSP is 'not doing federal firearms determinations.'" Second Epstein Decl. ¶ 17. Plaintiffs offer nothing but speculation that the "AG [who had] provided guidance to MSP on CPLs" was not the then-AG but a former AG. Pls.' MSJ at 10. Nor does the Second Epstein Declaration's description of the notes otherwise conflict with the notes themselves.

Further, nothing in the record conflicts with the Second Epstein Declaration's statement, based on Mr. McQuillan's notes, that the Michigan AG had "provided guidance to MSP on CPLs." *Contra id.* at 11-13. The fact that a different MSP official later represented to ATF that MSP was "currently waiting on direction from the

---

[6] Plaintiffs fail to support their assertion that Mr. McQuillan's notes must include his name or that Mr. McQuillan must submit a declaration before his notes can be considered by the Court. *See* Pls.' MSJ at 9.

19

Michigan Attorney General," ATF000036, does not contradict the assertion that by May 16, 2019, the Michigan AG had already provided some form of guidance to MSP regarding her position on Michigan CPLs. These are two characterizations made by different individuals, not (as Plaintiffs apparently believe) statutory terms that must be reconciled under canons of construction, Pls.' MSJ at 11. Similarly, based on statements in April 2019 from MSP's legal counsel to FBI that "[t]hey [MSP] are more interested in waiting to receive an opinion and direction from their AG" than "in having a call to discuss matters that have been previously talked about," ATF000026, Mr. Epstein reasonably "interpreted MSP's pending request for an 'opinion' from the Michigan AG to be a request for issuance of a formal written legal opinion under M.C.L. § 14.32." Second Epstein Decl. ¶ 13. And a different MSP official's representation to ATF in May 2019 that MSP was "currently waiting on direction from the Michigan Attorney General," ATF000036, is consistent with both the April 2019 statement that MSP was "waiting to receive an opinion and direction from their AG," ATF0000026, and with Mr. Epstein's interpretation that MSP had requested a formal written legal opinion.

Nor do any other paragraphs of the Second Epstein Declaration undermine this interpretation. *Contra* Pls.' MSJ at 13-14. For example, Plaintiffs offer only speculation for the notion that if the Michigan AG had intended to issue a formal written legal opinion, she would have asked ATF to delay its issuance of the 2020 PSA until she had issued her opinion. Pls.' MSJ at 13. Additionally, nothing in the declaration conflicts with the May 22, 2019 statement from an MSP official that "[f]or applications that

20

indicate a possible MCDV, [MSP is] obtaining a police report for the particular offense. If the police report documents a MCDV qualifying relationship, we process it and log it pending the outcome of the MI AG opinion.  We will follow up or pass along to NICS/ATF, depending on the MI AG opinion." ATF000037.  These statements that as of May 2019, MSP was waiting for a formal written Michigan AG opinion do not suggest—as Plaintiffs contend—that the Michigan AG had not already conveyed to MSP some form of guidance regarding her position, Pls.' MSJ at 13-14.  Instead, they merely show that the AG had not formalized that position in a written opinion.  This is underscored by a statement in March 2019 from an MSP official that "they [MSP] were advised by their MSP legal counsel that they are not adhering to the previous direction provided by the previous Michigan AG, they are waiting on an opinion from the new AG as to whether the new AG agrees with the process."  ATF000024.

Plaintiffs have thus failed to identify any portion of the record that contradicts any part of the Second Epstein Declaration.

### B.      Plaintiffs Provide No Legal or Factual Basis for Striking the Second Epstein Declaration.

As explained above, in response to this Court's direction, Defendants have supplemented the record with declarations from "knowledgeable ATF or FBI employee[s]" addressing four "inquiries related to ATF's understanding of the Michigan Attorney General's legal position between January 2019 and March 2020."  Op. &

Order at 18, ECF No. 55.  Although Plaintiffs now seek to strike the Second Epstein Declaration, Pls.' MSJ at 15-17, they provide no legal or factual basis for doing so.[7]

As an initial matter, this Court directed Defendants to supplement the record by "providing at least one affidavit by a knowledgeable ATF or FBI employee" regarding designated topics.  Op. & Order at 18, ECF No. 55.  Although the Second Epstein Declaration discusses the content of emails and other communications, the Court did not direct Defendants to provide such emails and communications, but only to file declarations on prescribed topics.  In any event, Defendants are now filing these emails and other communications as an exhibit hereto.

