UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GUN OWNERS OF AMERICA, INC.
and DONALD J. ROBERTS II,

       Plaintiff,

v.

U.S. DEPARTMENT OF JUSTICE et al.,

       Defendant.
_____/

Case No. 1:20-cv-10639

Honorable Thomas L. Ludington
United States District Judge

**OPINION AND ORDER (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, (2) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, (3) DENYING PLAINTIFFS' MOTION TO AMEND THE BRIEFING SCHEDULE, AND (4) DISMISSING PLAINTIFFS' COMPLAINT**

This case stems from the Bureau of Alcohol, Tobacco, and Firearms's (ATF) decision to issue a public safety advisory about Michigan's concealed pistol license (CPL) in 2020. The 2020 advisory informed federal firearm licensees (FFLs) that the ATF no longer considered the Michigan CPL a valid alternative to federal background-check requirements. Plaintiffs Gun Owners of America, Inc. and one of its members, Donald J. Roberts II, sued the ATF, its Director,[1] and the U.S. Department of Justice to enjoin the advisory, arguing that the advisory violates the Administrative Procedure Act (APA), 5 U.S.C. § 1001 *et seq*.

Three motions are currently before this Court. First, Plaintiffs submitted a motion to suspend the briefing schedule for summary judgment motions. But soon after, Plaintiffs filed a motion for summary judgment. Defendants filed a cross-motion for summary judgment in

---

[1] At the time this case was filed, Regina Lombardo was the Acting Director. In April 2022, the Acting Director was Gary M. Restaino. But as of July 2022, the Director is now Steven Dettelbach. Under Civil Rule 25(d), the substitution of Dettelbach for Restaino occurred automatically. FED. R. CIV. P. 25(d).

response. Ultimately, this case does not have a home in federal court because Plaintiffs lack Article III standing. So the Defendants' Cross-Motion for Summary Judgment will be granted, Plaintiffs' Motion for Summary Judgment will be denied, and Plaintiffs' Motion to Suspend the Briefing Schedule will be denied as moot.

# I.

## A. Federal Firearm Law

In 1968, Congress enacted the Gun Control Act (GCA), Pub L. No. 90-618, 82 Stat. 1213 (1968), to control the firearm industry. The GCA limited the industry to certain federally licensed dealers, manufacturers, and importers. *See* 18 U.S.C. § 922(a)(1). A federally licensed firearm dealer is called a "federal firearm licensee" (FFL). 28 C.F.R. § 25.2. The GCA, as amended, forbids FFLs from selling firearms to certain persons, including felons, "fugitive[s] from justice," controlled substance users, and those convicted of a "misdemeanor crime of domestic violence" (MCDV). 18 U.S.C. § 922(d). And the GCA prohibits such persons from buying a firearm. *Id.* § 922(g). These persons are predictably branded "prohibited persons." *See United States v. McKenzie*, 33 F.4th 343, 347 (6th Cir. 2022).

In 1993, Congress amended the GCA through the Brady Handgun Violence Prevention Act (the "Brady Act"), Pub. L. No. 103-159, 107 Stat. 1536 (1993). The Brady Act directed the Attorney General to establish a "national instant background check system" (NICS) that every FFL could access. *Id.* § 103(b). In 1998, the FBI launched NICS. ECF No. 46-1 at PageID.734. Today, FFLs must contact NICS and provide certain information for a background check before completing firearm sales. 18 U.S.C. § 922(t)(1).

The NICS background check process works like this: The potential purchaser completes ATF Form 4473,[2] which requires certain personal information. 27 C.F.R. § 478.102. The FFL then contacts NICS by telephone and relays the information.[3] 28 C.F.R. § 25.6. NICS uses the information to search for disqualifying records in three FBI databases: Interstate Identification Index, National Crime Information Center, and NICS Indices. *Id.* After the search, NICS generates three possible responses: (1) "Proceed" (allowing the sale); (2) "Deny" (instructing the FFL not to complete the sale); (3) "Delayed" (further research is required, and the FFL must not complete the sale yet). *Id.* § 25.6(c)(1)(iv). When an FFL receives a "Delayed" response but no further NICS response within three business days, the FFL may complete the sale without a "Proceed" response.[4] 18 U.S.C. § 922(t)(1)(B)(ii).