Nor, contrary to Plaintiffs' representation, has the Court previously directed Defendants to produce any "internal documents."  Pls.' MSJ at 15.  Rather, the Court noted in its May 2022 decision that Defendants had "propose[d] a multifaceted approach" to supplement the record by "addressing three topics from the Sixth Circuit's opinion."  Op. & Order at 8, ECF No. 39.  The Court observed that regarding the topic of "the factual operation of the NICS database," "Defendants [had] propose[d] submitting either operational documents or an explanatory declaration from FBI-NICS."  *Id.*  And regarding the other two topics, "the MSP's legal position" and "ATF's

---

[7] Nor have Plaintiffs demonstrated entitlement to discovery that this Court has previously denied twice already.  *See* Op. & Order at 8-11, ECF No. 39; Op. & Order at 17, ECF No. 55; *see also NVE, Inc. v. Dep't of Health & Hum. Servs.*, 436 F.3d 182, 195 (3d Cir. 2006) (noting the "strong presumption against discovery into administrative proceedings").

legal position," the Court noted that Defendants had proposed, respectively, "either inviting briefing from the Michigan Attorney General or certifying the question to the Michigan Supreme Court" and "submitting a declaration from the ATF outlining its legal position at the time of the [2020] Advisory." *Id.* The Court adopted Defendants' proposal, *id.* at 9-11, and directed Defendants to "file the supplemental record," *id.* at 11. Plaintiffs are thus mistaken in representing that the Court has ordered Defendants to submit any "internal documents," or that the submission of the Second Epstein Declaration somehow runs afoul of such (nonexistent) order.[8]

Plaintiffs do accurately state that the Second Epstein Declaration describes a February 2006 letter from Mike Cox, then-Attorney General for the State of Michigan, to ATF, a letter that Plaintiffs have previously sought and that Defendants previously believed in good faith they did not possess. Pls.' MSJ at 17. This error by Defendants occurred as follows. In a November 2022 motion, Plaintiffs sought to supplement the record with this letter. ECF No. 47. In response, ATF searched all components it reasonably believed might possess the letter, but it did not locate a copy.[9] Defendants

---

[8] Further, *Makhamreh v. Att'y Gen. Dep't of Justice*, No. 3:18-cv-227, 2020 WL 6146593, (S.D. Ohio Oct. 20, 2020), cited by Plaintiffs, is inapposite. That case did not involve any attempt by either party to supplement or complete the record, and Plaintiffs' quotation from this case is taken from its standard-of-review section. *See id.* at *4.

[9] Specifically, ATF searched its Public and Governmental Affairs Directorate, Enforcement Program and Services Directorate, Division Counsel for the Detroit Field Division, and the Chief Counsel Library. ATF also queried a former Detroit Division Counsel and searched the files of multiple former ATF attorneys believed to have worked on the Michigan alternate permit issue.

thus accurately represented in good faith that they did not possess the letter.  However, when tasked to prepare the Second Epstein Declaration, Mr. Epstein reviewed all documents in his possession relating to the four topics designated by the Court in its September 2023 decision.  These documents included the February 2006 Cox letter, and Mr. Epstein described this document in his declaration.  Second Epstein Decl. ¶ 3. Undersigned counsel for Defendants, when reviewing and filing the Second Epstein Declaration, did not realize that a document described in that declaration was one that Plaintiffs had previously requested in their November 2022 motion.  Defendants regret this good faith error and are now filing this document with the Court.[10]

However, Plaintiffs err in contending that Defendants' inadvertent error warrants striking the Second Epstein Declaration, *see* Pls.' MSJ at 17, and they provide no support for such a contention.  Additionally, the Court has previously recognized that the February 2006 Cox letter "is not relevant to ATF's decision—made almost 15 years later—to issue the March 2020 PSA."  Op. & Order at 12, ECF No. 55.  The Court further explained that the First Epstein Declaration "adequately explains ATF's legal position on the issue at the time of the challenged agency action, so an outdated legal position is not necessary for 'meaningful review' of the challenged action," and thus declined to include this letter in the administrative record.  *Id.* (citation omitted). Plaintiffs thus vastly overstate the significance of this nearly eighteen-year-old letter.

---

[10] Mr. Epstein does not possess the other documents sought by Plaintiffs in their November 2022 motion.

In sum, Plaintiffs provide no basis for striking the Second Epstein Declaration.

## CONCLUSION

For the foregoing reasons, and the reasons explained in Defendants' motion for summary judgment, Defendants respectfully request that the Court enter judgment for Defendants, and deny Plaintiffs' motion for summary judgment.

DATED: January 29, 2024                    Respectfully submitted,


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

  /s/ Daniel Riess
DANIEL RIESS (TX Bar #24037359)
Trial Attorney
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, D.C. 200005
Telephone: (202) 353-3098
Fax: (202) 616-8460
Email: Daniel.Riess@usdoj.gov

Bradley Darling
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9100
Bradley.Darling@usdoj.gov
*Attorneys for Defendants*

25