Yet the Brady Act allows certain state-issued firearm permits to exempt FFLs from requiring the buyer to complete the NICS background check process at the point of sale—call these permits "Brady Alternates." *See Gun Owners of Am., Inc. v. DOJ*, No. 21-1131, 2021 WL 5194078, at *1 (6th Cir. Nov. 9, 2021) (quoting *Abramski v. United States*, 573 U.S. 169, 172 n.1 (2014)) [hereinafter *Gun Owners*]. The Brady Alternates provision declares the following:

> (3) [the ordinary point of sale NICS background check requirement] shall not apply to a firearm transfer between a licensee and another person if—
>
> (A)(i) such other person has presented to the licensee a permit that—

---

[2] A sample Form 4473 is available on the ATF website. *See Form 4473*, BUREAU OF ALCOHOL, TOBACCO, AND FIREARMS, https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download (last visited Sep. 23, 2024) [https://perma.cc/6U3F-HW46].

[3] An exception occurs where the FFL is in a "point-of-contact state." A "point-of-contact state," or "POC state," is a state that opts in to serve as an intermediary between the FFL and NICS. 28 C.F.R. § 25.2. In these states, FFLs contact the state POC rather than NICS. *Id.* The state POC then conducts a NICS check. *Id.* Michigan is a non-POC state, so Michigan FFLs contact NICS directly.

[4] The Bipartisan Safer Communities Act, Pub L. No. 117-159, 136 Stat. 1313 (2022) imposes additional requirements for buyers under 21. *See* 18 U.S.C. § 922(t)(1)(C).

>> (I) allows such other person to possess or acquire a firearm; and
>
>> (II) was issued not more than 5 years earlier by the State in which the transfer is to take place; and
>
> (ii) the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law

18 U.S.C. § 922(t)(3). Based on this provision, the Bureau of Alcohol, Tobacco, and Firearms (ATF) publishes letters to FFLs determining which state firearm permits qualify as Brady Alternates. *See Brady Letters to FFLs*, BUREAU OF ALCOHOL, TOBACCO, AND FIREARMS, https://www.atf.gov/rules-and-regulations/brady-letters-ffls (last visited Sep. 23, 2024) [https://perma.cc/6WR8-FFED].

### B. Michigan Law and Michigan Brady Alternates

**1.**

Michigan law features a permitting scheme for firearms. First, the general rule is that people wishing to "purchase, carry, possess or transport [a] pistol or to purchase a firearm" must obtain a "license to purchase" (LTP). MICH COMP. LAWS § 28.422. The LTP statute provides that local law enforcement is tasked with issuing LTPs. *Id.* § 28.422(3). An LTP applicant is qualified if the issuing official determines that she is not subject to a lengthy list of disqualifications, which include certain prior convictions and mental health dispositions. *Id.* § 28.422(3).

Michigan exempts two classes of pistol purchasers from the LTP requirement: (1) concealed pistol license (CPL) holders, and (2) purchasers who buy "from [an FFL] in compliance with 18 USC 922(t)." MICH COMP. LAWS § 28.422a(1). Besides purchasing a pistol,

- 4 -

the CPL allows its holder—as its name suggests—to carry a concealed pistol.[5] Michigan residents may apply for a CPL if they are:

> (1) at least 21 years of age,
>
> (2) not subject to certain legal dispositions (*e.g.*, personal protective order, involuntary hospitalization),
>
> (3) not a felon,
>
> (4) not dishonorably discharged from the military,
>
> (5) not convicted of certain misdemeanors,
>
> (6) not previously found "guilty but mentally ill,"
>
> (7) not currently or previously committed to a mental institution,
>
> (8) not diagnosed with mental illness "that includes an assessment that the individual presents a danger to himself or herself or to another,"
>
> (9) not under a court order of legal incapacity, and
>
> (10) have completed qualified pistol safety training.

MICH. COMP. LAWS § 28.425b(7). MSP is responsible for making many of these CPL determinations and preparing a report for the "county clerk of the county in which the [applicant] resides," who, upon "determining that all of the [preceding] circumstances exist," "shall issue" a CPL to the applicant. *Id.* § 28.425b(1), (7).

**2.**

When the Federal Bureau of Investigation (FBI) first activated NICS in 1998, ATF issued a permit letter entitled "Open Letter to All Michigan Federal Firearms Licensees." ECF No. 46-1 at PageID.734. The letter informed Michigan FFLs that, beginning November 30, 1998, FFLs must use the NICS background check process before completing a firearm sale. *Id.* The letter

---

[5] In any case, Michigan allows residents to "open carry" a pistol. As Michigan State Police (MSP) explained in a public notice, "[I]t is legal for a person to carry a firearm in public as long as the person is carrying the firearm with lawful intent and the firearm is not concealed . . . because there is no Michigan law that prohibits it." *Legal Update No. 86*, MICH. STATE POLICE (Oct. 26, 2010), https://www.michigan.gov/-/media/Project/Websites/msp/legal2/msp_legal_update_no_86_2.pdf [https://perma.cc/MBK6-2HKC].

noted that while Michigan's LTP was a valid Brady Alternate, the Michigan CPL "did not . . . qualify." *Id.* at PageID.735. ATF published another letter on March 15, 2004, confirming that the Michigan CPL was not a Brady Alternate and reminded FFLs that they "must contact NICS" before selling firearms. *Id.* at PageID.736.

In response, Michigan added a NICS check requirement in 2005. MICH COMP. LAWS § 28.426. This NICS check requirement applies to both LTP and CPL applicants.[6] *Id.* ATF records indicate that soon after Michigan enacted § 28.426, Michigan Attorney General (AG) Michael Cox requested that ATF deem the Michigan CPL a Brady Alternate.[7] ECF No. 64-1 at PageID.1335–36. This letter stipulated that Michigan CPL issuance would entail the following:

1. A full NICS check being conducted by an authorized Michigan government official;

2. A determination made by that official that the permit holder is not prohibited under federal or state law from possessing firearms; and

3. The permit being denied if the individual is prohibited from possessing a firearm under federal (or state) law.

*Id.* (enumeration added). So ATF released another letter on March 24, 2006. ECF No. 46-1 at PageID.737. The letter stated that any Michigan CPL "issued on or after November 22, 2005" would qualify as a Brady Alternate because of recent changes to Michigan law. *Id.* Thus, Michigan CPL holders could purchase firearms with their CPLs in lieu of a NICS check for many years.

---

[6] ATF records suggest that Michigan already performed background checks for LTPs—which is why the LTP has been a Brady Alternative from the start. *See* ECF No. 46-1 at PageID.737 (noting that the ATF's 1998 decision to recognize the LTP as a Brady Alternate was "based on the fact that Michigan conducted background checks through NICS" before issuing LTPs).

[7] The letter is not part of the administrative record.

## C. Discord, Federal Audit, and 2020 ATF Letter to Michigan FFLs

### 1.

Things changed. According to ATF personnel, in 2017, ATF and the FBI learned that MSP—when issuing CPLs—was not conclusively determining whether an applicant was federally prohibited from possessing firearms when NICS showed a potential prohibiting condition. ECF No. 58-1 at PageID.1199. Indeed, MSP legal advisor Steve Beatty opined that MSP was not legally obligated to conduct follow-up research to make conclusive legal determinations on federal disqualifications when NICS lacked such a determination. *Id.*; *see also* ECF No. 64-1 at PageID.1339–40. ATF disagreed, asserting that MSP must apply federal law and make such determinations before issuing CPLs if CPLs enjoyed Brady Alternate status. ECF No. 58-1 at PageID.1199–1200. After significant "back and forth discussion," MSP informed the FBI that the Michigan Attorney General had granted MSP "the authority to make determinations on [federal prohibitions] and enter those in the NICS Indices database." ECF No. 46-1 at PageID.756; *see also* ECF No. 58-1 at PageID.1200. All was well—until the next Michigan Attorney General turnover.

In March 2019, MSP informed the FBI that following the recent election of Attorney General Dana Nessel, the "direction that the MSP permit unit has received in the past on [the CPL] issue ha[d] changed." ECF No. 46-1 at PageID.757; ECF No. 58-1 at PageID.1200. Kevin Collins, an MSP Field Support Section Manager, conveyed to the FBI that MSP legal counsel "[were] not adhering to the previous direction provided" but were "waiting on an opinion from the new AG as to whether the new AG agrees with the process." ECF No. 46-1 at PageID.757; *see also* ECF No. 58-1 at PageID.1200–01. As a result, 63 CPL applications that were awaiting further research on a potential MCDV prohibition were "pushed to the county clerks" without

further investigation—50 of those applications were approved, leading the FBI to conclude that 50 CPLs were issued to persons with a potential MCDV prohibition. ECF No. 46-1 at PageID.761, 769–75.

The FBI tried to initiate a conference call with MSP, but MSP declined. *Id.* at PageID.759. FBI records indicate that "MSP legal counsel spoke with [the] AG and they are not interested in having a call . . . , [and] [t]hey are standing firm that they do not have to conduct research for [federal prohibitions]." *Id.* About a month later, a local ATF attorney spoke with MSP legal advisor Steve Beatty and according to ATF, Beatty stated: "(a) MSP had 'solicited input from AG'; (b) 'AG provided guidance to MSP on CPLs'; (c) MSP is 'not doing federal firearms determinations,' and (d) . . . 'show us where under . . . federal law . . . [we're] require[d] to do that.'" ECF No. 58-1 at PageID.1203 (quoting ECF No. 58-2 at PageID.1209).

**2.**

In June 2019, the FBI conducted a NICS audit of Michigan's compliance with federal law. ECF No. 46-1 at PageID.739. In the FBI's view, the audit uncovered several instances of noncompliance. *Id.* at PageID.741. The central finding of the audit was that Michigan CPL applicants "[were] not being evaluated and/or denied with criteria based on all of the federal prohibitions outlined in [18 U.S.C. § 922(g)]." *Id.* at PageID.742. Specifically, the FBI was concerned that Michigan was not denying CPL applicants with MCDVs, "fugitive[s] from justice," or marijuana users. *Id.* MSP disputed these findings and stated they were not "aware of [a] federal law requiring [them] to make a final determination of factual and legal issues in applying federal law under 18 U.S.C. § 922(g) . . . ." *Id.* at PageID.743.

Despite the FBI's findings about the CPL program, the audit found no comparable violations by local law enforcement in issuing LTPs. *See generally id.* at PageID.741–55.

Internal FBI records explain this distinction between the LTP and CPL programs. *See id.* at PageID.764. In these records, FBI officials observe that the Michigan official charged with training local law enforcement was, for whatever reason, "contin[uing] to direct [them] to conduct research according to federal law on all LTP applications," even as MSP followed a different protocol for CPL applications.[8] *Id.*

### 3.

Against that backdrop, on March 3, 2020, ATF issued an advisory entitled "Public Safety Advisory to All Michigan Federal Firearms Licensees" (PSA). ECF No. 46-1 at PageID.833–34. The PSA informed Michigan FFLs that given changes to Michigan's CPL process, the ATF rescinded the March 2006 Open Letter, and "a valid Michigan CPL is no longer" a Brady Alternate. *Id.* at PageID.834. As a result, "[a]ll Michigan FFLs are required to conduct a NICS background check" before transferring "a firearm to a non-licensee, even if that individual possesses a valid, unexpired CPL." *Id.*

ATF also sent a letter to the Michigan AG, informing her that ATF rescinded its March 2006 Open Letter. *Id.* at PageID.836–38. The letter concluded with a list of "corrective measures" that Michigan must take before the Michigan CPL could qualify as a Brady Alternate again. *Id.* at PageID.838.

### D. This Case

### 1.

Four days after ATF published its 2020 PSA, Michigan CPL holder and Gun Owners of America (GOA) member Plaintiff Donald J. Roberts II tried to buy a firearm from a Michigan

---

[8] FBI records reflect that while Kevin Collins led the MSP research program for CPLs, a different Michigan official, Jason Pierce, led local law enforcement on LTP research. ECF No. 46-1 at PageID.764.

FFL. ECF No. 63 at PageID.1270. Roberts had no federal or state disqualifications preventing him from purchasing a firearm. *Id.* Heeding the recent 2020 PSA, the FFL told Roberts his CPL would not suffice, and the FFL needed to fulfill the NICS background check process before selling Roberts a firearm. *Id.* at PageID.1271. When the FFL told Roberts this, he left the store without buying a firearm.[9] *Id.*

Plaintiffs promptly sued. On March 9, 2020, Roberts and GOA filed a complaint against Defendants, alleging that the 2020 PSA violated the Administrative Procedure Act (APA). ECF No. 1. Specifically, Plaintiffs contend that the PSA is arbitrary and capricious (Count I), the PSA exceeds ATF's statutory authority (Count II), and ATF promulgated the PSA without proper notice and comment (Count III).[10] *Id.* at PageID.16–19.

After Defendants submitted a certified administrative record, ECF No. 16, the Parties filed cross-motions for summary judgment, ECF Nos. 17; 21. The Parties did not raise jurisdictional issues and focused on whether ATF acted within its statutory authority and discretion when it issued the 2020 PSA. *See* Nos. 17; 19. Subsection (ii) of the Brady Alternate provision, 18 U.S.C. § 922(t)(3)(A)(ii)—was the critical point of contention. Plaintiffs argued that by using the phrase "the law of the State" in subsection (ii), Congress commanded ATF to look no further than the statutory law of the State in question. ECF No. 17 at PageID.418–19. And because Michigan's CPL law facially satisfies the Brady Alternate requirements, Plaintiffs concluded that ATF had no authority to withdraw the Michigan CPL's Brady Alternate status based on the opinions of MSP's counsel. *Id.* at PageID.420–21.

---

[9] The Parties stipulate to this account of Robert's trip to the FFL. *See* ECF Nos. 60 at PageID.1231–33; 63 at PageID.1270–72.

[10] Plaintiffs also alleged that the PSA violated 18 U.S.C. § 926(a) (Count IV)—which Plaintiffs construed as prohibiting Defendants from creating a "national gun registry"—but the Parties dismissed this claim. ECF No. 19.

By contrast, Defendants argued that because subsection (ii) requires state officials to "verif[y]" that "the information available" "does not indicate" a federal prohibition, the statute naturally contemplated some level of research and analysis. ECF No. 21 at PageID.464–65. This interpretation was consistent with the Brady Act's purpose, they argued, because it prevented states from feigning compliance with the Brady Alternate exception. *Id.* at PageID.466–69.

Applying *Skidmore* respect, this Court adopted ATF's interpretation. *Roberts v. DOJ*, 507 F. Supp. 3d 864, 875 (E.D. Mich. 2020). This Court noted that the dictionary definition of "law" encompassed "customs, practices, [and] rules," not just statutory codes, and that ATF's interpretation prevented States from "feign[ing] compliance with the Brady Act by enacting statutes that they had no intention of enforcing." *Id.* at 876.

This Court also found that the ATF did not abuse its discretion, citing MSP's statement that it would not research certain federal prohibitions. *See id.* at 879–80 ("'[T]he MSP has not been made aware of federal law requiring a state agency in our position to make a final determination of factual and legal issues in applying federal law under 18 USC 922(g) and (n) . . . .'" (quoting MSP Resp. to 2019 ATF Audit, ECF No. 16-1 at PageID.97)).

For those reasons, Defendants' motion for summary judgment, ECF No. 21, was granted.

**2.**

Plaintiffs appealed. ECF No. 27. On appeal, the Sixth Circuit took a more critical view of the ATF's 2020 PSA and its administrative record. To start, the Sixth Circuit agreed that Plaintiffs had stretched the statute's literal meaning "too far." *Gun Owners*, 2021 WL 5194078 at *3. But the Sixth Circuit refused to adopt the ATF's interpretation. *Id*. And the court noted that "the mere presence of erroneous permit grants in the past" does not alone authorize the ATF "to remove a State from the eligibility list." *Id.* at *4.

The problem with the ATF's interpretation, the Sixth Circuit further explained, was that it required state officials to complete "difficult matching problems." *Id.* at *4. For example, recall that federal law includes people with state-law MCDV convictions in its prohibited persons list. *Id.* (citing 18 U.S.C. § 922(g)(9)). Congress defined MCDV to encompass (1) "the use or attempted use of physical force, or the threatened use of a deadly weapon," and (2) "committed by" a person with a certain domestic relationship to the victim, including "a current or former spouse, parent, or guardian." 18 U.S.C. § 921(a)(33)(A)(ii). But Michigan, like other states, has a domestic violence statute that is more inclusive. *See* MICH. COMP. LAWS § 750.81 (covering violence against "resident or former resident of . . . household"). So under the ATF's reading, if a CPL applicant has a domestic-violence conviction from Michigan, the MSP might have to investigate the specific facts of her offense to determine whether she is federally prohibited from possessing a firearm. *See Gun Owners*, 2021 WL 5194078, at *4.

Aside from these and other practical difficulties, the Sixth Circuit criticized the ATF's approach for lacking a firm textual basis. As the Sixth Circuit explained, "[the Brady Act] requires only that the State 'verify that the information available' 'does not indicate' federally prohibited status"; it does not require the State to "verify that the circumstances of the underlying offense do not violate federal law." *Id.* Said otherwise, the Sixth Circuit "reject[ed] the position that there is no limit—not even a reasonableness limitation—to a state official's duty to root out matches between federal prohibitions and state laws." *Id.*

In short, the Sixth Circuit found itself "unwilling to accept" either side's interpretation of the statute. *Id.* Yet rather than decide the case on the record before it, the Sixth Circuit remanded it "to allow both sides to account for what [it] h[ad] said so far in pressing their respective legal arguments and, if appropriate, to supplement the record." *Id.* at *5.

**3.**

On remand, Defendants supplemented the record. To that end, Defendant filed a certified supplemental administrative record. ECF No. 46. And, at this Court's direction, Defendants filed ATF personnel affidavits. ECF Nos. 57; 58.

The Parties again filed cross-motions for summary judgment. ECF No. 60; 63. Many of the arguments still center on 18 U.S.C. § 922(t)(3)(A)(ii)'s text. *See generally* ECF Nos. 60; 63. But Defendants also raise a fresh argument: that Plaintiffs lack Article III standing, so this case must be dismissed even if Plaintiffs' statutory interpretation is correct. ECF No. 63 at PageID.1288–91.

**II.**

"The APA establishes the procedures federal administrative agencies use for 'rule making,' defined as the process of 'formulating, amending, or repealing a rule.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95 (2015) (citing 5 U.S.C. § 551(5)). Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA further empowers federal courts to set aside unlawful agency action:

> (2) [The reviewing court shall] hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . .
> >
> > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> >
> > (D) without observance of procedure required by law; . . . .

5 U.S.C. § 706(2). "When a federal court is reviewing a final agency action, the usual rules and standards governing summary judgment do not apply." *KPK Techs., Inc. v. Cuccinelli*, No. 19-

10342, 2019 WL 4416689, at *3 (E.D. Mich. Sept. 16, 2019) (citing *Alexander v. Merit Sys. Prot. Bd.*, 165 F.3d 474, 480–81 (6th Cir. 1999)). "[S]ummary judgment 'serves as the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review.'" *Singh v. Johnson*, No. 15-CV-12957, 2016 WL 3476701, at *3 (E.D. Mich. June 27, 2016) (quoting *Resolute Forest Prod., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100, 106 (D.D.C. 2016)).

### III.

As a threshold matter, plaintiffs seeking an injunction must demonstrate Article III standing—which Plaintiffs have not demonstrated here. The Federal Government's branches possess limited and separated powers. *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 536 (6th Cir. 2021). The federal judiciary is not immune from such limitations—so not all disputes belong in federal court. *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 860 (6th Cir. 2020). Under Article III of the United States Constitution, the federal judiciary's power extends only to "Cases" and "Controversies." *United States v. Texas*, 599 U.S. 670, 675 (2023). This "Cases and Controversies" mandate "limits the role of the Federal Judiciary in our system of separated powers." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). In this way, Article III and corresponding separation-of-powers principles forbid federal courts from "operat[ing] as an open forum for citizens" to critique government action. *Id.* at 379. Flowing from these principles is Article III's requirement that a plaintiff must have a "personal stake" in a case—that is, a plaintiff must have "standing." *Id.*

In essence, this standing requirement is "'not merely a troublesome hurdle . . . ; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787.'" *Texas*, 599 U.S. at 675 (quoting *Valley Forge Christian College v. Americans United for*

*Separation of Church and State, Inc.*, 454 U.S. 464, 476 (1982)). Indeed, standing "implements 'the Framers' concept of the proper—and properly limited—role of the courts in a democratic society.'" *All. for Hippocratic Med.*, 602 U.S. at 380 (quoting J. Roberts, *Article III Limits on Statutory Standing*, 42 DUKE L.J. 1219, 1220 (1993)). And it thwarts bystanders' attempts to prowl "the country in search of government wrongdoing," eluding Article III's limits on federal courts. *Id.* (cleaned up).

To demonstrate Article III standing, plaintiffs—that is, the party invoking federal jurisdiction—bear the burden of answering "a basic question: 'What's it to you?'" *Id.* at 379 (quoting A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 882 (1983)). In that vein, standing requires plaintiffs to establish three things: (1) that they have suffered an injury-in-fact; (2) that their injury is traceable to the defendant's conduct; and (3) that the injury is likely to be redressed by a favorable judicial decision. *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 750 (6th Cir. 2023).

## A.

Roberts does not demonstrate a cognizable injury-in-fact, the first standing element. Roberts's purported injury is that because of ATF's 2020 PSA, he cannot use his CPL and instead must undergo a NICS background check to buy firearms. *See* ECF No. 1 at PageID.17 ("Plaintiffs are adversely affected because they are being and will continue to be harmed by Defendants' action, in that they are prohibited from using their Michigan concealed carry permits as a lawful and Congressionally authorized alternative to the NICS system."); *see also* ECF No. 66 at PageID.1352–55.

But Roberts's injury must be both "(1) particularized and (2) concrete." *Ward v. Nat'l Patient Acct. Servs. Sols., Inc.*, 9 F.4th 357, 361 (6th Cir. 2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). Concreteness is the relevant sub-element here. Concreteness requires an injury to be real and not abstract. *Crawford v. United States Dep't of Treasury*, 868 F.3d 438, 453 (6th Cir. 2017). To be sure, "concrete is not synonymous with tangible: intangible harms such as those produced by defamation or the denial of individual rights may certainly be concrete enough to constitute an injury in fact." *Id.* (citing *Spokeo*, 578 U.S. at 340). This concreteness requirement applies with "special force when a plaintiff files suit to require an executive agency to 'follow the law.'" *Spokeo*, 578 U.S. at 346 (Thomas, J., concurring). After all, "[a] citizen may not sue based only on an asserted right to have the Government act in accordance with law." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (cleaned up).

Roberts's purported injury is not concrete. Roberts does not assert that the 2020 PSA prevents him from buying a firearm without undue delay, which *is* a concrete injury. *See Lee v. DOJ*, 554 F. Supp. 3d 1228, 1234 (N.D. Ala. 2021) (citing *Robinson v. Sessions*, 721 F. App'x 20, 24 (2d Cir. 2018)). In fact, by all indications, had Roberts completed Form 4473, he would have promptly passed the NICS check and left the FFL with a new firearm the same day. *See* ECF No. 60 at PageID.1231–33 (Parties stipulated facts). Instead, Roberts's purported injury is that he could not purchase a firearm *the way that he wanted to*—with his CPL instead of a Form 4473—which *is not* a concrete injury. *See Lee*, 554 F. Supp. 3d at 1234–35 (holding that the plaintiff's inability to use her concealed weapons permit to purchase a firearm because of an ATF FFL letter was not a concrete injury). Nor is Roberts's obligation to complete Form 4473 and undergo a NICS background check at an FFL a concrete injury. *See Robinson v. Sessions*, 721 F. App'x 20, 22–24 (2nd Cir. 2018) (concluding that "provid[ing] information on Form

4473s in the course of routine firearm purchases" is not a sufficient injury-in-fact); *see also Lee*, 554 F. Supp. 3d at 1235. In the end, Roberts's alleged injuries are abstract annoyances—not concrete injuries.

Attempting to rescue his dispute, Roberts raises three unavailing arguments. First, Roberts mounts an attack on the timing of Defendants' standing challenge. On that front, Roberts contends that Defendants' challenge is "belated" and wonders why Defendants engaged in "several more rounds of briefing and record supplementation" on remand. ECF No. 66 at PageID.1352, n.3. This is a fair but ultimately irrelevant question. It is irrelevant because standing is jurisdictional and thus "cannot be waived or forfeited." *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019). So Defendants' standing challenge, while late in the game, is not past due.

Roberts next argues standing must exist on policy grounds because otherwise, "ATF can unlawfully create new background check requirements while avoiding legal challenge." ECF No. 66 at PageID.1353. But some entities could presumably bring actions to challenge ATF's PSA. For example, FFLs *might* have Article III standing since this case suggests at least one FFL—the FFL Roberts visited—lost a sale and may continue to lose sales because of ATF's PSA.[11] *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (noting lost sales satisfy standing). Yet no FFL joined this action. And in any event, this Court cannot exceed its constitutional authority under Article III out of concerns that an agency's action might go unchallenged. *See Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 536 (6th Cir. 2021).

---

[11] Of course, the FFLs would still need to establish the second and third elements of Article III standing to bring an action seeking to enjoin ATF's 2020 PSA.

Finally, Roberts argues that the "law of this case" establishes standing. ECF No. 66 at PageID.1354. Roberts's theory goes like this: courts must consider Article III standing in all cases and may raise it *sua sponte*; this Court reached the merits in its first summary judgment order; the Sixth Circuit reached the merits on appeal; implicitly, then, this Court and the Sixth Circuit found that the Plaintiffs possessed standing. *See id.* Clever as this argument may be, its implications are far-reaching and clash with standing principles. Consider the following: Suppose a district court ruled on a Civil Rule 12(b)(6) motion to dismiss without anyone raising a standing issue, and that decision is appealed without the appeals court addressing the issue; under Roberts's implicit-law-of-the-case theory, no one could raise standing at summary judgment, even if the plaintiff lacked standing. That hypothetical illustrates why Roberts's theory is at war with standing principles. First, under the hypothetical, the district court would continue to exercise jurisdiction over a case to which Article III judicial power does not extend. *See Imhoff Investment, LLC v. Alfoccino, Inc.*, 792 F.3d 627 (6th Cir. 2015) ("Where the plaintiff has no Article III standing to bring a case, jurisdiction is lacking, and the court *must* dismiss it." (emphasis added)). Second, the defendants would, in effect, forfeit the unforfeitable standing argument. *See Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019). All said, neither this Court nor the Sixth Circuit's prior decisions held or confirmed that Roberts has standing.

In sum, Roberts does not demonstrate a concrete injury-in-fact. Thus, Roberts does not have Article III standing to challenge ATF's 2020 PSA.

**B.**

Nor does GOA have Article III standing to challenge ATF's 2020 PSA. When a plaintiff is an association like GOA, the association must show three elements to satisfy the standing

- 18 -

threshold: "(1) the association's members would otherwise have standing to sue in their own right; (2) the interests that the suit seeks to protect are germane to the [association]'s purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 537 (6th Cir. 2021) (cleaned up).

Here, GOA cannot satisfy the first element. For its part, GOA does "not separately argue that [it] has standing." ECF No. 66 at PageID.1352, n.2. Nor could it. GOA's alleged injury is the same as the injury Roberts alleged: absent ATF's 2020 PSA, GOA members could use their CPLs to purchase firearms. *See* ECF No. 1 at PageID.4, 17. As discussed, this purported injury does not give GOA's members standing to challenge the 2020 PSA. GOA thus lacks standing because its members do not "otherwise have standing to sue in their own right." *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 537. Because no Plaintiff has demonstrated Article III standing, the Constitution commands that this case can no longer remain in federal court. So, Defendants' Cross-Motion for Summary Judgment will be granted, and Plaintiffs' Complaint will be dismissed.

### IV.

Accordingly, it is **ORDERED** that Plaintiffs' Motion for Summary Judgment, ECF No. 60, is **DENIED**.

It is further **ORDERED** that Defendants' Cross-Motion for Summary Judgment, ECF No. 63, is **GRANTED.**

It is further **ORDERED** that Plaintiffs' Motion to Suspend the Briefing Schedule, ECF No. 59, is **DENIED AS MOOT.**

It is further **ORDERED** that Plaintiffs' Complaint, ECF No. 1, is **DISMISSED**.

- 20 -

**This is a final order and closes the above-captioned case**.

Dated: September 27, 2024                                   s/Thomas L. Ludington
                                                            THOMAS L. LUDINGTON
                                                            United States District Judge